**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ADAM STEELE, et al., | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No: 14-cv-1523-RCL |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Plaintiffs bring this class action against the United States to challenge regulations promulgated by the Treasury Department and the Internal Revenue Service requiring tax return preparers to obtain and pay fees for preparer tax identification numbers (PTINs).  Both parties have moved for partial summary judgment on the first issue raised in plaintiffs' lawsuit: whether Treasury and the IRS have the authority to require that all tax return preparers obtain and pay for a PTIN.[1]  For the reasons stated below, the Court finds that although the IRS has the authority to require the use of PTINs, it does not have the authority to charge fees for issuing PTINs.  The Court will grant in part and deny in part both parties' summary judgment motions.

## II.    BACKGROUND

This case revolves around a group of 2010–2011 regulations promulgated by the Treasury Department and the IRS regarding tax return preparers.  As explained fully below, the regulations imposed certain requirements for becoming a tax return preparer, including obtaining a specific

---

[1] The Court makes no determination regarding plaintiffs' second claim: that the fees exacted were excessive.

PTIN and paying a user fee for obtaining such PTIN.  Plaintiffs argue that the government lacks legal authority to require PTINs and PTIN fees, and alternatively, that the fee imposed is excessive and impermissible.  They seek a declaratory judgment that Treasury and the IRS lack legal authority to charge these fees or that the fees charged are excessive, and for the return or refund of all fees previously collected or for the return and refund of the excessive fees.  In 2016, this Court certified the proposed class of "all individuals and entities who have paid an initial and/or renewal fee for a PTIN, excluding Allen Buckley, Allen Buckley LLC, and Christopher Rizek."  *See Steele v. United States*, 159 F. Supp. 3d 73, 88 (D.D.C. 2016); *Steele v. United States*, 200 F. Supp. 3d 217, 227 (D.D.C. 2016).

### A.        Statutory and Regulatory Framework

Each year, every American is required to submit a tax return to the IRS.  Given the complexity of the tax code, it is unsurprising that many people hire others—tax return preparers—to prepare their returns for them.  Some tax return preparers have credentials, such as CPAs and attorneys, but others are known as uncredentialed tax return preparers.  Before 2010, anyone could file a tax return on behalf of someone else, credentialed or not.  In 2010, however, the IRS, attempting to regulate both credentialed and uncredentialed tax return preparers, promulgated new regulations.  The regulations established a new "registered tax return preparer" designation, requiring individuals other than attorneys and CPAs to: "(1) [p]ass a one-time competency exam, (2) pass a suitability check, and (3) obtain a PTIN (and pay the amount provided in the PTIN User Fee regulations)."  Regulations Governing Practice Before the Internal Revenue Service, 76 Fed. Reg. 32286, 32287 (June 11, 2011); 26 C.F.R. § 301.7701-15 (defining "tax return preparer"); 31 C.F.R. § 10.4(c) (describing the requirements to become a registered tax return preparer); 31 C.F.R. § 10.3(f) (stating that registered tax return preparers may practice before the IRS); 31 C.F.R.

§ 10.5(b) (stating that fees may be charged for becoming a registered tax return preparer); 26 C.F.R. § 1.6109-2(d) ("Beginning after December 31, 2010, all tax return preparers must have a preparer tax identification number or other prescribed identifying number that was applied for and received at the time and in the manner, including the payment of a user fee, as may be prescribed by the Internal Revenue Service."). The regulations also imposed renewal and continuing education requirements. Regulations Governing Practice Before the Internal Revenue Service, 76 Fed. Reg. at 32287; 31 C.F.R. § 10.6. As statutory authority for these regulations, the IRS relied on a provision of the U.S. Code which states that the Secretary of the Treasury may "(1) regulate the practice of representatives of persons before the Department of the Treasury; and (2) before admitting a representative to practice, require that the representative demonstrate—(A) good character; (B) good reputation; (C) necessary qualifications to enable the representative to provide to persons valuable service; and (D) competency to advise and assist persons in presenting their cases." 31 U.S.C. § 330(a).

In support of its conclusion that such regulations were necessary, the IRS pointed to the prevalence of the use of tax return preparers but the lack of consistent oversight, and specifically found that

> [t]he tax system is best served by tax return preparers who are ethical, provide good service, and are qualified. . . . As such, the IRS recognizes the need to apply a uniform set of rules to offer taxpayers some assurance that their tax returns are prepared completely and accurately. Increasing the completeness and accuracy of returns would necessarily lead to increased compliance with tax obligations by taxpayers.

