# EXHIBIT A



Deposition of:
# David Williams

*December 16, 2021*

In the Matter of:

# Steele v. United States of America

Veritext Legal Solutions
800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

1     program prior to 2010, when you joined the
2     implementation team?
3            A.   I was.
4            Q.   What was your knowledge of the
5     voluntary PTIN system?
6            A.   I was aware that some tax return
7     preparers chose to obtain PTINs as part of their
8     overall professional engagement with the IRS, but
9     that it was not mandatory, it was voluntary.
10           Q.   Did you know why that -- why the
11    voluntary PTIN program was in place, that is, for
12    what purpose it served?
13           A.   I did not.
14           Q.   What did you understand a return
15    preparer could do in terms of the voluntary
16    program?
17           A.   I understood that they could obtain a
18    PTIN.  It gave them better access to IRS services,
19    and it put them on the IRS radar screen.  And it
20    was my under -- my belief -- though I didn't have
21    any real knowledge of it at the time, it was my
22    belief that folks who voluntarily obtained PTINs
23    were more likely to be credible and reliable return
24    preparers than those who chose not to.
25           Q.   Do you recall whether any of the

1  impetus for setting up the PTIN system was to allow
2  tax return preparers to protect the confidentiality
3  of their Social Security numbers?
4        A.   I don't.
5        Q.   Were you familiar with the system
6  within IRS prior to 2010 that dealt with the
7  voluntary PTIN registration?
8        A.   I wasn't.
9        Q.   Do you know which -- which BOD within
10 IRS handled voluntary registration?
11       A.   I know now.  I believe it was the Wage
12 and Investment division, but it really wasn't
13 something on which I focused until I took over the
14 job.
15       Q.   When you say you know now, this was
16 something you learned as part of taking over the
17 job?
18       A.   That's right.
19       Q.   Do you recall there being any
20 discussion in 2010 about using the existing
21 registration system that was in place and
22 converting it to a mandatory registration system?
23       A.   I do not.  I do not recall those
24 conversations.
25       Q.   Do you know at the time, in 2010,

Case 1:14-cv-01523-RCL   Document 176-1   Filed 03/23/22   Page 5 of 18
David Williams                                    December 16, 2021
Steele v. United States of America

Page 15

1      approximately how many return preparers had, in
2      fact, obtained voluntary PTINs?
3              A.   I don't.
4              Q.   Do you know, prior to 2010, how many
5      people within IRS were involved with respect to the
6      voluntary PTIN registration system?
7              A.   I do not.
8              Q.   You had mentioned that you had -- there
9      were discussions about whether to handle PTIN
10     registration -- that is, the mandatory
11     registration -- within IRS or without -- or outside
12     IRS.  Do you recall, in any of those discussions,
13     working with the existing system?
14             A.   I don't.
15             Q.   Okay.  Did you have any -- did you
16     learn at any point what the capabilities or
17     functionality of that -- I'll call it the pre-2010
18     system was?
19             A.   To the best of my recollection, when I
20     took over and started to dig into this, there was a
21     fairly -- there was a consensus that the system,
22     whatever its capabilities, could not scale to reach
23     what we then thought was the population of return
24     preparers that would need to register and obtain
25     PTINs.

Case 1:14-cv-01523-RCL   Document 176-1   Filed 03/23/22   Page 6 of 18
David Williams                                            December 16, 2021
Steele v. United States of America

Page 23

1   what that would look like and worked with the
2   organizations and with individual preparers to
3   determine what that looked like.  Because I wasn't
4   trying to squeeze people out; I was trying to make
5   available to them a basic set of knowledge that
6   anyone who prepares a tax return ought to have.
7               And the guiding principle under that is
8   something called IRS Pub 17.  And if you've not
9   read it, it's available online.  And that pub
10  actually is sort of -- is basic tax law.  And if
11  you don't know that, it's virtually impossible for
12  you to prepare a return without using tax software
13  that actually tells you what to do.
14         Q.   Fair enough.
15              What was the purpose of the mandatory
16  registration within the -- the vision you just
17  described?
18         A.   The way I think about it -- and, mind
19  you, it's been ten years now -- is that we needed a
20  way to identify who was actually out there
21  preparing tax returns for money.
22              If you look at the requirement as to
23  who had to get a PTIN, essentially what it says is
24  any individual who prepares all or substantially
25  all of the tax return for compensation needs to

