# EXHIBIT F



Deposition of:

# 30(b)(6) Kitty Leann Ruf

*October 26, 2021*

In the Matter of:

# Steele v. United States of America

Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

```
 1            Q.    Go down to Paragraph 8.
 2            A.    Okay.
 3            Q.    Do you see the second sentence that
 4     says, RPO Communications supports RPO programs by
 5     helping ensure that IRS personnel, taxpayers, and
 6     return preparers understand the requirements of
 7     these programs?
 8            A.    Yes.
 9            Q.    What are the RPO programs referring to
10     there?
11            A.    That's referring to the PTIN
12     requirement.  Originally, that was referring to
13     testing and suitability requirements also.
14            Q.    And by PTIN requirement, what do you
15     mean by that?
16            A.    That paid preparers were required to
17     have a Preparer Tax Identification Number and to
18     renew that number annually with the IRS in order to
19     be a paid preparer of federal tax returns.
20            Q.    And you said it was originally
21     referring to testing.  What do you mean by that?
22            A.    The original proposal by the IRS
23     included testing requirements for those return
24     preparers who did not otherwise have a credential
25     they were not -- those who were not attorneys, CPAs
```

```
 1     or enrolled agents or supervised by one of those,
 2     those that we referred to as non-credentialed
 3     return preparers, initially we had planned to have
 4     a testing requirement for those individuals.
 5            Q.   And there's no longer a testing
 6     requirement, correct?
 7            A.   Correct, not a testing requirement.
 8            Q.   You said originally it was referring to
 9     suitability requirements.  What did you mean by
10     that?
11            A.   Again, originally, as part of the
12     Return Preparer Review, we had proposed testing and
13     suitability requirements for non-credentialed
14     return preparers, so the suitability requirements
15     were -- while I was at the IRS, were never quite
16     finalized as far as being a requirement, but the --
17     the plan was to have a requirement that
18     non-credentialed preparers be subject to tax
19     compliance and other suitability testing, including
20     potentially fingerprinting or background checks.
21            Q.   You said this was never finalized while
22     you were at the IRS as a requirement.  What do you
23     mean by that?
24            A.   Well, we were going to phase in the
25     various proposals that were in -- or
```

Case 1:14-cv-01523-RCL   Document 176-6   Filed 03/23/22   Page 5 of 12
30(b)(6) Kitty Leann Ruf                                October 26, 2021
Steele v. United States of America

Page 23

1   recommendations that were in the Return Preparer
2   Review.  We were going to begin with the PTIN
3   requirement and get everyone with a PTIN, get that
4   PTIN requirement into place, and then phase in,
5   over approximately a three-year period, the testing
6   and suitability requirements.  And it was during
7   that three-year phase-in period that, because of
8   litigation, we ceased that.
9           Q.   Were personal tax compliance checks
10  ever performed on return preparers?
11          A.   Yes.
12          Q.   For what period of time?
13          A.   As a communications director, I was not
14  greatly involved with that, other than from a
15  high-level involvement.  I -- I don't know the
16  exact time frame.
17          Q.   Do you have an estimate?
18          A.   I don't.
19          Q.   Were they being performed on return
20  preparers when you left in 2020?
21          A.   Some were, yes, but there was --
22          Q.   And when you say some --
23          A.   Yeah, I wanted to continue that.
24               But the purpose was more of a -- um,
25  well, the primary purpose was for those people who

```
 1    were voluntarily participating in the voluntary
 2    system that we put in place.  It was not an
 3    across-the-board tax compliance check.  It was for
 4    those who were voluntarily participating in the
 5    voluntary program that we established.
 6           Q.   And the voluntary program, are you
 7    referring to the Annual Filing Season Program?
 8           A.   Yes, I am.
 9           Q.   Go ahead and scroll down to
10    Paragraph 9.
11           A.   Okay.
12           Q.   Do you see the second-to-last sentence
13    of that paragraph says, This review resulted in
14    several recommendations aimed at improving
15    oversight of the return preparer committee?
16           A.   Yes.
17           Q.   And these are recommendations as a
18    result of the Return Preparer Review?
19           A.   Yes.
20           Q.   What does "aimed at improving oversight
21    of the return preparer community" refer to?
22           A.   Well, it referred to -- aimed at
23    improving oversight of the community in order to
24    ensure that those individuals who were preparing
25    tax returns for taxpayers were -- had the proper
```

1           Q.   What are the distinctions you're
2      referring to there?
3           A.   Well, there were several categories of
4      tax return preparers.  There were CPAs, attorneys,
5      enrolled agents.  There were those who were going
6      to obtain the credential Registered Tax Return
7      Preparer, or RTRP.  There were those who were
8      supervised preparers, which were those who did not
9      have a credential but worked directly for somebody
10     who was a CPA or attorney or enrolled agent.  There
11     were those who were non-1040 preparers, meaning
12     that they only prepared tax returns outside of the
13     1040 series.  And so there had to be distinctions
14     between, out of all of those categories, who needed
15     a PTIN, who was going to be subject to
16     fingerprinting or a background check, who was going
17     to be subject to testing and continuing education
18     requirements?  That's what is meant by the
19     distinctions between those.
20          Q.   In paragraph 15, says, The
21     implementation team was also responsible for
22     standing up the Registered Tax Return Preparer
23     credential program and incorporating existing
24     programs -- such as the Enrolled Agent Program --
25     into RPO.

