# EXHIBIT K

# TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION



## IRS Efforts to Address Unregulated Return Preparer Misconduct Lack a Coordinated Strategy and Could Be More Effective

**Messaging Document**

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA. This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a). Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

.

**Phone Number** / 202-622-6500
**E-mail Address** / *TIGTACommunications@tigta.treas.gov*
**Website** / *http://www.treasury.gov/tigta*

# *Background*

Paid tax return preparers serve an important role in the U.S. tax system as they prepare approximately 60 percent of all tax returns filed, and their actions have an enormous impact on the Internal Revenue Service's (IRS) ability to administer tax laws effectively.[1]  The category of paid tax return preparers includes attorneys, Certified Public Accountants, enrolled agents (including enrolled actuaries and enrolled retirement plan agents), and unenrolled return preparers.  Some of these tax professionals are subject to certain qualifying standards that can involve educational prerequisites, qualifying examinations, and continuing professional education (attorneys, CPAs and enrolled agents are referred to throughout as "tax professionals").[2]  However, unenrolled tax return preparers can prepare returns without possessing training, education, and in some cases, they possess the intent to defraud taxpayers and the Government. While tax professionals are subject to oversight by the IRS's Office of Professional Responsibility (OPR), the IRS has no similar oversight mechanism for unregulated preparers, and there is little return preparer oversight among the States.[3]  There is extensive evidence that unregulated tax preparers negatively impact tax administration and prey upon innocent taxpayers.[4]  As will be discussed in more detail below, after the IRS's attempt at regulating the return preparer industry was overturned in the courts the business of tax return preparation is essentially unregulated at the federal level.

Because of the critical role tax preparers have in helping taxpayers comply with the tax laws, identifying incompetent and unscrupulous preparers is an essential component of the IRS's oversight responsibilities. This audit was initiated to determine whether IRS procedures,

---

[1] IRS Publication 4832, Return Preparer Review (2009).

[2] The practice of law is generally governed by the requirements of the particular state in which a person practices; however, the American Bar Association accredits law schools that meet certain standards, and a national organization develops a uniform multistate test that serves as part of the qualifying examination process.  Likewise, practicing as a Certified Public Accountant is governed by state licensing requirements, and the American Institute for Certified Public Accountants develops and administers the examination with state and national partners.  The IRS enrolled agents program allows individuals to represent taxpayers before the IRS provided they have passed a 3-part test and maintain continuing education requirements of 72 credit hours every 3 years.

[3] Only four states regulate tax return preparers: California, Maryland, New York and Oregon. *Regulating Return Preparers, Turning Loving from a Stumbling Block to a Stepping Stone*, 83 UMKC L. Rev. 1079 (2015).

[4] National Taxpayer Advocate 2013 Annual Report to Congress 61; Treasury Inspector Gen. for Tax Admin., *Most Tax Returns Prepared by a Limited Sample of Unenrolled Preparers Contained Significant Errors*, Ref. No. 2008-40-171 (2008); U.S. Gov't Accountability Office, *Paid Tax Return Preparers: In a Limited Study, Chain Preparers Made Serious Errors* (2006); U.S. Gov't Accountability Office, *Paid Tax Return Preparers in a Limited Study, Preparers Made Significant Errors* 9-12 (2014).

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA.  It may not be disseminated beyond the IRS without the permission of TIGTA.  This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a).  Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

USA-0030697

guidelines and policies pertaining to paid preparer misconduct are being effectively administered.

## The IRS Attempted to Regulate All Paid Tax Return Preparers

To address the problem of incompetent and unscrupulous preparers, the IRS initiated an effort to regulate tax return preparers in Calendar Year (CY) 2009.[5] The extensive regulatory effort included background checks to ensure good character, tax compliance checks, minimum educational standards, a qualifying examination and continuing education requirements.[6] As part of the effort, the IRS recognized that holding tax return preparers accountable for their own tax noncompliance was vital to the integrity of the program.

In order to become a registered tax return preparer, individuals were required to pass a background check, competency exam, obtain a preparer identification number (PTIN),[7] and satisfy continuing education requirements.[8] While part of the purpose of the PTIN was to help protect the personal and private information of tax return preparers by using a number other than the preparer's Social Security number (SSN) on the tax returns that they prepare, the IRS stated that:

> The requirement to use a PTIN will allow the IRS to better identify tax return preparers, centralize information, and effectively administer the rules relating to tax return preparers. The final regulations will also benefit taxpayers and tax return preparers and help maintain the confidentiality of SSNs.[9]

In order to obtain a PTIN, preparers were required to submit an application through an online application managed by a contractor along with a $50 fee.[10] To lead this regulatory effort, the IRS established the Return Preparer Office (RPO) as a direct report to the Deputy Commissioner of Services and Enforcement. RPO's stated mission is to improve taxpayer compliance and the accuracy of tax returns by providing comprehensive oversight and support of tax professionals.[11] RPO is organized around this mission with 9 functions. The main functions include: Compliance and Complaint Referrals, Suitability, Vendor Management and Business Operations, and

---

[5] 76 Fed. Reg. 32,286 (June 3, 2011) (final regulation).

[6] IRS Notice 2011-80, *Guidance Regarding Obtaining and Renewing PTINs, Continuing Education Requirements for Registered Tax Return Preparers* (Sept. 22, 2011).

[7] Treas. Reg. § 1.6109(d).

[8] Tax professionals were exempted from some of the requirements since those individuals are already subject to qualifying standards.

[9] 75 F.R. 60309 (Sept. 10, 2010).

[10] The IRS discontinued collecting the user fee in June 2017 as a result of the court's decision in *Steele v. United States*, 159 F. Supp. 3d 73, 88 (D.D.C. 2016).

[11] IRM 1.1.28.1(2).

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA. This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a). Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

USA-0030698

Continuing Education Management.  RPO's Vendor Management and Business Operations function maintains vendor contracts for three of its functions:  the Tax Professional PTIN System – this system provides online registration/renewal for PTIN issuance to return preparers; The Academic Professional & Corporate Testing System – this system implements competency examinations for Enrolled Agents; and the Continuing Education Provider Registration & Tracking System – which tracks Continuing Education hours earned by tax return preparers. In CY 2014, return preparer regulations were deemed by a court to be invalid as being beyond the regulatory authority of the IRS.[12]  In CY 2017, a court held that while the IRS had the authority to require preparers to obtain PTINs, the IRS did not have the authority to charge a fee for the issuance of PTINs.[13]

## Addressing Preparer Misconduct in a Post-*Loving* Environment

Notwithstanding the decision in *Loving*, the IRS has tools to hold incompetent and unscrupulous preparers accountable.  Multiple functions in the IRS have responsibility for holding these tax return preparers accountable for misconduct.  All of the functions with this responsibility (*i.e.*, Small Business/Self-Employed Division, the Return Preparer Organization, and the Criminal Investigation division) are direct reports to the Deputy Commissioner for Services and Enforcement, and thus, the Deputy Commissioner is responsible for ensuring that the IRS has a coordinated return preparer strategy.

### Return Preparer Organization (RPO)

RPO's mission is to improve taxpayer compliance by providing comprehensive oversight and support of tax professionals.  The RPO consists of five major groups:[14]

- Suitability.  This office as originally envisioned reviews and determines individuals' eligibility as Federal tax return preparers, including their tax compliance and any history of felonies.  Prior to the IRS's initiation of the return preparer regulation effort in CY 2009, suitability was only assessed as to enrolled agents.  After *Loving*, suitability applies to tax professionals (*i.e.*, attorneys, CPAs and enrolled agents) and those who volunteer for the Annual Filing Season Program but not to all of the other unregulated preparers.

---

[12] Pursuant to 31 U.S.C. § 330, the IRS is authorized to "regulate the practice of representatives of persons before the Department of the Treasury," and the court held that return preparation does not constitute representing persons before the IRS. *Loving v. IRS,* 917 F. Supp. 2d 67 (D.D.C. 2013), aff'd, 742 F.3d 1013 (D.C. Cir. 2014).

[13] *Steele v. United States*, 159 F. Supp. 3d 73, 88 (D.D.C. 2016).  On September 6, 2017, the IRS filed an appeal in *Steele* to the District of Columbia Circuit Court of Appeals, and there has been no outcome in this case at the time of the issuance of this report.

[14] RPO also consists of Strategy and Finance, Joint Board of Actuaries, Vendor Process and Business Requirement Management, and Communications.

