# EXHIBIT N



Deposition of:
## Carol A. Campbell 30b6 The IRS

*November 16, 2021*

In the Matter of:

## Steele v. United States of America

Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Carol A. Campbell 30b6 The IRS                    November 16, 2021
Steele v. United States of America

Page 40

1    needed to test, and the number of preparers who had

2    actually taken the test was very small.  And there

3    was a two-year window, at that time, in which to

4    get testing complete.

5            Q.   Was the 400,000 or so the number of

6    non-credentialed PTIN holders?

7            A.   Yes.

8            Q.   And do you recall at that time roughly

9    how many -- maybe you told me -- how many had taken

10   the test, or had signed to take the test?

11           A.   I don't -- I know it was less than a

12   hundred thousand.  Probably about 80,000 people had

13   registered to take the test.  How many had actually

14   taken the test at that time, I don't know.

15           Q.   At the time you joined the office in

16   2012, was the registration and renewal process

17   already stood up, that is, actually registering and

18   renewing PTINs?

19           A.   Yes.

20           Q.   And at the time you started in 2012,

21   was Accenture the one that was handling the

22   registrations and renewals?

23           A.   Yes.

24           Q.   Was there -- at the time you started in

25   2012, were you aware of any issues specifically

Carol A. Campbell 30b6 The IRS          November 16, 2021
Steele v. United States of America

Page 41

1   relating to either the registration process or the

2   renewal process, that is, things that had to be

3   fixed or addressed?

4           A.   I remember that there were some

5   usability issues, there were some scope kind of

6   issues; but anything beyond that, I don't -- I

7   don't recall.

8           Q.   When you say scope issues, what do you

9   mean by a scope issue?

10          A.   The number of people trying to renew

11  their PTIN at any one time.  So the peak season

12  would open, generally, between mid October and the

13  end of December, and we would end up with a

14  significant number of people trying to register the

15  last week of the peak season year, and it would

16  bring the system down.  Too many people are trying

17  to get on to do it, so scope issues.

18          Q.   I see.  So technological problems with

19  the system because of overload in terms of people

20  applying?

21          A.   Right.

22          Q.   At the time you started in 2012, were

23  all the paper applications handled by Accenture?

24          A.   Yes.

25          Q.   Did -- was it possible -- did it -- at

Carol A. Campbell 30b6 The IRS          November 16, 2021
Steele v. United States of America

Page 42

1   the time you started in 2012, did the IRS -- that

2   is, the Office of the RPO -- itself have the

3   ability to issue a PTIN?  That is, could your

4   office issue it independent of Accenture?

5          A.   No.

6          Q.   If a paper application somehow got

7   directed to the RPO, would it be sent to Accenture?

8          A.   Yes.

9          Q.   Was there even a process or an ability

10  of the RPO to actually do a registration or a

11  renewal?

12         A.   No.

13         Q.   This is in 2012.  Has any of that

14  changed since 2012 to today?

15         A.   No, all --

16         Q.   And to --

17         A.   -- applications go through the

18  contractor, the vendor.

19         Q.   And to the best of your knowledge,

20  going back to 2010, was that also true?

21         A.   Once the responsibility for PTINs

22  transitioned to RPO, yes, that was true.  I don't

23  know at what point in -- actually, it was September

24  2010.  So it was September 2010 when the RPO

25  process started -- the PTIN process -- the systemic

Carol A. Campbell 30b6 The IRS          November 16, 2021
Steele v. United States of America

Page 43

1   process started.  From that point on, it's my

2   understanding that all PTINs were issued through

3   the vendor.  There was no longer any ability for

4   Wage, for instance, to issue PTINs.

5          Q.   You've answered my question; that's

6   what I was trying to get to.  And there is no

7   voluntary PTIN anymore.

8               In other words, if you want a PTIN,

9   you've got to go through the -- either the online

10  application process through Accenture or through

11  the written application process through Accenture,

12  correct?

13         A.   PTINs are not voluntary if you're

14  preparing tax returns --

15         Q.   Right --

16         A.   -- so --

17         Q.   Yeah, it --

18         A.   I'm not sure what you mean by

19  voluntary.

20         Q.   Poor question.

21              Going further on in Exhibit 203, if I

22  look at the last paragraph, the -- you say -- the

23  first sentence of the last paragraph there is,

24  "Just as urgent are compliance efforts."

25              Do you see that?

Page 44

1          A.    Yes.

2          Q.    And I'm assuming, when you say "just as

3    urgent," you mean just as urgent as getting people

4    to take the Registered Tax Return Preparer test,

5    correct?

