# EXHIBIT P



Deposition of:

**Eva J. Williams**

*November 18, 2021*

In the Matter of:

**Steele v. United States of America**

Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Page 54

1    agreements, but they did not have day-to-day

2    control over the operations of the program, but

3    they wrote the policy.

4           Q.   You mentioned user fees for

5    applications for certain pension plans, correct?

6           A.   Yes.

7           Q.   What office within the IRS was

8    responsible for -- was it multiple user fees or

9    just one?

10          A.   It was a -- depending on the type of

11   plan and the size of the plan, it was a different

12   fee.  And it was Tax Exempt Government

13   Organizations, T-E-G-E, that oversaw that program.

14          Q.   And TEGE oversaw other programs as

15   well?

16          A.   Yes.

17          Q.   Was there a specific organization that

18   was responsible just for the user fees for

19   applications for pension plans?

20          A.   There was an employee planning group

21   under TEGE.  I don't know where the policy work was

22   done, but all of applications were filed in

23   Cincinnati.

24          Q.   You mentioned Enrolled Agent user fee.

25          A.   Yes.

Page 55

1        Q.    Was there an office within the IRS that
2   was responsible for handling the Enrolled Agent
3   user fees?
4        A.    At the time I started, it was the
5   Office of Professional Responsibility.  Once the
6   PTIN organization was fully stood up and running,
7   organizationally, that group was moved under that
8   director, their executive.
9        Q.    I believe you mentioned the user fee
10  for advanced pricing agreements with national
11  companies.  What office within the IRS was
12  responsible for that user fee?
13       A.    Chief Counsel.
14       Q.    And Chief Counsel's office of --
15       A.    Actually, I'm sorry, advanced pricing
16  agreements, I think, fell under what was called
17  LMSB, Large and Mid Size Businesses.
18       Q.    And Large and Mid Size Businesses, that
19  organization had other responsibilities beyond
20  advanced pricing agreements with national
21  companies, correct?
22       A.    Yes, that was a small part of their
23  work.
24       Q.    And then you mentioned a user fee for
25  rulings and determinations.

Page 56

1          A.    Yes, that was chief counsel.

2          Q.    And chief counsel's office had other

3    responsibilities as well, correct?

4          A.    Yes.

5          Q.    Are you aware of any offices within the

6    IRS that were created just for the purpose of

7    collecting user fees?

8          A.    No organization was stood up just for

9    the purpose of collecting user fees.  They are only

10   created to do work.  Now, there might be a user fee

11   charged for the work, but we don't set up offices

12   to just charge fees.

13         Q.    Do you set up offices just to manage

14   fee income?

15         A.    No, we -- in the CFO, we would

16   coordinate any activities involving user fees,

17   ensuring that the right amount is charged and that

18   when the user fee comes into IRS, it's recorded in

19   a financial system and we have support for those

20   user fees to provide to the auditors.  So the CFO

21   role was a part of a -- what I would call a system.

22              For example, some user fees need a

23   regulation and we worked very closely with the

24   Chief Counsel who would issue the regulation.  And

25   they were a very important part of the process and

Page 57

1   we would make sure it was -- they were in the loop

2   and we provided the information that they needed.

3          Q.   Accenture received a portion of the

4   PTIN user fee, correct?

5          A.   Yes.

6          Q.   And do you recall that Accenture's

7   portion of the user fee for initial registration

8   was $14.25?

9          A.   That sounds about right.

10         Q.   Do you also recall that there was a

11  different Accenture portion for renewal?

12         A.   Yes.

13         Q.   And that amount was 13 dollars,

14  correct?

15         A.   That sounds about right.

16         Q.   Do you know why Accenture's portion of

17  the user fee was different for initial registration

18  and renewal?

19         A.   I don't know the specifics, but as I

20  understood, it would be the creation of the first

21  record in their system, in building the record, so

22  that when the applicant came back later to renew,

23  the record was set up.  So there was less work.

24  But the decision on how to charge that and recover

25  their costs was internal to them.

Page 85

1        Q.    Do you know what meeting he's referring

2    to there?

3        A.    The core group would come together on a

4    regular basis for several days and go through the

5    assumptions and work things out and fine-tune the

6    cost model, so it would have been a regularly

7    scheduled group meeting.  There were several of

8    them.  There may have been special side meetings,

9    but I assume this is just one of our three-day

10   meetings that we had.

