# EXHIBIT V

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ADAM STEELE, et al.,                )
                                    )   Case No. 1:14-cv-1523-RCL
    Plaintiff,                  )
                                    )
v.                                  )
                                    )
UNITED STATES OF AMERICA,           )
                                    )
    Defendant.                  )
_____)

**DECLARATION OF KIMBERLY D. ROGERS**

I, Kimberly D. Rogers, pursuant to the provisions of 28 U.S.C. § 1746, declare as follows:

1. I have been employed with the IRS since 1988.

2. I served as the Director of Suitability ("Suitability") in the Return Preparer Office ("RPO") of the Internal Revenue Service ("IRS"), in Washington, D.C. from July 2011 until October 2016. From October 2016 until December 2016 I served as the Acting Deputy Director of RPO.

3. From August 2015 until May 2016 I was a participant in the Executive Readiness Program and began working a detail in Wage & Investment (W&I) in Area 1 Field Assistance in Andover, Massachusetts. Field Assistance manages the Taxpayer Assistance Centers located throughout the country. The Taxpayer Assistance Centers provide comprehensive face-to-face assistance to taxpayers as well as assistance via telephone or written correspondence. As part of my detail to W&I, I was in charge of



Exhibit
PI 048
7/26/2021

the Area 1 Taxpayer Assistance Centers for W&I. Area 1 Field Assistance included Massachusetts and other states in the northeast region of the United States. During my detail in W&I, Nadine McPhail served as Acting Director of RPO Suitability.

4. Prior to joining RPO, I served as a Senior Operations Advisor for the Director, Collection Small Business/Self Employed ("SB/SE") business unit of the IRS.

5. Currently, I am Director, Collection Planning and Performance Analysis in the SB/SE Division. My post of duty is in Chicago, Illinois.

6. As the Director of RPO Suitability, I was responsible for overseeing the RPO Suitability department and coordinating with managers from other departments within the IRS. While I was Director, RPO Suitability was responsible for checking personal tax compliance, checking professional designation, matching prisoner lists, checking compliance of Enrolled Agents ("EAs") and Enrolled Retirement Plan Agents ("ERPAs"), checking compliance with the Annual Filing Season Program ("AFSP"),[1] Former Employee EA Enrollment Applicants, and matching Specially Designated Nationals ("SDNs") lists.

---

[1] AFSP is a voluntary program that allows non-credentialed return preparers to take 18 hours of continuing education, including a six-hour federal tax law refresher course with test. The return preparer must also renew their PTIN for the upcoming year. Upon completion of these requirements, the return preparer receives an Annual Filing Season Program – Record of Completion from the IRS, and AFSP participants are included in a public database of return preparers on the IRS website.

2

7. I have been asked to provide my understanding of RPO Suitability, including:

    a. Its purpose;

    b. Its operations;

    c. Its involvement with the Preparer Tax Identification Number ("PTIN"); and

    d. The amount of time spent on each activity conducted by RPO Suitability personnel.

8. This declaration is based on my personal knowledge and experience, as well as a review of relevant contemporaneous materials.

## RPO Suitability Background

9. RPO Suitability carries out certain activities, or "lanes of work," that are explained in greater detail below (*e.g.*, professional designation checks; prisoner list checks; specially designated nationals checks; criminal background checks, *etc.*).

10. I came to RPO in December 2010. Before becoming Director of RPO Suitability, I was detailed to the RPO Implementation Team as an Acting Senior Operations Advisor.

11. All members of the RPO Implementation Team were responsible for brainstorming, data gathering, and making recommendations concerning the standup of RPO and the programs it would administer.

3

12. As a member of the RPO Implementation Team, I played a role in finalizing the governing structure of RPO that the RPO Implementation Team had in place when I joined the team. I was also a member of the team that was responsible for standing up and staffing RPO.

13. I became the Director of RPO Suitability in July 2011. Starting from the time I was a member of the Implementation Team through the first several months of my appointment as the Director of RPO Suitability, I was responsible for staffing up RPO Suitability during the Wave 1 and Wave 2 hiring process. Exhibit 1 at slide three shows the RPO Suitability Wave 1 Hiring (2 employees including myself) and Wave 2 hiring (15 employees) through 2011.

