# EXHIBIT W



Deposition of:
# Kimberly Rogers

*July 26, 2021*

In the Matter of:

# Steele v. United States of America

Veritext Legal Solutions
800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Case 1:14-cv-01523-RCL   Document 176-23   Filed 03/23/22   Page 3 of 8
Kimberly Rogers
July 26, 2021
Steele v. United States of America

Page 33

1        Q.  And was Suitability the office that
2  determined whether their work history was
3  sufficient to give them an exemption from
4  examination?
5        A.  Yes.
6        Q.  And did that -- was that work that was
7  done -- I've kind of skipped ahead here, but as
8  long as we're on it -- was that work that was done
9  continuously from the start of Suitability through
10 your -- through the end of 2016 --
11       A.  Yes.
12       Q.  -- when you left --
13       A.  Yes.
14       Q.  And did how that work was done change
15 at all or was that a pretty constant lane of work
16 throughout?
17       A.  It was a pretty constant lane of work
18 throughout my tenure as director of Suitability.
19       Q.  When you were director of Suitability,
20 do you have an understanding of how Suitability was
21 funded?  And what I mean by that is, how much of
22 the funding for Suitability was based on PTIN user
23 fees and how much might have been from
24 appropriations?
25       A.  So the beginning of your question,

Case 1:14-cv-01523-RCL   Document 176-23   Filed 03/23/22   Page 4 of 8
Kimberly Rogers                                                July 26, 2021
Steele v. United States of America

Page 34

1     could you repeat that? Was I aware or was I
2     involved --
3         Q. Yeah, well, it was -- it was not a good
4     question.
5         A. Okay.
6         Q. While you were director of Suitability,
7     did you have an understanding of how much of the
8     Suitability Office was funded through PTIN user
9     fees?
10         A. It was my understanding that we were
11     fully funded by user fees.
12         Q. When you say user fee, PTIN user fees?
13         A. PTIN user fees, yes, and our
14     organization was funded by PTIN user fees, Return
15     Preparer Office.
16         Q. When you say the organization, are you
17     talking about the RPO?
18         A. RPO, yes.
19         Q. You weren't aware, at least, when you
20     were director, that there was separate funding,
21     say, from general authorization -- appropriations,
22     excuse me -- funding the RPO?
23         A. No.
24         Q. Okay. What I'm wondering is, do you
25     know why PTIN user fees would have funded the work

Case 1:14-cv-01523-RCL   Document 176-23   Filed 03/23/22   Page 5 of 8
Kimberly Rogers                                    July 26, 2021
Steele v. United States of America

Page 35

1    of Suitability determining whether former IRS
2    employees can become enrolled agents?
3         A.    Former employees -- anyone attempting
4    to become an enrolled agent had to have a PTIN,
5    just like those getting an EFIN.  Anyone applying
6    for an EFIN had to have a PTIN.  So anything
7    related to that -- you know, the PTIN was related
8    to enrolled agents -- that's how that work came to
9    Suitability.
10        Q.    I've got you, okay.
11              Let me go back.  We were on personal
12   tax compliance.  Let's go to -- let's go to the
13   next item, which is criminal background checks.
14        A.    Yes.
15        Q.    Let's talk about how that changed.
16   Well, prior to Loving, on who -- on who did you
17   perform criminal background checks?
18        A.    Prior to Loving, non-credentialed PTIN
19   holders were individuals that we focused on that
20   self-identified.  Initially it was those that
21   self-identified a criminal background.
22              And then, as, you know, time and
23   resources permitted, we would do a certain number
24   of those that did not self-identify.
25        Q.    Okay, so let me break that down.

Case 1:14-cv-01523-RCL   Document 176-23   Filed 03/23/22   Page 6 of 8
Kimberly Rogers                                          July 26, 2021
Steele v. United States of America

Page 87

1    case-specific work and how many people are either
2    managing, or, you know, advising, and not doing
3    case-specific work?
4         A.   There probably were six not doing
5    case-specific work.  Well, hang on, maybe seven not
6    doing case-specific work.  Everyone else was doing
7    case-specific work, including the staff assistant.
8         Q.   Okay.  And I noticed -- I think
9    somewhere in here you mentioned the Loving decision
10   as being issued in 2013.
11             I noticed that after the Loving
12   decision -- I guess it's, actually, I think, on
13   Paragraph 44, you mentioned the Loving decision,
14   enjoining the RTRP requirements in 2013.
15             But I noticed that post Loving, the
16   office actually grows a little bit.  Do you know
17   why that is?
18        A.   It grew a little bit with the addition
19   of a temporary team.  There were -- a decision was
20   made to refund the testing fees that individuals
21   had paid, and we needed additional employees to
22   process those refunds and to answer questions
23   regarding those refunds, so we -- we staffed up an
24   additional temporary team to process that work.
25        Q.   Now, there were some activities that

1    you stopped doing as a result of the Loving
2    decision.
3              Did that free up any people?
4         A.   I'm not sure what you mean by free up.
5         Q.   Well, in other words, there were things
6    that you had been doing pre Loving that you were no
7    longer doing post Loving.  We talked about that
8    earlier this morning.  There were certain things
9    that you stopped doing.  And I was wondering
10   whether, if in no longer performing those tasks,
11   the people who had been doing those were available
12   to do other things.
13        A.   Well, it definitively caused a shift in
14   work.  There was no one not doing anything, or
15   sitting around doing nothing, but we just had to
16   shift some work.
17             So when we stood up this third team, a
18   lot of -- several employees that were doing the
19   other work wanted to be on that team to process the
20   refunds and so we would just shift the work -- it
21   shifted what we were performing and how much of it
22   we could perform based on the resources that we
23   had.
24        Q.   Was there any reduction in force in
25   2013 after Loving either in Suitability or any of

Case 1:14-cv-01523-RCL   Document 176-23   Filed 03/23/22   Page 8 of 8
Kimberly Rogers
July 26, 2021
Steele v. United States of America

Page 89

1     the other offices, to your knowledge?
2          A.   Not to my knowledge, no.
3          Q.   When I go to Paragraph 25, if I -- this
4     is a paragraph in which you describe the work of
5     the analysts.
6               And you mentioned that they had a
7     variety of functions, including analytical studies,
8     policies, project -- analysis of project data,
9     systems.
10              And then you say at the end, "Collected
11    and analyzed reporting metrics and performance
12    information in order to recommend opportunities for
13    improvement."
14              Were there particular metrics that
15    Suitability used to evaluate its performance from
16    time to time?
17         A.   I guess the answer is yes.
18         Q.   And what were those?
19         A.   So the metrics, we looked at number of
20    cases coming into Suitability, number of cases
21    open, number of cases closed, the timeframe, how
22    long it took some of these -- you know, the cases
23    to go from opening to closure, so there were --
24    those were some of the major metrics that I recall.
25         Q.   In terms of volume, professional -- in