# EXHIBIT AT



INTERNAL REVENUE SERVICE

| Media Relations Office | Washington, D.C. | Media Contact: 202.622.4000 |
| www.IRS.gov/newsroom | | Public Contact: 800.829.1040 |

### Commissioner of Internal Revenue Douglas H. Shulman's
### Keynote Speech Before the AICPA Fall Tax Meeting
### Washington, DC

IR-2010-107, Oct. 26, 2010

WASHINGTON — Good afternoon and thank you for that warm welcome and introduction and for inviting me to address AICPA's Fall Tax Meeting.

With the leaves changing, the days shortening, and children back in school, this is a time of year that speaks of change and getting down to work after the long days of summer.

And today, I would like to spend my time with you talking about some of the changes in our tax system that we could have barely imagined 10…15…or 20 years ago … and how we are working smarter to stay on top of these changes and continually innovating to meet the challenges of tomorrow.

Our starting point is a given: our tax system is constantly changing. With its evolutions and revolutions, it's anything but static. The dizzying pace of change continues to accelerate with no signs of slowing down. And it's one hard stretch of road ahead full of dangerous curves, speed bumps and unexpected hazards.

For example, the sheer girth and complexity of the tax code continue to grow, in spite of efforts to simplify it. There have been an astonishing 4,400 legislative changes to the Code from 2000 to September of this year.

Our taxpayer base is also far more diverse and different than it was a mere 20 or 30 years ago, creating new needs and challenges to provide both innovative service channels and enforcement strategies.

For example, S corporations and partnerships, which are more difficult to audit, have grown rapidly. From 2000 to 2009, they increased by 55 percent and 70 percent respectively.

We are also dealing with an expanding number of Limited English Proficiency taxpayers who need to be served. To meet this need, IRS has over 1,800 bilingual employees who provide service to them. We also created a Spanish language web site and an IRS Multilingual Gateway and offer over 600 tax products translated into Spanish, Chinese, Vietnamese and Russian.

And as this audience well knows, our tax system reflects an enormous and dynamic global economy and all that it has ushered in… …from complex transfer pricing issues to wealthy individuals using global capital markets to facilitate investment strategies.

USA-0034042

Relationships and paradigms are shifting too as we break down barriers and open doors. This past year, I have spoken at length about the IRS retooling its relationship with large corporate taxpayers…how we are moving away from protracted trench warfare, which serves neither of us well, to earlier and speedier issue resolution and greater efficiency and certainty.

Congress has also expanded the IRS' portfolio of duties as we are increasingly asked to administer the tax portion of new social and economic programs, such as the Economic Stimulus, the Recovery Act, the HIRE Act, the Small Business Act …and now, the tax provisions of the Affordable Care Act.

The simple fact is that our job is getting harder…much harder…with no let up in sight. And to make a tough job even tougher, resources are scarce and will continue to be for the foreseeable future.

My intention in describing the current state of play of our tax system is not to give you a pre-Halloween scare. Rather, I am hoping that by viewing the tax system through a wide angle lens, we can start to see how we can sort out and overcome some of the hurdles we face… improve our performance… and produce results we can all embrace, such as sound, fair and efficient tax administration…and of course, improved compliance.

Working smarter has been a theme of mine since I became Commissioner. But what does working smarter really mean? In the case of the IRS, it means evolving to keep pace with change, constantly looking ahead, and being innovative and more imaginative with available resources inside and outside the agency.

Let me dive down a little deeper into this concept. In many ways, it is all about a leveraged model.

In a classic business sense, leveraging translates to applying a relatively small amount of capital that yields a high level of impact or return for the company and its shareholders. For the IRS, it means maximizing the use of our resources, while tapping into the experience, specialized knowledge, infrastructure, technology and activities of other players in the tax system and making them an integral part of our service and compliance strategies.

By leveraging our joint resources, we can advance and support common objectives and outcomes we both desire, such as certainty, clarity and not wasting time and resources. The bottom line is that we can achieve far more working together than either of us could by working alone.

