# EXHIBIT BH

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ADAM STEELE, et al.,  )
)
Plaintiffs,  )
)
v.  )  No. 1:14-cv-1523-RCL
)
UNITED STATES OF AMERICA,  )
)
Defendant.  )
)

**DECLARATION OF DIANN WENSING**

I, Diann Wensing, pursuant to the provisions of 28 U.S.C. § 1746, declare as

follows:

1.      I am the former Director of the Return Preparer Office Compliance

Department (or "RPO Compliance") of the Internal Revenue Service ("IRS").

2.      I was appointed as the original Director of RPO Compliance on December

15, 2010.  I remained Director of RPO Compliance until my retirement on January 31,

2021.

3.      Scott Wieczynski, who has been with RPO Compliance since December 18,

2011, has now succeeded me as Director of RPO Compliance.

4.      My Department was originally called "Compliance & Enforcement" but

its title was eventually changed to "Compliance."

5.      RPO originally had a separate Department named "Referral Processing &

Discipline" but its title was eventually changed to "Complaint Referrals."



1

6.      RPO Complaint Referrals merged into RPO Compliance on October 1, 2014.  As a result of the merger, RPO Complaint Referrals became part of RPO Compliance as its Referral Group 1.

7.      With the merger, RPO Complaint Referrals' staff became members of RPO Compliance's Referral Group 1.

8.      In addition, with the October 1, 2014 merger, as Director of RPO Compliance I became the RPO Director responsible for Referral Group 1.

9.      Because RPO Complaint Referrals was originally separate from RPO Compliance, I am only generally familiar with RPO Complaint Referrals' operations prior to the October 1, 2014, merger.

10.      As the former Director of RPO Compliance, I have direct personal knowledge regarding Referral Group 1's operations as part of RPO Compliance after the October 1, 2014 merger.

11.      My primary responsibilities as Director of RPO Compliance were to set policies and procedures and to direct and manage RPO Compliance.

12.      In particular, I was responsible for overseeing programs to evaluate and treat program noncompliance; to detect and treat "ghost" preparers;[1] to evaluate and

---

[1] As explained below, "ghost preparers" are return preparers who do not report their valid Preparer Tax Identification Number ("PTIN") on tax returns that they prepare for compensation.

process complaints against return preparers, including referrals to other IRS units; and to support return preparer programs in other IRS business units.[2]

13.     My post of duty as Director of RPO Compliance was in Chesterfield, Missouri, also known as Town & Country, Missouri.

14.     I joined the IRS in 1991.  Prior to joining RPO, I was a Program Manager in Exam Policy and a Fraud Technical Manager.  Both of these positions were in the Small Business/Self-Employed Division ("SB/SE").

15.     As explained below, I was also a member of the Return Preparer Initiative Implementation Team ("Implementation Team") immediately prior to becoming Director of RPO Compliance.

16.     I have been asked to provide my understanding of RPO Compliance, including

     a.  its purpose;

     b.  its operations;

     c.  its involvement with the PTIN; and

     d.  the amount of time spent on each activity conducted by RPO Compliance personnel.

17.     In addition to my personal knowledge and experience, this declaration is also based upon review of relevant contemporaneous materials.

---

[2] *See* I.R.M. 1.1.28.4.6 (10-16-2017).

18.     Certain IRS documents are attached as Exhibits as exemplars, illustrations, or to provide greater depth regarding RPO Compliance or RPO Complaint Referrals functions, activities, or other matters.

## I.     <u>Return Preparer Review (Dec. 2009)</u>

19.     I understand that in approximately June 2009, the Commissioner of Internal Revenue launched the process that resulted in the IRS issuing the Return Preparer Review in December 2009.[3]

20.     I was not involved in the Return Preparer Review that occurred in 2009.

21.     Nevertheless, as both a member of the Implementation Team and thereafter as Director of RPO Compliance, I became very familiar with the 2009 Review.

## II.     <u>Implementation Team (2010-2011)</u>

22.     In early 2010, and soon after the Return Preparer Review was issued, the IRS formed the Implementation Team.

23.     I was not among the original members of the Implementation Team.

24.     I joined the Implementation Team sometime in the latter half of 2010.

25.     By the Spring of 2011, I was one of the nine individuals (*i.e.*, David Williams, Nicole Myers, Melissa Reynard, Leann Ruf, Larry Orozco, Lisa Hernandez, Jim Kurdziel, Kim Rogers, and myself) who comprised the Implementation Team.[4]

---

[3] *See* Exhibit 1 (Return Preparer Review (Dec. 2009)).

[4] *See* Exhibit 2 (RPO Implementation New Staff Orientation (May 5, 2011)), Slide 4.

26.     In broad terms, the Implementation Team's function included implementing the recommendations made in the Return Preparer Review.

27.     My duties as a member of the Implementation Team included developing RPO's Compliance, Complaint Referrals, and Suitability functions.

28.     My initial work consisted of selecting individuals to be in charge of various Sub-Teams, as well as developing the organizational structure for Compliance, Complaint Referrals and Suitability.

29.     I was also responsible for overseeing the development of the work processes that control the operations of those functions.

30.     The Implementation Team recommended that there be two Compliance workstreams.

31.     One workstream would be comprised of PTIN Analysts who would staff the Unidentified Preparer Detection Group (or "Ghost Preparer Group").

32.     The other workstream would be comprised of Technical Analysts who would staff the Enforcement Planning & Direction Group ("EPD Group").

33.     Originally, RPO Compliance was to include two Ghost Preparer Groups, but only one Group (with one Frontline Manager) was staffed.[5]

---

[5] See Exhibit 9 (RPO Implementation Team and Wave 1 and Wave 2 Hiring (Sept. 29, 2011)), Slides 40-45.