Regulations Governing Practice Before the Internal Revenue Service, 76 Fed. Reg. at 32294. Thus, "[t]he primary benefit anticipated from these regulations is that they will improve the accuracy, completeness, and timeliness of tax returns prepared by tax return preparers." *Id.* The IRS later specifically identified two overarching objectives of the new regulations: "The first overarching objective is to provide some assurance to taxpayers that a tax return was prepared by

an individual who has passed a minimum competency examination to practice before the IRS as a tax return preparer, has undergone certain suitability checks, and is subject to enforceable rules of practice.  The second overarching objective is to further the interests of tax administration by improving the accuracy of tax returns and claims for refund and by increasing overall tax compliance."  Furnishing Identifying Number of Tax Return Preparer, 75 Fed. Reg. 60309, 60310 (Sept. 30, 2010).

A statutory provision—in effect prior to the new regulations—requires that "[a]ny return or claim for refund prepared by a tax return preparer shall bear such identifying number for securing proper identification of such preparer, his employer, or both, as may be prescribed."  26 U.S.C. § 6109(a)(4).  The statute explains that an individual's social security number "shall, except as shall otherwise be specified under regulations of the Secretary, be used as the identifying number."  *Id.* § 6109(d).  The regulations, however, required, for the first time, that "tax return preparers must obtain and exclusively use the [PTIN] in forms, instructions, or other guidance, rather than a social security number (SSN), as the identifying number to be included with the tax return preparer's signature on a tax return or claim for refund."  Furnishing Identifying Number of Tax Return Preparer, 75 Fed. Reg. at 60309; 26 C.F.R. § 1.6109-2(d).  As justification for the requirement that preparers must obtain and use a PTIN, the IRS repeatedly cited to the need to identify individuals involved in preparing a tax return for others so as to aid their ability to oversee such individuals "and to administer requirements intended to ensure that tax return preparers are competent, trained, and conform to rules of practice."  Furnishing Identifying Number of Tax Return Preparer, 75 Fed. Reg. at 60310, 60313.  The IRS further explained the need for the exclusive use of PTINs, as opposed to both PTINs and social security numbers, arguing that "[m]andating a single type of identifying number for all tax return preparers and assigning a

4

prescribed identifying number to registered tax return preparers is critical to effective oversight." *Id.* at 60313.   Specifically, "[e]stablishing a single, prescribed identifying number for tax return preparers will enable the IRS to accurately identify tax return preparers, match preparers with the tax returns and claims for refund they prepare, and better administer the tax laws with respect to tax return preparers and their clients."   *Id.* at 60314.   The IRS also briefly mentioned that the regulations requiring the use of a PTINs would "help maintain the confidentiality of SSNs."   *Id.* at 60309.

The regulations also imposed a user fee requirement for obtaining a PTIN.   *See* User Fees Relating to Enrollment and Preparer Tax Identification Numbers, 75 Fed. Reg. 60316 (Sept. 30, 2010); 26 C.F.R. § 300.13.   As authority for requiring these fees, the IRS relied on the Independent Offices Appropriations Act of 1952 ("IOAA").   *See* User Fees Relating to Enrollment and Preparer Tax Identification Numbers, 75 Fed. Reg. at 60317.   The IOAA provides that agencies "may prescribe regulations establishing the charge for a service or thing of value provided by the agency."   31 U.S.C. § 9701(b).   The IRS stated that a PTIN is a "service or thing of value" because without a PTIN "a tax return preparer could not receive compensation for preparing all or substantially all of a federal tax return or claim for refund," and "[b]ecause only attorneys, certified public accountants, enrolled agents, and registered tax return preparers are eligible to obtain a PTIN, only a subset of the general public is entitled to a PTIN and the special benefit of receiving compensation for the preparation of a return that it confers."   User Fees Relating to Enrollment and Preparer Tax Identification Numbers, 75 Fed. Reg. at 60317.