1    register.
2              And that actually was a -- the
3    compensation piece was a critical distinction.  A
4    number of the preparers wanted volunteers to be
5    required as well and -- and I had to explain that
6    they weren't charging for their services.  Whether
7    or not those services were competent was a separate
8    issue.  But to the extent that you're making money
9    off of others by preparing their returns for them,
10   you needed to demonstrate basic competency.  This
11   is straight from my stump speech, by the way.
12   That's all coming back to me now.
13        Q.   Fair enough.
14              Was part of the outreach and
15   educational process also directed towards
16   individuals who might have their returns prepared
17   by tax preparers?
18              That is, were you trying to educate the
19   general public about tax return preparers and how
20   to choose a tax return preparer and the competency
21   kinds of issues you talked about?
22        A.   I guess I'd say there had been, prior
23   to the review, and the RPO's creation, an effort by
24   the IRS to encourage people to make wise choices
25   when they're having -- when they're making --

Case 1:14-cv-01523-RCL   Document 176-1   Filed 03/23/22   Page 8 of 18
David Williams                                       December 16, 2021
Steele v. United States of America

Page 25

1    finding someone to do their returns.  We continued
2    that.  I wouldn't say it was a major prong of the
3    program because it was already ongoing.  And, by
4    the way, I felt that, really, the push on that
5    piece should wait until we actually had the regime
6    in place so that there were registered tax
7    preparers who could actually be the folks to whom
8    tax -- individual taxpayers would go.
9         Q.   Prior to 2010, were you aware of any
10   restrictions on who could obtain a voluntary PTIN?
11        A.   No.
12        Q.   For example, prior to 2010, do you know
13   whether someone who was incarcerated or in prison
14   could obtain a PTIN?
15        A.   I don't.  Actually, though, I don't
16   think they should have been able to, but I don't
17   know for sure.
18        Q.   Okay.  Do you know if there, prior to
19   2010, was an age restriction?
20        A.   I don't.
21        Q.   Do you know whether after 2010 there
22   was an age restriction?
23        A.   I don't recall one.  And if there had
24   been one, I would have -- if you're talking about
25   on the upper end, I would have objected to it

Case 1:14-cv-01523-RCL   Document 176-1   Filed 03/23/22   Page 9 of 18
David Williams                                              December 16, 2021
Steele v. United States of America

Page 26

1     seriously.  On the lower end, I wouldn't have had a
2     problem saying you have to be 18 or 21 to do it.
3     But certainly on the upper end, I would have
4     objected to it strenuously.
5            Q.   No, And what I was talking about was a
6     minimum age, was I don't think it's disputed that
7     you couldn't, after 2010, obtain a PTIN unless you
8     were more than 18 years old --
9            A.   Yeah.
10           Q.   -- but I take it you don't have any
11    recollection of that being something that --
12           A.   I just -- it wasn't a big point of
13    debate.  I just -- it was assumed that that made
14    sense.
15           Q.   Do you recall that there was a
16    discussion about -- during your tenure -- about
17    whether prisoners should be permitted to obtain
18    PTINs?
19           A.   You know, I do, but I don't -- I
20    just -- when you mentioned it, I remembered
21    something about it, but I actually don't recall the
22    discussion.
23           Q.   Do you recall any activities or
24    discussion about whether people who were on what
25    are generically referred to as terrorist watch

Case 1:14-cv-01523-RCL   Document 176-1   Filed 03/23/22   Page 10 of 18
David Williams                                    December 16, 2021
Steele v. United States of America

Page 49

1  ████████████████████████████████████████
2  ████████████████████████████████████████
3  ██████████████████████████████████
4           ████████████████████
5       ██████████████████
6        ████████████
7          ████████████████████████████
8  ██
9       ██████████████████
10 ██████████████
11    ████████████████████████████████████
12 ██████████████████████████████████
13 ████████████████████████████████████████
14 ██████████████████████████████████████
15 ██████████████████████████████
16       ████████████
17            Q.   And I think what you see in the ensuing
18    e-mails is exactly what you talked about, which was
19    pushing them pretty hard to try to keep these
20    numbers down, understanding their variable costs
21    and the like.  Do you recall that?
22            A.   Vaguely, and this is bringing it back.
23    This is exactly what I was alluding to earlier.  I
24    was pushing them to essentially justify any
25    potential increase in costs, because I didn't