1       Do you see that?
2       A.   Yes.
3       Q.   And just to make sure we're on the same
4  page, because I'm sure this is going to come up a
5  lot today, what do you mean by the registered tax
6  return preparer credential program?
7       A.   That was the name of the new credential
8  that was created through the recommendations of the
9  Return Preparer Review report.
10           This was the credential that would be
11 given to an individual who was previously
12 non-credentialed and subject to the mandatory
13 testing requirement that we were going to phase in
14 over three years.  That was the name of the new
15 credential.  They would obtain that credential by
16 passing a test, passing a suitability test, and
17 then, also, they would be subject to continuing
18 education requirements every year.
19      Q.   What were the suitability requirements
20 to obtain that credential?
21      A.   I do not recall from 2012 or so when we
22 first started that credential.  I do not recall
23 specifically what they were.
24      Q.   Prior to 2012, individuals could obtain
25 PTINs without the RTRP credential?

1      A.   Yes.  And you could -- you could obtain
2  a PTIN without the RTRP credential before and after
3  2013.
4      Q.   But prior to 2013 -- withdrawn.
5           Prior to 2013, the testing and
6  continuing education requirements were going to be
7  mandatory; is that correct?
8      A.   The testing and continuing education
9  requirements were being phased in.  There would
10 have been a point in time when they would have
11 become mandatory, but at the time of the Loving
12 litigation, they were still being phased in, and
13 there were people who had become registered tax
14 return preparers and there were people who were
15 still non-credentialed who had their PTIN and were
16 still carrying on preparing tax returns.
17          We never reached a point where the RTRP
18 credential was mandatory and you could not obtain a
19 PTIN without it.
20     Q.   And what about the suitability
21 requirements, prior to Loving were those being
22 phased in at that point as well?
23     A.   Yes, the plan was to phase those in.
24     Q.   And after Loving, did individuals have
25 to pass any suitability requirements before

| | |
|---|---|
| 1 | was really already in existence, the very, very |
| 2 | basic PTIN system. |
| 3 | Q. What additional key functionality would |
| 4 | have been needed before the Big Boy system came |
| 5 | into place for the legacy system? |
| 6 | A. I'm sure there are other things, but |
| 7 | the -- the primary thing that comes to mind would |
| 8 | be the -- the additional fields of data that we |
| 9 | were going to gather. For example, credentials. |
| 10 | We were going to gather everyone's credentials. We |
| 11 | were going to get e-mail addresses for everyone, |
| 12 | phone numbers. We were going to have |
| 13 | decision-making regarding testing or not testing. |
| 14 | There's some of that -- the |
| 15 | decision-making would have probably been the Big |
| 16 | Boy system, as it's referred to here, But just some |
| 17 | of the basic things the legacy system would have |
| 18 | needed. |
| 19 | Q. Go ahead and scroll up to the next |
| 20 | e-mail at the bottom of Page 350. |
| 21 | A. Okay. |
| 22 | Q. And these are notes from Melissa to |
| 23 | you, and it looks like to help get you started on |
| 24 | this PowerPoint she's asking you to create? |
| 25 | A. Okay. |

1    Q.   Do you see where it says, "July 2012 -
2    Full system implementation to include online user
3    fee payment, registration, CPE self-certification,
4    interface with third party test centers, automated
5    notices, reports, et cetera.  MITS is exploring
6    incremental releases -- what can be done in pieces
7    between 2010 and 2010.  At present, full system
8    cost at approximately $22 million."
9    A.   Yes.
10   Q.   Is she referring to the costs
11   associated with what she characterized below as the
12   Big Boy system?
13   A.   Yes, I think so.
14   Q.   And then the sentence above it says,
15   "July 2010 - We can have basic registration,
16   however, payment processing at this point is
17   unresolved.  At present it appears that we will not
18   be able to process payments online."
19        Is that referring to basic registration
20   under the throwaway system she referred to below?
21   A.   Yes.
22   Q.   And you believe that's the legacy
23   system that was previously used?
24   A.   Yes.
25   Q.   Could the legacy system process

```
 1    payments?
 2         A.   No.
 3         Q.   And it appears that is one difficulty
 4    of using the system in July 2010?
 5         A.   Yes.
 6              MS. LOPER:  Go ahead and close out of
 7    that document.  And this one was previously marked
 8    as Exhibit 10, and for the record it's Bates
 9    USA-0039155.
10              (EXHIBIT 10, December 18, 2009, Return
11    Preparer Registration:  System Options; Bates
12    USA-0039155, was previously introduced into
13    evidence and presented to the witness.)
14              THE WITNESS:  Okay.  I have that one
15    open.
16    BY MS. LOPER:
17         Q.   Do you recognize this document?
18         A.   I know that I've seen it before, yes.
19    This would have been --
20         Q.   Is this a PowerPoint?
21         A.   Yes, that's what I was going to say.
22    This is the document that I was being given
23    instructions on preparing, yes.
24         Q.   Did you prepare this document?
25         A.   Yes, using information from various
```