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA.  It may not be disseminated beyond the IRS without the permission of TIGTA.  This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a).  Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

USA-0030699

- Competency and Standards. This group oversees IRS competency testing. After *Loving*, the tests are voluntary and only administered to preparers who are applying to become an enrolled agent or enrolled retirement plan agent.[15] This group was formerly with the Office of Professional Responsibility (OPR) and was transferred to RPO when that office stood up.

- Continuing Education Management. This group oversees the IRS continuing education program which is mandatory for enrolled agents and other tax preparers who voluntarily subject themselves to it. This group was also formerly with the OPR and was transferred to RPO when that office stood up.

- Compliance and Complaint Referrals. As originally envisioned, this office was intended to field complaints about all return preparers and enforce noncompliance with the standards return preparers were supposed to comply with. Post- *Loving*, this office addresses PTIN non-compliance with all preparers. However, the Complaint Referrals activities apply to all tax preparers and tax professionals alike and refers cases for potential enforcement activities to be conducted across the IRS.

- Enrolled Agent Policy and Management. This office is responsible for the processing of various forms from enrolled agents, enrolled retirement plan agents, and actuaries. This group was also formerly with the Office of Professional Responsibility and was transferred to RPO when that office stood up.

**SB/SE Division's Examination Function**

The Deputy Commissioner for Service and Enforcement has designated the SB/SE Division as the lead IRS function in the IRS's effort to address incompetent and unscrupulous return preparers. The Internal Revenue Manual refers to a National Preparer Strategy, and employees in SB/SE Examination are supposed to carry out this strategy. This effort occurs mainly through revenue agents and tax compliance officers who have the authority to assess penalties for preparer misconduct. Penalties for unregulated preparers can include:

- A minimum of $1,000 penalty if a preparer understates a taxpayer's tax due to an unreasonable position.[16]

- A minimum of $5,000 penalty if a preparer understated a client's tax obligation due to the preparer's willful attempt to understate the tax liability, or reckless or intentional

---

[15] An enrolled retirement plan agent is an individual who has been approved by the IRS to practice before the IRS on certain retirement plan issues. These agents are similar to enrolled agents.

[16] I.R.C. § 6694(a), the penalty is the greater of $1,000 or 50% of the income derived by the tax return preparer in preparing the return.

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA. This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a). Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

disregard of rules or regulations.[17]

- A \$50 penalty for each failure to furnish an identifying number (PTIN) on a return or claim.[18]  The maximum penalty imposed on any tax return preparer may not exceed \$25,000 in a calendar year.

These penalties do not need to be a part of an examination since deficiency procedures do not apply to these penalties.[19]  However, the penalties can be imposed as part of an examination of a taxpayer, and they can also be assessed as part of a focused examination of the tax return preparer which involves examining 30 tax returns prepared by the return preparer.[20]  The number of returns can reach as many as 50 depending on the outcome of the initial review.  These focused examinations are known as Program Action Cases (PAC) which are established when there appears to be a widespread pattern of material errors.[21]  Return Preparer Coordinators in each of SB/SE Examination's seven Areas, among other duties, evaluate referrals for PAC examinations.[22]  Return Preparer Coordinators are supposed to test referrals against judgmental criteria developed by each Area within SB/SE, such as the dollar-value or the number of returns filed thresholds, when making this determination. If the referral meets the criteria of a particular Area, an examination is initiated.[23]

A referral may arise during the course of a routine examination when a tax examiner notices a pattern of behavior from a preparer.  The employee may either initiate an assessment for civil penalty using Form 8278, *Assessment and Abatement of Miscellaneous Civil Penalties*, or initiate a referral to the Return Preparer Coordinator.  Similar to a taxpayer's complaint, procedures require the Return Preparer Coordinator to evaluate the referral and coordinate with Criminal Investigation to ensure all aspects of the preparer are under consideration.  In CY 2015, RPO in coordination with SB/SE Research, developed a function in the Return Preparer Database to log misconduct referrals.  This database is used by the Return Preparer Coordinator to follow the progress and disposition of the case.

In the case of tax professionals regulated by the Office of Professional Responsibility, any IRS office evaluating preparer misconduct may send a referral to the Office of Professional

---

[17] I.R.C. § 6694(b), the penalty is the greater of \$5,000 or 50% of the income derived by the tax return preparer in preparing the return.

[18] I.R.C. § 6695(c).

[19] I.R.C. § 6696(b).

[20] IRS procedures require that the examination of the taxpayer be completed first and the determination of whether a preparer penalty is appropriate is conducted afterward - IRM 4.1.10.3.6.

[21] IRM 4.1.10.3 (Jan. 14, 2011).

[22] IRM 4.11.51.3 (Sept. 23, 2016).

[23] Prior to conducting the PAC, it must be approved by the local Penalty Steering Committee, which is chaired by the local RPC. See IRM 4.1.10.2.1 (Dec. 13, 2016).

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA. This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a). Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

Responsibility (OPR) using Form 8484, *Suspected Practitioner Misconduct Report for the Office of Professional Responsibility.*

The Lead Development Center is also located in the SB/SE Examination function and has responsibility for reviewing referrals for the assessment of penalties involving I.R.C. § 6700, which establishes penalties for promoting abusive tax shelters, and I.R.C. § 6701, which establishes penalties for aiding and abetting understatement of tax liability. The Lead Development Center is physically located at the Laguna Niguel, California IRS facility and was established to centralize the receipt and development of leads on abusive tax schemes and promoters, as well as the authorization and referral of promoter investigations for assignment to the field. The Lead Development Center may assess penalties, or, working with the IRS Division Counsel, may attempt to have the preparer enjoined from conduct related to promoting tax shelters.

**IRS Collection**

The IRS Collection function can also play an important role in holding tax preparers accountable for misconduct. Given the importance of penalty assessment as a tool to address preparer misconduct, the Collection function can ensure that the penalties have the maximum impact by prioritizing the collection of preparer penalties. In a Fiscal Year (FY) 2013 TIGTA report, the IRS agreed to develop procedures to expedite assigning I.R.C. § 6694 preparer penalty tax accounts to revenue officers, and to give more consideration before suspending collection action on these types of accounts.[24]

**Criminal Investigation**

The IRS's Criminal Investigation division pursues tax return preparers for criminal offenses. The Criminal Investigation function tracks on an annual basis the initiation of new fraud investigations initiated against unscrupulous tax return preparers, as well the recommended prosecutions, indictments and incarceration rates. For example, in FY 2016, 248 investigations were completed, indictments were obtained in 204 cases and the average sentencing for preparers convicted of fraud was 22 months.[25]

Other functions and agencies also play important roles in this process, including Division Counsel for both SB/SE and Criminal Investigation who support special agents and the Department of Justice in pursuing cases to enjoin tax preparers from preparing returns pursuant to IR.C. § 7407.

---

[24] TIGTA, Ref. No. 2013-30-075, *Improvements Are Needed in Assessing and Enforcing Internal Revenue Code Section 6694 Paid Preparer Penalties* (September 2013).

[25] Criminal Investigations, Business Performance Review, FY 2016.

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA. This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a). Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

To illustrate the preparer misconduct that gives rise to IRS enforcement efforts when unscrupulous preparers prey upon taxpayers, a few excerpts from court opinions from cases in which the IRS sought to enjoin tax preparers are set out below:

From *United States v. Moss,* the court found:

At trial, the three co-defendants who pled guilty…….testified against Moss and Jenkins. Melinda Lambert testified that she prepared tax returns for Flash Tax, went to training sessions conducted by James Moss, and would plug numbers provided by Moss into Flash Tax's Taxwise software. Lambert further testified that Moss held the training sessions in his living room—the employees would sip margaritas while Moss displayed tax forms on a flat screen television. According to Lambert, Moss trained them to maximize the returns customers would receive by "working the numbers out."[26]

From *United States v. Brooks,* the court found:

In September 2012, IRS agents interviewed Brooks regarding bogus claims on tax returns he prepared. During the interview, Brooks stated that he prepares 5 to 10 tax returns per day for about two months and that each year he prepares approximately 300 to 600 tax returns. IRS records show that between CY 2013 and CY 2016, Brooks electronically filed between 600 and 800 tax returns each year. In addition, Brooks stated that 40 to 50 percent of the tax returns he prepares are filed electronically. Brooks admitted to the IRS agents that he does not sign the electronically-filed tax returns that he prepares…. Brooks' fraudulent tax return preparation continued after his indictment and while he was awaiting trial.[27]

From *United States v. Fitzgerald*, the court found:

After an IRS audit meeting, Ms. Fitzgerald told a former customer, Ms. Goodwin, "I like to play game[s] with the government." The customer was assessed taxes, penalties, and interest in an amount exceeding $10,000. Ms. Fitzgerald told another customer, Mr. Fetterly, that people are paying too much tax to the government and that the government should be allowed to have only what people are willing to pay.[28]

From *United States v. Lawrence,* the court found:

Aikens instructed employees to falsify tax returns so that customers would receive large refunds based on the earned-income tax credit ("EITC" or "EIC").[3] To help

---

[26] *United States v. Moss*, 828 F.Supp.2d 1292 (M.D. AL 2011).