6          A.    Yes.

7          Q.    What did you -- why was that just as

8    urgent, that you focus on compliance efforts?

9          A.    Because there was a large concern in

10   the preparer community that the people who were

11   abiding by the regulations, and, you know, doing

12   the testing and getting the PTINs and getting

13   continuing education, would go down this path, but

14   the bad actors, the folks who are ghost preparers,

15   underground, we wouldn't do anything about.  And so

16   they would be taking away business from the people

17   who were doing the right things.  So we wanted to

18   ensure that our compliance efforts were directed at

19   those folks who were intentionally doing the wrong

20   thing.

21         Q.    All right.  We can close Exhibit 203.

22               Okay.  So let's go back to September of

23   2012 when you first became director of the RPO.

24               Was there a written job description for

25   that position?

Carol A. Campbell 30b6 The IRS          November 16, 2021
Steele v. United States of America

Page 45

1          A.    I don't know, actually.  I do not know.

2          Q.    How would you describe that job in

3    2012, the one that you took on?  What was that job?

4          A.    It was to provide oversight and

5    leadership for the standup of the Return Preparer

6    Office, ensuring that the requirements for tax

7    return preparation were clear for the return

8    preparer community, to promote education and

9    outreach in the preparer community, to ensure that

10   we, RPO, understood what the preparer community

11   issues were, and to improve tax administration by

12   improving the readiness of the tax preparer

13   community since more than 60 percent of all tax

14   returns were completed by a tax return preparer.

15         Q.    Okay.  Has that basic job description

16   changed from 2012 to present?

17         A.    Except for the testing and -- for the

18   required testing and the required continuing

19   education, no.  We're still promoting preparer

20   education and excellence, because it impacts

21   taxpayers completing tax returns.  So the number of

22   taxpayers relying on a tax return preparer may have

23   slipped a little bit, but not significantly.  So

24   it's still important to tax administration for tax

25   return preparers to be as equipped with education

Carol A. Campbell 30b6 The IRS          November 16, 2021
Steele v. United States of America

Page 54

1    taxpayers.

2          Q.    Okay.   And as I understand it, that is

3    done every year?   In other words, let's suppose

4    this year I get a PTIN and I indicate that I'm an

5    attorney, someone would check to make sure that, in

6    fact, that, you know, I hold a license from a

7    particular state.

8                If I renew next year, does it get

9    checked again?

10         A.    In general, we do the -- because --

11   because there are more than 750, 800,000 PTIN

12   holders, we don't have the staff to do it every

13   year, but we try to make sure that we touch

14   everybody at least every third year.   Some people,

15   we touch more often, depending on how much work we

16   have, how much additional resources.   But the plan

17   is, once every three years, we double-check

18   credentials.   So we check you this year, you know,

19   and if resources don't permit, we won't get to you

20   again until three years from now.

21               Generally, once the credential is

22   verified, it doesn't change unless you retire, you

23   get disbarred for some reason, you know, those

24   kinds of things.

25               Most of what we are cleaning up is

Case 1:14-cv-01523-RCL   Document 176-14   Filed 03/23/22   Page 10 of 35
Carol A. Campbell 30b6 The IRS          November 16, 2021
Steele v. United States of America

Page 55

1   people who don't understand what credential they
2   have in the first place, so...
3          Q.   Okay.  A PTIN would not be revoked
4   because someone's improperly identified
5   themselves --
6          A.   No.
7          Q.   -- as an enrolled agent, correct?
8          A.   No.
9          Q.   You would simply remove the designation
10  from the online listing and inform the affected
11  individual?
12         A.   Yes, exactly.
13         Q.   Now, you indicated that started about
14  2015, is that correct, the best you can recall?
15         A.   Yes.
16         Q.   We're going to talk a little bit about
17  the Loving decision today.  As I understand it in
18  response to the final Loving decision -- that is,
19  the decision of the D.C. Circuit -- the decision
20  was made within the RPO that it could no longer do
21  mandatory testing or CLE, correct?
22         A.   Yes.
23         Q.   As a result of that decision, were
24  there any layoffs or firings of any individuals
25  within the RPO?

Carol A. Campbell 30b6 The IRS                    November 16, 2021
Steele v. United States of America

Page 56

1          A.    No.

2          Q.    What -- what happened to the people who

3    were performing those functions within the RPO?