11       Q.    A three-day meeting for the purpose of

12   determining the amount of the PTIN user fee?

13       A.    Well, it was developing the program,

14   identifying people that they needed, where it would

15   come -- where they would come from -- and how they

16   would build the organization.  The costing was a

17   part of that.  We had to be there to hear and

18   observe what should be included in the costing to

19   keep them up to date and then not come in six

20   months later after everything is developed and

21   figure out how much it costs.  So the purpose of

22   the meeting was to bring up the program, not just

23   to set the fee.

24       Q.    If you could turn the page, you see a

25   PowerPoint with the title Return Preparer (RP) User

Eva J. Williams                          November 18, 2021
Steele v. United States of America

Page 86

1   Fee Discussion.

2            A.    Uh-huh.

3            Q.    This is the attachment with the file

4   name IRS RP_User Fee Exec Briefing?

5            A.    Okay.

6            Q.    I mean, does that seem correct to you?

7            A.    Yes.

8            Q.    Exec Briefing in the file name, what

9   executives do you understand that to be referring

10  to?

11           A.    Um, it could be a regularly scheduled

12  meeting that Dave Williams had with the

13  commissioner regarding the status of where we were

14  in rolling out the program, and setting the fee

15  would be part of that discussion.

16           Q.    Did you ever participate in those

17  meetings?

18           A.    No.

19           Q.    Do you know how often Dave Williams met

20  with the Commissioner about the program?

21           A.    I don't know.

22           Q.    If you could turn the page again to the

23  first slide after the title slide.

24           A.    Uh-huh.

25           Q.    And about halfway down the page, do you

Eva J. Williams                    November 18, 2021
Steele v. United States of America

Page 87

1    see a reference to Registration User Fee and

2    Renewal Fee?

3            A.    Yes.

4            Q.    Those are the PTIN registration user

5    fee and the renewal -- the PTIN renewal user fee,

6    correct?

7            A.    Yes.

8            Q.    At this point in time, roughly what

9    percentage of RPO's operating costs were expected

10   to be covered by the PTIN user fee?

11           A.    A hundred percent.  We're required to

12   recover a hundred percent of our costs.

13           Q.    For the Return Preparer Office?

14           A.    Yes.  And, again, you could refer to

15   the OMB circular, which requires permission from

16   OMB to charge less than full costs.

17           Q.    While you were in the CFO's office,

18   were there any offices other than the Return

19   Preparer Office within the IRS that were fully

20   funded with user fees?

21           A.    No.  That was an unusual agreement

22   between the Commissioner, Treasury, and OMB.  There

23   is one tiny little fee that brings in about $3,000

24   a year that must be used to support the program,

25   and that's very difficult to track, and I wish we

Eva J. Williams                    November 18, 2021
Steele v. United States of America

Page 88

1    didn't have that.  But that's the only one that I

2    recall that's designated to go someplace special.

3            Q.   If you could turn to the second slide.

4    The title is, The Registration user fee

5    calculations relied on several key assumptions to

6    accurately estimate costs associated with

7    programmatic activities.

8            Do you see that?  I'm just making sure

9    we're on the same slide.

10           A.   I do.

11           Q.   Do you see the second dash under the

12   Major assumptions bullet there, "Permanent PTINs

13   cannot be revoked without due process"?

14           A.   Yes.

15           Q.   At this point in time it was expected

16   that RPO would revoke PTINs?

17           A.   It was assumed that if there was a PTIN

18   preparer that was not behaving appropriately or for

19   some reason deemed not -- should not be part of the

20   program, it would be revoked; however, at the time,

21   I think it was the Office of Professional

22   Responsibility that would do the actual revoking.

23           Does that matter to you?  The cost of

24   doing that was included, but it was done by a

25   different office.

Eva J. Williams                    November 18, 2021
Steele v. United States of America

Page 128

1    that these analysts would do?

2         A.   I can mention several studies that they

3    would do, but I can't say specifically what they

4    did, or planned to do.

5         Q.   So you don't know what's included in

6    this 3.2 million?

7         A.   In Lines 28 through 31?

8         Q.   Yes.

9         A.   Well, I can -- six FTE ranging in grade

10   from 13 to 15, so they're analysts that look at the

11   work that's being done.