14. After I became the Director of RPO Suitability in July 2011 my attention shifted to making RPO Suitability functional. Specifically, I was responsible for: (1) overseeing the fingerprinting vendors and their business processes; (2) developing all work processes for RPO Suitability (included self-identified felony convictions, egregious tax compliance issues, and prisoners with PTINs); (3) serving as RPO lead for the Electronic Filing Identification Number ("EFIN")/PTIN reconciliation implementation effort; and (4) developing a functional case management tool in TPPS in conjunction with Accenture and the RPO IT team. Most of my time was spent developing all work processes for RPO Suitability and overseeing the fingerprinting vendors' business processes.

4

15. The proposed fingerprinting process for all PTIN holders never came to fruition. Initially, RPO Suitability planned to conduct background checks in coordination with the FBI using an applicant's fingerprints.

16. After a receiving negative feedback about the proposed fingerprinting process from the public, plans for the fingerprinting for all PTIN holders was halted in October 2011. As an alternative to fingerprinting, RPO decided to perform manual background checks which relied on information found on public databases.

### A. RPO Suitability Staffing

17. RPO Suitability staffing is shown for various points in time by Exhibit 2 which includes RPO Suitability organizational charts for certain months from January 2012 through the end of my tenure as the Director of RPO Suitability.

18. Exhibit 2 thereby reflects the various positions in RPO Suitability, and the individuals employed in those positions, as of certain months from FY2012 to the end of my tenure as the Director of RPO Suitability.

19. The Director of RPO Suitability oversees all groups and lanes of work within RPO Suitability.

20. While I was the Director of RPO Suitability, the following employees reported directly to me: (1) one Staff Assistant; (2) one Staff Support Assistant (Secretary); (3) two Management & Program Analysts and one Policy Analyst

(collectively "the Analysts"); and (4) three[2] Frontline Managers that reported directly to the Director of RPO Suitability.

21.     The Staff Support Assistant (Secretary) provided administrative assistance to the Director of RPO Suitability generally.

22.     The Staff Assistant processed former employee EA Enrollment applications.

23.     The Analysts (two Management & Program Analysts and one Policy Analyst) were responsible for overseeing the work performed RPO Suitability employees, referring cases to other offices within the IRS as necessary, and answering questions from RPO Suitability employees.

24.     The Analysts funneled the work coming into RPO Suitability into the appropriate RPO Suitability lanes of work.

25.     The Analysts also (1) served as project managers responsible for accomplishing major analytical studies and/or projects relating to substantive, mission-oriented programs for the IRS; (2) participated in formulating new or revised policies for RPO Suitability; (3) conducted in-depth analyses of project data, requirements, and impact in order to identify problem areas and determine how to resolve them; (4) established systems to review, control, and report on project status; and (5) collected

---

[2] The Frontline Managers were not hired at the same time.  From 2012-2013 there was one Frontline Manager.  By 2014, there were two Frontline Managers.  And by 2015 and through the remainder of my tenure as Director, RPO Suitability there were three Frontline Managers. *See* Exhibit 2 (2012 through 2016 RPO Suitability Organizational Charts).

6

and analyzed reporting metrics and performance information in order to recommend opportunities for improvement.

26. During my tenure as Director of RPO Suitability, the department had a Group 1 Frontline Manager and a Group 2 Frontline Manager. Each Frontline Manager oversaw the work performed by the Suitability Analyst, Para-Technicians, and Clerks assigned to their group. The responsibilities of the Group 1 Frontline Manager and Group 2 Frontline Manager were identical.

27. Frontline managers performed the following tasks: (1) conducted workflow planning, coordinating amongst each other to direct and review work; (2) trained employees; (3) assisted in employee development and reviewed employee work performance; (4) resolved questions regarding the Criminal Background Checks and Personal Tax Compliance and (5) performed regular case reviews for each Suitability Analyst and maintained reports on department performance, key accomplishments, and all metrics.

**1. Groups 1 and 2**

28. As reflected in Exhibit 2, RPO Suitability has generally had two Groups, referred to as "Group 1" and "Group 2," with each Group under the direction of a Frontline Manager.

29. Typically, Group 1 and Group 2 staff have not specialized according to the various lanes of work handled by RPO Suitability, instead working all types of cases handled by RPO Suitability.

7

30. One of the few exceptions where employees did specialize involved EFIN Adjudication cases that were assigned by employee Grade Number according to the number of pages in the case file.