Before I get into a front-burner topic – the return preparer initiative – let me point out that we're already applying the concept of working smarter through leverage to achieve our goals. For example, over the past year, I reached out to members of corporate boards to hopefully leverage off of good corporate governance practices that might limit some risky tax planning behavior…and assure that corporate boards and audit committees are assessing and managing tax risk just as they do other material business risks.

I brought a similar message to the Council on Foundations…namely that good governance for a non-profit is mostly the same as general good governance. Both involve oversight of the organization's effectiveness in pursuing its mission. And both the IRS and foundations want many of the same things from tax-exempt organizations.

USA-0034043

We want well-run institutions that deliver on their missions – or exempt purpose – in tax parlance. And we want appropriate controls in place to ensure clean books and records and adherence with legal requirements.

In this regard, we both benefit from what each of us does separately. And we both benefit by leveraging another set of eyes to look at the same issues.

Now, today, I want to speak about two key steps in this evolutionary chain of getting smarter and working smarter...and here too leverage plays a role. The first is the return preparer initiative.

I believe it is one of the most important initiatives and defining actions that the IRS has taken in recent years in improving both compliance and our ability to deliver better service to taxpayers; in this case, helping them to file accurate returns from the get-go and avoid potentially time-consuming problems later on.

As with our international strategy, it is important to see the return preparer initiative as reflecting and adapting to changing elements in and around our tax system.

Sixty years ago, when the World Wide Web was not even a twinkle in a computer expert's eye, no one would have thought of e-File or IRS.gov. Today, no one would think of an effective and efficient tax administration system without them.  In fact, our e-file rate is one of the biggest success stories of government modernization. Last year, we had a 70 percent e-file rate for individuals as compared to a mere 10 percent fifteen years ago. And this translates into a huge savings. For FY 2009, it cost us only 19 cents to process an e-filed return – a fraction of the $3.29 it takes to process a paper return. And with e-file, taxpayers get their refund faster, with fewer data processing errors that can lead to hassles later in the process.

It was this same type of systemic change in our tax system – subtle at first and tectonic later – that would make the return preparer initiative not a "nice-to-have" but a "must have" program. Let's see why by taking a quick look in the rear view mirror.

For many years, most taxpayers prepared their own returns with pencil and paper and an adding machine. You could also always count on the 11:00 PM news story about procrastinating taxpayers lined up at the Post Office to mail in their returns, or seeking 11th hour preparation help from the IRS. One of my predecessors even stood outside of a Metro Station on April 15th handing out extension forms.

And that's the quaint, sleepy image that stayed the same until about 20-30 years ago. Then we had a wake up call that would irrevocably change the way people would prepare and file their taxes.

Growing tax code complexity fueled an explosive growth in tax return preparation. Once a cottage industry, today, more than 8 out of ten taxpayers use a tax preparer or tax software. And there are now an estimated 1 million individuals preparing tax returns for a fee. Barring some sort of massive tax simplification, this trend will continue.

There are a number of positives in this trend. As I noted earlier, one of the most important is that qualified return preparers can help taxpayers get it right...right from the start.

Working with the taxpayer, they can prevent inadvertent errors which can save both taxpayers and the IRS headaches and precious resources down the road.

And let's face facts….taxpayers want to keep their interactions with the IRS to a minimum. One of the best ways to insure that minimum interaction is for taxpayers to file an accurate and timely return…once again, getting it right the first time around.

In a world of greater complexity and sometimes the temptation to push the tax planning envelope beyond acceptable bounds, qualified return preparers can also advise taxpayers on the risk associated with a possible reporting position. They can also explain taxpayer rights and responsibilities. So, we at the IRS see the professional return preparer community as a strong ally in our efforts to boost overall service and compliance.

Now, an individual's return filing is often one of their biggest financial transactions in any given year. Yet any person can prepare a federal tax return for any other person for a fee.