34.     Originally, RPO Compliance was to include one EPD Group (with one Frontline Manager).[6]

35.     The Implementation Team recommended that processing of complaints against return preparers be handled by a separate RPO Department.

36.     Originally, RPO Referral Processing & Discipline was to include four Groups (with four Frontline Managers), but only one Group was staffed.[7]

III.    **Original Functions, Stand-up, and Staffing of the three Compliance Workstreams**

37.     My review of early RPO documents, identified below, confirms my general recollection of the originally intended functions, stand-up, and the early years' staffing of RPO Compliance and RPO Complaint Referrals.

A.      **Three Expected Workstreams/Functions**

38.     As of early 2011, RPO Compliance Ghost Preparer Group's expected workstream/functions were to detect and plan enforcement activities relating to return preparers misusing or not utilizing PTINs.[8]

39.     RPO Compliance EPD Group's expected workstream/functions were to develop and run analytics to identify return preparers requiring treatment, to provide

---

[6]*See* Exhibit 9 (RPO Implementation Team and Wave 1 and Wave 2 Hiring (Sept. 29, 2011)), Slide 34-38.

[7] *See* Exhibit 9 (RPO Implementation Team and Wave 1 and Wave 2 Hiring (Sept. 29, 2011)), Slides 53-59.

[8] *See* Exhibit 2 (RPO Implementation New Staff Orientation (May 5, 2011), Slide 28.

input to return preparer enforcement planning and resource allocation across the IRS,

and to plan and direct enforcement actions targeted towards return preparers across the

IRS, including the development of innovative treatments to change return preparer

behavior.[9]

40.     RPO Complaint Referrals' expected workstream/functions were to act as

a centralized processing unit to receive taxpayer complaints regarding return preparers,

to gather metrics on common types of complaint referrals, to assist in the building of a

return preparer database, and to review and do preliminary research on potential cases

to refer to the Office of Professional Responsibility ("OPR").[10]

41.     These basic workstreams/functions for the Ghost Preparer Group and

EPD Group in RPO Compliance, and RPO Complaint Referrals (which after the October

1, 2014 merger with RPO Compliance became Referral Group 1, as noted above) have

continued to current date.[11]

**B.     Stand up/Initial Staffing**

42.     RPO staffing was expected to be accomplished in "Waves" going forward

from mid-2011, into 2012, and perhaps beyond.

---

[9] *See* Exhibit 2 (RPO Implementation New Staff Orientation (May 5, 2011), Slide 28.

[10] *See* Exhibit 2 (RPO Implementation New Staff Orientation (May 5, 2011)), Slide 29.

[11] *See* Exhibit 3 (Compliance Analyst Desk Guide Version 4.0 (June 2019)), p. 11 (listing the three Groups' functional responsibilities).

43.    Staffing was expected to begin with the hiring of RPO Department Directors, and some Frontline Managers and administrative staff.[12]

44.    By June 2011, RPO Compliance had filled all three of expected Wave 1 hires.[13]

45.    By September 2011, RPO Referral Processing & Discipline completed its Wave 1 hiring by bringing Nadine McPhail on-board as its Director.[14]

46.    In late 2011, Wave 2 hiring then commenced for RPO Compliance and RPO Complaint Referrals, which involved hiring PTIN Analysts, Technical Analysts, and Case Specialists.[15]

47.    By early 2012 the staffing of both RPO Compliance and RPO Complaint Referrals had essentially reached a steady-state level; *i.e.,* approximate steady staffing level thereafter.[16]

---

[12] *See* Exhibit 8 (RPO Implementation Team and Wave 1 and Wave 2 Hiring (January 31, 2012), *passim*.

[13] *See* Exhibit 9 (RPO Implementation Team and Wave 1 and Wave 2 Hiring (Sept. 29, 2011), Slides 34, 40; Exhibit 5 (RPO Monthly Status Report (June 2011)), *passim* (including discussion of RPO Compliance Director activities but not RPO Referral Processing & Discipline Director activities).

[14] *See* Exhibit 6 (RPO September 2011 Monthly Status Report (Sept. 2011)), Slides 2, 16.

[15] *See* Exhibit 8 (RPO Implementation Team and Wave 1 and Wave 2 Hiring (Jan. 31, 2012), Slides 37-38, 44-45, 58-59; Exhibit 7 (RPO November 2011 Monthly Status Report (Dec. 15, 2011)), Slide 16.

[16] *See* Exhibit 8 (RPO Implementation Team and Wave 1 and Wave 2 Hiring (January 31, 2012)), Slides 33-46, 54-60.

C.      **Early Operations**

1.      **RPO Complaint Referrals**

48.      According to the May 2012 Complaint Referrals Operational Review, RPO

Complaint Referrals "commenced operations in February of 2012" with staff located in

St. Louis, Missouri, and Atlanta, Georgia.[17]

49.      RPO Complaint Referrals' Case Specialists may have specialized

according to the type of complaint received (*e.g.,* e-File Allegation, Project Case, Theft of

Refund, Potential Circular 230 Violation, Potential Ghost Preparer, and Other Return

Preparer Allegations).[18]

50.      It appears that RPO Complaint Referrals' time-per-case (i.e., time-per-

complaint) initially may have ranged from over 1 hour to approximately 4 hours.[19]

51.      By my understanding, neither the *Loving* District Court decision issued in

early 2013, nor the Court of Appeals *Loving* affirmance in early 2014, changed RPO

Complaint Referrals' activities.

---

[17] *See* Exhibit 17 (RPO Complaint Referrals Department Operational Review (May 16, 2012)), pp. 5-6.

[18] Exhibit 17 (RPO Complaint Referrals Department Operational Review (May 16, 2012)), p. 6, *see generally* pp. 5-8.