## B.     Prior Caselaw Interpreting the Tax Return Preparer Regulations

In 2014, the D.C. Circuit addressed the regulations regarding the exam and education requirements, asking "whether the IRS's statutory authority to 'regulate the practice of

representatives of persons before the Department of the Treasury' [under 31 U.S.C. § 330] encompasses authority to regulate tax-return preparers." *Loving v. I.R.S.*, 742 F.3d 1013, 1015 (D.C. Cir. 2014). Considering the meaning of the terms "representatives" and "practice . . . before the Department of the Treasury," the history of Section 330, the broader statutory framework, the nature and scope of authority being claimed by the IRS, and the IRS's past approach to the statute, the Circuit found that the IRS's interpretation of Section 330 was unreasonable and failed under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *Id.* at 1016–22. The court concluded that "the IRS's statutory authority under Section 330 cannot be stretched so broadly as to encompass authority to regulate tax-return preparers," and invalidated the regulations requiring competency testing and continuing education. *Id.* at 1015. Thus, after *Loving*, the only part of the new regulatory scheme that remains is the PTIN requirement and the attendant PTIN fee requirement.

The only other cases regarding these regulations that have been litigated have taken place in the Northern District of Georgia (and subsequently the Eleventh Circuit), and all were decided prior to the D.C. Circuit's *Loving* opinion. First, in *Brannen v. United States*, plaintiffs sought "to prevent charges of user fees under 31 U.S.C. § 9701 for the right to receive an identification number necessary to file tax returns on behalf of others for compensation and to recover amounts paid as such fees." *Brannen v. United States*, No. 4:11-CV-0135-HLM, 2011 WL 8245026, at *1 (N.D. Ga. Aug. 26, 2011). After concluding that the authority to charge a user fee for a PTIN stemmed from 31 U.S.C. § 9701, and finding that the complaint failed to contain allegations to state a claim that the amount of the fee was inappropriate under § 9701, the *Brannen* court rejected the argument that "the imposition of the PTIN fee is an unauthorized attempt on the part of the Secretary of the Treasury to license tax return preparers." *Id.* at *5. It found that "Congress

specifically authorized the Secretary of the Treasury to create regulations requiring tax return preparers to identify themselves, by means of identifying numbers, on tax returns and refund claims that they prepare" in 26 U.S.C. § 6109 and therefore the Secretary of the Treasury did not exceed his authority by issuing regulations requiring the use of PTINs.  *Id.*  It then found that the PTIN fee requirement was authorized by Section 9701 because PTINs provide a benefit to tax return preparers: "The provision of a PTIN confers a special benefit on tax return preparers, who otherwise would not be permitted to prepare tax returns and refund claims on behalf of others in exchange for compensation."  *Id.* at *6.

The *Brannen* decision was affirmed on appeal.  *See Brannen v. United States*, 682 F.3d 1316 (11th Cir. 2012).  The Eleventh Circuit held that the PTIN user fees are permissible under Section 9701:

> [A] tax return preparer cannot prepare tax returns for others for compensation without having the required identifying number.  And because § 6109(a)(4) expressly authorizes the Secretary to assign such numbers, a person cannot prepare tax returns for another for compensation unless that person obtains from the Secretary the required identifying number.  For this reason, when the Secretary assigns the identifying number (the preparer tax identification number or "PTIN"), the Secretary is conferring a special benefit upon the recipient, i.e., the privilege of preparing tax returns for others for compensation.

*Id.* at 1319.

Approximately eighteen months after the *Brannen* decision, and after the *Loving* district court decision, the Northern District of Georgia considered "whether 26 U.S.C. § 6109(a)(4) permits the United States Treasury Department to issue regulations that assess user fees as well as annual renewal fees associated with PTIN assigned to those who prepare tax forms for compensation" and "whether the annual renewal fee assessed for renewing one's PTIN number is either arbitrary and capricious or excessive."  *Buckley v. United States*, No. 1:13-CV-1701, 2013 WL 7121182, at *1 (N.D. Ga. Dec. 4, 2013).  Agreeing with *Brannen*, the *Buckley* court found that the imposition of PTIN user fees was authorized and that the fee confers a special benefit on

tax return preparers.  *Id.* at *1–2.  The court then found *Loving*—which at the time was still a district court decision—inapplicable because it "reviewed the competency testing and continuing education requirements for return preparers," which were not at issue in *Buckley*.  *Id.* at *2.  It concluded that "the *Loving* case specifically held that Congress authorized the PTIN scheme via a different statutory authority than the testing and competency requirements for registered tax return preparers, which were at issue in the *Loving* case."  *Id.*  Following the D.C. Circuit's *Loving* decision, there have been no further developments in the caselaw specifically analyzing the authority to require PTINs and charge fees for them.