1   like -- I don't -- I didn't want to ask return
2   preparers to pay for anything that they shouldn't.
3        Q.   And after things went live and you had
4   your celebratory dinner, what role did the Return
5   Preparer Office play in the actual registration
6   process, if you recall?
7        A.   Well, oversight of Accenture's work, if
8   that's what you mean.
9        Q.   Well, that's what I'm trying to get at,
10  which is --
11       A.   I mean, we set the rules.  Accenture
12  had to implement them.  We had to follow up and
13  make sure they were doing it correctly.
14       Q.   During your tenure, roughly two years,
15  were you satisfied with the work they did?
16       A.   I was.
17       Q.   Did you feel they were handling the
18  registrations and renewals appropriately?
19       A.   To the best of my knowledge.  We didn't
20  have a -- let's just recall, it took a year to get
21  it up and running, and then there was a year of
22  running.  It wasn't like I had a huge amount of
23  data to go in and say, You're doing well, you're
24  doing not.  And I left just as if I would have --
25            You know, one of the things in my head

1    in the plan -- which I didn't lay out because I
2    wanted people to focus on getting it done -- was
3    sort of a regular review of every piece of the
4    program.  How was it running?  I mean, what were
5    the objectives?  Were we achieving them?  How well?
6    So on.  And Accenture would have been part of that.
7    But I left before any of that became standard
8    operating procedure.  And, as you know, the program
9    was enjoined, again, after I left, or most of the
10   program was enjoined after I left.
11         Q.   By the time you had left, had there
12   been any testing actually set up and done?
13         A.   You know, I don't remember.
14              Yes, there had, because I had a number
15   of people tell me the test was very reasonable.
16   They had been worried, but they took it and thought
17   it was fairly reasonable.  It was Pub 17.
18         Q.   Did the RPO, during the time you were
19   there, have any enforcement authority?
20         A.   Well, let's be clear.  Pulling a PTIN,
21   now that we're under OPR -- now that return
22   preparers were under OPR's governance -- required
23   due process.
24              So to the extent that a PTIN would, in
25   fact, be revoked, that would require OPR to make

```
1    guess what I'm trying to do is figure out how I
2    would use this document to extract just that
3    portion of the expense or the user fee buildup that
4    relates to registration renewal.  And I guess what
5    you're telling me is that, at least today, you're
6    not able to do that?
7         A.   I have no idea of how one would do
8    that.
9         Q.   Okay, fair enough.
10             Did you, in your position as director
11   from 2010 to 2012, interface with the folks at
12   Accenture?
13        A.   Yes.
14        Q.   How often?
15        A.   I don't recall exactly, but regularly.
16   You've already shown me e-mails where I've written
17   to Armand directly, but I dealt with him and his
18   team on a regular basis.
19        Q.   What were the -- now I'm talking about
20   post implementation.  Now registration is up and
21   running.  Does that -- does that interaction
22   continue?
23        A.   Yes.  I don't remember the exact
24   operating mechanism we used, but it wasn't like we
25   just handed it off and let them run.
```

Case 1:14-cv-01523-RCL   Document 176-1   Filed 03/23/22   Page 14 of 18
David Williams                                    December 16, 2021
Steele v. United States of America

Page 63

1            We would -- we would have an overall
2    program review and work through things, as needed,
3    which is how one would run any program.
4        Q.   What was the role of Booz Allen,
5    both -- well, let me start with during the
6    implementation period.
7        A.   They were the thought partners, the
8    analytic arm.  They enabled us to move quickly and
9    scale to what we -- to what we needed to do.  They
10   also had analytic capabilities in other parts of
11   the IRS that they leveraged in order to ensure that
12   we were thinking wholistically about the program.
13           THE COURT REPORTER:  One second.
14           (Off-the-record discussion for reporter
15   clarification.)
16   BY MR. NARWOLD:
17       Q.   Do you recall whether they were
18   involved in creating the user fee cost model?
19       A.   Yes, they were.
20       Q.   What was their role with respect to the
21   user fee cost model, as best you recall?
22       A.   They developed a lot of the analytic
23   framework that under -- that underscored -- that
24   supported the model.
25       Q.   When you say --