[27] *United States v. Brooks,* 119 A.F.T.R.2d 2017-2119 (E.D. MO 2017).

[28] *United States v. Fitzgerald,* 118 A.F.T.R.2d 2016-6541(W.D. MI 2016).

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA. This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a). Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

preparers claim the largest EITC possible, Aikens gave all of them an "Earned Income Chart" showing the income ranges that would provide customers the maximum EITC. Aikens told preparers that they should manipulate customers' incomes to fall within the ranges on the chart, in order to produce large—but illegal—refunds. Preparers used this chart "[a]lmost every time" they prepared a tax return.[29]

There are many more such cases, though the process to enjoin tax preparers involves litigation which can be lengthy and resource intensive.[30] Both the GAO and the IRS have expressed concerns to Congress about paid preparer oversight. The IRS has the authority only to initiate a voluntary program for unenrolled preparers, so it has asked Congress to approve a legislative proposal granting it explicit statutory authority to regulate all paid tax return preparers. The President's FY 2018 Budget also seeks IRS oversight of tax return preparers.

This review was performed at the Return Preparer Office at IRS National Headquarters in Washington, D.C.; Offices of SB/SE Return Preparer Coordinators in Philadelphia, Pennsylvania; Denver, Colorado; and Los Angeles, California; SB/SE Lead Development Center in Laguna Niguel, California; and SB/SE Research in Hartford, Connecticut during the period December 2016 through December 2017. We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objective. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objective. Detailed information on our audit objective, scope, and methodology is presented in Appendix I. Major contributors to the report are listed in Appendix II

# *Results of Review*

## *The IRS Does Not Have a Coordinated Return Preparer Strategy and Enforcement Actions Can Be More Effective*

Although the IRS does not have the legal authority to regulate paid tax return preparers, it has the authority and tools available to identify and discourage preparer misconduct. For example, the

---

[29] *United States v. Lawrence et al.,* 118 A.F.T.R.2d 2016-5958 (S.D. FL 2016).
[30] I.R.C. § 7407 allows the IRS to enjoin tax preparers and I.R.C. § 7408 enjoin promoters of tax shelters from certain specified conduct.

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA. This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a). Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

IRS can impose significant penalties on preparers who deliberately understate clients' liabilities. However, the IRS does not have a coordinated strategy among the different functions with the authority to address preparer misconduct, and the IRS does not use the tools available to it as effectively as it could.

### *The IRS Does Not Have a National Return Preparer Strategy and Does Not Track Progress Towards Program Goals for Addressing Preparer Misconduct*

As part of this audit, we met with the officials from the Deputy Commissioner for Services and Enforcement's office as well as the leadership in the Small Business and Self-Employed Division (SB/SE), the Criminal Investigations division and the Return Preparer Organization to discuss the overall IRS strategy for addressing the problem of return preparer conduct. When we asked what the overall strategy for addressing preparer misconduct was, we were informed that generally the strategy was to utilize the tools at the IRS's disposal to as effectively as possible within resource constraints to improve tax compliance by increasing the accuracy of tax returns and holding tax return preparers accountable for misconduct. When we asked for more specificity, we were also told that the SB/SE Division was the lead organization for addressing preparer misconduct. When we asked whether this strategy was committed to a formal written document and whether SB/SE's lead role was memorialized in writing, we were told that the Internal Revenue Manual (IRM) contained the required information. Although the IRM references a "National Return Preparer Strategy," we did not find evidence that such a strategy exists.[31] IRS compliance functions have annual program letters which highlight important areas of emphasis for the year. No SB/SE Examination program letter prior to FY 2018 contained language emphasizing the IRS's return preparer strategy. However, after the initiation of our audit, the FY 2018 SB/SE Exam Program letter designated as part of one of the goals to develop a return preparer strategy. This is a positive step towards developing a return preparer strategy. However, the strategy is not defined in how a collaborative effort will address preparer misconduct.

We reviewed SB/SE's Business Performance Results (BPR) documentation to determine how the lead function responsible for preparer misconduct reports on progress in the program it oversees. The major divisions and functions of the IRS meet quarterly with the IRS Commissioner to discuss program results, and the BPR documentation serves as the basis from which those discussions occur. In reviewing SB/SE's FY 2016 BPR, its responsibility as the lead organization in the preparer misconduct effort is not referenced anywhere. The BPR contains information about goals and how well the organization is meeting the goals during the fiscal year. For example, the SB/SE BPR document for the fourth quarter FY 2016 contains the number of closed field examinations for the year (261,000) as compared to the plan (253,879)

---

[31] IRM 4.1.1.7.10 (March 3, 2013).

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA. This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a). Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

USA-0030705

and a comparison to FY 2015's examination closures (286,424). The BPR is very detailed and breaks down the examination plan and performance into different taxpayer income levels and business types, *e.g.* partnerships versus corporations. The BPR has sections on "*Performance Levels By Function*," "*Sensitive Oversight*," "*Priority Programs and Challenges*." Yet, there is no information (*e.g.*, no goals or performance numbers) about the number of specific preparer examinations nor any information about the Return Preparer Coordinators or the Lead Development Center. The only reference in the fourth quarter FY 2016 BPR to tax return preparers is in the section devoted to SB/SE Division Counsel which reported under the section titled "Preparer Injunction Developments" its efforts in an ongoing investigation.

As the Deputy Commissioner's lead in the effort to address the problem of return preparer misconduct, the SB/SE Division should establish goals for return preparer examinations each year and track the progress towards those goals. The Deputy Commissioner should also arrange for a coordinated approach that harnesses the resources of the different functions with authority to impact return preparer conduct to best utilize limited IRS resources.

### *IRS's Preparer Penalty Effort Could Be More Effective*

Penalties can be an effective enforcement tool because they impose an economic consequence on preparers who engage in misconduct. Recent studies have shown that error rates by some preparers are high, and the IRS has the authority to impose penalties against these tax preparers. In a limited Government Accountability Office study, undercover site visits to preparers found that 17 of 19 preparers made mistakes by incorrectly inflating tax refunds.[32] These findings are consistent with the results of GAO's analysis of IRS's National Research Program (NRP) database. GAO analysis of NRP data from tax years 2006 through 2009 showed that tax returns prepared by preparers had a 60 percent error rate. Figure 1 shows that during CY 2016, the IRS assessed 901 penalties (6694(a) and 6694(b)) totaling $36,407,267[33] against preparers.[34]

---

[32] Government Accountability Office, GAO-14-467T, *Paid Tax Return Preparers: In a Limited Study, Preparers Made Significant Errors* p.9 (April 2014).

[33] During calendar year 2016, there were a total of 2,296 penalties issued totaling $263.3 million. These figures include all preparer penalties which may be assessed by revenue agents when misconduct is identified during routine examinations, through outreach efforts, or through the complaint/referral process. The number of preparers for PY 2016 is as of May 2016, and limited to preparers who filed 11 returns or more.

[34] In the prior 16 years, the IRS averaged about $109 million in annual preparer penalty assessments. There was an unusually high volume of Failure to Furnish Information Regarding Tax Shelter assessments during FY 2016. Such penalties can range in the hundreds of thousands of dollars each.

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA. This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a). Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

USA-0030706

**Figure 1: PAC and Non-PAC Preparer Penalties Assessed for FY 2016**

| Violation | I.R.C. §6694(a) | | I.R.C. §6694(b) | |
|---|---|---|---|---|
| | PAC | NON-PAC | PAC | NON-PAC |
| Penalty Count | 45 | 171 | 136 | 549 |
| Penalty Count % | 21% | 79% | 20% | 80% |
| Penalty Dollars | $578,000 | $359,750 | $8,355,000 | $27,114,517 |
| Penalty Dollar % | 62% | 38% | 24% | 76% |
| TOTALS | | | | |
| Penalty Count | 216 | | 685 | |
| Penalty Dollars | $937,750 | | $35,469,517 | |

*Source: TIGTA Analysis of Data Provided by the IRS.*

To put these numbers into perspective, RPO receives approximately 10,000 complaints a year against preparers.[35] Of those 10,000 complaints, 2,830 complaints were referred to IRS enforcement and of those, 1,158 complaints were referred to RPCs in FY 2016. Each referral involves multiple complaints, so the number of referrals is less than the number of complaints. During FY 2016, there were 191 referrals that were based on 1,158 complaints. However, complaint referrals represented just 20 percent of all referrals received. The majority of the referrals received come from Exam (483 referrals, which is approximately 50 percent). The balance of referrals originated from various other sources, such as TIGTA Office of Investigations, Criminal Investigation, SB/SE Lead Development Center, and National Office. However, few referrals, regardless of where they originate, actually result in a PAC. Specifically, just 140 (15 percent) of 951 referrals received by RPCs resulted in a PAC investigation.