4          A.    Most of them were performing other

5    functions as well.  And some work, we just

6    transferred around.  So there was always more work

7    than we actually had staffing for anyway.  And so

8    although there were some things that people could

9    no longer do, there was always sufficient work

10   for -- there was sufficient remaining work for

11   the -- the staff to engage in, so...

12         Q.    And the Loving decision, the

13   D.C. Circuit decision, was in 2014, correct?

14         A.    Yes, February 2014.

15         Q.    When was it decided that the IRS or the

16   RPO would take on this new task of doing credential

17   checking?

18         A.    Um, that was decided 2014/2015.  There

19   was an encouragement for taxpayers -- and there's

20   a -- news releases to taxpayers about choosing your

21   return preparer wisely.  You know, know what your

22   preparer's credentials are, what he or she has the

23   ability to do.  In order to offer that kind of

24   service, we needed to know, you know, who had what

25   credentials, so the -- the -- I don't know what we

Page 57

1    call it, the -- the -- it's not really a website,

2    but it's a -- a location system where taxpayers can

3    go in, and it will identify preparers by state, ZIP

4    code, city, credential, you know, so that if, you

5    know, I am looking for a tax return preparer who

6    can represent me, you know, in an audit, you know,

7    then I -- you know I find the definition of CPA,

8    attorney, enrolled agent, Annual Filing Season

9    Program participants, you know, et cetera, so that

10   I know what these particular preparers can do, and

11   hopefully I select someone who can assist me with

12   my problem, rather than randomly relying on word of

13   mouth, you know, from family members or strangers

14   or, you know, whatever.  So that taxpayers have a

15   better idea of the gamut of tax return preparers

16   and who can offer them what service.

17           Q.   Is that -- I think you called it a web

18   location, or a location.  Is that within the IRS

19   website?

20           A.   Yes, it is.

21           Q.   And was that -- was that functionality

22   created by the RPO, or some other arm of the IRS?

23           A.   It was created by RPO and IT, our

24   technology people.

25           Q.   And roughly when was that created, as

Carol A. Campbell 30b6 The IRS            November 16, 2021
Steele v. United States of America

Page 65

1   Enrolled Agent Management and Policy.  They just
2   sit in -- Business Operations sits in EAP&M.
3           Q.    Okay.
4           A.    They used to sit in Vendor, but we
5   moved them.  I moved them.
6           Q.    And in terms of the information that is
7   taken in on an application or a renewal, that
8   information is maintained by Accenture in the TPPS
9   database, correct?
10          A.    It is.
11          Q.    Okay.  Has that been true at least
12  through the time you've been director?
13          A.    Yes.
14          Q.    Okay.  Are you aware of whether the RPO
15  has the ability to, in any way, change or amend any
16  of the registration or renewal data that resides in
17  TPPS?
18          A.    The preparer-specific information?
19          Q.    Right.
20          A.    No, we don't go in and amend
21  preparer-specific information.  The preparer has to
22  go in and do that.
23          Q.    In 2012, do you have a recollection,
24  roughly, of -- and coming forward each year -- of
25  how much -- how many applications are renewals and

Page 66

1   how many are new?  That is, what I'm trying to get

2   is a percentage breakdown, roughly, of, in any

3   given year, renewals versus new applicants.

4           A.   Oh, um, I'd say 85 to 90 percent are

5   renewals.  The rest are the new applications, but

6   that varies from year to year too.

7           Q.   But certainly since you've been there,

8   the substantial majority has been renewals, not --

9           A.   New applications.

10          Q.   -- new applications, correct?

11               And if none of your information has

12  changed, you -- well, on a renewal, you get the

13  same number, correct, irrespective of whether your

14  information changes or not.

15          A.   That's right.  So long as we can

16  identify you as the same person who got that number

17  in the first place, you keep the number, yes.

18          Q.   Right.  To the extent that there is

19  either tax compliance or credential checking or

20  other activities engaged in by the RPO, those

21  activities all take place after a PTIN has been

22  issued or renewed, correct?