12             For example, in my job as user fees, I

13   had to watch user fee revenue.  And I might want to

14   know the revenue that comes in from installment

15   agreements, because I have to know how much I'm

16   going to collect in a year and report to OMB if

17   there's any difference between what I collect and

18   what I projected.

19             Well, it doesn't come in evenly.  Most

20   of it comes in in July, August, and September.  So

21   I'm very often pulling information from the fee

22   collections from prior years, and when they came in

23   the door, looking at it to see what's going on with

24   it.  So, I mean, that's my program, and I look into

25   it.

Case 1:14-cv-01523-RCL   Document 176-16   Filed 03/23/22   Page 12 of 23
Eva J. Williams                    November 18, 2021
Steele v. United States of America

Page 129

1          So return preparer was not my program,

2    so, specifically, I can't tell you what these

3    analysts decided to look at, whether it's how many

4    preparers have names that begin with A or how many

5    are in Kansas, but there would be things that they

6    would want to look at to understand about the

7    program, to modify the program, to make

8    corrections, to consider whatever.

9          So I can't say what they particularly

10   planned to do; but as a data analyst, I love

11   nothing better than getting into a spreadsheet and

12   working with numbers.

13        Q.   So none of these analysts assigned

14   PTINs?

15        A.   They were all assigned to the PTIN

16   program.  The PTIN program would have to have

17   analysts assign to it.

18        Q.   No, that wasn't -- that wasn't my

19   question.  They didn't actually assign the PTIN

20   numbers?

21        A.   No, they did not.

22        Q.   What's included in rows 33 and 34?

23        A.   That would be your person that would

24   generally deal with outside stakeholders.  That

25   could be Congress; it could be AICPA.  So just

Page 130

1  anyone that is in communications to deal with

2  outside stakeholders.  This could also be internal

3  to IRS if there was someone that had to conduct

4  meetings within groups of IRS.

5       Q.   These people didn't assign PTINs to tax

6  preparers either, correct?

7       A.   They did not assign PTINs, but they

8  were part of the PTIN program.  You couldn't have

9  the program if you didn't have people working it.

10      Q.   What did you understand to be included

11 within the PTIN program?

12      A.   Having preparers register; have us

13 perform checks to make sure that they pass exams;

14 that they don't have any felonies; that they -- if

15 they have designations that they say they have,

16 that they actually have them; informing taxpayers

17 to be aware that they should look for registered

18 return preparers to ensure that their returns were

19 prepared correctly and to watch the whole program,

20 to -- to make sure that the program with PTINs is

21 effective; that the people who are registered are

22 educated, they do not have impediments to providing

23 return information, and the taxpayers are

24 protected.

25      Q.   So the PTIN program was much broader

Eva J. Williams                    November 18, 2021
Steele v. United States of America

Page 131

1    than just assigning a PTIN number to a tax return

2    preparer?

3         A.    Assigning a PTIN number is a facet of

4    the program.  So what the PTIN preparer is paying

5    for is the whole cost to run the program, which

6    included ensuring the effectiveness of the program

7    and communication out to stakeholders and to

8    taxpayers about the program.  And in order to have

9    this program, there are support staff you have to

10   have.  Someone's got to approve and pay the bills,

11   someone's got to run the program.  It takes a lot

12   to run a program; it isn't just a machine providing

13   a number.

14        Q.    So the PTIN user fee was for the

15   program?

16        A.    Yes.

17        Q.    It wasn't just for the simple act of

18   assigning the number?

19        A.    Right.  Well, to be fair, you couldn't

20   assign a number unless you had a system, and you

21   couldn't have a system unless you paid for it, and

22   you couldn't pay for it unless you had procurement

23   involved in procuring the contract; and you

24   couldn't pay for it unless you had finance people

25   involved in signing off on it and issuing the

Page 132

1    check.

2              And, again, the user fee requirements

3    under OMB is to recover the full cost to the

4    government.  And to set up this program and

5    administer it and run it, this estimate was IRS's

6    best estimate on what it would take to run this

7    program for 1.2 million applicants.

8              And while some of these things did not

9    incur -- these costs did not incur -- because we

10   didn't have that many applicants, because we didn't

11   staff up on the FTE, there were other costs

12   incurred to run the program.

13             And once the Return Preparer Office

14   stood up under its own financial plan, the full

15   cost of that organization, other than the corporate

16   overhead, is in financial documents created by the

17   Return Preparer Office.  And they do not, for the

18   most part, disagree with the user fee we were

19   charging.  So while you build an estimate and build

20   it on various assumptions, things do change.