**2. Group 3**

31. From May 5, 2014, until about October 31, 2016, RPO Suitability also had a Group 3 with its own Frontline Manager.

32. Group 3 was initially staffed, in part, by Group 1 and Group 2 employees who successfully applied to join Group 3.

33. Group 3 was also initially staffed, in part, by newly hired employees.

34. Group 3's activities included working on a project to issue refunds of Registered Tax Return Preparer ("RTRP") testing fees and conducting criminal background check ("CBC") pilot programs.

35. Over time, Group 3 also assisted Groups 1 and 2 in performing all of RPO Suitability's various lanes of work.

36. Group 3 was eliminated as a separate group in October 2016 and its employees were merged into Groups 1 and 2.

**3. RPO Suitability staffing totals over time**

37. RPO Suitability Organizational Charts included in Exhibit 2, show the following snapshots of RPO Suitability's total staffing, as of certain months, from January 2012 through February 2016.

8

|  | Number of Employees | |
|---|---|---|
| January 2012 | 19 | |
| May 2013 | 29 | |
| January 2014 | 30 | |
| April 2015 | 33 | (includes Group 3) |
| February 2016 | 34 | (includes Group 3) |

38. Other than the changes in total RPO Suitability staffing relating to Group 3 discussed above, other increases/decreases in RPO Suitability total staffing during my tenure as Director of RPO Suitability were the result of attrition and the timing of hiring replacements.

### RPO Suitability Systems and Activities Overview

39. While I was Director of RPO Suitability, the department used two systems to manage and process cases: the Tax Professional PTIN System ("TPPS") and e-Trak Practitioner ("e-Trak").

40. TPPS establishes accounts for PTIN applicants, stores applicant information, allows updates to applicant accounts, tracks annual renewals, and tracks changes to the status of a PTIN.

41. e-Trak stores, among other things, information from the enrollment and renewal applications of EAs and ERPAs, continuing education data, and information about EAs and ERPAs who are currently suspended or terminated.

42. While I was Director of RPO Suitability, the activities conducted by RPO Suitability can be broadly broken down into the following categories:

   a. Professional Designation Checks;

9

    b. Personal Tax Compliance;

    c. Prisoner Lists;

    d. Specially Designated Nationals;

    e. Former Employee EA Enrollment Applicants;

    f. Criminal Background Checks;

    g. Referrals; and

    h. Electronic Filing Identification Number Adjudication and Appeals.

43. After the stand-up of RPO Suitability that occurred in fiscal year 2011 through early fiscal year 2012, the tasks completed in each of these categories stayed largely consistent during my time as Director of RPO Suitability. However, the scope of some of those activities changed following the *Loving* district court decision.

44. The IRS was enjoined from enforcing the RTRP requirements in 2013. *See Loving v. IRS*, 917 F. Supp. 2d 67 (D.D.C. 2013), *aff'd Loving v. IRS*, 742 F.3d 1013 (D.C. Cir. 2014).

45. I was Director of RPO Suitability prior to and immediately following the *Loving* district court decision.

**A. Professional Designation Checks ("PDCs")**

46. The Service created and maintains the Directory of Federal Tax Return Preparers with Credentials and Select Qualifications as a searchable, sortable database for individuals to identify tax professionals who have certain credentials.

47. RPO Suitability conducts PDCs using TPPS to ensure that specific credentials of PTIN holders are valid and current.

48. By conducting PDCs, RPO Suitability ensures that credentials self-reported by return preparers on their PTIN initial application or renewal, or on their AFSP application, are valid and current.

49. Prior to the *Loving* district court decision, PDCs were a minor lane of work and not the focus of RPO Suitability.

50. Following the *Loving* district court decision, RPO Suitability performed PDCs on return preparers who were applying for a PTIN for the first time and self-reported a credential on their PTIN application. PDCs and the implementation of the AFSP accounted for the majority of the work performed by Suitability following the *Loving* district court decision.

51. RPO Suitability began performing PDCs on AFSP participants in November 2014.

**B. Personal Tax Compliance ("PTC")**

52. For some PTIN holders, RPO Suitability checks the Personal Tax Compliance ("PTC") of the PTIN holder.

53. To be considered "compliant," an individual must have filed all tax returns for both personal and business accounts and must have a total outstanding balance under a specified amount for all accounts and tax years.

54. When I first started as Director of RPO Suitability, the department performed PTC checks on all PTIN applicants and EA applicants. If any PTIN applicant was not compliant with their tax obligations, RPO Suitability would send what we called a "soft letter" reminding the applicant of their tax compliance responsibilities.