The average person on the street might assume there is some sort of formal oversight or licensing for every return preparer. After all, even a barber must attend a formalized training program and obtain a license. However, that average taxpayer would be mistaken.

It might surprise taxpayers to learn that the level of oversight varies widely. There's little oversight of paid tax return preparers, particularly for those who are not attorneys, enrolled agents, and CPAs – like you – or other individuals authorized to practice before the IRS. Again, it bears repeating that this is one of the most important annual financial transactions for taxpayers, yet many preparers do not have to meet any professionally-mandated competency requirements.

This begs the question. Are too many taxpayers rolling the dice when it comes to their paid return preparers? The Government Accountability Office, the Treasury Inspector General for Tax Administration and our own research suggest that our tax system and a large number of taxpayers may be poorly served by some return preparers. And let no one forget that it is the taxpayer who is legally responsible for penalties and interest if their return is not accurately prepared, or they claim deductions or tax credits to which they are not entitled.

Given the critical mass of issues building around paid return preparers, the IRS launched its return preparer review in June of 2009. It meets two of our most important strategic goals and reflects our commitment to working smarter.

First, it strengthens partnerships with tax practitioners, tax return preparers, and other third parties to ensure effective tax administration. And second, it ensures all of the above and other third parties in the tax system have a minimal level of competency and adhere to professional standards… with an overarching goal of better service to taxpayers and increased compliance.

As most of you are aware, our return preparer initiative is now undergoing a staged implementation process. We took a big first step last month when we launched the new online PTIN application system. It's now up and running and will eventually get everyone into the system.

But more than just an identification number, the PTIN registration process gives us an important and better line of sight into the return preparer community than we've ever had before. We can

leverage that information to help us better analyze trends, spot anomalies and potentially detect fraud.

Indeed, the PTIN process will help us build, in several years, a publicly-accessible database of those registered. I view this as an extremely important tool for consumers and another example of working smarter, as consumers will be able to search the database to ensure that their preparer is registered. This ups the game for everyone. The data base will confirm for the public which return preparers are properly registered with the IRS.  It will also make it easier for everyone to find and track the bad actors out there. They won't be able to pull up stakes and move around anonymously.

There are a number of transition issues we are also working through as we implement the return preparer initiative. One of the first out of the gate was foreign PTINs for those paid return preparers outside of the United States who lack a Social Security Number, but prepare US tax returns for their clients. We recognized the hurdles they faced, and in response, are providing them with some needed flexibility.

We are also still refining our rules for people who work in a professional firm, like an accounting firm, who prepare all, or substantially all of a return under the supervision of an accountant, enrolled agent or lawyer. While this is a tricky area, and I can't give you definitive guidance until we publish our final guidance later this year, I will tell you that I am sympathetic to the argument that the rules should be flexible for people who have met a higher professional standard. Therefore, it is highly likely that as we implement the new rules and procedures there will be some relief for testing and continuing education requirements for people who do not sign a return and work in a professional firm under the supervision of an accountant, enrolled agent or lawyer.

We are also still working on a start date for testing, and an effective date for the 15 hours of continuing education. Some of those commenting encouraged us to slow down or delay these important parts of the program. While we are moving forward to put in place continuing education, we recognize the need for a staged transition to reduce burden and uncertainty. Therefore, during the first year of implementation, we intend to waive the requirement for continuing education. This will give us time to work through the many issues regarding CE, including working with third parties who already certify CE courses to attempt to leverage their infrastructure.

Finally, with any major initiative, I need to look at the people and structure that we will use to implement it. I am pleased to announce today that we are creating a Return Preparer Office inside of the IRS that will be led by David R. Williams, who is familiar to many of you for his work on the return preparer initiative. He will report directly to Steve Miller, Deputy Commissioner for Services and Enforcement.