[19] *See* Exhibit 17 (RPO Complaint Referrals Department Operational Review (May 16, 2012)), p. 8

2.      **Ghost Preparer Group**

52.     RPO Compliance's Ghost Preparer Group commenced operations in March of 2012.[20]

53.     Contemporaneous documents describing the Ghost Preparer Group's early activities are attached.[21]

54.     The Ghost Preparer Group's PTIN Analysts did not specialize according to the type of potential PTIN non-compliance at issue.

55.     The Ghost Preparer Group's initial time-per-case in FY2012 in some instances exceeded 8 hours, with its average time per closed case being just over 6 hours.[22]

56.     Neither the *Loving* District Court decision issued in early 2013, nor the Court of Appeals *Loving* affirmance in early 2014, changed the Ghost Preparer Group's activities.

---

[20] *See* Exhibit 11 (RPO Compliance & Enforcement Department Operational Review: Debrief Document (September 11, 2012)), p. 7.

[21] Exhibit 15 (PTIN Analyst Desk Guide, Release 1.0 (December 9, 2011)), pp. 3-15; Exhibit 11 (RPO Compliance & Enforcement Department, Operational Review:  Debrief Document (September 2012)), p. 8.

[22] *See* Exhibit 11 (RPO Compliance & Enforcement Department, Operational Review: Debrief Document (September 2012), p. 9; Exhibit 12 (Metrics Report (Oct. 2014) (TY2012 average time per closed case reported as 6.12 hours).

    3.    **EPD Group**

57.    The EPD Group commenced operations at some point in time during the second half of 2011.[23]

58.    A contemporaneous description of EPD Group early activities is attached.[24]

59.    Because the EPD Group does not work assigned cases or complaints, a "time-per-case" measure is not meaningful for that Group, nor has RPO Compliance ever attempted to calculate one.

60.    Neither the *Loving* District Court decision issued in early 2013, nor the Court of Appeals *Loving* affirmance in early 2014, changed the EPD Group's activities.

**D.**    **Staffing from FY2012-2019**

61.    Exhibit 10 is a collection of the RPO Compliance and RPO Complaint Referrals pages from selected RPO Organizational Charts spanning October 2011 through September 2019.

62.    Since 2012, the Ghost Preparer Group generally ranged from 9 – 13 staff members; RPO Complaint Referrals/Referral Group 1 ranged from 8 – 12 staff members; and the EPD Group totaled either 9 or 10 staff members.[25]

---

[23] *See* Exhibit 9 (RPO Implementation Team and Wave 1 and Wave 2 Hiring (Sept. 29, 2011), Slides 33, 36-37.

[24] Exhibit 11 (RPO Compliance & Enforcement Department Operational Review: Debrief Document (September 11, 2012)), pp. 5-8.

[25] *See* Exhibit 10 (Compliance & Complaint Referrals Organizational Charts), *passim*.

63.     With one exception, the fluctuation in FTE totals for RPO Compliance and RPO Complaint Referrals reflected in Exhibit 10 is the result of natural attrition, new hires, and details.

64.     The exception is that the merger of RPO Compliance and RPO Complaint Referrals resulted in a slight reduction in staffing, as shown by comparing the 2014 and 2015 Organizational Charts collected in Exhibit 10.

65.     RPO Complaint Referrals had at least two Directors (Nadine McPhail and Teresa Medlock) and one Acting Director (Ken Marek) prior to its merging into RPO Compliance at the beginning of FY2015.[26]

## IV.     Case Inventory

### A.     Ghost Preparer Group

66.     Once the Ghost Preparer Group began operations, it immediately had a significant case inventory for its PTIN Analysts to work.

67.     For example, as of mid-2012, "the PTIN Analyst Group ha[d] received over 14,000 potential ghost cases."[27]

---

[26] *See* Exhibit 10 (Compliance & Complaint Referrals Organizational Charts) (Complaint Referrals charts for FY2012 – FY2014).

[27] Exhibit 11 (RPO Compliance & Enforcement Department Operational Review: Debrief Document (September 11, 2012)), p. 8.

68.     The Ghost Preparer Group has subsequently always had a case inventory to work.[28]

**B.      RPO Complaint Referrals/Referral Group 1**

69.     It is my understanding that prior to the October 1, 2014, merger, RPO Complaint Referrals also always had a complaint inventory for its Case Specialists to work.[29]

70.     When RPO Complaint Referrals was merged into RPO Compliance on October 1, 2014, RPO Complaint Referrals had a significant inventory of complaints that had not yet been processed.

71.     Eliminating that complaint inventory was one of my primary initial goals for Referral Group 1 after the merger.

72.     We substantially eliminated this large complaint inventory by early 2015.

73.     We eliminated the large complaint inventory by specially assigning EPD Group Technical Analysts to work on that inventory over several months.

74.     We eliminated the inventory primarily by closing unassigned complaints that were "out of cycle" (*i.e.,* over three years old).

75.     EPD Group Analysts and RPO Compliance management also worked with other Business Operating Divisions ("BODs") and stakeholders to refine and

---

[28] *See* Exhibits 12-14 (Metrics Reports) (Oct. 2014, Sept. 2017 & Apr. 2019) (reporting number of "unassigned" cases).

[29] *E.g.,* Exhibit 17 (RPO Complaint Referrals Department Operational Review (May 2012)), pp. 7-8.

improve referral criteria, including that if a complaint did not involve a compensated return preparer, that the complaint should not be sent to RPO.

### C.     EPD Group

76.     Because the EPD Group is not a case driven group, it never has had a case inventory.

## V.     RPO Compliance Activities after Merger with RPO Complaint Referrals

77.     With the October 1, 2014 merger, RPO Complaint Referrals became part of RPO Compliance.

78.      The "mission of the Compliance department is to address return preparer program and PTIN noncompliance, and process complaints involving compensated return preparers.  Compliance identifies and develops treatments and referral criteria for varying types of return preparer noncompliance."  I.R.M. 1.1.28.4.6 (10-16-2017).