## III.   LEGAL STANDARDS

Plaintiffs first argue that the PTIN requirements—that tax return preparers obtain and pay fees for PTINS—are arbitrary and capricious under the Administrative Procedure Act.  They alternatively argue that even if the fee requirements are not arbitrary and capricious, they are unlawful under the IOAA because Congress did not grant the IRS licensing authority over tax return preparers, so the fees do not confer a "service or thing of value."  After summarizing the general legal standards for summary judgment, the Court will address the standards for review of an agency action and those applicable to the IOAA.

### A.   Summary Judgment

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To show that a dispute is "genuine" and defeat summary judgment, the nonmoving party must present evidence "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Facts are material when they might affect the outcome of the suit.  *Id.*  The parties here have agreed that the first claim—whether the

government had the legal authority to charge PTIN fees—may be decided as a matter of law at the summary judgment stage.

### B.     Review of an Agency Action

The APA permits the judicial review of an agency action unless a statute precludes judicial review or an "agency action is committed to agency discretion by law." 5 U.S.C. § 701. Although some agency actions are therefore unreviewable, there is a strong presumption of judicial review for agency actions, and the exemption to judicial review is "very narrow." *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). The exemption applies "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 410. In other words, "a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Labs*, 387 U.S. at 141.

If a court may review an agency action, more than one standard of review exists. First, *Chevron* review—the standards promulgated in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)—is appropriate to determine "whether an agency has authority to act under a statute." *Arent v. Shalala*, 70 F.3d 610, 615 (D.C. Cir. 1995). *Chevron* review employs a two step analysis:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron*, 467 U.S. at 842–43.  "The paradigmatic Chevron case concerns '[t]he power of an administrative agency to administer a congressionally created . . . program.'"  *Arent*, 70 F.3d at 615 (quoting *Chevron*, 467 U.S. at 843).  As described by the D.C. Circuit, "a reviewing court's inquiry under *Chevron* is rooted in statutory analysis and is focused on discerning the boundaries of Congress' delegation of authority to the agency; and as long as the agency stays within that delegation, it is free to make policy choices in interpreting the statute, and such interpretations are entitled to deference."  *Id.*

Alternatively, agency actions may be held unlawful because they are arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(A).  When "a statute plainly authorizes an agency authority to act and '[t]he only issue . . . is whether the [agency]'s discharge of that authority was reasonable,' the case 'falls within the province of traditional arbitrary and capricious review.'"  *Sociedad Anonima Vina Santa Rita v. U.S. Dep't of Treasury*, 193 F. Supp. 2d 6, 15 (D.D.C. 2001) (quoting *Arent*, 70 F.3d at 616).  The standards for arbitrary and capricious review were set out in the Supreme Court's *State Farm* decision:

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency.  Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."  In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  The reviewing court should not attempt itself to make up for such deficiencies: "We may not supply a reasoned basis for the agency's action that the agency itself has not given."  We will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citations omitted).  Keeping with the rule that agencies must explain their decisions,

courts "do not defer to the agency's conclusory or unsupported suppositions." *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004). Courts must "set aside agency regulations which, though well within the agencies' scope of authority, are not supported by the reasons that the agencies adduce." *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 374 (1998).

Although agencies may change existing policies, to survive arbitrary and capricious review they must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). Although it "'need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate,' . . . the agency must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Id.* at 2125–26. Unexplained inconsistencies in agency position are arbitrary and capricious and therefore unlawful. *Id.* at 2126.

*Chevron* review and arbitrary and capricious review under *State Farm* "overlap at the margins." *Arent*, 70 F.3d at 615, n.6 ("[W]hether an agency action is 'manifestly contrary to the statute' is important both under *Chevron* and under *State Farm*."). For example, "a finding that an agency has acted arbitrarily or capriciously in discharging its statutory duties could be phrased as a conclusion that the agency's interpretation of the controlling statute is unreasonable." *Sociedad Anonima Vina Santa Rita*, 193 F. Supp. 2d at 16. In such cases, a decision that an agency action is arbitrary and capricious is "functionally equivalent" to a determination that the action is unreasonable under *Chevron*. *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996).