1        A.   They had to build most of the model
2   themselves, and with my direction.  I would spend a
3   fair amount of time with them working through each
4   detail and satisfying myself and satisfying -- and
5   asking my leaders as well, satisfying themselves,
6   that they felt it was an accurate and complete
7   representation of costs.  And then I would be
8   looking at, well, how could we keep those costs
9   down, what could we reduce?  What made sense?  And
10  what could we justify and what wasn't justifiable?
11       Q.   Do you recall working with a consultant
12  by the name of MITRE, M-I-T-R-E?
13       A.   I do.  MITRE is what is known as an
14  FFRDC, federally funded research and development.
15  I don't remember what the C stands for.
16            But, anyway, they have a ten -- had --
17  I don't know whether they still have it -- a
18  ten-year contract with the IRS in which they
19  function more as an internal analytic resource
20  rather than as an external consultant; and they
21  would, on occasion, provide insight and guidance,
22  but I don't recall spending much time with them on
23  this.
24       Q.   With respect --
25       A.   They were --

Case 1:14-cv-01523-RCL   Document 176-1   Filed 03/23/22   Page 16 of 18
David Williams                                      December 16, 2021
Steele v. United States of America

Page 124

1  still call a robust program, while trading off the
2  fact that we were asking people to pay this fee
3  with all the things we thought that needed to be
4  done.  And I'll remind you, it was the first time
5  we had done anything like this, and we knew that it
6  would never be exactly right, but we did our level
7  best to try to make sure that it -- it held
8  together and delivered what -- against the criteria
9  just described.
10       Q.   So if I look at the description of
11  September 1 activities, and I look, let's say, for
12  example, Office of the Director, the first sentence
13  says, "The program will require executive
14  leadership to continue in the deployment and
15  implementation of program capabilities."
16            What does that mean?
17       A.   Well, the way I think about that, and
18  I -- you know, again, it's pre-decisional.  I'm not
19  sure how it came up.  But basically, the way I
20  think about it is, you don't just launch a program
21  and walk away.  You give it your first best try,
22  and then you continue to evaluate and grow, learn,
23  and make changes as needed to address the needs and
24  goals that you've identified.  And so that's what
25  executive leadership does.  It -- it isn't that you

Case 1:14-cv-01523-RCL   Document 176-1   Filed 03/23/22   Page 17 of 18
David Williams                                          December 16, 2021
Steele v. United States of America

Page 125

1    put something on autopilot and just leave it to go.
2    You need to watch it carefully and help it grow and
3    evolve and adjust even your goals if you learn
4    something that you didn't know before.
5         Q.   If I look at policy and analysis, do
6    you have an understanding, just generally, what
7    that function was, policy and analysis?
8         A.   Uh-huh, yeah.
9         Q.   What would that mean?
10        A.   I mean, look, here we were imposing a
11   user fee and a program -- actually, the program is
12   supported by the user fee, because the program was
13   the priority.  Here we were imposing what we
14   thought was the best and most reasonable approach,
15   but the only way that you can run a program like
16   this -- or, frankly, most programs -- is to do the
17   kind of analysis around critical questions that are
18   important to the program.
19             For example, are we identifying and
20   addressing problematic preparers?  What kinds of
21   problematic preparers are we seeing?  What have we
22   learned from our -- excuse me -- from our last
23   effort to identify and address them?  How is OPR
24   handling the referrals that it gets?  What are the
25   outcomes of those referrals?  How is the public

Page 126

1    thinking about them?  How are tax professionals
2    thinking about them?  I could go on for months.
3    Those are the kinds of things that you need an
4    analytic staff to take on and think through so that
5    you get better.
6         Q.   What is the -- was the ultimate goal
7    here to raise the quality of tax returns being
8    submitted by tax preparers on behalf of their
9    clients?
10        A.   Um, I think one of the goals is to
11   ensure that tax returns have a better chance of
12   being accurate because the individuals preparing
13   them -- or at least the ones who are charging for
14   their services -- and I want to make that
15   distinction, because that was the way in which the
16   regime was developed -- have at least minimal
17   competency, as determined by the testing and
18   continuing education standards we set, to engage in
19   the practice of preparing tax returns.
20             It was my belief -- and that would have
21   been one of the analytic points we'd make -- that
22   doing so would result in more accurate tax returns,
23   and, to be frank, less burden on individual
24   taxpayers who might otherwise have gone to
25   unscrupulous preparers and found themselves holding