Furthermore, preparer noncompliance is not limited to instances that are identified by Exam or reported to the IRS via a complaint. As reported by the GAO, there are indications of much more widespread noncompliance by preparers. The IRS has the ability to improve its detection

---

[35] While numbers can fluctuate in any given year, complaints received FY 2015 and FY 2016 were 10,984 and 9,479 respectively.

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA. This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a). Such information may be disclosed only to Department of the Treasury employees who have a need to know this information its connection with their official tax administration duties.

USA-0030707

of preparer noncompliance through other means such as data analyses, which we discuss in more detail later in this report.

**Program Action Cases (PAC) could have more impact on preparer misconduct.**

When preparer misconduct is identified or suspected, IRS employees can make referrals for the IRS to investigate the suspected misconduct. These referrals are typically routed to the Return Preparer Coordinators, who make determinations about whether a PAC is warranted. During FY 2016 referrals from examiners comprised approximately 60 percent of the Return Preparer Coordinators' workload.[36] If the referral meets the Return Preparer Coordinator's criteria, the PAC is initiated and the cases are referred to SB/SE examination. In certain circumstances, the PAC can be extended to 50 cases, however, no more than 50 taxpayer tax returns are permitted as part of the preparer investigation. During the course of the PAC examinations, the preparer may be assessed a $5,000 penalty for willful or reckless conduct per return under I.R.C. § 6694(b), or $1,000 per return for an understatement of tax liability due to an unrealistic position under I.R.C. § 6694(a).

Although PAC examinations can be an important tool for holding tax preparers accountable, the IRS could utilize the tool more effectively. Between October 2015 and September 2016, Return Preparer Coordinators received 819 referrals, but only 104 of those referrals resulted in a PAC. By contrast, the IRS's Criminal Investigation function initiated 248 investigations of fraudulent return preparers and obtained 204 indictments in FY 2016. This is unexpected given the respective resources of these two IRS functions as well the intensive nature of a criminal investigation versus civil penalty cases. The SB/SE Division Examination function has approximately 6,500 revenue agents and tax compliance officers compared to Criminal Investigation's nearly 2,200 special agents. The Government must also prove a criminal case to a "beyond a reasonable doubt" standard while in a penalty case the Government only has to prove by a "preponderance of the evidence."[37]

The IRS has established seven geographical Areas, and the Return Preparer Coordinators for each Area established their own internal user guides, with differing judgmental criteria on establishing the PAC. For example, one Area prioritizes PACs on preparers with high refund rates, while another Area prioritizes cases that are especially egregious or impact a high number of taxpayers. These inconsistent and judgmental criteria result in an uneven approach to preparer

---

[36] Although the Examination employee may assess a penalty against the preparer for the return they are examining, employees are prohibited from "browsing" the records of taxpayers who are not under examination (*i.e.*, other preparer clients) to determine if the preparer issue they identified was also present on other taxpayers' returns.
[37] *See United States v. Pugh*, 717 F.Supp.2d 271 (E.D. NY 2010), discussing the preponderance of the evidence standard in an I.R.C. § 6694 penalty case and *United States v. Moss*, 828 F.Supp.2d 1292 (M.D. AL 2011), discussing standard of beyond a reasonable doubt in tax fraud case brought against a tax preparer under I.R.C. § 6702.

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA. This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a). Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

USA-0030708

oversight and contribute to the low percentage of PAC referrals to Examination. SB/SE Examination does not have specific goals for the number of PAC examinations.

Furthermore, even when PACs are established, their impact is often limited; especially when the preparer has a large number of clients. Because PACs are limited to 50 examinations, the maximum penalty that can be imposed on any preparer is $250,000; even if they have filed significantly more returns with the same issue(s). Limiting the number of returns at 50 is not consistent with other approaches in IRS examination, in which the IRS pursues the taxpayer fully when noncompliance is identified. Furthermore, the Examination function does not specifically include PACs as part of its inventory work plan each year. Instead, PAC cases are worked as part of a revenue agent's normal inventory, along with other assigned cases. As a result, preparer misconduct cases are not prioritized.

### The Lead Development Center lacks formal performance measures and procedures.

If IRS employees suspect a preparer is engaged in the promotion or aiding and abetting of an abusive tax shelter, the case is referred to the LDC.[38] Much like the PAC process, leads meeting Lead Development Center criteria are assigned to the SB/SE Examination function's Abusive Transaction group for investigation. If the IRS identifies conduct involving the promotion of abusive tax shelters, it may assess penalties amounting to the lesser of $1,000 or 100 percent of gross income derived from activity;[39] or in the case of aiding and abetting the understatement of tax liabilities $1,000 where the liability is on an individual return or $10,000 when the understated liability is on a corporate return.[40]

Federal Government agencies are expected to identify performance measures, as well as methods of performance assessment, to provide management with information on how resources should be allocated to ensure program effectiveness.[41] While the Lead Development Center plays an important role in the identification and deterrence of preparer involvement in abusive tax shelters, its effectiveness is uncertain because it lacks formal procedures and/or written criteria for which its performance may be assessed. In addition, some communication issues with the Department of Justice and IRS Counsel reported in the results of peer reviews can hinder or delay the final determination of tax preparer cases. During FY 2016, IRS management informed us that the Lead Development Center received 501 referrals from other IRS functions, and assigned 275 cases to SB/SE Examination for investigation.[42] However, it is unclear if the

---

[38] Such conduct is in violation of I.R.C. § 6700 for promoting abusive tax shelters or I.R.C. § 6701 for aiding and abetting the understatement of tax liabilities.

[39] I.R.C. § 6700.

[40] I.R.C. § 6701.

[41] The Government Performance and Results Act of 1993 Pub. L. No. 103-62, 107 Stat. 285 (codified as amended in scattered sections of 5 U.S.C., 31 U.S.C., and 39 U.S.C. (2013)).

[42] LDC management advised us that this number excludes 1,444 cases that were misrouted to the LDC, and instead gone to another organization or function, such as TIGTA Office of Investigations, or IRS Identity Theft.

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA. This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a). Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

number and quality of the cases that were ultimately assigned (or not assigned) were appropriate and/or an effective use of resources. Management does not track how many of the referred cases resulted in penalties.[43] Therefore, it is unclear if the cases that were not assigned could have produced similar results. While the Lead Development Center has recently developed a local "desk guide" to assist employees, it lacks any formal policy, procedures, or criteria on how cases are selected an assigned to Examination. This condition allows for subjectivity in the selection process, and may result in inequitable treatment of taxpayers, missed opportunities to collect revenue, and the potential continuation of preparer involvement in abusive tax shelters.

## Most assessed preparer penalties are never collected.

After penalties are assessed against preparers, the liabilities are generally processed like any other taxpayer liability within IRS's Collection Division, which is also within the SB/SE division. The process typically involves a notice stream, in which the taxpayer is sent a series of systemic notices requesting payment; the Automated Collection System, in which the IRS may work the cases through systemic processes such as lien and levy determinations; and finally Field Collection, in which cases are worked by Revenue Officers who may initiate personal contact with the delinquent taxpayers.

Collection prioritizes cases that should be actively worked by employees based on various risk-based criteria. Because the IRS has limited resources, a significant number of taxpayer delinquencies are not worked beyond the notice stream and Automated Collection System. These cases are often assigned to the "queue," in which they await assignment to the Field for up to one year; or they are ultimately "shelved," in which they are no longer actively worked.

Between FY 2013 and FY 2015, the Collection functioned prioritized the collection of tax return preparer penalties in its annual Program Letter. However, in FY 2016's Program Letter, collection of these penalties was no longer a priority. Moreover, TIGTA recently reported[44] in a separate audit report that even when the IRS prioritizes a particular area for collection, the IRS does not establish collection goals with respect to that area or track the number of cases worked that fall into that category. [45]

---

[43] The IRS assessed preparers 183 penalties for these referred cases, but some preparers had more than one penalty assessed against them, while other preparers may have not had any penalties assessed against them. The IRS does not track how many referred cases resulted in penalties (only the number of penalties).