23          A.   Yes.

24          Q.   There's no pre-checking that goes on by

25  IRS prior to the issuance of a PTIN, correct?

Page 67

1          A.   No, there is not.  That was not the
2     original plan, but, no, there's not.
3          Q.   Right.  Initially, there had been the
4     idea that maybe tax compliance and certain other
5     checks might be done prior to issuance, but that
6     never happened --
7          A.   Yes.
8          Q.   -- correct?
9          A.   No, that never happened, right.
10         Q.   Under what circumstances between the
11    period 2012 to present may the IRS -- does the RPO
12    either revoke or seek the assistance of another
13    office in revoking a PTIN?
14         A.   Prisoner PTINs are automatically
15    revoked once we are made aware that a preparer is
16    incarcerated, so we have a process for revocation
17    of those.  And in any instance where the preparer
18    has been enjoined from preparing returns by a
19    court, those PTINs are revoked, um, and -- I think
20    that's it.  Prisoners and enjoined folks.
21         Q.   So let's take each of those.
22              The prisoner, if you determined that an
23    individual -- if the RPO determines that an
24    individual is incarcerated at the time they are
25    holding a PTIN, does RPO handle that exclusively on

Page 68

1    its own, or must it refer that out to process the

2    revocation?

3           A.    No, we handle it in-house.  We take

4    care of it.

5           Q.    And when you do that, do you just -- is

6    there just an in-house process that the PTIN is

7    revoked and the individual is notified that there's

8    been a revocation?

9           A.    Yes.  Well, we notify the individual,

10   when we find out that they're incarcerated, to

11   confirm whether or not they are incarcerated,

12   because sometimes it's not timely.  We find out

13   they were incarcerated, but they got out the

14   week -- you know, a week later, so, you know --

15          Q.    Right.

16          A.    -- they get to keep their PTIN.

17                But once we confirm that they are

18   indeed incarcerated, we revoke their PTIN and

19   notify them that their PTIN has been revoked.

20          Q.    Is there an approval process within RPO

21   that, before you do a revocation, that it's got to

22   go to a certain level within RPO?  Or is the person

23   doing the prisoner checks authorized to do that?

24          A.    The person who does the prisoner checks

25   actually sends the letters.  And once there is

Carol A. Campbell 30b6 The IRS                    November 16, 2021
Steele v. United States of America

Page 94

1   knowledge on IP PINs?

2          A.   I think so, I think so.

3          Q.   All right.  So let's go back to

4   Exhibit 204.  You had identified the Relationship

5   Management Office and the e-File responsibilities

6   as two things that were there earlier in the

7   process but no longer.  Are there -- other than

8   that, does this -- does this overview, the offices

9   that are identified here -- and I recognize there

10  might have been some title changes, but does this

11  generally look like the responsibilities of RPO

12  through the period 2012 to present?

13         A.   Yeah, with the exception that

14  Competency and Standards is missing, yes.

15         Q.   Right.  Now, if I go to the next page,

16  it's sort of an organization chart.  And, again,

17  with the understanding of your comment about

18  Competency and Standards -- or you see it here --

19  does this look like -- at least at the time

20  Mr. Stackhouse was deputy director, does this look

21  like a fair representation of the RPO?

22         A.   Uh, yes.  The names have changed, but

23  yes.

24         Q.   Can you, just by looking at this, kind

25  of say when this -- this would have been an

Case 1:14-cv-01523-RCL   Document 176-14   Filed 03/23/22   Page 18 of 35
Carol A. Campbell 30b6 The IRS          November 16, 2021
Steele v. United States of America

Page 95

1   accurate depiction of the office, just based on

2   looking at the names of the people involved?

3          A.   Oh, um, this was probably true, um,

4   through 2019, maybe even early 2020.

5          Q.   Okay.  When you say true through that,

6   in other words, this was -- 2012 to 2020, this was

7   roughly accurate?

8          A.   This was roughly accurate from 2014 to

9   20 -- 20 -- to the present.

10         Q.   Okay, okay.

11              When -- um, after the Loving decision

12  was handed down by the D.C. Circuit, whose idea was

13  it to come up with the Annual Filing Season

14  Program?

15         A.   Mine.

16         Q.   Had you started laying the groundwork

17  for that prior to even hearing from the

18  D.C. Circuit on Loving, or was this all done

19  after --

20         A.   This was all after -- after we lost in

21  February 2014.

22         Q.   Right.  And who was -- who were the

23  people responsible for developing the ideas, coming

24  up with the program, thinking about what it was

25  going to look like?  Who -- who dealt with that

Page 96

1    within RPO?

2            A.    Me.

3            Q.    By yourself?

4            A.    Pretty much.  I came up with the

5    concept, you know, and, um, I did work with counsel

6    on, you know, getting us the -- the Rev Proc.  You

7    know, brought my team in to explain how I saw how

8    this process would work, and, um, we stood it up.

9            Q.    And who were they -- when you say "I

10   brought my team in," who were you talking about,

11   the team?