21        Q.   What's including in Rows 36 through 40?

22        A.   That would be the people that worked

23   with making sure that any issues revolving around

24   background checks or tax compliance checks were

25   resolved, as far as they could take it, before any

Page 133

1  issues might have to be turned over to OPR.

2       Q.   What's included in Rows 42 through 45?

3       A.   That's a communications person that

4  would deal with nongovernment -- well, getting

5  information out to people -- the communications

6  specialist.

7       Q.   What's included in Rows 47 through 49?

8       A.   That's an executive assistant for the

9  director.

10      Q.   And what's included in Rows 51 to 52?

11      A.   That's contract support and --

12      Q.   Is that Booz Allen?

13      A.   I don't know.  I would assume that --

14 Booz Allen was the only contractor that I worked

15 with.  I did work with Accenture people, but that

16 was back in with fee stuff once fees came in the

17 door.

18      Q.   Could you look at Page 16 of 27 and let

19 me know if that appears to be the backup for the

20 Registration section of the Summary page.

21      A.   Page 16 doesn't seem to have costs

22 associated with it.  Am I reading that wrong?

23      Q.   Oh, no...

24      A.   It says Registration & Renewal.

25      Q.   Yep.  The title of which suggests that

Page 154

```
 1              Do you see that?

 2        A.    Yes.

 3        Q.    The cost model did not amortize it over

 4   two -- IT costs over two cycles; is that correct?

 5        A.    We amortized it over 6 years for --

 6        Q.    So is that two cycles of three years?

 7        A.    Yes.

 8        Q.    Got it, okay.

 9              MS. OLIVER:  Ebony, could you move into

10   the marked exhibits, Tab 9.  This is a document

11   with Bates number USA-0036134 that has been

12   previously marked as Plaintiff's Exhibit 85.

13              (EXHIBIT 85, June 24, 2010, e-mail to

14   Melissa Reynard and others from Nicole Myers;

15   Subject:  User Fee Reg Issue; Bates USA-0036134,

16   was previously introduced into evidence and

17   presented to the witness.)

18   BY MS. OLIVER:

19        Q.    Take a look at this and let me know

20   when you have had a chance to review it.

21        A.    This is a memo of an e-mail from

22   Melissa?

23        Q.    I believe it's from Nicole Myers.

24        A.    Oh, sorry.  Did you say behind Tab 9,

25   or 8?
```

Page 155

1          Q.    Tab 9.

2          A.    I'm sorry, yes, it was from Nicole.

3          Q.    Yes, Melissa is the first person listed

4     in the "to" field.

5                (Discussion between the court reporter

6     and the witness regarding technology.)

7     BY MS. OLIVER:

8          Q.    Have you had a chance to look at that

9     e-mail?

10         A.    Yes.

11         Q.    Have you seen this e-mail before?

12         A.    Yes.

13         Q.    Do you have any reason to believe that

14    it is not a true and correct copy of the e-mail

15    from Nicole Myers to a whole bunch of people,

16    including you, on June 24th, 2010?

17         A.    This is a true copy.

18         Q.    And did you receive it in the ordinary

19    course of IRS business?

20         A.    Yes.

21         Q.    Initially, the plan was to require a

22    PTIN renewal and payment of the PTIN fee every

23    three years; is that correct?

24         A.    Correct.

25         Q.    And -- but the final regulations called

Page 156

1    for renewal and fee payment on an annual basis

2    instead, correct?

3            A.    Yes.

4            Q.    Was the reason the fee was changed from

5    a fee every three years to an annual fee to avoid

6    the PTIN fee regulation being an economically

7    significant regulation?

8            A.    The purpose was to reduce burden on

9    return preparers, so, yes.

10           Q.    Do you see toward the bottom, the

11   last -- I don't know how to describe this other

12   than to say the squiggly bullet --

13           A.    Uh-huh.

14           Q.    -- that says, "Push OMB at the highest

15   levels (which may not turn out favorably for us

16   politically)."

17           A.    Yes.

18           Q.    What did you understand that to mean?

19           A.    The fee, if it has an economic impact,

20   has to go -- be approved by Congress.  And so that

21   could take some time to get that through and

22   approved.  So it made sense to do it annually

23   rather than do it every three years.