55. Prior to the *Loving* district court decision, RPO Suitability would send out soft letters to all PTIN holders who were not in tax compliance. Prior to *Loving*, RPO Suitability sent the information to RPO Compliance to determine whether a PTIN holder that was not in tax compliance needed to be referred to another business operation division within the IRS. RPO Suitability referred credentialed PTIN holders with problematic PTC to the IRS Office of Professional Responsibility for any possible enforcement based on the PTC.

56. In 2013, RPO Suitability limited its soft letter campaign to return preparers whose tax non-compliance was egregious; *i.e.*, return preparers who satisfied certain thresholds regarding their balance due and/or having failed to file a return for a certain number of recent years.

57. In early 2014, RPO Suitability performed the necessary data compilation to conduct PTC checks. However, no action was taken on the data collection related to the PTC checks because of a backlog of work. For example, at that time EA had a substantial application backlog on which RPO Suitability focused its resources to resolve. RPO Suitability did not initiate any new PTC checks in 2014 because it lacked the resources to send soft letters while it focused on eliminating the backlog of work.

RPO Suitability resumed initiating PTC cases in 2015. Exhibit 3 contains RPO Quarterly Business Performance containing RPO Suitability Quarterly Metrics that show zero PTC cases initiated in 2014, and 2,605 new PTC cases were initiated in 2015. The chart does not account for the fact that although no cases were initiated in 2014, RPO Suitability continued to perform work on gathering data related to PTC in 2014.

58. Following the *Loving* district court decision, RPO Suitability only conducted PTC checks on PTIN holders who applied to participate in the AFSP or who apply to be an EA. Likewise, any soft letters following *Loving* were only sent to PTIN holders who applied to participate in the AFSP or apply to be an EA.

**C. Prisoner Lists**

59. I am informed and understand that pursuant to Federal Bureau of Prisons regulations incarcerated individuals are not permitted to earn income outside of work release programs. *See* 28 C.F.R. § 541.3 (Prohibited Acts and Available Sanctions).

60. While I was Director of RPO Suitability, RPO Suitability denied PTIN applications and renewals from individuals who were incarcerated.

61. While I was Director of RPO Suitability, RPO Suitability revoked PTINs from PTIN holders who are incarcerated.

62. While I was Director of RPO Suitability, RPO Suitability conducted reviews of Prisoner Lists from state and federal prisons annually.

63. In March 2015, RPO Suitability began conducting these reviews of prisoner lists quarterly and, based on my understanding, continues to do so.

13

D. **Specially Designated Nationals ("SDNs")**

64. I am informed and understand that, as part of its enforcement efforts, the Office of Foreign Assets Control ("OFAC") of the Department of the Treasury publishes a list of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries.

65. OFAC also lists individuals, groups, and entities, such as terrorists and narcotics traffickers, designated under programs that are not country-specific.

66. Collectively, these lists of individuals and companies are called Specially Designated Nationals ("SDNs").

67. SDNs' assets are blocked and U.S. citizens are generally prohibited from dealing with them.

68. The complete list of SDNs is published online at https://www.treasury.gov/ofac/downloads/sdnlist.pdf.

69. While I was Director of RPO Suitability, each month, RPO Suitability received a list from the Office of Program Evaluation Risk Analysis ("OPERA") containing possible matches between the SDN list and current PTIN holders based only on an individual's name.

70. While I was Director of RPO Suitability, Suitability Analysts in RPO Suitability conducted an initial review of this list to determine probable matches.

71. Any probable match was then sent to IRS Criminal Investigation for additional review and investigation.

72. Additionally, while I was Director of RPO Suitability, RPO Suitability checked the names of each new PTIN applicant against the SDN list to refer any probable matches to IRS Criminal Investigation for further investigation. If IRS Criminal Investigation confirmed a PTIN applicant appeared on the SDN list, their PTIN application would be denied.

73. The work surrounding SDNs, and its frequency (*i.e.*, monthly), remained the same throughout my entire tenure as Director of RPO Suitability.

### E. IRS Former Employee Enrollment Applicants

74. Some former IRS employees may become EAs without passing the Special Enrollment Examination ("SEE") by virtue of their career experience with the IRS.

75. While I was Director of RPO Suitability, RPO Suitability determined whether a former employee's experience with the IRS satisfies the requirements for either full Enrollment or limited Enrollment.