This new office will have broad responsibility for the return preparer initiative.  It will manage all of our activities related to continuing education and testing of all professionals under IRS jurisdiction.  It will also manage the registration system and process, as well as coordinate resource planning for IRS efforts across the organization related to return preparers. If you have any insights, concerns and suggestions as we proceed on implementing the return preparer initiative, please feel free to contact David.

David's leadership on the return preparer initiative will complement the excellent work Karen Hawkins is carrying out as Director of the Office of Professional Responsibility. This critical organization will remain a separate entity within the IRS, and I see its impact being enhanced in

the future to ensure that tax professionals meet the high ethical standards that taxpayers expect, need and deserve.

Indeed, it is my intention to provide Karen and her able team increased resources to investigate additional cases of improper conduct, ethical violations and other disciplinary issues involving tax professionals falling under Treasury Circular 230. I think it's fair to say that we could see an appreciable jump in the OPR case load in the foreseeable future as we work to ensure that all return preparers are serving the American people well.

I would like to turn now to how we are working smarter with some of our largest corporate taxpayers. Our new uncertain tax position reporting requirement is a key element of our larger program to retool our relationship with these taxpayers and create greater efficiency and certainty.

Let me frame this discussion by saying that I believe the concept of more transparency is consistent with our nation's historic framework of a voluntary compliance system. Our tax system is set up in such a way that taxpayers fill out their own returns. This self-assessment system reflects the fact that it is the taxpayer, and not the IRS, who possesses all of the information relevant to tax liability. We then use information reported by the taxpayer to make judgments about issues to pursue, and returns to audit.

Inherent in this system is the basic assumption that a taxpayer will be forthcoming in dealing with the IRS with respect to the items it has reported on its tax return, including the underlying positions related to those items. But this is much more than an assumption – it is the foundation on which our tax system is built.

Guided by the fundamental principle that transparency is essential to achieving an effective and efficient self-assessment tax system, the IRS took a major step towards transparency this past January with Announcement 2010-9 to require business taxpayers to report basic information regarding their uncertain tax positions when they filed their tax returns. As many of you know, last month we released the Final Schedule UTP and Instructions effective for 2010 tax years along with a directive to the field and modifications to our Policy of Restraint to provide guidance to IRS examiners and other personnel regarding how we will implement UTP reporting.

This new requirement gets to the heart of information we need without trying to get into the taxpayer's head. I believe that it helps achieve what most taxpayers and the IRS strive for and basically want. And that's not the endless tug of war between the IRS and taxpayers, but certainty, consistent treatment and the efficient use of government and taxpayer resources by focusing on issues and taxpayers that pose the greatest risk of tax noncompliance.

The Final Schedule UTP fulfills these goals in a very balanced and sensible fashion and addresses important concerns expressed by affected taxpayers and the practitioner and business community. I would like to thank AICPA and its members for their very thoughtful and constructive comments which helped us craft a final product that moves us towards our shared objectives. Indeed we made some significant changes to the schedule based on the feedback we received. These include:

- A five-year phase-in for filing the schedule;
- Elimination of the maximum tax adjustment requirement;
- Clarification of concise description of an issue; and
- Clarification and strengthening of our policy of restraint

Our Schedule UTP needs also to be viewed as part of a major restructuring of the relationship with large corporate taxpayers that includes our permanent CAP program, fast-track appeals, industry issue resolution strategies, advanced pricing agreements, and other tools – all aimed at the goal of issue resolution and greater efficiency and certainty.

So here we are … an IRS that is working smarter and evolving to meet today's and tomorrow's changes and challenges. To do so, we must be open and welcoming of new ideas and forge new relationships with taxpayers and other stakeholders. We must look for opportunities to make the best use of resources, including leveraging the enormous reservoir of expertise and experience that is infused throughout the professional tax community. And we must be willing to innovate as we seek continuous improvement and work on some of the country's most difficult and interesting problems.

That concludes my remarks and I thank you again for inviting me to share some thoughts with you. I would be happy to take a few questions.

—30—