79.     For greater detail regarding RPO Compliance activities with respect to ghost preparers, *see* Exhibit 16 (I.R.M. 25.20.2 (Ghost Preparer Treatment) (04-13-2020)).

80.     For greater detail regarding RPO Compliance's complaint referrals activities, *see* Exhibit 20 (I.R.M. 25.20.1 (Complaint Referrals) (07-24-2019)).

### A.     Allocation of the Director's and the Frontline Managers' Time

81.     The following Paragraphs provide rough estimates of my time allocations, and RPO Compliance Frontline Managers' time allocations.

1. **Allocation of Director's Time**

82.     As shown in the Organizational Charts collected in Exhibit 10, RPO Compliance has had three Groups since the merger with RPO Complaint Referrals in October 2014:  (1) Ghost Preparer Group; (2) EPD Group; and, (3) Referral Group 1.

83.     Since the October 2014 merger my activities and time were devoted to managing each of these three Groups.

84.     In recent years, managing the Ghost Preparer Group took about 40% of my time; managing Referral Group 1 took about 40% of my time; and, managing the EPD Group took about 20% of my time.

85.     Managing the Ghost Preparer Group and Referral Group 1 took more management time, relative to the EPD Group, because those two Groups' work is case driven.

86.     For example, when RPO Compliance receives outside contacts (*e.g.,* anywhere from a taxpayer complainant, to SB/SE, to the United States Congress), those contacts more likely relate to a potential Ghost preparer case, or to a particular taxpayer complaint, than to EPD Group work.

87.     In addition, the Ghost Preparer Group and Referral Group 1 both have case inventories that made significant demands upon my management time.

88.     Additionally, changing work processes requires less management time for the EPD Group.

89.     These percentage allocations of my time remained stable over recent years.

90.     It is harder for me to estimate my time allocation for FY2012 – FY2014 prior to the RPO Complaint Referrals merger.

91.     However, I would roughly estimate that prior to the merger approximately two-thirds of my time was spent managing the Ghost Preparer Group and one-third spent managing the EPD Group.

92.     Managing the EPD Group has always taken less of my time than managing the Ghost Preparer Groups for the reasons stated above in Paragraphs 85-88.

**2.      Allocation of Frontline Managers' time**

93.     The Frontline Managers have recently changed for all three Groups.

**(a)      EPD Group**

94.     Scott Wieczynski has been a member of the EPD Group since December 18, 2011 and replaced Tracy Pettaway as its Frontline Manager upon her retirement on December 31, 2020.

95.     Consequently, Mr. Wieczynski's recent time has been split between his duties as an EPD Analyst and as the Frontline Manager of the EPD Group.

**(b)      Ghost Preparer Group**

96.     In December 2020, Elma Mandel became the Acting Frontline Manager for the Ghost Preparer Group.

97.     Ms. Mandel's time, since becoming the Acting Frontline Manager, has been allocated among the following activities with the accompanying approximate percentages:  (1) Program management (40%); (2) Reviewing/approving case work (30%); (3) Reviewing/completing performance documents/conduct issues (5%); (4) Bi-

weekly team meeting (5%); (5) Creating monthly briefing reports (5%); (6)

Managing/analyzing and assigning inventory (5%); (7) Administrative tasks including

timekeeping approval (5%); (8) Other (5%).

### (c)  Referral Group 1

98.     Daphne Meadows was detailed as the temporary Frontline Manager for

Referral Group 1 on November 24, 2019.

99.     Her time allocations are essentially the same as Ms. Mandel's and

therefore are: (1) Program management (40%); (2) Reviewing/approving case work

(30%); (3) Reviewing/completing performance documents/conduct issues (5%); (4) Bi-

weekly team meeting (5%); (5) Creating monthly briefing reports (5%); (6)

Managing/analyzing and assigning inventory (5%); (7) Administrative tasks including

timekeeping approval (5%); (8) Other (5%).

### B.  Operations/Activities of the Three RPO Compliance Groups

100.    Detailed descriptions of the operations/activities of each of RPO

Compliance's three Groups follow:

### 1.  Ghost Preparer Group

101.    There are various ways that a return preparer may be classified as a

potential Unidentified Preparer, *i.e.,* a "Ghost Preparer."

102.    Many return preparers do not enter any identifying information on

returns that they prepare, thereby making the returns appear to have been self-

prepared by the taxpayer.

103.    Other return preparers use their Social Security Number ("SSN") instead of their valid PTIN.

104.    Others use expired PTINs or "Legacy" PTINs that were issued prior to FY2011.

105.    Additional examples of PTIN non-compliance include return preparers using deceased individuals' PTINs, or other return preparers' PTINs.

106.    RPO categorizes all return preparers who do not comply with 26 U.S.C. § 6109 PTIN requirements as "ghost preparers."[30]

107.    The Ghost Preparer Group is primarily staffed by PTIN Analysts.  PTIN Analysts have generally been GS-12 level employees.

108.    A few employees have carried the job title of Tax Analyst, but they do the same work as those with the PTIN Analyst title.

109.    The Ghost Preparer Group's PTIN Analysts have been supported by Case Processor(s) and Clerk(s) who over the years have been GS-05/06 level employees.

110.    The PTIN Analysts who staff the Ghost Preparer Group do not specialize with respect to certain functions or duties.

111.    Rather, all PTIN Analysts may be assigned to the full range of Ghost Preparer cases handled by their Group.

---

[30] Exhibit 16 (I.R.M. 25.20.2.1(1)); *see also* I.R.M. 4.11.51.3.3.