### C.    "Service or Thing of Value" Under the IOAA

The IOAA permits agencies to charge user fees for "a service or thing of value provided by the agency."  31 U.S.C. § 9701(b).  The Supreme Court has read the language of the Act narrowly in order to distinguish between fees and taxes, the latter of which are the province of Congress.  *See Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340–41 (1974). Fees are "incident to a voluntary act" and connote a benefit.  *Id.*  Agencies may impose fees for bestowing special benefits on individuals not shared by the general public.  *Id.*; *Fed. Power Comm'n v. New England Power Co.*, 415 U.S. 345, 350–51 (1974); *Engine Mfrs. Ass'n v. E.P.A.*, 20 F.3d 1177, 1180 (D.C. Cir. 1994).  There must be "a sufficient nexus between the agency service for which the fee is charged and the individuals who are assessed."  *Seafarers Int'l Union of N. Am. v. U.S. Coast Guard*, 81 F.3d 179, 183 (D.C. Cir. 1996).  Agencies must "make clear the basis for a fee it assesses under the IOAA."  *Nat'l Cable Television Ass'n, Inc. v. F.C.C.*, 554 F.2d 1094, 1100 (D.C. Cir. 1976)

## IV.    ANALYSIS

The Court first finds that the agency action here is reviewable.  The statute enacted by Congress specifies that tax return preparers shall use their social security numbers to identify themselves on prepared returns unless the Secretary of the Treasury specifies otherwise.  *See* 26 U.S.C. § 6109.  Nowhere does the government identify the clear and convincing evidence showing that Congress sought to specifically commit discretion to the agency to determine whether a different number should be used so as to completely preclude judicial review.  *Cf. Abbott Labs*, 387 U.S. at 141.  Therefore the Court will review the agency action here and will determine whether the agency had the authority to require the use of a PTIN and to charge PTIN user fees.

### A.    The Agency is Authorized to Require the Exclusive Use of PTINs

Although the parties disagree about the proper standard under which to judge the IRS's action, the Court first finds that the IRS was authorized to issue regulations requiring the exclusive use of PTINs under both *Chevron* and *State Farm*.  First, plaintiffs' arguments fail step one of *Chevron*.  *Chevron* states that "if Congress has directly spoken to the precise question at issue . . . that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 842.  The statute specifically says that the Secretary has the authority to specify the required identifying number to be used on prepared tax returns.  26 U.S.C. § 6109(d) ("The social security account number issued to an individual for purposes of section 205(c)(2)(A) of the Social Security Act shall, *except as shall otherwise be specified under regulations of the Secretary*, be used as the identifying number for such individual for purposes of this title." (emphasis added)).  The Court must give effect to the unambiguous intent of Congress that the Secretary may require the use of such a number.

In addition, the decision to require the use of PTINs was not arbitrary or capricious.  The agency offered several justifications for the regulation requiring the exclusive use of PTINs.  First, the IRS explained the need to identify tax return preparers in order to maintain oversight, and stated that the use of a single identifying number was critical to such effective oversight.  *See* Furnishing Identifying Number of Tax Return Preparer, 75 Fed. Reg. at 60310, 60313.  The IRS stated that the use of a single number would "enable the IRS to accurately identify tax return preparers, match preparers with the tax returns and claims for refund they prepare, and better administer the tax laws with respect to tax return preparers and their clients."  *Id.* at 60314.  The IRS has articulated satisfactory explanations for its actions.  *See State Farm*, 463 U.S. at 43.  There is a rational connection between the regulations—requiring the use of PTINs—and the stated

rationales—effective administration and oversight.  *See id.*  And, there is no indication that the IRS entirely failed to consider an important aspect of the problem, or that its rationales ran counter to the evidence before it, or that its reasoning is completely implausible.  *See id.*  In addition, this was not an unexplained change in policy.  *See Encino Motorcars*, 136 S. Ct. at 2126.  The aforementioned reasons for the change in policy were identified by the IRS.

Other courts to consider this issue also have found that the PTIN requirement is authorized by law.  *See Brannen*, 2011 WL 8245026, at *5 ("Congress specifically authorized the Secretary of the Treasury to create regulations requiring tax return preparers to identify themselves, by means of identifying numbers, on tax returns and refund claims that they prepare."); *Brannen*, 682 F.3d at 1319 ("§ 6109(a)(4) expressly authorizes the Secretary to assign such numbers"); *Buckley*, 2013 WL 7121182, at *1–2.[2]

For these reasons, the Court concludes that the IRS was authorized to issue the regulations requiring tax return preparers to obtain PTINs.