[44] TIGTA Audit Report, Prioritization of Collection Cases Is Inconsistent and Systemic Enforcement Actions Are Limited for Inactive Cases; Reference Number 2017-30-069.

[45] See earlier footnote regarding our attempt to reconcile the $109 million average we cited earlier in the report with the $815 million over a 15-year period shown here.

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA. This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a). Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

The IRS no longer assigns any special priority to preparer misconduct penalties; therefore, many of the assessments are not worked and the delinquencies are never paid.[46] Because many return preparers are familiar with the IRS' collection processes, they may believe that if they ignore the IRS' correspondence regarding their liability, the IRS may ultimately give up attempts to collect it. RPO tracks the collection of penalties issued to "ghost preparers," *i.e.*, tax return preparers who are not using PTINs assigned to them by the IRS, and reported in its FY 2016 Business Performance Review that only 8 percent of penalties are collected. From CY 2012 to CY 2015, the IRS has collected just $46.3 million (15 percent) of the $317.2 million of penalties assessed on individual return preparers.

In order for penalties to be an effective part of a return preparer strategy, it is important that the IRS assesses them consistently and regularly. In addition, the IRS should take steps to enforce the collection of the penalties after they are assessed. A more robust and strategic approach to the assessment and collection of penalties can help deter preparer misconduct and protect taxpayers who fall victim to preparer negligence and misconduct.

### *Few Tax Preparers Are Enjoined*

The ultimate civil penalty for unscrupulous preparers is when the Department of Justice enjoins the preparer from preparing tax returns for clients.[47] IRS procedures for enjoining return preparers describe a coordinated process between SB/SE Examination employees, Criminal Investigation, IRS Counsel, and the Department of Justice.[48] During a routine examination or during a PAC, examiners are supposed to determine whether a preparer's actions rise to the level in which an enjoinment may be warranted. If a determination is made that enjoinment is warranted, a referral should be made to the Lead Development Center or to Criminal Investigation.

The examinations and investigations of these referrals are conducted by the Abusive Transaction groups within the Lead Development Centers and Criminal Investigation, respectively, to determine whether enjoinments against preparers should be pursued. If the examination/investigation determines that enjoinments are warranted, IRS counsel should coordinate with the Department of Justice to execute the enjoinments. Although enjoinment is

---

[46] Between FY 2013 and FY 2015, IRS' Collection Program Letters identified preparer penalties as a collection priority. However, preparer penalties were not shown as a priority in the FY 2016 or FY 2017 Collection Program Letters. Furthermore, TIGTA has previously reported that there is little correlation between Collection Program Letter priority areas and cases that are assigned to be worked. TIGTA Audit Report, Prioritization of Collection Cases Is Inconsistent and Systemic Enforcement Actions Are Limited for Inactive Cases; Reference Number 2017-30-069.

[47] The Department of Justice may enjoin either enrolled or unenrolled preparers.

[48] IRM 4.32.2.2 (June 8, 2012)

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA. This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a). Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

USA-0030711

the most permanent and potentially effective civil action that can be taken to address preparer misconduct, it is rarely used.  Specifically, during CY 2016 just 61 preparers were enjoined from preparing returns.  By contrast, the IRS's Criminal Investigation function initiated 248 investigations of fraudulent return preparers and obtained 204 indictments in FY 2016.

## Recommendations

**Recommendation 1:**  The Deputy Commissioner for Services and Enforcement should develop a preparer misconduct strategy that encourages programs with the authority to address preparer misconduct to coordinate with one another to establish program goals and track progress towards those goals.

The Commissioner, Small Business and Self-Employed Division should:

**Recommendation 2:**  Establish preparer misconduct program goals, including goals for establishing PACs, and track progress towards those goals.

**Recommendation 3:** Analyze procedures among the Return Preparer Coordinators for best practices and establish national procedures, including PAC referral criteria and the number of cases reviewed.

**Recommendation 4:**  Establish formal procedures and criteria for Lead Development Center case selection and assignment to Examination along with performance measures that compare results with goals and criteria, such as the percentage and amount of penalties assessed for referred cases, and the recidivism rates for Lead Development Center cases that are both referred and not referred.

**Recommendation 5:**  Prioritize and track the collection of preparer misconduct penalties.

## The IRS's Enforcement Impact on Unregulated Return Preparers Could Be Strengthened

### Oversight Authority of Tax Return Preparers Is Limited

When the RPO was established in FY 2010, its mission was to improve taxpayer compliance by providing comprehensive oversight and support of tax return preparers.  As described in the background section above, the RPO established several subordinate offices, each with different oversight responsibilities.  For example, the Suitability office was supposed to make tax compliance checks and perform criminal background investigations for *all* PTIN holders.  The RPO anticipated a high volume of workload, considering there were well over 600,000 PTIN holders who need to renew each year, as well as nearly 100,000 new applicants each year.  To

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA.  It may not be disseminated beyond the IRS without the permission of TIGTA.  This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a).  Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

USA-0030712

meet the expected demand, the RPO staffed its various offices with employees who would handle the day-to-day duties, as well as interface with various other IRS business units, such as SB/SE Examination and the Office of Professional Responsibility. By FY 2013, there were approximately 167 RPO employees.

In addition, to satisfy the resource demands of preparer oversight, the RPO was authorized to impose a user fee on preparers when they obtained and renewed their PTIN. The user fee was initially established at $64.25 for new registration and $63.00 for renewals. In November 2015, both the initial application and renewal fees were reduced to $50, with $17 of the proceeds allocated to the vendor who manages the PTIN online system (this amount was reduced to $14.95 as of May 2017), and $33 of the proceeds to the RPO to pay for resources that were directly involved in preparer oversight or services. The contract for the vendor was renewed in August 2016 with the last option due to expire in July 2021.

From the time that PTIN use by paid preparers became mandatory in FY 2010, the IRS has issued over 1.3 million PTINs; collecting over $65 million in user fees. Approximately 70 percent of the RPO's annual budget comes from these fees.[49] If the *Steele* decision is affirmed on appeal, it is unclear how or if RPO and the vendor would be funded.

### *RPO Shifted Mission Post-Loving Away from Unregulated Preparers on to Tax Professionals and AFSP Participants*

After *Loving*, the RPO substantially shifted its focus away from unregulated preparers towards tax professionals and voluntary participants in the Annual Filing Season Program (AFSP). Of the RPO functions, only the Complaint Referral process is currently relevant (albeit of limited relevance, as we describe further below) to the unregulated preparers who do not volunteer to be subject to the Annual Filing Season Program. Figure 2 below reflects the impact on the functions of RPO as far as the number of preparers they were originally supposed to impact versus the number they actually impact today, post-*Loving*.

### Figure 2:  Changes to Number of Preparers Impacted by RPO Area

| IMPACT | | |
|---|---|---|
| **RPO AREA** | **Pre-*Loving* Case** | **Post-*Loving*** |

---

[49] The rationale for funding RPO through user fees outside of the normal budget process was that the authority underpinning regulating return preparers emanates from Title 31.

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA. This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a). Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

| | Function | Potential Preparers Impacted | Function | Potential Preparers Impacted |
|---|---|---|---|---|
| Suitability - Tax Compliance | Review all PTIN applicants - deny/revoke PTIN if not tax complaint | 1,300,000 | Review AFSP applicants - removed from AFSP if not tax compliant (can not represent client). No impact on tax preparation. | 54,485 |
| Suitability - Criminal Background for AFSP | Review all PTIN applicants - deny/revoke PTIN for financial related crimes | 1,300,000 | Review AFSP applicants - removed from AFSP for financial related crimes | 54,485 |
| Competency & Standards | Administer testing to all PTIN applicants | 1,300,000 | Administer testing to EA | 59,209 |
| Continuing Education Management | Obtain vendors for all PTIN applicant testing | 1,300,000 | Obtain vendors for EA testing | 59,209 |

*Source: TIGTA Analysis of the Return Preparer Database and RPO Business Performance Reviews*

When established, Suitability and Competency and Standards were expected to have significant role regulating the entire tax return preparer community.  Because the courts ruled that the IRS does not have authority to regulate preparers, Suitability has focused attention on preparers who volunteer for the Annual Filing Season Program (AFSP) and tax professionals.  Preparers who volunteer for the AFSP allow some IRS oversight in exchange for the limited right to represent taxpayers before the IRS with respect to the tax returns that they prepare.  However, relatively few preparers volunteer for this oversight.  There are 54,485 AFSP participants and approximately 389,000 unregulated tax return preparers who do not participate in the AFSP.  The Complaint Referral function refers some complaints to Return Preparer Coordinators in the SB/SE Examination function and also addresses some complaints using educational letters.  In the post-*Loving* environment, Suitability only utilizes educational letters on AFSP participants and does not use them for unregulated preparers.