12           A.    The leadership team.  So that would

13   have been Vendor, Communications, Strategy and

14   Finance, Competency and Standards, Continuing

15   Education, and Suitability.  Those are the ones who

16   had been directly involved.  Compliance would have

17   been tangential.  The Joint Board didn't have

18   anything to do with it at the time.  Uh, yeah.

19           Q.    So this cut across most of the -- most

20   of the groups?

21           A.    It crossed most of the groups for one

22   reason or another.

23           Q.    And, initially, say -- let's take

24   2014 -- was the work that was being done to set

25   that up funded through PTIN user fees?

Page 107

1   I haven't filled behind yet.

2           Q.    Okay.  And so that -- that has been

3   larger at some points?

4           A.    Yes, it has been larger at some points.

5           Q.    Do you know how large at its largest

6   point?

7           A.    I think that there were six people

8   doing the TPPS work at one time.

9           Q.    Does any of that TPPS work include what

10  I'll call non-registration renewal stuff?  So, for

11  example, to the extent that there is back-end

12  processes now in TPPS for, you know, tax compliance

13  or for other things, are you including that within

14  this three to six people?

15          A.    No, no.  These people all do work

16  specific to changes in TPPS, troubleshooting with

17  regard to TPPS, the security requirements in TPPS,

18  ensuring that we meet the FISMA requirements for

19  TPPS, ensuring that these people have background

20  investigations to manage TPPS and the call center.

21  They manage the relationship between IT.

22              Our Accenture -- not the contract --

23  the -- the -- the system sits on an external

24  platform.  It doesn't sit within the IRS, but it

25  has to talk to certain IRS systems to make it work.

Carol A. Campbell 30b6 The IRS          November 16, 2021
Steele v. United States of America

Page 108

1    So they work with IT to manage that functionality.

2    They work with Wage on the identity-proofing piece

3    so that the systems work together.  So they all do

4    systems type of work on the vendor side of the

5    house.

6            Q.   Okay.  If I go back a few more pages --

7    so we were on the Strategy and -- or, excuse me, we

8    were on the Vendor Processing and Management and

9    Business Requirements Management.  If I keep going

10   back, past Communications, I get to something

11   called Suitability.  Do you see that?  It's

12   probably about four or five pages back.

13           A.   Yes.

14           Q.   And if -- if you would look at the

15   seven lanes of work that are identified for

16   Suitability, is that your understanding of

17   generally what Suitability is doing?

18           A.   Yes, for the most part, yes.

19           Q.   And has that changed in any material

20   fashion from 2012 to the present?

21           A.   Yes, there have been -- there have been

22   some changes.  So in 2012 they did some personal

23   tax compliance work that was not related to

24   credentialed preparers, right?  Once Loving was

25   decided, you couldn't do that, you know, anymore.

Case 1:14-cv-01523-RCL   Document 176-14   Filed 03/23/22   Page 22 of 35
Carol A. Campbell 30b6 The IRS                November 16, 2021
Steele v. United States of America

Page 109

1          They -- the professional designation
2     work came, as I said before, you know, in the
3     2014 -- late 2014, early 2015 period.
4          Criminal background checks, they do for
5     enrolled agents and Annual Filing Season Program.
6     We talked about the prisoner lists.  Specially
7     designated nationals, that's PTIN related, and
8     they've always done that particular work.  Former
9     employee enrollment applicants, they've always done
10    that.  And referrals, they've always done that.
11         Q.   Okay.  I had asked you before about
12    whether certain kinds of people could get a PTIN,
13    and we talked about people with no education or
14    training; we talked about people who might be
15    judged incompetent.
16         If someone is personally delinquent
17    and -- so let's take an individual who has never
18    filed their own personal tax return or has filed
19    fraudulent returns; are they precluded from getting
20    a PTIN?
21         A.   No.
22         Q.   It would only be if they got enjoined?
23         A.   Yes, or locked up.
24         Q.   Or locked up, right.
25         A.   Uh-huh.

Case 1:14-cv-01523-RCL  Document 176-14  Filed 03/23/22  Page 23 of 35
Carol A. Campbell 30b6 The IRS          November 16, 2021
Steele v. United States of America

Page 110

1          Q.   You mentioned that the criminal

2     background check is done currently for Annual

3     Filing Season applicants?

4          A.   Yes.

5          Q.   And what's the purpose of doing that?

6          A.   Enrolled agents?  Well, criminal

7     background checks were something that we were going

8     to do on PTIN applicants as well, but the idea is

9     that return preparers who have been involved in

10    financial, tax-related crimes, fraudulent schemes,

11    that kind of thing, are not the people that we want

12    assisting taxpayers with their tax returns.