24           Q.    And if it was done annually, the IRS

25   wouldn't have to secure congressional approval; is

Page 157

1  that correct?

2          A.   Correct.  Because there is not a

3  significant burden.  For some reason, they think

4  50 dollars a year isn't a problem, but 156 dollars

5  every three years is.  It's Congress, so...

6               They don't say the impacts over five

7  years or ten years, they say in a year.  So there

8  you have it.

9               MS. OLIVER:  Ebony, could you mark

10 Tab 10.

11              MS. BOBBITT:  Marked as 235.

12              (EXHIBIT 235, April/May 2010 e-mail

13 chain between Eva Williams, Nicole Myers, Brett

14 Luhring and others; Bates USA-0035819, was marked

15 for identification.)

16 BY MS. OLIVER:

17         Q.   I have just marked as Exhibit 235 a

18 document with Bates number USA-0035819 to 820.

19              And, Ms. Williams, if you could just

20 take a minute and review this and let me know if

21 you've seen this e-mail string before.

22         A.   Okay.  What's your question?

23         Q.   I've never read the Hitchhiker's Guide

24 to the Galaxy, but I hear of it often and feel like

25 I should.

Case 1:14-cv-01523-RCL   Document 176-16   Filed 03/23/22   Page 21 of 23
Eva J. Williams                    November 18, 2021
Steele v. United States of America

Page 219

1  Tab 16, please.

2              MS. BOBBITT:  Okay.

3              MS. OLIVER:  Is this 240, Ebony?

4              MS. BOBBITT:  Yes, That's correct.

5              MS. OLIVER:  I have marked as

6  Plaintiff's Exhibit 240 a document with --

7  beginning with Bates number BAH_0002931.

8              And because of how the documents were

9  Bates numbered, to assign each page its own Bates

10  number, Plaintiffs added -- appended -- the dot

11  0001 to the Bates number.

12             And it also includes BAH_0002932.0001,

13  which is the attachment -- one of the attachments

14  to this cover e-mail.

15             (EXHIBIT 240, June 15, 2011, e-mail

16  between Eva Williams, Nicole Myers, and others;

17  Subject:  Return Preparer User Fee Apportionment

18  Request; Bates BAH_0002931, was marked for

19  identification.)

20  BY MS. OLIVER:

21      Q.   Have you seen this document before,

22  Ms. Williams?

23      A.   Yes.

24      Q.   What is it?

25      A.   This specific e-mail was a request to

Page 220

1    get information for a spending plan to get an

2    apportionment request from OMB.

3          Q.   Have you seen the attachment to this

4    e-mail before?

5          A.   Um, yes.

6          Q.   What is it?

7          A.   It's a brief outline of what we want to

8    request, but it doesn't include any dollars.

9          Q.   Does this appear to be a true and

10   correct copy of that document?

11         A.   Yes.

12         Q.   And do you -- did you prepare this

13   document?

14         A.   Um, no.

15         Q.   Who prepared it?

16         A.   I don't remember.

17         Q.   Does it appear to have been prepared in

18   the regular course of IRS business?

19         A.   It definitely -- yes, in the regular

20   course of business, yes.

21         Q.   We talked about these expedited or

22   emergency apportionment requests, for -- for lack

23   of a better term.  I don't know if there's a formal

24   name for them.  Is there a formal name for

25   apportionment requests designed to cover

Page 221

1   unanticipated expenses?

2          A.   No.

3          Q.   Is this one of those such apportionment

4   requests designed to obtain funds to cover

5   significant unanticipated expenses?

6          A.   Yes.

7          Q.   And in this case, it was -- it appears

8   to be to cover unanticipated Accenture costs; is

9   that correct?

10         A.   Yes.

11         Q.   And the amounts being sought would have

12  been in addition to the amounts recovered by

13  Accenture as part of the Accenture portion of the

14  user fee, correct?

15         A.   Yes, there were significant

16  out-of-scope costs for Accenture.  This became a

17  buzz word.

18             MS. OLIVER:  Ebony, could you mark

19  Tab 17.

20             MS. BOBBITT:  Okay.

21             MS. OLIVER:  And I'll tell you that the

22  version that's in your binder is the stickered

23  version that was previously marked as Plaintiff's

24  Exhibit 93.

25             Ebony is marking as Exhibit 241.  It's