76. While I was Director of RPO Suitability, RPO Suitability also checked whether there were any TIGTA "alerts" with respect to a former employee applicant that would preclude Enrollment.

77. The work surrounding Former IRS Employee Enrollment Applications remained the same throughout my entire tenure as Director of RPO Suitability.

### F. Criminal Background Checks ("CBCs")

78. While I was Director, RPO Suitability was also responsible for conducting Criminal Background Checks (CBCs) on certain individuals.

79. Prior to *Loving* RPO Suitability focused on CBCs for non-credentialed PTIN holders based on the assumption that a credentialed preparer went through a CBC to obtain the credential. All CBCs were conducted in the same manner to evaluate "major," "moderate," and "minor" crimes.

80. Following the *Loving* district court decision, RPO Suitability only conducted CBCs on EAs and ERPAs who self-attested to felonies and AFSP applicants. After *Loving*, RPO Suitability reviews these applications to determine if the felony conviction is a tax crime, a financial crime, or a crime against the public trust.

**G. Referrals**

81. In addition to the suitability checks performed in RPO Suitability's ordinary course as explained above, other sources can refer complaints regarding PTIN holders to RPO Suitability and lead to a Suitability Review.

82. Referrals to RPO Suitability can originate either internally (from other IRS units) or externally (from other return preparers or TIGTA).

83. RPO Suitability may receive a referral via email, TPPS, or mail from another source that indicates that one or more suitability checks should be performed on a PTIN holder.

84. While I was Director of RPO Suitability, referrals were processed using Microsoft Excel Spreadsheets, but I understand referrals are now assigned and processed using a case management system in TPPS.

85. RPO Suitability also receives referrals relating to other lanes of work discussed above and will handle such cases according to the accompanying processes discussed above.

**H. Electronic Filing Identification Number ("EFIN") Adjudication and Appeals**

86. Third-party participants which offer clients services required for the electronic filing of federal returns are referred to as Authorized IRS e-file Providers.

87. To become an Authorized IRS e-file Provider, third parties must complete an application and submit that application to the Service. The Service reviews the application and other information to determine whether the applicant meets the requirements for initial and continued participation in IRS e-file.

88. If the third party is accepted by the Service to become an Authorized IRS e-file Provider, the Service issues the third party an EFIN.

89. As part of the application process, the Service conducts a criminal background check and a review of personal and/or business tax compliance of the applicant.

90. EFIN Adjudication and Appeals activities included reviewing EFIN applicant background check results.

91. From approximately October 2012 through June 2014, RPO Suitability conducted the criminal background checks and personal and/or business tax compliance checks on all Authorized IRS e-file Provider applicants.

17

92. Responsibility for EFINs lane of work was transitioned to Wage & Investment Division ("W&I") approximately on June 30, 2014.

### Time Analysis

93. It would be difficult for me to estimate the percentage of time that RPO Suitability staff have spent each year on the various lanes of work discussed above, as the focus of work performed within RPO Suitability shifted over the years.

94. The EFIN lane of work took up the majority of the time in the beginning, followed by PTCs and CBCs. The PDC lane of work was a minor lane of work in the beginning.

95. As we began to approach the transfer of the EFIN lane of work to W&I in June 2014, that work began to wane. During that period, the PTC and the CBC lane of work became a priority until the district court entered its decision in *Loving*.

96. After *Loving* and through the end of my tenure as the Director of RPO Suitability, PDC was the largest lane of work, followed by PTC.

97. Exhibit 4 consists of select RPO Suitability pages from the RPO Business Performance Reviews for 2012. The various lanes of work in Ex. 4 are consistent with EFIN being the largest lane of work performed in 2012.

98. Exhibit 3 consists of select RPO Suitability pages for the RPO Business Performance Reviews for the fourth quarters (Q4) of 2013 of fiscal year 2013 through the fourth quarter of 2016.

99.     The various lane of work fiscal year case totals shown in Exhibit 3 are consistent with the shift to PDC and PTC being the two largest lanes of work in terms of hours worked by RPO Suitability staff over the years as EFIN was transferred out and the *Loving* district court case was decided.

Executed on the ____ day of July, 2021, in Chicago, Illinois.

Kimberly D. Rogers
Digitally signed by Kimberly D. Rogers
Date: 2021.07.22 13:03:36 -04'00'

KIMBERLY D. ROGERS
Internal Revenue Service