### (a)   Sources of the Ghost Preparer Group's work

112.   The Ghost Preparer Group has received its cases from various sources over the years.[31]

113.   The EPD Group is the primary source for potential case inventory for the Ghost Preparer Group to work.

114.   Technical Analysts in the EPD Group engage in various data analyses and queries, thereby yielding potential Ghost cases for the Ghost Preparer Group.[32]

115.   Referral Group 1 is the other primary source for Ghost Preparer Group case inventory.

116.   The Ghost Inventory Tracking System ("GITS") includes data regarding the sources of cases referred to the Ghost Preparer Group for possible investigation by it.

### (b)   Categories of Ghost Preparer Group cases

117.   Cases worked by the Ghost Preparer Group may be grouped according to certain categories.

118.   Categories of cases worked by the Ghost Preparer Group include, among others, no PTIN used, use of SSN, use of non-active PTIN, use of stolen PTIN, and return preparation by sanctioned/enjoined preparers.

---

[31] *See* Exhibit 16 (I.R.M. 25.20.2.2); Exhibit 11 (Compliance Operational Review: Debrief Document (Sept. 11, 2012), p. 8; Exhibits 12-14 (Metrics Reports) (Oct. 2014, Sept. 2017, Apr. 2019).

[32] *See* Exhibit 16 (I.R.M. 25.20.2.2).

119.    The GITS includes data regarding number of cases worked by the Ghost Preparer Group according to certain categories.

(c)    **Ghost Preparer Group Activities**

120.    In working a Ghost case, the Ghost Preparer Group's primary responsibilities involve investigating Ghost Preparer leads, administering treatments, and documenting determinations and actions.[33]

121.    As explained in the I.R.M., steps in working a Ghost Preparer case involve source/lead evaluation; deconfliction;[34] research and investigation; analysis and determination; treatment; documentation; and completion and submission.[35]  In greater detail, the Ghost Preparer Group's activities involve:

122.    Initially receiving or independently identifying suspected Ghost Preparer non-compliance.  The Ghost Preparer Group's activities are initiated when the Group receives a file that indicates a particular return preparer is not utilizing a valid PTIN when preparing returns for compensation.  In early years, the Ghost Preparer Group Clerk typically entered the case information into a case management spreadsheet, but now the data entry step has been automated.  The Frontline Manager then assigns the

---

[33] *See* Exhibit 16 (I.R.M. 25.20.2.1.2(3)).

[34] Deconfliction is performed in order to ensure an identified ghost preparer case is not already being worked by another IRS business unit.  Processes for deconfliction are explained in Exhibit 16 (*see* I.R.M. 25.20.2.3.2).

[35] *See* Exhibit 16 (I.R.M. 25.20.2.3).

case to a PTIN Analyst and sends the file and any supporting documents to the PTIN Analyst.

123.   <u>Working Ghost Cases.</u> In working a Ghost case, the PTIN Analyst attempts to uniquely identify and locate the individual who is not recording her valid PTIN upon the tax returns prepared for compensation.  The PTIN Analyst may utilize searches in Accurint, internal IRS systems, various internet search engines, websites and publicly available data, and/or other databases and information sources in order to identify and locate the preparer.[36]  PTIN Analysts will also initiate telephone calls and other communications with suspected Ghost preparers in the course of working a Ghost case.

124.   <u>Treating PTIN non-compliance via telephone calls and letters.</u>  Once the PTIN Analyst has identified and located a return preparer engaging in PTIN non-compliance, the PTIN Analyst makes a determination regarding the correct response to that PTIN non-compliance.  In some cases, the PTIN Analyst may call the return preparer and discuss the PTIN non-compliance over the phone.[37]  Often the PTIN Analyst will determine that the correct treatment is to send the return preparer a letter that identifies the specific PTIN non-compliance and explains how that non-compliance may be remedied.  Other potential actions include a no action determination or

---

[36] *E.g.,* Exhibit 3 (Compliance Analyst Desk Guide Version 4.0 (June 2019)), pp. 17-20 (listing available information and database sources); Exhibit 16 (I.R.M. 25.20.2.3.3).

[37] *See* Exhibit 16 (I.R.M. 25.20.2.3.5(1)).

referring the case to an IRS business unit outside of the RPO.[38]  The Ghost Preparer

Group's Frontline Manager determines whether the PTIN Analyst's recommended

action is implemented.

125.   <u>Referring Ghost Preparer cases to other IRS units for enforcement.</u>  Many

Ghost Preparers do not report their valid PTIN on the returns they prepare in an

attempt to camouflage additional wrongful conduct.  Consequently, the PTIN Analyst's

investigation of potential PTIN non-compliance may discover substantive tax law

violations by that Ghost Preparer.  In such cases, the Ghost Preparer Group may refer

the case to another IRS unit (*e.g.*, SB/SE) for further investigation/action.  The PTIN

Analyst will provide documentation for the other IRS unit.[39]  The Metric Reports from

2014, 2017, and 2019 include data on the number of cases that the Ghost Preparer Group

referred to SB/SE, Criminal Investigation ("CI"), Lead Development Center ("LDC"),

*etc*.  *See* Exhibits 12, 13 & 14.

126.   <u>Provide appropriate documentation.</u>  The PTIN Analyst must also

appropriately document the case before closing.[40]

127.   <u>Assisting other IRS units in pursuing Ghost Preparer cases</u>.  If the Ghost

Preparer Group has referred a particular Ghost case to another IRS unit for enforcement

action, the Ghost Preparer Group may provide support to that other IRS unit.

---

[38] *See* Exhibit 3 (Compliance Analyst Desk Guide Version 4.0 (June 2019)), pp. 22-25;
Exhibit 16 (I.R.M. 25.20.2.3.5).

[39] *See* Exhibit 16 (I.R.M. 25.20.2.3.6(2)).