B.      **The IRS May Not Impose User Fees for PTINs**

Having found that the IRS has the authority to require the exclusive use of PTINs, the Court now turns to the question of whether the IRS is authorized to charge user fees for PTINs.  Plaintiffs argue that after the D.C. Circuit struck down the eligibility criteria for becoming a registered tax return preparer in *Loving*, it removed the IRS's stated rationale for requiring PTIN fees—to regulate tax return preparers.  Given that the IRS now no longer has any valid justification for the fees, plaintiffs argue that they are arbitrary and capricious, and therefore unlawful under the APA. Alternatively, plaintiffs argue that because Congress did not grant the IRS licensing authority—as found by *Loving*—tax return preparers receive no special benefit in exchange for the fees,

---

[2] As explained in the next section, however, this Court disagrees with these decisions to the extent that they conclude that the IRS may charge fees for PTINs under the IOAA.

rendering them unlawful under the IOAA.  In other words, plaintiffs argue that the IRS originally created a licensing scheme that would limit tax return preparers to those certain people who could meet eligibility criteria.  But, because *Loving* found that Congress did not authorize a license requirement for tax return preparers, there are now no restrictions on who may obtain a PTIN and therefore it is no longer true that only a specific set of people may receive PTINs and the "special benefit" of being able to prepare tax returns for compensation.  The only beneficiary of the PTIN system is therefore the IRS.

The government argues that the PTIN and user fee regulations are separate from the regulations imposing eligibility requirements on registered tax return preparers.  It argues that the PTIN requirements are not arbitrary and capricious because they make it easier to identify tax return preparers and the returns they prepare, which is a critical step in tax administration, and because PTINs protect social security numbers from disclosure.  In support of its position that it may charge fees for PTINs, the IRS states that PTINs are a service or thing of value because the ability to prepare tax returns for compensation is a special benefit provided only to those people who obtain PTINs, who are distinct from the general public.  Individuals without PTINs cannot prepare tax returns for compensation.  In addition, the IRS argues that PTINs protect the confidentiality of tax return preparers' social security numbers, and that protection itself is a service or thing of value.

The Court finds that PTINs do not pass muster as a "service or thing of value" under the government's rationale.  First, the argument that the registered tax return preparer regulations regarding testing and eligibility requirements and the PTIN regulations are completely separate and distinct is a stretch at best.  While it is true that they were issued separately and at different times, they are clearly interrelated.  The RTRP regulations specifically mention the PTIN

requirements and state that PTINs are part of the eligibility requirements for becoming a registered tax return preparer. *See* Regulations Governing Practice Before the Internal Revenue Service, 76 Fed. Reg. at 32287–89; 26 C.F.R. § 1.6109-2(d) ("[T]o obtain a [PTIN] or other prescribed identifying number, a tax return preparer must be an attorney, certified public accountant, enrolled agent, or registered tax return preparer authorized to practice before the Internal Revenue Service under 31 U.S.C. 330 and the regulations thereunder."). Furthermore, the overarching objectives named in the PTIN regulations indicate a connection to the RTRP regulations. They were 1) "to provide some assurance to taxpayers that a tax return was prepared by an individual who has passed a minimum competency examination to practice before the IRS as a tax return preparer, has undergone certain suitability checks, and is subject to enforceable rules of practice;" and 2) "to further the interests of tax administration by improving the accuracy of tax returns and claims for refund and by increasing overall tax compliance." Furnishing Identifying Number of Tax Return Preparer, 75 Fed. Reg. at 60310. The first objective clearly relates to the RTRP regulations regarding eligibility requirements for tax return preparers. The second objective is less explicit, but it does not stretch common sense to conclude that the accuracy of tax returns would be improved by requiring tax return preparers to meet certain education requirements.

Having concluded the inter-connectedness of the regulations, the government's argument begins to break down. The *Loving* court concluded that the IRS does not have the authority to regulate tax return preparers. *Loving*, 742 F.3d at 1015. It cannot impose a licensing regime with eligibility requirements on such people as it tried to do in the regulations at issue. Although the IRS may require the use of PTINs, it may not charge fees for PTINs because this would be equivalent to imposing a regulatory licensing scheme and the IRS does not have such regulatory authority. Granting the ability to prepare tax return for others for compensation—the IRS's

proposed special benefit—is functionally equivalent to granting the ability to practice before the IRS. The D.C. Circuit has already held, however, that the IRS does not have the authority to regulate the practice of tax return preparers. *See id.* In coming to its conclusion, the Circuit considered the statutory language that the Secretary may "regulate the practice of representatives of persons before the Department of the Treasury." *Id.* at 1017–18 (quoting 31 U.S.C. § 330(a)(1)). The court found that the IRS improperly expanded the definition of "practice . . . before the Department of Treasury" to include "preparing and signing tax returns" because to "practice before" an agency "ordinarily refers to practice during an investigation, adversarial hearing, or other adjudicative proceeding." *Id.* at 1018. The *Loving* court concluded that "[t]hat is quite different from the process of filing a tax return" in which "the tax-return preparer is not invited to present any arguments or advocacy in support of the taxpayer's position . . . [and] the IRS conducts its own ex parte, non-adversarial assessment of the taxpayer's liability." *Id.* The ability to prepare tax returns is the "practice" identified by the IRS in *Loving*, but the court found that such an activity does not qualify as practicing before the IRS. Therefore, it appears to this Court that the IRS is attempting to grant a benefit that it is not allowed to grant, and charge fees for granting such a benefit.