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA.  It may not be disseminated beyond the IRS without the permission of TIGTA.  This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a).  Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

**Suitability has limited impact and is not using all of its tools effectively.**

Staffed with 28 employees, the RPO Suitability office's role includes but is not limited to verifying the eligibility of the preparer by conducting tax compliance checks of PTIN applicants and checking preparers' professional credentials. Because post-*Loving* PTINs must be granted to nearly anyone who applies, these checks are done after the PTINs have been issued to the applicant. However, even if Suitability detects a problem with the applicant, with the exception of sending outreach/education letters to the applicant, it can do very little to deny preparers their right to prepare tax returns for compensation. It is the IRS's position that once granted, a PTIN can only be revoked if the preparer is currently incarcerated, deceased or enjoined by the Department of Justice. As of May 2017, over 1.3 million PTINs have been issued in total, but only 1,689 (fewer than 0.02 percent) have been revoked. Of these, in FY 2016 for example, 747,682 PTINs were issued and renewed (101,554 and 646,128 respectively).

Validating Professional Status

Suitability's workload involves checking professional credentials of any PTIN applicant who represents that they are an attorney, CPA or Enrolled Agent. Specifically, during FY 2015 and FY 2016, 230,702 (96 percent) of the 240,838 total case closures involved professional credentials. Thus, a function that was designed to address unregulated return preparers is instead focusing most of its time on tax professionals. The credential check includes verifying with affiliated websites such as *CPAverify* or the various states' websites for accountant or attorney credentials. The check is initially performed when a preparer applies for a PTIN, and then again revalidated once every three years. Because Suitability has no regulatory authority over unregulated preparers, it only subjects tax professionals to this credential check but issues PTINs to the majority of PTIN applicants (over 60 percent) without regard to whether they have a criminal background, a history of defrauding taxpayers, a history of committing identity theft or any other such criminal behavior. RPO only revokes PTINs of those who are incarcerated or deceased. All others may obtain PTINs upon demand.

The current credential validation process is manual; requiring employees to check each state's bar or board of accountancy. When a discrepancy is found, Suitability will issue Letter 5122-A, *You Must Verify Your Professional Status*, advising the preparer that they may not use their credentials on returns they submit. Figure 3 shows the number of credentials validated and letters sent to preparers for credential issues.

*Figure 3: Results of Suitability Credential Validation Process*

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA. This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a). Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

USA-0030715

| Fiscal Year | Validated | L5122-A Issued | L5273 Issued[50] | L5070 Issued[51] |
|:---:|:---:|:---:|:---:|:---:|
| 2015 | 50,603 | 3,434 | 2,629 | 614 |
| 2016 | 121,944 | 2,908 | 1,906 | 971 |

*Source: Program Manager of RPO Suitability*

Although RPO cannot take enforcement action on persons misrepresenting their status, they are able to refer these cases for investigation to the Office of Professional Responsibility if the preparer's credentials are expired, inactive or suspended. Additionally, if a preparer is attempting to misrepresent their status with altered or manipulated credentials in a way to falsely misrepresent themselves, RPO can refer these preparers to TIGTA Office of Investigation. In FY 2016, Suitability referred 294 cases to the Office of Professional Responsibility and no cases to TIGTA Office of Investigation.[52] However, as discussed in the next section these referral actions had limited impact on preparer misconduct.

Validating Tax Compliance

Suitability also conducts personal tax compliance checks under the same authority that requires preparers to have a valid PTIN.[53] Prior to FY 2017, Suitability routinely made tax compliance checks on all PTIN applicants. However, in FY 2017 management limited these checks to only those PTIN applicants who are tax professionals or return preparers who elect to participate in the AFSP. It does not do tax compliance checks on unregulated tax return preparers. As a result, the number of preparers who had compliance issues that required tax compliance checks dropped 92 percent, from 444 taken during the first quarter of FY 2016 to just 34 taken during the first quarter of FY 2017.

A tax compliance check on AFSP volunteers or tax professional begins when the RPO Vendor Process office refers to Suitability cases for which the preparer has an outstanding liability of greater than $500 or has not filed all tax returns identified by the Service as required. If a Suitability employee identifies noncompliance on the part of an AFSP participant, such as a balance due from a prior year, the employee checks to see if the return preparer has entered into an arrangement, such as an installment agreement, to satisfy the delinquency. If no such arrangement is present on the account, the Suitability employee will generate a treatment letter to

---

[50] L5273 *Final request to verify your professional status* is sent by RPO Suitability to PTIN holders who were previously asked to verify their professional status, and either didn't provide information, or the information sent didn't confirm the status was active.

[51] L5070 *Your issue is resolved* is sent to tax preparers who have been contacted by RPO Suitability when their issues are resolved. The letter informs them that no further action will be taken against their PTIN.

[52] TIGTA did not verify the accuracy of this figure.

[53] Treas. Reg. § .6109-2(f).

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA. This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a). Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

USA-0030716

be sent by the third party contractor to the preparer.[54]  However, the letter does not provide details about the preparer's noncompliance.  Instead, it advises the preparer that they need to come into compliance in order to participate in AFSP.  The letter advises the preparer to call IRS customer service with any questions to resolve the matter.  If the preparer is unresponsive, the Suitability Office may send a series of up to three letters to the preparer.  The final letter advises the preparer that the noncompliance issue will be referred to the OPR.  If this process provided more information to the preparer, such as the alleged nature of the noncompliance, it would likely be more effective at addressing preparer noncompliance.

However, Suitability's referrals to OPR were not effective because the referral process was flawed in several respects. The first problem with the referral process was that OPR's systems were not set up to receive case referrals from the RPO.  In January 2016, a Memorandum of Understanding was signed by RPO and OPR, in which it was established that Suitability would refer to OPR all Circular 230 practitioners that Suitability identified as being non-compliant with their tax obligations.  For FY 2016, Suitability sent 97 referrals of tax noncompliant preparers to OPR; however, it was later determined that OPR was not receiving the cases transferred.  At the time, OPR did not have the technical ability to intake cases from the third-party contractor database that Suitability was using to refer the cases.  The case transfer issue was later identified by the contractor and reported to the IRS. Subsequent analysis showed that only 50 cases were actually referred to OPR.  The IRS has attempted to correct the data transfer problem, which should help the referral process for legitimate cases.

The second, and more significant problem with the referral process related to the fact that RPO was using outdated pre-*Loving* referral criteria from January 2014 to refer cases to OPR.  Using the out dated referral criteria resulted in cases being referred to OPR that were outside of OPR's jurisdiction.  Out of the 50 cases OPR received, 45 of the referrals were against unenrolled preparers, which do not meet the requirements of Circular 230, and; therefore, were not within OPR's jurisdiction to work.  Although all of the cases were not within OPR's jurisdiction, OPR worked the cases anyway.  Once cases are received, OPR creates a record to show case dispositions.  As a result, 38 of the 50 (76 percent) cases were closed at intake.  Additionally, because the OPR employee assigned to work the cases initially was unable to intake cases from the third-party contractor, the cases referred during FY 2016 were not worked until FY 2017 into FY 2018.

Suitability advised that the non-Circular 230 preparers were referred to OPR because they were all either part of the AFSP or requesting to be part of the AFSP.  However, upon review of the cases, OPR determined that only one of the preparers participated in the AFSP.  Furthermore, it is Suitability's responsibility to allow or deny a preparer to participate in the AFSP and if the preparer is tax non-compliant, the preparer should not be allowed to participate.  Instead of

---

[54] L4911-A *You must take steps to resolve your tax compliance issues.*

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA.  This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a).  Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

simply denying the preparer participation in AFSP, Suitability used outdated guidance to refer these tax noncompliant preparers to OPR which did not have jurisdiction over those preparers. As a result of the erroneous referrals, OPR resources were being diverted from focusing on addressing preparer misconduct that was under its jurisdiction.

The resources used by Suitability to conduct credential research is not commensurate with the benefits realized. At best, preparers who have misrepresented themselves will stop doing so after being notified to do so by Suitability. However, if the preparers continue with the behavior, the IRS is not taking additional steps to address it. Suitability takes no further action if the preparer is unregulated. Even when cases are referred to OPR, nearly all of them are closed upon receipt because the preparers are not currently practicing before the IRS and therefore OPR lacks jurisdiction. The appropriate function to report unregulated preparers misrepresenting themselves as tax professionals is TIGTA's Office of Investigations who is able to pursue criminal investigations where appropriate.