13             So for programs, you know, like

14    enrolled agents, and for Annual Filing Season

15    Program, we have a preclusion of having those types

16    of people in our program; so we check those things.

17    We don't have the authority to preclude it for just

18    PTIN holders.

19         Q.   Why does the RPO not charge a fee for

20    people to participate in the Annual Filing Season?

21         A.   We don't charge a fee for it, because

22    most of what they do, or most of what they're

23    required to have, they have to pay for.

24             So they're required to have a PTIN.

25    They already pay a user fee to get the PTIN.  Then

Page 154

1          A.    We're talking about someone who is

2     outside the United States who is preparing tax

3     returns.  So if you worked for Grant Thornton in

4     London and are preparing U.S. tax returns, you need

5     a PTIN.

6          Q.    Right.

7          A.    Right?  So in order to get a PTIN, you

8     have to be recognized, one, as a foreign

9     preparer -- because you can't go through the

10    regular identity verification process.  You know,

11    that identity verification process is based on you

12    having a Social Security number and us checking

13    your last tax return, et cetera, et cetera, et

14    cetera.

15          But if, you know, you're a citizen of

16    the UK, clearly you don't have a U.S. Social

17    Security number, and so there is a different

18    verification process.  Those people have to submit

19    documents that are -- now we have the ability to

20    upload them into the system.

21          And there are, you know, a certain

22    number of rules with related -- relating to

23    processing of -- of those documents.  So we have to

24    be able to verify that the -- you know, the

25    documents are actually identity documents, that the

Page 155

1   name, address, and whatever else is on the document

2   matches the information provided on the

3   application, and a number of other things that I

4   don't know about, but anyway...

5          Q.    In that circumstance, let's suppose I'm

6   a U.S. citizen working for Grant Thornton, I have a

7   U.S. Social Security number and I pay U.S. taxes,

8   but my address, at least at the moment, is London.

9   Am I considered a foreign preparer or can I apply

10  in the normal PTIN process?

11         A.    No, you can prepare the normal PTIN --

12               MR. SERGI:  Object to the form.  Sorry,

13  objection, form.

14  BY MR. NARWOLD:

15         Q.    You can answer.

16         A.    Okay.  Yes, you can apply in the normal

17  process, because you have a U.S. Social Security

18  number, you filed U.S. tax returns, so we have an

19  ability to identify you.

20         Q.    Okay.  So the distinction is, those

21  that you can do the identification for and those

22  that you can't?

23         A.    Right.

24         Q.    How are the foreign preparers, the

25  truly foreign, the ones that you can't

Page 156

1  automatically verify, who handles that?  Does

2  Accenture handle that?  Does the RPO handle that?

3  Or is there some combination?

4        A.   Well, for some of them, we have

5  processes that are already written, because we've

6  had so much experience with them, that Accenture

7  can do the processing.

8             And some of them that do not fall

9  within the processing mechanisms requirements that

10 we've set up, they come to the BizOps folks for

11 determination of whether or not this person is --

12 determination of identity and whether or not this

13 person can get a PTIN.

14        Q.   Assuming that that foreign preparer

15 application is ultimately approved, do they get

16 issued a PTIN that looks exactly like a PTIN that's

17 in the U.S.?  In other words, it doesn't

18 distinguish --

19        A.   No --

20        Q.   -- foreign preparers --

21        A.   No, it does not.

22        Q.   Right.

23        A.   No, it does not.

24        Q.   So it would be a nine-digit

25 alphanumeric PTIN --

Page 157

1        A.    -- a P and eight digits, yes.

2        Q.    Okay.

3              THE COURT REPORTER:  Ms. Campbell,

4   would you do me a favor and just let Mr. Narwold

5   finish his question?

6              THE WITNESS:  Oh, okay.

7              THE COURT REPORTER:  It's easy to

8   anticipate and then I can't get the rest of his --

9   the end of his question when that happens.  Thank

10  you.

11             THE WITNESS:  Got it.  No problem.

12             THE COURT REPORTER:  Thanks a bunch.

13             MR. NARWOLD:  I'm going to take a

14  ten-second break and close the shades here because

15  I think I'm washing out.

16  BY MR. NARWOLD:

17        Q.    In the case of foreign preparers they

18  would not have a Social Security number, correct?