[40] *See* Exhibit 16 (I.R.M. 25.20.2.3.7).

128.   <u>Engaging in "Look-Back" activities.</u>  "Look-back" activities involve the PTIN Analyst determining whether prior treatment has altered the Ghost Preparer's conduct and brought the return preparer back into compliance.  The Look-Back process is an annual process because, generally speaking, it is not possible to confirm whether a particular preparer has cured her PTIN non-compliance detected during one filing season until the following tax year's filing season.  However, on occasion the PTIN Analyst may treat the PTIN non-compliance during the early portion of the annual filing season and then conduct Look-Back later in that same filing season.  If the Look-Back process determines that the Ghost Preparer's PTIN non-compliance has continued, then the PTIN Analyst may attempt to reach the return preparer by telephone and may also send a further treatment letter.  Additional Look-Backs to confirm compliance may occur.[41]

129.   Exhibits providing greater detail regarding PTIN Analysts' activities are attached.[42]

---

[41] *See* Exhibit 3 (Compliance Analyst Desk Guide Version 4.0 (June 2019)), pp. 35-36 (Appendix D – Case Revisit (Look Back) Job Aid); Exhibit 16 (I.R.M. 25.20.2.4 & 4.1 & 4.2 (Case Revisit Procedures)).

[42] *See* Exhibit 3 (Compliance Analyst Desk Guide Version 4.0 (June 2019)); Exhibit 16 (I.R.M. 25.20.2 (Ghost Preparer Treatment).

**(d)     Percentage Allocation of Time by Activity**

130.     Of the above listed activities, working each Ghost case takes the most time, followed by the time entailed by the Look-Back, and Treatment activities respectively.

**(e)     Time-Per-Case**

131.     As noted in Paragraph 55, PTIN Analysts were initially spending a substantial amount of time researching some cases during the Ghost Preparer Group's early operations.

132.     Ghost Preparer Group time-per-case substantially decreased in following years.

133.     By 2014, average time per closed case had decreased to five hours, which was further reduced to about three hours by 2017.[43]

134.     The Ghost Preparer Group was able to reduce its time per case because of increased efficiencies including via automation, replacing paper processes with computer processes, better case selection, increased analysts' experience, implementing the GITS that prepopulates some data in case files, and via redesigning processes, for example, to reduce the volume of unworkable/nonprocessable cases that were being referred to the Ghost Preparer Group.

---

[43] *See* Exhibits 12, 13 & 14 (Metrics Reports (Oct. 2014); (Sept. 2017) & (April 2019)).

### 2. Referral Group 1

#### (a) October 2014 Merger

135.   As of mid-2014, the Director of RPO Complaint Referrals was Teresa Medlock.

136.   Ms. Medlock retired at the end of FY2014, *i.e.,* on September 30, 2014.

137.   In order to increase operational efficiency and because its Director was retiring, RPO Complaint Referrals was then merged into RPO Compliance.

138.   Accordingly, on October 1, 2014, RPO Complaint Referrals staff were merged into RPO Compliance as Referral Group 1.

139.   As the Director of RPO Compliance, I was thereafter responsible for Referral Group 1.

140.   The merging of RPO Complaint Referrals into RPO Compliance was not related to the *Loving* lawsuit.

#### (b) Staffing Overview

141.   The Organization Charts collected in Exhibit 10 show Referral Group 1 personnel after the October 1, 2014 merger.

142.   As shown by Exhibit 10, Referral Group 1 Case Specialists were GS-12 level employees until 2017 when they were re-graded as GS-9 level positions.

143.   Referral Group 1 has also included a few GS-05/06 level Clerks and Case Processors.

144.    Prior to the merger, particular RPO Complaint Referrals' Case Specialists may have focused on particular categories of taxpayer complaints.[44]

145.    Subsequent to the merger, Referral Group 1 Case Specialists have not specialized by particular category of complaint but have worked on all types of complaints received by the Group.

### (c)    Sources of Referral Group 1's Casework

146.    The complaints worked by Referral Group 1 come primarily from taxpayers but may also arise from other IRS units outside of RPO, or from return preparers themselves.

147.    Taxpayer complaints*:*  Referral Group 1's casework primarily derives from complaints submitted by taxpayers on IRS Form 14157, Return Preparer Complaint.

148.    The current version of Form 14157 is attached as Exhibit 18.

149.    I understand that RPO issued the original version of Form 14157 in July 2011.[45]

150.    The majority of Forms 14157 reviewed by Referral Group 1 consist of taxpayer complaints, received via mail or electronic means, regarding a return preparer.

151.    IRS Sourced Complaints*:*  IRS units outside of RPO may also be a source for Referral Group 1 work.

---

[44] *See* Exhibit 17 (RPO Complaint Referrals Department Operational Review (May 16, 2012)), p. 6, *see generally* pp. 5-8.

[45] *See* Exhibit 4 (GAO Response:  Strategic Plan Update (February 6, 2012)), Slide 12.

152.    CI, OPR, and LDC have over the years referred matters to be worked by Referral Group 1.

153.    IRS Account Management Services ("AMS") has also been a source of Referral Group 1 case work.

154.    <u>Return Preparer Complaints</u>:  Referral Group 1 also receives cases to work directly from return preparers themselves.

155.    Return preparers submit Form 14157, or contact the IRS via other methods, in order to report certain matters, such as their PTIN having been compromised, that they had suffered a data breach or security incident, or that a new client's prior return preparer had acted improperly.

156.    For example, the Tax Professional PTIN System ("TPPS") allows a return preparer to view the number of returns received by the IRS under that preparer's PTIN.

157.    If the IRS count of returns under the preparer's PTIN does not match the preparer's own count, the preparer's PTIN may have been stolen/misused, and the preparer may report that discrepancy to the IRS.