Over forty years ago, the Supreme Court interpreted the predecessor to the current form of the IOAA, which stated that that an agency could charge fees for "any work, service . . . benefit, . . . license, . . . or similar thing of value" provided by the agency. *Nat'l Cable Television Ass'n, Inc.*, 415 U.S. at 337. In listing examples of activities for which an agency could charge a fee, the Supreme Court noted "a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station," *i.e.*, permits and occupational licenses. *Id.* at 340. Subsequently, the D.C. Circuit cases finding that a fee was permissible under the IOAA

generally concern valid regulatory schemes, as opposed to the situation here where the regulatory scheme was struck down.  In *Elec. Indus. Ass'n, Consumer Elecs. Grp. v. F.C.C.*, common carriers and equipment manufacturers *regulated by the FCC* challenged the validity of fees for "(1) common carrier application, filing, and grant fees; (2) common carrier tariff filing fees; and (3) equipment type approval, type acceptance and certification fees."  554 F.2d 1109, 1111 (D.C. Cir. 1976).  The court found that fees could be assessed for tariff filings and equipment testing and approval because such services created the "independent private benefit[s]" of "provid[ing] a means for the carrier to obtain its revenues and to regulate subscriber use of its facilities" and "assist[ing] the manufacturer in marketing a quality product and giv[ing] him credibility in the market place."  *Id.* at 1015–16.  The other fees were "justified by the statutory requirement of a permit for construction of new or extended lines or the discontinuance of service by a common carrier, and by the requirement of an operating license and station construction permit."  *Id.* at 1016.

In *Engine Mfrs. Ass'n v. E.P.A.*, the Engine Manufacturers Association ("EMA") challenged an EPA rule assessing fees for the EPA's "Motor Vehicle and Engine Compliance Program under which it test[ed] vehicles and engines for compliance with the emissions standards of the Clean Air."  20 F.3d at 1178.  Each year, vehicle manufacturers were required to obtain certificates of compliance to sell their equipment through EPA's compliance program which included a comprehensive testing regime.  *Id.* at 1179.  The testing had three stages: 1) manufacturer testing; 2) selective enforcement audits by EPA; and 3) in-use testing.  *Id.*  The EMA did not dispute that the compliance certificate conferred a special benefit, but argued that selective enforcement audits and in-use compliance testing were means of enforcing emissions standards and the benefits of such testing accrued exclusively to the public.  *Id.* at 1180.  The court found

that "[s]elective enforcement audits and in-use compliance testing are integral parts of the compliance regime . . . [and] passing each successive compliance test is necessary in order to keep its product certified for sale and to avoid the cost of a recall." *Id.* The court therefore concluded that "the manufacturer obtains a benefit from the entire Compliance Program, not just from the annual certification." *Id.*

Finally, in *Seafarers Int'l Union of N. Am. v. U.S. Coast Guard*, the court considered fees charged for issuing "merchant mariner licenses, certificates of registry, or merchant mariner documentation . . . to qualified individuals seeking to work aboard a United States merchant marine vessel," which were documents that "serve[d] as occupational licenses." 81 F.3d at 181. The court, finding that "a person who is lawfully required to obtain an occupational license may be charged a fee to reimburse the agency for the cost of processing the license," concluded that an "agency may exact a fee for administering any procedures reasonably necessary to ensure that [job-related eligibility criteria necessary to obtain a license] have been met." *Id.* at 185. The court therefore concluded that because Congress laid out specific eligibility criteria for such licenses which "permit[ted] the Coast Guard to take reasonable steps to ensure that the particular requirements have been met," the Coast Guard could charge fees "to recover the expense of whatever reasonable procedure is employed by the Coast Guard to comply with the statute." *Id.* at 185–86.