An even more significant problem is that Suitability no longer devotes any resources to unregulated preparers. Ensuring the tax compliance of tax preparers yields benefits to tax administration, however, Suitability is only checking the status of the relatively small number of tax professionals and volunteers for the AFSP program, *e.g.*, those who present the least risk to tax administration. Our review of the IRS's Return Preparer Database reflects that over 26,000 return preparers while applying for their PTIN self-certified that they were not in tax compliance. RPO could cause Suitability to perform compliance checks on all PTIN applicants as was originally intended and refer those individuals to SB/SE Collection and Examination for enforcement. While *Loving* does not permit the IRS to bar unregulated preparers from preparing returns if they fail to be tax compliant, the IRS can and should audit those return preparers and prioritize the collection of their delinquent debts.

The following hypothetical examples are provided to illustrate current RPO priorities of the Suitability office.

> TAX RETURN PREPARER NO. 1 – Tax Return Preparer No. 1 is an attorney and a Certified Public Accountant who has been practicing law for 25 years and applies to renew her PTIN. After the PTIN is renewed, the Suitability office will perform both a tax compliance check and a professional credential check. Assuming there are tax compliance issues or troubles validating professional credentials with respect to Tax Preparer No. 1, a series of warning letters will be sent followed by a referral to OPR if the letters go unresponsive.

> TAX RETURN PREPARER NO. 2 – Tax Return Preparer No. 2 has recently been released from prison for committing fraud and has never filed a tax return. He decides to go into the tax return preparation business and applies for a PTIN. He

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA. This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a). Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

declines to participate in the AFSP program. The PTIN is granted and no further
checks are made to determine whether this preparer is suitable for return preparation.

While Tax Return Preparer No. 2 obviously presents the greater risk to the tax administration
system, no attention is given to him to determine whether he is suitable for return preparation.
The IRS has been saddled with difficult strategic choices post-*Loving*.  However, focusing
attention on the least likely to threaten tax administration and not addressing those who pose the
most significant risks to tax administration may not be the most effective compliance strategy.
More can and should be done by RPO to address unregulated return preparers.

### Complaint Referrals result in minimal compliance action.

The Complaint Referral group serves as the main intake function when taxpayers or other IRS
employees make complaints about tax preparers.  Staffed with 11 employees, the group is
supposed to identify noncompliant return preparers, then plan and direct enforcement activities
to be conducted across the IRS.  Complaint Referral activities may result in outreach and
education to preparers when referrals are not directed to enforcement arms of the IRS.

The Complaint Referral group typically receives over 10,000 complaints a year from taxpayers
(via Form 14157 *Complaint: Tax Return Preparer*) or from other IRS employees (via Form
3949-A *Information Referral*) and uses a 4-step process to handle complaints: Intake, Evaluation,
Research and Resolution.

- Intake:  Clerks log each complaint into the Return Preparer Database and attempt to
  identify the preparer.

- Evaluation:  Case processors determine the merit of the allegations and decide
  whether RPO's has the ability to address and direct the complaint.  A complaint that
  can be processed is one in which the complaint is legible, identifies the return
  preparer by either name or identification number, includes an allegation or violation,
  and is in English or has been translated.  On average, RPO does not process
  approximately 25 percent of complaints due to lacking merit.  We reviewed a
  judgmental sample of cases for which case processors classified as lacking merit and
  did not identify any cases that should have been referred for additional research.

- Research:  Research typically involves assessing and analyzing the details of the
  complaint to determine potential violations by following process steps and decision
  criteria.  If the case specialist determines that the complaint has merit, the actions to
  be taken will be determined during resolution.

- Resolution:  In general, complaints are resolved by treating the preparer with a Letter
  5175 *Warning and Educational Letter*, or the case specialist will make a referral to an

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA.  It
may not be disseminated beyond the IRS without the permission of TIGTA.  This document may contain
confidential return information protected from disclosure pursuant to I.R.C. § 6103(a).  Such information may be
disclosed only to Department of the Treasury employees who have a need to know this information in connection
with their official tax administration duties.

enforcement arm of the IRS.[55]  In order to make a referral, the complaint must meet minimum referral criteria established by each of the different IRS enforcement functions.

Figure 4 shows the number of referrals and Warning and Education letters issued by Complaint Resolution since FY 2013.

### Figure 4:  Referrals and Warning/Education Letters Issued by Complaint Referral (FY 2013-2016)



*Source:  Return Preparer Office Business Performance Review for Fourth Quarter 2015 and First Quarter 2017*

Since FY 2014, Complaint Referral has received approximately 30,000 complaints and referred approximately 10,000 complaints to various IRS enforcement functions and issued more than 1,200 warning/education letters to preparers.[56]  These referrals produce only a small number of actions from SB/SE Examination.  For example, during FY 2016, the 2,830 complaint referrals resulted in only 140 PAC preparer examinations being established.

---

[55] Other education letters may be sent for PTIN issues or to request further information.

[56] TIGTA separately reported on the effectiveness of IRS's preparer outreach efforts.  See TIGTA Ref. No.2018-40-001, *Improvements Are Needed to Better Document the Return Preparer Refundable Credit Compliance Treatment Identification and Selection Process* (October 2017).

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA.  It may not be disseminated beyond the IRS without the permission of TIGTA.  This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a).  Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

Although the researching and disposition of complaint referrals involves manual processes, many of the manual steps could be performed more efficiently using available technology. For example, during the Resolution phase employees currently research whether the preparer meets the following objective criteria for referral to an RPC including: 3 complaints were filed against the preparer, the preparer filed at least 200 returns, and fewer than 50 percent of the returns had an earned income credit. These criteria checks could be automated. Similar manual processes are also used by employees in Evaluation and Research.

Complaint Referral could migrate some of its current manual processes to electronic-oriented processing, which would reduce the risk of employee errors and increase the speed and efficiency of the investigations. Furthermore, the complaint data in the Return Preparer Database is accessible by many of the enforcement functions of the IRS in which the referral would be made; therefore, each function could pull their own workload instead of relying on Complaint Referral to process referrals for them. For example, OPR has recently started processing their own referrals in this manner.

## PTINs are not Effectively Used as a Compliance Tool:

RPO administers the issuance and renewal of PTINs to all tax return preparers. Before the *Loving* decision, it was contemplated that tax return preparers who failed to meet the required standards of conduct would not receive a PTIN or would have their PTIN revoked. Although the IRS's authority to issue PTINs remains currently unchallenged by the courts, RPO does not believe it has the authority to revoke PTINs unless the preparer is deceased or incarcerated. RPO leadership informed TIGTA that its role with respect to unregulated tax return preparers is primarily educational and not enforcement related. As of May 2017, 1,689 PTINs have been revoked since CY 2010 when it became mandatory for preparers to obtain PTINs.

The law provides for a $50 penalty for each tax return submitted by a tax return preparer that is unaccompanied by a valid PTIN which can be waived or abated if the return preparer shows there was reasonable cause and the omission was not due to willful neglect.[57] The IRS can directly impose tax return preparer penalties because they are not subject to deficiency procedures, and therefore no examination of the return preparer is required.[58] However, the penalty is applied sparingly. As part of this audit, we identified 72,590 ghost preparers in processing year 2016 with inactive PTINs who filed 2,769,381 or more tax returns. Had penalties been proposed when PTINs were not provided with tax returns as required, more than $122,747,250 could have been assessed; however, only 215 penalties were assessed for all of 6694(a)-(e) penalties, inclusive of 6694(c) penalties, totaling $1,572,055 which is only 1 percent of the potential penalty assessment, and for just one of the possible violations.

---

[57] I.R.C. § 6695(c).

[58] I.R.C. § 6696(b); see also Treas. Reg. §1.6696-1.

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA. This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a). Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

RPO's Compliance group investigates and treats suspected ghost return preparers by using the Ghost Inventory Tracking System within the Return Preparer Database.[59]  Within the RPO, treatment is limited to notifying suspected ghost preparers of their noncompliance by mail, and asking them to take corrective action.  When we asked why the IRS does not utilize RPO to summarily impose the $50 penalty based on whatever thresholds it deems appropriate, we were informed that employees in the RPO Compliance group do not have the delegated Title 26 authority.  In light of the fact that RPO has authority to issue PTINs and PTINs are provided for under Title 26, we also asked why this authority was not sufficient to impose I.R.C. § 6695(c) penalties, and Exam and Campus Policy management stated "absent statutory or other regulatory provisions, the Commissioner has broad authority to act in the best interests of tax administration, and may delegate that authority within the agency.  Enforcement authority for I.R.C. §6695(c), along with several other return preparer-related penalties, has been delegated to the Small Business/Self-Employed Division.  There is no statutory impediment to delegating enforcement authority to the RPO; rather, a business decision was made to maximize our limited resources by using existing compliance operations for enforcement activities."