19        A.    That's correct.

20        Q.    But they would still get issued a PTIN,

21  but it's not for the purpose of protecting their

22  Social Security number?

23        A.    No.  They would get a PTIN because

24  they're required to have a PTIN on the -- on the

25  1040 that they're signing.

Case 1:14-cv-01523-RCL Document 176-14 Filed 03/23/22 Page 28 of 35
Carol A. Campbell 30b6 The IRS                    November 16, 2021
Steele v. United States of America

Page 160

1    objectors?

2         A.    Yes.

3         Q.    Okay.  So to the extent there are

4    exceptions, things that have to be dealt with, like

5    some of the things we've talked about, those would

6    be dealt with by the people we've talked about in

7    EAPM?

8         A.    Yes.

9              MR. NARWOLD:  Let me ask you to look at

10   Tab 9 in your binder, and we will mark this --

11             Ebony, we'll mark this as -- this is

12   208, Ebony?

13             MS. BOBBITT:  Yes, that's correct.

14             MR. NARWOLD:  208.

15             (EXHIBIT 208, July 14, 2020 e-mail

16   chain between Richard Goldstein, Nicole Myers, and

17   Others; Subject: PTIN User Fee Spreadsheet; Bates

18   USA_0035896, was marked for identification.)

19   BY MR. NARWOLD:

20        Q.    And I don't -- I'm not going to ask you

21   a lot of questions about the attachment unless you

22   indicate some familiarity with it, but this is an

23   e-mail string in July of 2010, just prior to the

24   start of the PTIN -- the mandatory PTIN

25   registration process.  And I'm showing this to you

Carol A. Campbell 30b6 The IRS          November 16, 2021
Steele v. United States of America

Page 161

1    because your name appears as a cc on some of these

2    e-mails, perhaps all of them, actually.

3              And what's attached to this is a User

4    Fee Cost Model that was prepared by Booz Allen.

5    And I just -- what I'd like to start with is

6    whether you have any recollection of having seen,

7    back in 2010, the cost model that became the basis

8    for the user fee -- the PTIN user fee in 2010.

9         A.   No, I don't have any recollection of

10   having seen it.

11        Q.   Okay.  And so that if I were to kind of

12   go through it with you, you'd have no -- no

13   familiarity with what's here?

14        A.   No.

15        Q.   Do you recall Booz Allen being involved

16   in 2010?

17        A.   I do remember that they had a contract,

18   a management contract with the IRS for this

19   process, yes.

20        Q.   Okay.  When you say a management

21   contract for the process, what does that mean?

22        A.   Management contract versus -- Accenture

23   has a systems process contract.  So management,

24   Booz Allen dealt with helping develop the

25   framework, identifying issues, helping to stand up

Page 162

1   the RPO organization kind of contract.  So -- but

2   they didn't have anything to do with the

3   development of the PTIN system, as far as I know.

4          Q.    When you say the PTIN system, you're

5   talking about the actual physical -- I shouldn't

6   say physical, but the registration process piece of

7   it?

8          A.    Right, right.

9          Q.    They were more focused on --

10         A.    The registration -- the registration

11  process.

12         Q.    They were more focused on --

13         A.    I'm sorry.

14         Q.    They were more focused on the

15  management systems set up in the RPO?

16         A.    Yes, they were more focused on the

17  organization of RPO.

18         Q.    Had you worked personally with Booz

19  Allen prior to 2012?

20         A.    Not that I recall, no.

21         Q.    Okay.  When you came in in 2012, they

22  were already in place, correct?

23         A.    Yes.

24         Q.    Do you have a recollection of

25  approximately how much Booz Allen was paid during

Carol A. Campbell 30b6 The IRS          November 16, 2021
Steele v. United States of America

Page 163

1   the years that they were still there while you were

2   director on, say, like an annual basis?

3          A.   No, I don't.

4          Q.   Did they have people embedded in the

5   IRS offices working side by side with RPO

6   employees?

7          A.   In some instances, yes, but I think it

8   was only in Crystal City.

9          Q.   Did you have a point of contact at BAH,

10  or were you not the interface with Booz Allen?

11         A.   No, Strategy and Finance was the

12  interface with -- with -- with Booz Allen.

13         Q.   Did you -- do you recall being in

14  meetings in which Booz Allen was present, where

15  they'd make presentations?

16         A.   Yes.

17         Q.   How was it determined what work Booz

18  Allen would do?  Who would say, you know, we're

19  authorizing you to do this project or we want you

20  to do this report or we want -- how was that done?