**(d)     Total Complaints Received**

158.    RPO Complaint Referrals/Referral Group 1 has received anywhere from over 5,000 to nearly 11,000 complaints in any Fiscal Year.

**(e)     Categories of Complaints Received**

159.    Complaints may be categorized based upon the nature of the allegation against the return preparer.

160.    Form 14157 allows taxpayers to identify their complaint against the preparer according to certain categories of alleged preparer wrongdoing.[46]

161.    Categories of alleged preparer wrongdoing include theft of refund, preparer misconduct, RPO Program Noncompliance, Tax Preparation Noncompliance, E-File Issues, Data Breach Incident, Identity Theft to Obtain a PTIN, Compromised PTIN, TPPS Count Mismatch, etc.[47]

### (f)    Referral Group 1 activities

162.    Regardless of the source, once Referral Group 1 receives the complaint, the Group functions as a submission processing center for complaints against a particular return preparer or particular tax preparation company.

163.    As stated in the I.R.M., the "RPO Complaint Referrals unit receives and evaluates complaints against return preparers, and when applicable, refers the complaints to stakeholders."[48]

164.    The four phases of Referral Group 1's processing of a complaint against a return preparer are: (1) Intake Phase; (2) Evaluation Phase; (3) Acknowledgment Phase; and (4) Research & Resolution Phase.

---

[46] *See* Exhibit 18 (Form 14157).

[47] *See* Exhibit 20 (I.R.M. 25.20.1.4).

[48] *See* Exhibit 20 (I.R.M. 25.20.1.1(4)).

165.     Both the applicable Desk Guide and I.R.M. section provide further detail on each phase of Referral Group 1's processing a complaint.[49]

166.     <u>Identification of Non-Processable Complaints and Noncomplaints</u>:  Many complaints do not assert a tax law violation against a compensated return preparer, but instead assert some other matter.

167.     Other complaints may be illegible, illogical, or have other defects.

168.     These and certain other categories of complaints are categorized as "not processable" or "noncomplaints."

169.     Referral Group 1 routes those complaints to the appropriate IRS office to handle.[50]

170.     In recent years a substantial percentage of complaints have been closed as "nonworkable"/"unactionable."

171.     It is my understanding that RPO Compliance does not have data capturing the amount of time spent on non-workable/non-processable cases.

172.     The amount of time that Referral Group 1 may spend on a non-workable/non-processable case is quite variable.

---

[49] *See* Exhibit 19 (Complaint Referrals Process and Procedures Desk Guide (Oct. 1, 2015)), p. 7; Exhibit 20 (I.R.M. 25.20.1.1.1.2) (listing Intake, Evaluation, Research & Resolution, and Closing as the phases of complaint processing)).

[50] *See* Exhibit 19 (Complaint Referrals Process and Procedures Desk Guide (Oct. 1, 2015)), pp. 21-24, 38-40; Exhibit 20 (I.R.M. 25.20.1.1.1(4) (stating what qualifies as a "complaint" for the Complaint Referrals unit), 25.20.1.6 (identifying categories of "Noncomplaints"), and 25.20.1.8.7 ("Determining if a Complaint is Processable").

173.    In some cases, it may take almost as much time for Referral Group 1 to close a non-workable/non-processable complaint as it takes to close a workable/processable complaint.

174.    PTIN Status Review:  With minor exceptions such as complaint duplicates and return preparers who are already under treatment, all complaints, even non-workable/non-processable complaints, are reviewed by a Referral Group 1 employee to determine if the preparer is using a valid PTIN.

175.    Therefore, even if the taxpayer complaint does not expressly identify preparer PTIN non-compliance on her submitted Form 14157, Referral Group 1 will research whether PTIN compliance issues exist and may discover indications of a Ghost preparer.

176.    In order to conduct the PTIN Status Review, the Case Specialist will log on to the TPPS, search for the preparer, and review data regarding PTIN status for the preparer.

177.    The time to conduct the PTIN Status Review may take up to 10 minutes per complaint, depending upon the circumstances and method employed.

178.    Research & Resolution Activity:  The research, or case building, and resolution activity takes the most time.

179.    Case building involves confirming that an existing case is not in progress, and, if not, researching the case, and documenting the facts of the case and the conclusions reached in the Return Preparer Database, and in TPPS when appropriate.

180.    Once the case building is complete, Referral Group 1 may itself "treat" indicated PTIN non-compliance by calling the preparer and/or sending the preparer a letter.

181.    As stated in one of our Desk Guides, "[n]ot every identified ghost preparer warrants a referral to Compliance Ghost.  CR may in fact issue a letter to a preparer who is not complying with the regulations for properly using a valid PTIN."[51]

182.    Referral Group 1 resolves the vast majority of its workable/processable cases by referring the complaint to the Ghost Preparer Group, to RPO Suitability, or to an IRS business unit outside of RPO for handling.

183.    With respect to referrals to non-RPO business units, Referral Group 1 will primarily refer complaints to SB/SE, Wage and Investment, CI, OPR, or the Treasury Inspector General for Tax Administration ("TIGTA").

184.    The Referral Group 1 Frontline Manager then reviews the recommended action before it is implemented.

**(g)    Time-Per-Case**

185.    The efficiency of RPO Complaint Referrals/Referral Group 1's operations has increased over time.

186.    Prior to the October 1, 2014 merger, RPO Complaint Referrals used paper files and Excel spreadsheets to manage its casework.

---

[51] Exhibit 19 (Complaint Referrals Process and Procedures Desk Guide (Oct. 1, 2015)), p. 54; Exhibit 20 (I.R.M. 25.20.1.11.2 (Referral Group 1 treatment options for various categories of Ghost Preparers)).

187.    After the merger, the EPD Group created a database module for complaints that significantly increased the efficiency of Referral Group 1.