The Court acknowledges that courts in the Eleventh Circuit have found that the PTIN fees are permissible under the IOAA. *See Brannen*, 682 F.3d at 1319; *Brannen*, 2011 WL 8245026, at *5–6; *Buckley*, 2013 WL 7121182, at *2. But, the *Brannen* decisions were made prior to D.C. Circuit's *Loving* decision, *i.e.*, prior to the finding that the IRS lacks the authority to regulate tax return preparers and the striking down of the regulations attempting to do so. In addition, the Court

disagrees with the *Buckley* court's finding that *Loving* (at the time the district court opinion) is entirely inapplicable because although the PTIN scheme was authorized by a different statutory authority, it is, as explained above, interrelated with the RTRP scheme.

If tax return preparers were regulated entities required to obtain licenses, this case would be very different and the cases cited above may support the government's argument that it is authorized to charge fees. However, *Loving* makes clear that the IRS may not regulate in this area or require that tax return preparers obtain an occupational license. The Court is unaware of similar cases in which an agency has been allowed to charge fees under the IOAA for issuing some sort of identifier when that agency is not allowed to regulate those to whom the identifier is issued, and the government has not pointed to any.

Additionally, the Court notes that after *Loving*, anyone can obtain a PTIN. They need not meet any type of eligibility criteria. Thus, it is no longer the case that only a subset of the general public may obtain a PTIN and prepare tax returns for others for compensation. Hypothetically, every member of the public could obtain a PTIN, which means that every member of the public would also get the supposed "benefit" of being able to prepare tax returns for others for compensation. There is therefore no special benefit for certain individuals not available to the general public. It seems that if a benefit exists, it inures to the IRS, who, through the use of PTINs, may better identify and keep track of tax return preparers and the returns that they have prepared.

The government argues that the fact that anyone may obtain a PTIN is irrelevant, comparing it to the fact that anyone may enter a national park if they buy a ticket. This is unpersuasive. The Secretary of the Interior is authorized by statute to "establish, modify, charge, and collect recreation fees at Federal recreational lands and waters." 16 U.S.C. § 6802(a). As plaintiffs note, that statute would be wholly unnecessary if the agency were allowed to charge fees

under the IOAA.[3]  Here, the Secretary of the Treasury is not specifically authorized to charge user fees for PTINs, so the national park analogy fails.

Finally, the Court addresses the IRS's second argument that PTINs are things of value because they protect the confidentiality of social security numbers.   The confidentiality justification is mentioned only briefly in the regulations requiring the use of PTINs: "The final regulations will also benefit taxpayers and tax return preparers and help maintain the confidentiality of SSNs."  Furnishing Identifying Number of Tax Return Preparer, 75 Fed. Reg. at 60309.  It is not discussed in the regulation specifically addressing user fees.  *See generally* User Fees Relating to Enrollment and Preparer Tax Identification Numbers, 75 Fed. Reg. 60316. Despite the fact that tax return preparers were allowed for many years to use their SSNs, and that under the statute SSNs are presumptively to be used as the required identifying number, and that the taxpayer's SSN appears on their tax returns regardless of whether they used a tax return preparer, the regulations fail to even state that SSNs were being inadvertently disclosed or that their confidentiality was at risk.  It is not at all clear that requiring PTINs was necessary for this reason.  There is no stated evidence in the administrative record that permitted the IRS to make such a determination.  *See Innovator Enterprises, Inc. v. Jones*, 28 F. Supp. 3d 14, 20 (D.D.C. 2014) ("[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.").  The Court will not defer to these conclusory and unsupported justifications, *see McDonnell*, 375 F.3d at 1187, and finds that the IRS may not charge fees for PTINs for this reason.

---

[3] The Court makes no decision regarding whether fees for national park entry are permissible solely under the IOAA.

For all of the reasons stated above, the Court concludes that PTINs are not a "service or thing of value" provided by the IRS.  The IRS may therefore not charge fees for issuing PTINs and the regulations requiring payment of fees for PTINs are unlawful.

## V.    CONCLUSION

In sum, the Court finds that although the IRS may require the use of PTINs, it may not charge fees for issuing PTINs.  The Court will grant in part and deny in part both parties' motions for summary judgment.  Plaintiffs' motion shall be denied insofar as it argues that the IRS may not require the use of PTINs, but will granted with respect to the argument that the IRS may not charge fees under the IOAA for PTINs.  The government's motion shall be granted with respect to the issue of whether it may require the use of PTINs, but shall be denied with respect to the issue of whether it may charge fees for PTINs under the IOAA.

A separate Order accompanies this Memorandum Opinion.

Date: May ___, 2017

Royce C. Lamberth
United States District Judge