As a result, preparers who are suspected of falsifying or misusing PTINs are referred to SB/SE Examination for enforcement action.  However, the Examination function does not consider PTIN misuse to be priority work, since the maximum penalty for each violation under I.R.C. § 6695(c) is $50, with a maximum penalty of $25,000 per year for each preparer.[60]  Instead, examiners will consider the PTIN violation only if the preparer has corresponding income tax disparity on their personal income tax return.  As a result, few ghost preparers are ultimately assessed penalties.  Specifically, for the first quarter in FY 2017, 4,200 ghost preparer leads were identified.  However, RPO Compliance only referred 56 cases for examination in FY 2015, and 73 cases in FY 2016.  The SB/SE Examination function and RPO have completed two phases of a pilot in an attempt to increase the number of ghost preparer penalties, however, TIGTA was informed that neither phase resulted in policy changes because the assessment of these penalties do not count towards the Examination function's work plan.  The two phases of the pilot reviewed 10 preparers each and assessed $142,700 and $386,550 respectively.  The favorable results followed to a third phase.  The third phase reviewed 29 preparers and assessed $725,850.  If the SB/SE Division, as the lead in the IRS's efforts to curb preparer misconduct, makes preparer penalty work a part of its work plan as recommended by Field Exam Special Processes who conducted the pilots, establishes program goals and tracks progress towards those goals then the SB/SE Examination decision makers need not be concerned about expending hours on work which are not credited to Examination's program goals.

---

[59] At the conclusion of the analyst's investigation, the case is typically closed by: taking no action; referring the case to another IRS function; or issuing a treatment letter.

[60] I.R.C. § 6695(c), penalty for failure to furnish identifying number.  The penalty is $50 for each failure to comply with I.R.C. § 6109(a)(4) regarding furnishing an identifying number on a return or claim.  The maximum penalty imposed on any tax return preparer shall not exceed $25,000 in a calendar year.

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA.  It may not be disseminated beyond the IRS without the permission of TIGTA.  This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a).  Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

USA-0030722

### *More Analyses Could Identify Problematic Preparers*

The assignment of PTINs allows the IRS to keep track of preparers' behavior, such as the number of returns they prepare and file, the number of returns by filing method (paper or e-file), returns filed with refunds, and returns filed with balances due. This type of information is consolidated in the Return Preparer Database. This database is populated with preparer data from a variety of IRS computer systems, including the Compliance Data Warehouse[61] and IDRS.[62] The database is a resource tool that provides end users a single source for paid preparer information. The primary users of the database are the Return Preparer Organization, Return Preparer Coordinators, and the Criminal Investigation division. Specifically, the Return Preparer Database is:

- Populated by Return Preparer Organization log, work and track complaints on preparers.
- Used by RPO Compliance to identify preparers who are not properly using a PTIN.
- Populated by Return Preparer Coordinators to develop PACs and monitor the PAC process.
- Populated by the Lead Development Center during the lead process.
- Uploaded with criminal sanctions and civil injunctions from Criminal Investigations.

Despite the availability of this information in the database, the IRS has not yet taken full advantage of its capabilities. Much of the analyses and resulting corrective actions could be done systemically, with minimal need for employees' direct involvement. Expansion of the database's capabilities could allow the IRS to identify and deter additional preparer misconduct, while also freeing employees who are currently performing manual tasks that could be done systemically by the database. Given the resources reductions over the past several years, it is particularly important for the IRS to continue developing and taking full advantage of its available systemic capabilities.

#### Database analyses could identify additional preparer misconduct.

In addition to the identification and investigation of ghost preparers, the Return Preparer Database contains demographics and other statistics that could be used to identify preparers who are engaged in misconduct; currently only a small portion of preparers, identified by other case selection means, are investigated by the IRS. The database identifies a larger population of potentially risky behavior. For example, we analyzed the database and determined that during Processing Year 2016:

---

[61] Compliance Data Warehouse a compilation of IRS databases containing data and information services to support research and analysis.

[62] Integrated Data Retrieval System (IDRS) is an IRS computer system capable of retrieving or updating stored information. It works in conjunction with a taxpayer's account records.

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA. This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a). Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

- Over 7,000 preparers filed more than 1,000 Forms 1040.  This statistic implies that the same PTIN may have been used by more than one preparer.
- Over 3,800 preparers filed returns originating from a high number of geographically disbursed states.  This statistic also implies shared PTINs.
- Over 1,300 preparers filed returns using multiple EINs. This statistic implies the preparer may be the victim of identity theft.
- Over 10,900 preparers filed at least 25 returns with a refund claim on 100 percent of the returns. This statistic implies a likelihood of fraudulent returns prepared.
- Over 8,800 preparers had instances of noncompliance with the tax laws between 2008 to 2017 after investigation for various misconduct-related activity by other IRS functions, such as Criminal Investigation or the Examination function.
- Over 26,000 tax return preparers self-attested to be tax *noncompliant*. Tax preparers who cannot stay in tax compliance may not be promoting tax compliance among their clients.[63]

The data from the Return Preparer Database evidences troubling patterns of questionable behavior that warrant additional investigation.  The IRS could use the database to make similar analyses to develop possible referrals for preparer misconduct investigations.  RPO Compliance employees currently keep a list of the top 10 preparers with the most complaints against them and informed us that all of those 10 preparers were under some kind of investigation.  However, as the data above suggests, there are many more questionable tax return preparers, and RPO has not made similar comparisons for the types of analyses we performed to determine if any enforcement actions were being taken against preparers who were engaged in these activities.  Such comparisons could provide the IRS with potential leads that would help reduce and deter this noncompliant behavior.

**The Return Preparer Database could help improve workload selection.**

The Return Preparer Database includes a risk scoring model called the Preparer Risk Identification & Selection Model (PRISM).  PRISM scores preparers either on a fact base, such as the number of returns prepared; or issue based, such as a hypothesis broken.  The PRISM compares and ranks preparers on a variety of over 50 different hypotheses, such as the percentage of returns filed with Forms 1040, Schedule A, or Schedule C, and then ranks how that preparer compares to other preparers for those specific characteristics.  Preparers who are ranked at one end or the other may warrant additional investigation.

---

[63] A small fraction of the preparers meeting each of these hypotheses criterion was identified and worked by IRS functions, however; the preparers were not identified for review because they met these criteria.  They were instead identified through some other work stream.

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA.  It may not be disseminated beyond the IRS without the permission of TIGTA.  This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a).  Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.

USA-0030724

Currently the Return Preparer Coordinators are testing the use of the database as a strategic tool in developing PACs. For processing year 2015, 97,353 (20 percent) of the 476,054 preparers in the database broke at least one hypotheses and therefore have a PRISM score. The IRS initiated a pilot that focused on top 10 PRISM scored preparers that were not being worked by another business unit, and developed a PAC for those preparers. The purpose of the pilot is to determine if the PRISM scores can successfully identify return preparers that are preparing egregious returns that warrant enforcement action, even though there has not been a referral. We believe the IRS should consider expanding use of the PRISM to other IRS functions, including Lead Development Centers, Criminal Investigation, and the Examination function, if the pilot study yields positive outcomes.

## Recommendations

**Recommendation 6:** The Deputy Commissioner of Services and Enforcement should request the Commissioner of the SB/SE Division and the Director of the RPO to develop a compliance strategy that allows for the summary imposition of the I.R.C. § 6695(c) penalty on return preparers who routinely fail to supply their PTINs on tax returns they have prepared (upon such thresholds that are deemed appropriate).

**Recommendation 7:** The Commissioner of SB/SE Division should consider expanding use of the PRISM feature of the Return Preparer Database to assist the Lead Development Centers, Criminal Investigation, the Examination function; and, with the identification and development of PACs.

The Director of the Return Preparer Office should:

**Recommendation 8:** When sending tax return preparers letters informing them they are not in tax compliance, provide the details of the alleged noncompliance.

**Recommendation 9:** When Professional Designation Checks identifies a return preparer who is misrepresenting professional status, refer the case to TIGTA Office of Investigations for possible investigation.

This document has not been subjected to the TIGTA quality review process and remains the property of TIGTA. It may not be disseminated beyond the IRS without the permission of TIGTA. This document may contain confidential return information protected from disclosure pursuant to I.R.C. § 6103(a). Such information may be disclosed only to Department of the Treasury employees who have a need to know this information in connection with their official tax administration duties.