21         A.   They had a contract, and I'm sure there

22  were certain things in the contract that they were

23  required to do.  You know, as you said, the

24  contract was in place before I got there.  So

25  Strategy and Finance oversaw the contract, as well

Page 213

1   part of the -- the calculation of the user fee?

2        A.   The calculation of the user fee does

3   not take into consideration excess monies from a

4   prior determination of what the user fee ought to

5   be.

6        Q.   So --

7        A.   So -- yeah, so the computation of the

8   user fee is based on specific factors.  Okay?  And

9   so I have no ability to change the computation

10  based on excess funding that's accumulated that was

11  not used.  Because, you know, as I said before, the

12  user fee is a projection of what our costs ought to

13  be.  We're not required to hit it on the nail, you

14  know, in terms of how much we're actually going to

15  need.  We're supposed to look at our costs and what

16  we believe, you know, over time -- in this case,

17  three years out -- we will need to fund the

18  program.  So anything that we collect prior to that

19  time does not go back into the user fee -- the new

20  user fee calculation.

21       Q.   What happens to those surplus funds?

22       A.   In this instance, they're still sitting

23  in an account.  They are funds that, uh --

24  technically they do belong to the IRS, so...

25       Q.   Do you know how much is currently

Page 214

1    sitting in that account?

2         A.   No, I do not.  I do not.  At one time I

3    probably did.  I don't know today.

4         Q.   Do you know whether any of those monies

5    were used to fund operations from June 1, 2017,

6    until 2020 when you restarted the user fee process?

7         A.   No, they were not.  No, they were not.

8         Q.   Why not?

9         A.   Because they are user fees and they

10   were collected as user fees.  The Treasury

11   Department generally has responsibility for all

12   user fees.  The Return Preparer Office was a little

13   bit different in that the PTIN user fee was

14   specifically set aside for the operation of the

15   Return Preparer Office.  Generally, user fees go

16   into one big collection bucket at the Department of

17   Treasury and they are to be used as determined

18   and/or approved subsequently by Treasury, the IRS,

19   or the IRS request from Treasury to use user fee

20   funds.  Because the PTIN user fee was set aside for

21   the RPO office, that's why there is a -- there was

22   a separate account recognizing the excess PTIN user

23   fees, but, generally, in any user fee cases, if

24   there's excess money, it's in the general bucket

25   and it's used as needed by the Department of

Page 215

```
 1   Treasury.
 2          Q.   By the Department of Treasury or by the
 3   organization for which the user fees were
 4   dedicated?
 5          A.   Okay, the user fee is not generally
 6   dedicated.  All -- for the most part, all user fees
 7   collected by the IRS go into a Department of
 8   Treasury account to be used for whatever purposes
 9   the Department determines that to be appropriate
10   for.  It didn't happen for PTINs because the
11   account was set aside for RPO.  So but for the fact
12   that it was set aside for RPO, I wouldn't know how
13   much excess funds were in the account, because they
14   would be sitting in a Treasury account.
15          Q.   Can RPO access those funds in the
16   future for projects that it wants to undertake?
17          A.   No.
18          Q.   I guess I'm still a little bit
19   uncertain.  Can it use those funds -- in the event
20   that its projections, say for the next three years,
21   are low and it's not collecting enough in new user
22   fees, can it use it to supplement that?
23          A.   Yes.  Yes.
24          Q.   But you can't use it as part of the
25   calculation to reduce the user fee?
```

Page 216

```
 1        A.    That's right.  That's right.

 2              MR. NARWOLD:  Okay.  Let me -- let's go

 3  to Tab 28, which we'll mark as 219, I believe,

 4  until Ebony tells me otherwise.

 5              (EXHIBIT 219, GAO Response: Strategic

 6  Plan Update, dated February 6, 2012; Bates

 7  USA-0008986, was marked for identification.)

 8  BY MR. NARWOLD:

 9        Q.    This is also prior to your commencement

10  with RPO, and so I understand that -- excuse me --

11  yeah, with RPO.

12              And if you look at the second -- or,

13  excuse me, the third page of this PowerPoint -- you

14  see again the mission, vision, and goals that we

15  looked at in one of the previous exhibits?

16        A.    Yes.

17        Q.    And then in this particular -- this

18  document is entitled GAO Response:  Strategic Plan

19  Update.  There is a -- the underlying tasks are

20  identified as to where they stand in process.

21              Do you see that?  So if we go to the

22  one, two, three, four fifth page under Objective 1,

23  you will see the activity that we talked about

24  earlier.  Then you'll see the action next to it.

25  Correct?
```