188.    As a result, in recent years Referral Group 1 has taken about one hour to process a complaint against a return preparer.

189.    With respect to workable/processable cases, Referral Group 1's time-per-case does **not** significantly vary depending upon whether the case is referred to the Ghost Preparer Group or to some non-RPO business unit.

190.    For example, Referral Group 1 spends approximately the same time-per-case regardless of whether it refers a complaint to the Ghost Preparer Group or to CI.

### 3.    EPD Group

#### (a)    Staffing

191.    As with the Ghost Preparer Group, the EPD Group has been part of RPO Compliance ever since its inception.

192.    The Organizational Charts collected in Exhibit 10 show the staffing for the EPD Group from FY2012 to FY2019.

193.    EDP is comprised of Technical Analysts who have been, over the years, almost entirely GS-14 level employees.

194.    EPD employees have always been located around the country.[52]

---

[52] *E.g.,* Exhibit 11 (RPO Compliance & Enforcement Department Operational Review: Debrief Document (Sept. 11, 2012)), pp. 5-6 (identifying EDP Group Technical Analysts' names, activities, and posts of duty).

195.    Many of the Technical Analysts have been members in the EPD Group for many years and have developed their own substantial expertise and institutional knowledge.

### (b)    Background of EPD Group's Origin

196.    As part of the stand-up of RPO, the Implementation Team reviewed compliance function footprints in other organizations in the IRS.

197.    Nearly every compliance function in the IRS has a Planning & Direction team.

198.    IRS Planning & Direction teams, generally speaking, identify cases that fulfill work plans and meet organization goals, as well as monitor case work.

199.    IRS Planning & Direction teams generally also report to management.

200.    One reason that the IRS has separate Planning & Direction teams is that internal, external and oversight reviews have consistently found that strategy and case selection decisions should be performed at the Headquarters/National level.

201.    Placing strategy and case selection authority at the Headquarters/ National level promotes uniformity, and also mitigates the possible risk that a particular local IRS employee or manager could adopt an inefficient case selection process.

202.    Consequently, the EPD Group – as a separate RPO unit -- makes data driven strategy and case selection decisions in support of RPO strategic goals.

203.    For example, EPD Group analysis identifies potential PTIN non-compliance in various return preparer populations.

204.    Similar to other IRS Planning & Direction teams, the EPD Group summarizes operational results and makes recommendations for future work.

205.    The process is continuous and includes designing work plans, delivering cases, monitoring progress, analyzing results, reporting to Senior Management, and recommending next steps, process improvements, or new projects.[53]

206.    One notable example of the EPD Group's process improvements is its redesign of Referral Group 1 processes immediately after the October 1, 2014 merger.

207.    The EPD Group's process improvements reduced Referral Group 1's complaint backlog and also improved the Ghost Preparer Group's efficiency by reducing the number of nonworkable/nonprocessable cases that RPO Complaint Referrals had been referring to the Ghost Preparer Group.

### (c)    Core Activities

208.    The EPD Group's core activities that have recurred in at least some, or even most, years include:

| EPD Group Activity | Activity Description |
| --- | --- |
| Ghost Preparer Group Support | For new inventory workstreams: developing procedures; developing and delivering guidance and training to Ghost Preparer Group analysts; extracting, deconflicting, and delivering datasets. |
| | For existing workstreams: extracting, deconflicting, and delivering datasets. |
| Referral Group 1 Support | Monitoring case work; reviewing closed complaints; supporting Frontline Manager with |

---

[53] Exhibit 3 (Compliance Analyst Desk Guide, Version 4.0 (June 2019)), p. 11.

|  | data and analysis; developing training on new issues; reviewing case cycle time and reporting monthly and quarterly for RPO Compliance's Business Performance Review. |
|---|---|
| PTIN Compliance Letter Campaigns | Identifying return preparers who are using an expired PTIN or SSN on tax returns; issuing 7,000 to 12,000 letters per year; processing responses and assigning analysts to contact the non-compliant return preparers; monitoring PTIN compliance subsequent to the letters and during filing season. |
| Criminal & Civil Fraud Programs | Identifying and treating non-compliant return preparers identified via CI; reviewing discontinued CI cases, court rulings, and prisoner lists; referring PTIN non-compliance and court order/injunction violations for escalated treatment. |
| Develop Servicewide Return Preparer Strategy Recommendations for Deputy Commissioner for Services & Enforcement | Developing strategy recommendations for IRS Senior Management, including in recent years in response to TIGTA Audit 2018-30-042, "Internal Revenue Service Lacks a Coordinated Strategy to Address Unregulated Return Preparer Conduct." |
| Analyze Program Results & Report to Director of RPO | Collecting periodic reports from EPD Analysts; consolidating data and preparing monthly reports and quarterly Business Performance Reviews; responding to Senior Management data and reporting requests. |
| Performance Commitments for RPO Compliance Director & Frontline Managers | Creating annual performance commitments for the Frontline Managers; supporting RPO's Director's and Deputy Director's annual commitments; overseeing activities, programs and projects relating to commitment goals. |
| Partner with other BODs | Partnering with other BODs on ad hoc projects. |
| Preparer Risk Identification and Selection Model ("PRISM") | Creating and updating a system that summarizes certain line items from client returns linked to a particular return preparer. |

| | |
|---|---|
| Return Preparer Visitation Program (FY2012 – FY2014) | Identifying return preparers who are not PTIN compliant or have issues that RPO Technical Advisor determined needed to be addressed; delivering selected preparers to SB/SE for visits; training Revenue Agents; collecting data and analyzing results from preparer visits. |

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on the _19__ day of ___April_____, 2021, at ___4:35 pm_____.


/s/ Diann Wensing_____
Diann Wensing
Former Director of RPO Compliance
Internal Revenue Service