# EXHIBIT BJ

## RPO Complaint Referrals Department

*Operational Review*

*May 2012*

**Washington, DC**

**May 16, 2012**

*IRS Return Preparer Office*

USA-0035243

*RPO Referrals Operational Review – Debrief Document*

**Table of Contents**

1.0    Overview and Approach.................................................................................................................. 3

2.0    Background and Current State......................................................................................................... 6

3.0    Key Observations............................................................................................................................8

4.0    Key Recommendations.................................................................................................................. 10

5.0    Appendix:  Detailed Observations............................................................................................... 12

USA-0035244

*RPO Referrals Operational Review – Debrief Document*

## 1.0 Overview and Approach

<u>*MEETING DATES*</u>*:  MAY 8 – 10, 2012*

<u>*DEBRIEF DOCUMENTATION DELIVERED*</u>*:  MAY 17, 2012*

<u>*NOTE TO REVIEWERS*</u>*: The key observations and high-level recommendations outlined in this debrief document are based upon historical knowledge of Complaint Referrals Department standup, a high-level review of standard documentation, and a three-day meeting with department leadership and staff. Additional analysis and planning will be necessary to close the gaps between the current state and the desired future state.*

### BACKGROUND AND INTRODUCTION

To address standup challenges within the RPO Complaint Referrals Department, a small team led by the RPO Technical Advisor conducted an Operational Review of the department's progress, daily operations, and vision for continued maturation.  The purpose of the engagement was to better understand the current business practices in several key areas, and to develop recommended actions to improve the efficiency and effectiveness of work processes and move the department to the desired future state. The team also evaluated leadership practices and human-resource-related issues across the department to ensure effective ongoing management, as well as adherence to IRS/NTEU/RPO rules and guidelines. With few exceptions, all employees within the department took part in the operational review and were given the opportunity to provide input, ask questions, and make recommendations for improvement.

### KEY FOCUS AREAS OF THE COMPLAINT REFERRALS OPERATIONAL REVIEW

The Operational Review team conducted an assessment of the RPO Complaint Referrals organization across four core areas:

1. ***Policy, Mission, & Strategy:*** *A review of the Complaint Referrals Department's goals, existing metrics/targets to measure progress against those goals, and thought leadership that drives ongoing enhancements to the department*
   - <u>*Purpose*</u>*: To ensure that the CR Department's goals align with the RPO's overall mission & vision, that staff within the CR Department have a comprehensive understanding of the department's goals, and that the department is evolving with the needs of the RPO*
2. ***Operating Model:*** *An assessment  of the Complaint Referrals Department's responsibilities, processes/effectiveness, collaboration with other RPO Departments and IRS Divisions, performance management, and workload levels*
   - <u>*Purpose*</u>*: To ensure that the Complaint Referrals Department's tactical operations are effectively progressing against the organization's goals*
3. ***Organization & People:*** *An analysis of the Complaint Referrals organizational structure, governance model, employee level and skills, training opportunities/frameworks, as well as assurance that prescribed IRS/NTEU/RPO management practices are being followed*

USA-0035245

*RPO Referrals Operational Review – Debrief Document*

- o *Purpose*: To ensure that the Complaint Referrals Department is appropriately organized and staffed at the correct staff levels, and that resources are being effectively managed.
4. **Technology:** An assessment of the Complaint Referrals Department's technology tools/ infrastructure as well as an analysis of the office's business/technology needs (i.e. case management processing, data tracking/storage/analysis needs, etc.)
    - o *Purpose*: To ensure that Complaint Referrals has adequate technology to support its business operations

### HIGH-LEVEL AGENDA

The review of department operations took place between May 8 and May 10, 2012, in the department's offices in Saint Louis, MO; the first day's agenda included a meeting with all available department employees, including those in the Atlanta, GA office.  Additionally, a separate team conducted in-person interviews with staff in Atlanta, GA on May 11, 2012.  While in St. Louis, the team followed a prescribed three-day schedule:

- **Day 1**: The session began with a two-hour meeting between the Operational Review team, the Complaint Referrals director, and the group's frontline manager. The meeting focused on obtaining leadership's perspective on department standup progress, process effectiveness, identification of lessons learned, use of supporting technologies, and vision for continued office maturation.  Following the meeting with management, the team conducted a joint interview with the director, the frontline manager, case specialists, and the department's clerk. Employees were given the opportunity to provide an overview of their day-to-day processes and recommend improvements for the department as a whole
- **Day 2**:  The team met individually with the case specialists in the St. Louis office to gather information on their tactical/daily work processes and collect their perspectives on all aspects of the department's operations (e.g., process effectiveness, clarity in expectations, collaboration across CR groups, collaboration across the RPO/IRS, etc.).  The technical advisor also met with the director and frontline manager to review staff HR files to ensure that processes/policies prescribed by RPO/IRS/NTEU are being followed (e.g., assurance that exit performance reviews were conducted before the staff joined the RPO)
- **Day 3**: The team reviewed actual examples of closed case files submitted to the frontline manager for approval to assess the sufficiency of the research conducted by the case specialists and the justifications associated with the recommended dispositions. The team obtained additional information as necessary to close out the data gathering effort, and discussed preliminary findings and next steps with CR Department leadership

### MEETING ATTENDEES

During the course of the operational review, the team was able to engage most employees in the Complaint Referrals Department.  All interviewed employees were given opportunities individually and as a group to answer specific questions, as well as offer recommendations for improvement across the department.  The meeting attendees included:

---

USA-0035246

*RPO Referrals Operational Review – Debrief Document*

- ***Melissa Reynard***, *RPO Technical Advisor & Operational Review Team Lead*:  Responsible for facilitating the three-day meeting, leading the data collection and analysis effort, developing formal recommendations for executive review, and debriefing RPO executives on key findings
- ***Tania Fluitt,*** *AM Department Manager & Operational Review Team Member:*  Responsible for assisting the technical advisor in collection of data at the tactical/processing level and development of recommendations for holistic improvement across the department
- ***Nadine McPhail,*** *RPO Complaint Referrals Director*:  2nd line manager responsible for leading department activities to ensure efficient, effective case processing.  Leads efforts to develop processes to ensure that cases are appropriately built, referrals are properly categorized, and disciplinary actions or well-developed leads are effectively passed to OPR, other RPO departments, or other IRS BODs. Supported operational review by providing an overview of the current state, documenting lessons learned from ongoing standup, and providing recommendations on improvement for core processes and supporting technologies
- ***Zachery Woodside,*** *Issue Resolution Team Frontline Manager (St. Louis, MO):* Manages tactical delivery across the department, facilitates flow of caseload, manages employees, conducts training, and reviews case closure recommendations. Supported operational review by providing required documentation/data, sharing HR practices followed across the department, providing examples of closed caseload, and supporting the director in offering recommendations for improvement
- ***Cedric Brown***, *Case Specialist (St. Louis, MO):* Holds responsibility for all <mark>theft of refund complaints</mark> and makes referrals to appropriate parties for further action
- ***Tony Black,*** *Case Specialist (St. Louis, MO):* Holds responsibility for all possible Circular 230 violations, conducts research and makes recommendations for referral to OPR. Also supports Theft of Refund case work.
- ***Natalie Trankle***, *Case Specialist (St. Louis, MO):*  Holds responsibilities for all "project cases" that are being developed across the CR department, including Z-freezes, lists from CI and LDCs, etc.
- ***Daphne Meadows***, *Case Specialist (Atlanta, GA):* Holds responsibility for all <mark>e-File complaints</mark>
- ***Earline Smith***, *Case Specialist (Atlanta, GA):* Shares responsibility for all RP <mark>return preparation complaints</mark>
- ***Jared Kelly***, *Group Clerk*: Holds responsibility for all intake processes, updates master tracking spreadsheet, and makes case assignments to specialists

*Staff Not Interviewed:*

- ***Sonya Grier***, *Case Specialist (Atlanta, GA):* Holds responsibility for all potential ghost preparer complaints
- ***L'Tanya Chew,*** *Administrative Assistant (Crystal City, VA):* Holds responsibility for assisting the Complaint Referrals Director with administrative operational activities and coordinating with the Group Clerk  to update master case tracking spreadsheet
- ***Kay Patel***, *Case Specialist (Atlanta):* Shares responsibility for all RP preparation complaints

---

*May 17, 2012*

USA-0035247

*RPO Referrals Operational Review – Debrief Document*

## 2.0 Background and Current State

**OVERVIEW**

The department is primarily charged with:

- Serving as a centralized complaint referral processing/staging area (e.g., complaints from the field, public, etc.)
- Reviewing the initial complaint, logging required information, conducting research to build a case file, and sending case file/required complaint documentation to other RPO divisions, or externally to OPR/IRS stakeholders

The department is currently comprised of one director, one frontline manager, eight case specialists graded at GS-11/12, one administrative assistant graded at GS-7, and one clerk graded at GS-5.  The frontline manager, three case specialists, and the clerk are located in St. Louis, MO, while the remaining five case specialists are located in Atlanta, GA. The director and administrative assistant are located in Crystal City, VA.  Prior to joining the RPO in mid-December 2011 and early January 2012, the case specialists held positions within various IRS divisions as RA, ROs, CI Investigative Analysts, and TCOs. Case referrals training was held the week of January 23, 2012.  The Complaint Referrals Department commenced operations in February of 2012.

**CASE ASSIGNMENT AND INVENTORY TRACKING**

Leadership in the Complaint Referrals Department has assigned responsibility to their staff around the following complaint categories:

- e-File Allegation
- Project Case
- Theft of Refund
- Potential Circular 230 Violation
- Potential Ghost  Preparer
- Other Return Preparer Allegations

Employees in the department are generally assigned a category of work for which they are responsible. Each day the clerk retrieves the mail, counts and date stamps receipts.  He then goes to the oldest cases and inputs 20-25 of them into the excel spreadsheet where the inventory is tracked, and generally issues an acknowledgement letter (as of May 10, 2012 there were approximately 200 acknowledgement letters waiting to be mailed).  Based on the checkboxes on Form 14157 selected by the complainants, the CR clerk assigns complaint cases to the corresponding case specialist for further research and case-building. When multiple checkboxes are selected by the complainant, the case is assigned to the case specialist responsible for the category associated with the most severe violation.  ***In cases in which the complaint was not clearly documented and/or explained on Form 14157 or via email/complaint letters/Form 3949, the clerk must use his general knowledge/judgment*** to determine which category the complaint should fall under.  Case assignment is made solely on ***first-in first-out basis; cases are not prioritized based on any other criteria, i.e. type/complexity/criticality of referral*** .  The physical case files containing the original complaint and supplemental documents are forwarded to the case specialists to whom the cases are assigned.

USA-0035248

Research and case-building, which are also based on a first-in first-out inventory management system, are performed by case specialists.  Following case analyses, recommended dispositions (e.g., "no action", case referral to SBSE, or case transfer to C&E/Ghost), case activities logs, and check-sheets are added to the physical case file and ***submitted for Frontline Manager's review and approval***.   Approved case files are processed/closed out by the clerk to ensure uniform practices around record retention and referrals to other IRS entities are being followed, where necessary.  ***The Excel-based spreadsheet is then updated to record case closure dates and final dispositions***. For cases referred outside of RPO, the clerk copies key documentation to mail.  Closed cases that need to be stored are then packaged and mailed to Crystal City.  Due to space constraints these are packaged and sealed in UPS envelopes and stored in boxes pending mailing.  Because PII is included this information should be stored in locked cabinets, instead of boxes in the work area.

### STATUS OF CURRENT CASE INVENTORY

Since January 1, 2012, the Complaint Referrals Department has received **4090** complaints from the public, as well as from internal IRS sources and, as of May 11, 2012, **4,055** complaints have been successfully logged and categorized.  Due to management decisions made as a result of an excessive case backlog, an additional approximately **2,386** RP complaints received in 2011 (forwarded by Fresno Campus and other BODs) are not being logged or processed at this time.   Case Specialists have conducted research on approximately **789** complaints, which were either closed with no further action (i.e., the complaints lacked merit), requires a soft letter to be sent as treatment, or referred to another IRS division for further review or investigation.   However, approximately **70** complaint cases designated as "closed" have been set aside (i.e. not sent to record retention), awaiting issuance of soft letters, which are pending RPO approval, prior to making a final disposition (these letters have been in Counsel since March 19, 2012; some follow-up has occurred but still pending).   In summary, the department has:

- Received **6476** complaints as of May 11, 2012, including **2,386** complaints received prior to January 1, 2012.  **4090** complaints have been received since January 1, 2012.
- Logged **4,055** complaints as of May 11, 2012
- Identified 789 cases as closed from March 1, 2012 through May 15, 2012 (all Case Specialists were assigned to input complaints during the month of February).  70 of these cases still require the issuance of a series of soft letters, which in effect means that they are still open.  Actual closures from March 1, 2012 through May 15, 2012 are **719**.
- Open inventory as of May 11, 2012 is **3301** complaint cases.  Note that this does not include the 2,386 cases received prior to January 1, 2012.  Nor does in include inquiries received from the RPO Mailbox (a guesstimate of 40).

### PERFORMANCE MEASURES

USA-0035249

*RPO Referrals Operational Review – Debrief Document*

***The current Excel-based spreadsheet does not allow the Complaint Referrals Department to collect data on all aspects of the department's performance***.   ***Very limited performance metrics*** are available to gauge the average age of complaint cases, the types of non-compliances reported by complainants, the make-up of potentially non-compliant RPs with professional designations, etc.

Based primarily on daily observations, department leadership estimates that ***the Clerk categorizes and logs 20-25 complaints into the Excel-based tracking tool on a daily basis, while the daily receipt of complaints averages at 50-60***.   Depending on the amount of information provided by the complainant and the complexity of complaint, the ***case specialists spend 1.5 – 4.5 hours*** to complete the necessary research and determine the disposition of the complaint.   On average, the group as a whole ***closes approximately 20 complaints on a daily basis***.

## 3.0 Key Observations

As part of the operational review, the team collected data across four main categories: 1) Policy, Mission, and Strategy, 2) Operating Model, 3) Organization and People, and 4) Technology.  The initial data gathering effort resulted in a set of key observations that will guide recommendations for improvement and continued department standup.  The preliminary findings across the four main categories are:

1.  ***Policy, Mission, and Strategy***:  The Complaint Referrals Department has a defined vision for the organization that enables 1) Efficient and ***accurate processing*** of complaints that are routed to the appropriate owner, 2) ***Impact on return preparer behavior*** through two-way communications around complaint resolution, and 3) Use of an ***analytics capability to inform the community-wide compliance issues/behavior trends*** using aggregated complaint data.  At present, the CR Department may not be making the best use of available resources in order to meet RPO's complaint processing needs and achieve that vision. .  CR case specialists do not fully understand the roles/responsibilities of the other RPO departments impacted by their work, nor do they fully understand the ***ways in which its "customers" are using cases that are referred by the department.***  **This** is likely driving process inefficiencies across the RPO and the broader IRS, and may be resulting in a lack of effectiveness in case building activities within the CR Department.  In addition, the inventory management processes need to be reconsidered.  Given the current state of the CR inventory, operating solely on a FIFO basis with no consideration given for other case type priorities results in low priority work being processed while high priority work sits.  The CR departments is also receiving a large volume of complaints that are not within the RPO's jurisdiction, which is placing an additional burden on already stretched resources.

2.  ***Operating Model***:  The organization's effectiveness is diminished by department-wide ***process inefficiencies/"pain points"*** and ***bottlenecks***, which primarily result from a lack of clarity in roles and processes, as well as from ineffective case management methodologies and tools.  For example, although the long-term vision for the department is to ensure that each case specialist

USA-0035250

*RPO Referrals Operational Review – Debrief Document*

is equipped to process any type of complaint within RPO's jurisdiction, each employee within the CR department is **currently specializing in processing specific case types** (e.g., Theft of Refunds, e-File Allegations)**.**  This approach can act as an inhibitor for reprioritization of department-wide workforce responsibilities in instances when the CR Department experiences a particularly high workload in any complaint category, and is proving particularly problematic when cases that should be considered high priority, such as Theft of Refund, sit while lower priority cases, such as pay stub cases, get worked.  Also, the department is operating at a relatively low case closure rate (~20 cases per day) which, when coupled with a daily case intake of ~50-60 cases, has resulted in a **large case processing backlog**, which is currently at a level of approximately 3,300 cases.  It also appears as though efforts within the CR department are being duplicated in cases when the complainant incorrectly categorizes a complaint, or when additional research is necessary to reevaluate complaints that cite multiple issues.  Process duplication may also affect operations between the department and its partners within the RPO and across the IRS.  For example, if CR employees spend extensive time evaluating a potential Circular 230 violation, the team is unsure as to whether OPR will conduct a thorough set of its own analyses on the same case, which would result in a **large-scale duplication of effort between RPO and its partners**.  Additionally, the department's use of an interim Excel-based complaint tracking system is **inhibiting their ability to conduct analyses around preparers** with multiple offenses, as well as make determinations on **aggregated noncompliance** in the return preparation industry

3. **_Organization and People_**:  Employees within the Complaint Referrals Department **do not seem to have sufficient training** to effectively accomplish their assigned tasks.  Employees cite a lack of **full awareness of their individual role** relative to their CR peers, and their **department's role** relative to those of other RPO departments (e.g., C&E, Suitability) and those **across the IRS** (e.g., OPR).  They seem to have bits and pieces of needed information, but lack of fuller understanding of the impacts of their decisions.  Employees indicate that they are developing processes from scratch and educating themselves as best they can despite the fact that other IRS organizations have done or are doing similar work which could potentially be leveraged from both a process and training perspective.  An example would be theft of refund cases.  Current processes exist for handling those inquiries outside of RPO, including guidance on how to respond to taxpayers (likely complainants).  It is likely training exists as well.  In addition, although CR employees are assigned to work PTIN inquiries, they lack a basic understanding of the PTIN issuance process.  Also, several employees across the department voiced a preference to participate more actively in the decision-making process across the CR Department or, at a minimum, to be regularly **informed of senior-level decision making** such that they can more fully understand shifts in direction or priority.

A review of employee personnel and drop files indicated the following:

- The manager has a process for ensuring timely completion of annual and midyear performance assessments.  However, he needs to ensure that documented performance reviews are regularly included in EPFs.  In addition, both the Director and

USA-0035251

*RPO Referrals Operational Review – Debrief Document*

the FL Manager need to ensure that evaluative ratings are completed in accordance with Article 12 of the National Agreement.

- Two key documents, the flexiplace agreements and employee expectation memos were not included in any of the drop files. Both need to included and guidance to employees needs to be further clarified, with approval from RPO Director.

4. **Technology**:  The department has developed an **Excel-based complaint tracking tool** that is enabling employees to input data and track complaints across the complaint processing lifecycle and, by the time the operational review has concluded (Week of 5/14/2012), all **4,055 complaints received in CY2012** have been logged into the tracking spreadsheet.  The workbook is used to make case assignments, manage progress, and track closure rates.  Though the tracking tool is generally meeting the department's day-to-day needs, it **does not enable a comprehensive view of a preparer across the RPO**, or more broadly across the IRS.  Also, case input and tracking mechanisms are **labor- and time-intensive**, and **do not enable easy analysis** of individual preparer behavior, or aggregated complaint-driving return preparer behavior.  Also, without a centralized data repository, **all complaint case building data that does not meet the threshold of an external organization is at risk of being lost** if the complaint is not formally "referred"

Additional observations, recommendations, and comments gleaned from the RPO Complaint Referrals operational review are tracked in the Appendix (Section 5.0).

## 4.0 Key Recommendations

In order to continue to mature the RPO's Complaint Referrals Department, the team recommends that several guiding recommendations be leveraged to improve organizational impact.

1. **TPPS Case Management**:  Effective as soon as possible, all complaints received by the IRS RPO will be logged into TPPS.  This will enable access to a "one stop shop" for information on individual return preparers across the RPO.  Additionally, this will alleviate administrative burden around case development that does not result in a referral to another organization (i.e., CR Department staff will have the ability update the PTIN-holder's record in TPPS and close the referrals).  As necessary, the CR Department should also identify and transcribe all existing high-priority complaints into TPPS

2. **Understanding of Customer Needs**:  Conduct an analysis around the preferences/processes of the recipients of all CR Department caseload to ensure that the department is meeting their needs, and to ensure that efforts are not duplicated within CR, between CR and other RPO departments, and across the IRS. Some of this work has already begun, and is proving valuable.

3. **Process Review/Refresh**:  Develop approach and conduct analysis of core mission-facing processes (e.g., case intake, Circular 230 complaint resolution, etc.) across the CR Department to identify potential "pain points", recommend enhancements, and realize economies of scale, where available. Initial focus should be on maximizing efficiencies around inventory management and case prioritization.   Ensure that the full lifecycle of complaints received by the

USA-0035252

*RPO Referrals Operational Review – Debrief Document*

RPO are appropriately catalogued, tracked, analyzed, and closed/referred. As part of this effort, ensure that RPO, and the CR employees, have a sound understanding of the end-to-end process, i.e what happens after it leaves RPO, so that they can better understand the context of their work and facilitate improved processes and continuity in transition.  Where possible, consider leveraging similar processes existing in other Organizations.

4. ***Long-term Workforce Analysis***:  Following implementation of process enhancements, and based upon a more complete understanding of trends in caseload, the team recommends that the CR Department determine whether their organization is staffed with the correct number of employees, and that existing employees are bringing the right skill set to daily operations

5. ***Training***:  Within the CR Department, there is a high demand for training on many aspects of the IRS's and RPO's service offerings as part of professional development and competency building among the staff. Develop and deliver/re-deliver comprehensive training on the PTIN issuance process, TPPS Case Management functionality, responsibilities of all RPO departments, Service-wide touch points, needs of complaint case recipients, and case processing practices across all core complaint categories for all staff.  Leverage available training material from other Organizations, where possible, and consider shorter, ongoing training sessions, as opposed to a comprehensive "one-and-done" approach to minimize impacts to case processing and to establish an environment of continual learning.

6. ***Internal Communications***:  Institute additional "town hall" meetings with all CR Department staff to facilitate the two-way exchange of information with geographically-disbursed employees across the organization.  This will provide a venue that will enable communication around/integration of lessons learned across the department, enable staff to ask questions and make recommendations to leadership, and help generate staff buy-in across the department. Consider inviting guest speakers.

7. ***External Communications***:  The review team generally concurs with the CR Director's recommendation that, once a complaint has been substantiated and the CR department is planning to send the case to another IRS/RPO organization, the department should issue a letter to the implicated preparer to inform them that the IRS has been made aware of potential noncompliance so as to drive an immediate effect on RP behavior.

## 5.0 Appendix:  Detailed Observations

In addition to the thematic key observations presented in section 3.0, the Operational Review team tracked detail around specific observations obtained from leadership and staff across the Complaint Referrals Department.

KEY FINDINGS: POLICY, MISSION & STRATEGY

| # | Category | Observation | Additional Information and Potential Risks |
|---|----------|-------------|---------------------------------------------|
| 1 | *Vision Alignment* | *Employees may not fully understand the mission or strategic direction of the Complaint Referrals Department in the context of the* | • Without an understanding of the strategic role of the department in enforcing return preparer compliance across the IRS or within the RPO, employees may not feel empowered to offer recommendations for improvement, develop "ownership", or proactively resolve standup issues |

USA-0035253

*RPO Referrals Operational Review – Debrief Document*

| # | Category | Observation | Additional Description and Supporting Data |
|---|----------|-------------|--------------------------------------------|
| | | *broader RPO/IRS missions; they also may not understand their role in ensuring success of the organization* | • If the situation is left unresolved, staff may become myopic in approaching their roles, which could affect general productivity and the quality of overall work products across the organization |
| 2 | | *At present, the department may not be fully aware of how to allocate CR resources in the environment of the RPO's evolving strategic direction* | • May affect the department's ability to develop referrals that are most impactful to the recipients of the organization's casework<br>• May affect leadership's ability to identify process-related bottlenecks and/or assist employees in completing their core tasks |
| 3 | | *Complaint Referrals Department leadership has a defined vision that will inform the continued standup of the CR organization* | • The vision is that the future-state department fulfill three core requirements: 1) Efficiently and accurately process complaints and route them to the appropriate owner, 2) Affect return preparer behavior through two-way communications around complaint resolution, and 3) Leverage an analytics capability to inform community-wide compliance issues/behavior trends using aggregated complaint data<br>• The department leadership's vision will continue to inform standup activities and, if realized, will support efficiencies across the RPO, and the broader IRS |
| 4 | *Service-wide Interactions* | *No formal guidance/IRM exists to guide Service-wide inquiries sent to the Complaint Referrals email inbox* | • Processing misdirected inquiries puts an unnecessary drain on CR resources that could be more efficiently deployed in efforts to close the inventory backlog<br>• For example, the department currently has received a large number of PTIN related inquiries from CI. Many of these information requests can be resolved internally more expediently if the CI agents were better informed of the tools available to them for accessing PTIN information |
| 5 | *Customer Needs* | *Since February 2012, the CR Department has begun to refer caseload outside of the organization but may not have a fully-formed understanding of the specific needs of its caseload recipients* | • Only a selected number of "customer" organizations have provided feedback to CR on the criteria for referrals; most have not<br>• Need to better understand "customer" needs (e.g. criteria for making referrals, data requirements for referred case files) to ensure that the department's efforts are positively contributing to the mission of their "customer" organizations (e.g., RPO C&E, OPR, SB/SE, CI, etc.) |

**KEY FINDINGS: OPERATING MODEL**

| # | Category | Observation | Additional Description and Supporting Data |
|---|----------|-------------|--------------------------------------------|
| 1 | *Allocation of Caseload* | *Currently, each CR employee serves as a "subject matter specialist", retaining ownership for processing specific complaint categories (e.g., e-File Allegations)* | • The objective of this operating model is to allow the staff to develop functional expertise in specific complaint categories and then assist in streamlining category-specific case building procedures<br>• This knowledge will then be documented in the form of Subject Matter Specialist (SMS) Guides and shared among all staff; however, in the interim, this approach may preclude the department's ability to address an influx of cases of all types with sufficient agility<br>• Department leadership has a vision that the staff become case processing generalists after the SMS Guides are incorporated as job aids, enabling an automatic assignment of caseload through TPPS or another case management tool (i.e., vs. manual routing); A detailed plan to provide specialized training must be developed |
| 2 | *Taxpayer and/or* | *It is unclear how external* | • This is particularly true for cases in which the complaint is |

*May 17, 2012*

USA-0035254

*RPO Referrals Operational Review – Debrief Document*

| | | | |
|---|---|---|---|
| | *Return Preparer Contacts* | *stakeholders are being informed of department progress in resolving complaints, and/or whether they are consistently contacted to provide input when appropriate* | • referred out of the CR Department, or if the case is closed without merit<br>• For example, it seems unclear whether taxpayers are always informed of progress/resolution around cases involving theft of taxpayer refunds.   If the theft of refund is validated and a refund is due to the taxpayers, as per the current procedures, the case specialist will advise the taxpayer to complete Form 14157A and correspond with W&I to make them "whole." If the theft of refund is either not validated or a refund is not warranted, the case specialist will close the case without further action without further communication with the taxpayer<br>• For other types of complaints, there are no procedures to inform taxpayers or complainants of the outcome of case resolution activities (Solution must adhere to IRS disclosure policies)<br>• An analysis is required to confirm whether return preparers or taxpayers are being contacted in all cases in which they deserve to provide input in evaluation of their case |
| 3 | | *Unclear whether CR staff are using IRS-prescribed methods for self-identification when contacting taxpayers and/or return preparers over the phone* | • As per "*IRM 3.11.15.1.1 IRS Employee Contact – RRA 98 Section 3705(a)*, the IRS requires that all employees must properly identify themselves to external stakeholders, including over the phone. It does not appear as though these procedures for self-identification are not consistently followed by all case specialists when contacting taxpayers and/or RPs over the phone<br>• For example, due to training in prior positions, former revenue officers and revenue agents seem to be consistently identifying themselves when making taxpayer/preparer contacts, but staff with other backgrounds do not seem to be consistently following IRM guidance<br>• If prescribed methods are not being followed consistently, the RPO and IRS could be at reputational risk if the inconsistent practices are reported to oversight bodies |
| 4 | *Resource Management* | *Prioritization of resources across Complaint Referrals can sometimes be reactive, which could be affecting department-wide effectiveness* | • The department is experiencing challenges in predicting future workload levels, and in directing resources to address department complaint backlogs<br>• For example, to address backlogs, all department employees have been asked to refocus their efforts temporarily on intake processes in order to ensure that all received complaints are logged into the department's interim complaint tracking tool. In addition, office leadership sometimes supports tactical operations (e.g., processing inquiries through the RPO email box) to address backlogs; In the long-term, similar practices will diminish the department's effectiveness by distracting efforts away from the CR Department's core mission (i.e., complaint resolution)<br>• In addition to FS2012 data, the department may leverage data from complaints received in the second half of 2011 to better understand trends outside of filing season; based upon findings, the team recommends that leadership develop a plan (e.g., detailing additional resources, developing a data-driven hiring plan) to process future caseload in real time to avoid excessive backlogs |
| 5 | | *The CR Department's clerk is responsible for all intake-* | • In the near term, the team recommends that the CR Department detail an additional clerk to assist with intake |

USA-0035255

*RPO Referrals Operational Review – Debrief Document*

| | | | |
|---|---|---|---|
| | | *related activities and, in many cases, is not able to process the number of complaints that are being received each day* | • responsibilities. More permanent hiring decisions will require additional insight into the department's processes |
| 6 | *Case Prioritization* | *When a form 14157 with multiple allegations is evaluated by the department, the CR clerk forwards the information to the CR employee with responsibility for the most serious of the alleged allegations* | • Based on review of closed case files, once the most serious issue has been processed/referred, other allegations in the complaint are not necessarily addressed on a consistent basis<br>• This is particularly pressing in the absence of use of a standardized case management system, which would enable tracking of complaint information at the RP level (i.e., each complaint category could be tracked for the benefit of trend analysis even if not all allegations are actively pursued) |
| 7 | | *Complaints are processed on a "first in, first out basis", independent of analysis around prioritization of issues* | • The team found that for instances in which more severe/time-sensitive (e.g., Theft of Refund) complaints are received after cases that may not be as time-sensitive (e.g., Suspected Circular 230 violations), the CR Department staff processes cases in the order in which they are received. This may contribute to a situation in which resources focus on less severe issues at the expense of closing more severe cases |
| 8 | *Case Closure* | *The Complaint Referrals Department is currently closing ~20 cases per day while receiving ~50-60 per day through the intake process* | • At this averaged closure rate, the current inventory level of approximately 3,300 cases will age significantly before the department is able to address them, which may render the complaints less useful and negatively affect the RPO's ability to timely address RP non-compliance |
| 9 | *Performance Management* | *The department is not currently collecting data or conducting trend analyses around effectiveness/ performance, processing time, or case closure rates* | • In the absence of qualitative/quantitative performance metrics, the department will be unlikely to conduct robust workload analyses; this will negatively affect future staffing decisions and/or the identification of a need to engage detailees |
| 10 | *Resources for Inventory Backlog Resolution* | *Given the lack of clarity around core CR process efficiency, it is unclear whether additional staff/detailees could effectively support operations* | • Once process definition has been clarified, the team recommends that a workforce analysis be conducted to understand processing times and determine the need for additional staff and/or the realignment of existing staff |
| 11 | *Case Transfer Issues* | *Data suggests that the process for transferring physical case files between staff in St. Louis and Atlanta is resource intensive and inefficient* | • It is likely that ineffective handoffs across the department are resulting in longer turnaround times and/or contributing to a longer case development lifecycle<br>• For example, the original Form 14157s and supplemental documents provided by the complainants are mailed to the Atlanta staff after they are logged into the Excel spreadsheet. Upon case closure, the case file, including the original form, supplemental documents and case work activities forms are mailed back to St. Louis for manager approval. This practice could result in prolonged case lifecycle and risk misplacement of case files<br>• The team recommends that the department devise more efficient ways to share case files (e.g. electronically) to reduce the burden on staff to handle physical case files; also recommends that the department clarify/streamline intake processes and file transfer techniques across the organization |

*May 17, 2012*

14

USA-0035256

*RPO Referrals Operational Review – Debrief Document*

| | | | |
|---|---|---|---|
| 12 | *Duplication of Analysis* | <u>*Within Complaint Referrals*</u>*, it is likely that preliminary case analyses being conducted by the intake clerk may be repeated across the department if the complainant did not accurately categorize their complaints on form 14157* | • When a complaint is received by the clerk in the Complaint Referrals department, the form is evaluated, and the data is input into an excel spreadsheet. The clerk makes assignments to CR staff based upon his preliminary findings but, in many cases, the GS-11 and GS-12 employees in the office often have to duplicate the initial analysis in order to make a final determination<br>• The intake process can result in in duplication of effort and lack of efficiency in core department processes |
| 13 | | <u>*Across the IRS*</u>*, it is likely that CR staff is conducting extensive case research that will be repeated by another IRS (e.g., OPR) or RPO organization (e.g., C&E)* | • When a complaint has been referred out of the CR department, the organization does not have a full understanding of how the receiving organizations will use the information, and/or the extent to which processes are being duplicated across the department<br>• For example, if CR employees spend extensive time evaluating a potential Circular 230 violation, the team is unsure as to whether OPR will conduct a thorough set of its own analysis on the same case, resulting in a large-scale duplication of effort<br>• The team recommends that the department determine the correct LOE that enables 1) The CR staff to make a decision on where/how to refer a case, 2) The point of diminishing returns that may result in duplication of efforts in other departments, and 3) The level of rigor that the "customers" require that will enable the other offices (e.g., RPO C&E, OPR) to prioritize cases that are sent to them |
| 14 | | *CR has successfully developed/implemented a standardized case closure checksheet to summarize case work activities* | • The CR Department has begun to streamline the case closure process by developing a standardized checksheet, which is used by case specialists to document all system research conducted, fact-finding phone conversations with the RP or taxpayer, and justification for the recommended disposition<br>• The closure process will be further improved and automated once TPPS becomes the primary case management tool. The future state will reduce the burden of manually completing the checksheet, thus further streamline the closure process |
| 15 | *Process Standardization* | *Across CR, in some cases, it appears as though employees are working on cases using intuition and/or with an "every case is different" mentality* | • In some cases, it is likely that employees are not working every case/every category of case using a standardized approach, which could be a key contributing factor to the extensive and varying level of LOE required to fully process a complaint, and is likely contributing to the large backlog<br>• For example, potential Circular 230 violations often require establishment of willfulness and pattern of bad behavior before escalation to OPR. This requires expansive review of sample returns as well as deep knowledge of Circular 230 provisions to determine if a referral to OPR is justifiable<br>• A more robust understanding of criteria would support efforts to close the gap on this issue |
| 16 | *Interim Case Processing* | *Current Excel-based complaint case management tracking processes can sometimes be overly cumbersome* | • The current process requires that the CR clerk add a row for each complaint in a master Excel tool, numbering the cases sequentially at the point of input. When each case is categorized, the row in excel is pasted into the appropriate tab that aligns to the checked box/category and/or the resolution for the most serious issue checked on the form. Each case specialist will update his or her assigned tab as the cases are processed and closed. The Excel file containing closed cases is then sent back to the CR clerk for |

USA-0035257

*RPO Referrals Operational Review – Debrief Document*

| | | | |
|---|---|---|---|
| | | | • consolidation into a separate "closed cases" Excel file.  The master Excel file is then updated with the closed cases by the CR clerk<br>• This process requires extensive processing time for both the case specialist and clerk to ensure that open referrals are effectively tracked.  Additionally, since the data being recorded in the master Excel file are limited, the process only enables simple and rudimentary trend analyses and performance management |
| 17 | *Post-referral/closure analysis and communication* | *In the current state, CR employees are sending complaints to other parts of the IRS without sending communications to return preparers informing them that their behavior is being evaluated* | • In the absence of this practice, it may take months/years until another IRS organization addresses the issue, which would result in additional non-complaint RP behavior.  The CR department could proactively change behavior if we *adopted the CR Director's suggestion* to systemically send letters (Note: If approved, need to engage with Karen Masken to develop an approach to piloting this solution) |
| 18 | | *It is unclear the CR Department has an understanding of how complaints are processed and whether RP behavior is altered after they're referred case files outside the department* | • The team recommends that the CR Department conduct an analysis of how "customers" are using complaint caseload (e.g., Need to understand why OPR or TIGTA would close a complaint without taking action, especially if the CR Department believed that the complaint had merit)<br>• Also, need to understand whether current complaint processing techniques are altering RP behavior |
| 19 | *Preparer Complaint Aggregation* | *Currently, the CR department is tracking individual complaints vs. evaluating a pattern of complaints around individual return preparers or firms* | • The team recommends that the group develop a process to enable real-time identification of multiple referrals on the same preparer or firm to inform the selection prioritization models and treatment application that are part of the C&E strategies |
| 20 | *Process Standardization across the IRS* | *It does not appear as though the CR organization has a thorough knowledge of Enterprise-wide referral processing/evaluation/closure activities* | • By developing a more thorough understanding and documenting a baseline, the organization may be able to develop synergies, avoid duplication of processes, and incorporate lessons learned as well as best practices observed from across the IRS |
| 21 | *Complaint Processing Below Referral Threshold* | *In some cases, the Complaint Referrals Department receives complaints that, after some analysis, are deemed to have merit but are not sufficiently egregious to meet thresholds of other organizations* | • In the near term, the team recommends that the group determine whether these cases can be catalogued and closed with a lower LOE.  In the longer term, the team recommends the need to start using TPPS to enter data on these cases that will inform parties outside of CR without having to make a formal referral (e.g., If RPO CR notes a potential felony issue that could be addressed by Suitability in the future batch process, they can update the file in TPPS to notify Suitability of the incident so that the case can be addressed at a later point; this will mitigate the need to "forward" the case to Suitability immediately) |

*May 17, 2012*

USA-0035258

*RPO Referrals Operational Review – Debrief Document*

| # | | | |
|---|---|---|---|
| 22 | *e-File Complaints* | *The staff perceives a lack of clarity around ways in which they should be processing different types of e-File related complaints* | • e-File related complaints require immediate attention during the course of the filing season; quick resolution and effective treatment is a priority for the RPO<br>• In the absence of a clear understanding of e-File rules and common violations, staff were unable to refer e-File complaints to the appropriate "customers" for further processing and treatments<br>• Due to the high-profile nature and political sensitivity of e-File related complaints, this poses a reputational risk to the RPO in its ability to enforce e-File rules |

**KEY FINDINGS: ORGANIZATION AND PEOPLE**

| # | Category | Observation | Additional Description and Supporting Data |
|---|---|---|---|
| 1 | *Communications between Complaint Referrals and other RPO Departments* | *Seems unclear whether the CR department has fully implemented an RPO-wide complaint vision, which could result in lack of inter-departmental collaboration and inhibit general RPO success* | • The team recommends that the CR Department lead an effort across the RPO to define holistic complaint processing needs, seek to collaborate with other departments to enhance operations across the RPO, and train employees as necessary<br>• For example, several staff voiced that they have a vague understanding of the Suitability's function within the RPO. Also, on many occasions, PTIN -related cases have been erroneously referred to Suitability |
| 2 | *Communications within Complaint Referrals* | *CR employees perceive a lack of clarity around changes in processing and/or strategic direction* | • CR staff does not perceive the ability to contribute to thought leadership during standup, nor do they feel sufficiently informed of shifts in overarching strategy<br>• For example, when the department recently directed all resources to focus on inputting complaints into the tracking spreadsheet, the staff suggested that they did not sufficiently understand the strategic drivers around the temporary shift of focus<br>• In another example, two of the staff participated in a TPPS post-launch meeting and provided input around perceived system challenges. However, the issues they raised during the meeting were not addressed and, shortly thereafter, the department chose to move to an Excel-based tracking tool |
| 3 | | *Leadership holds bi-weekly staff meetings to foster inclusiveness across the CR Department* | • The bi-weekly department staff meeting have provided an effective forum to share key management decisions with employees, discuss challenges, and issue communications around CR Department performance; this has been particularly valuable given the geographic dispersion of the staff<br>• The team recommends that the CR Department continue to identify opportunities for employees from Atlanta and St. Louis to regularly communicate and collaborate |
| 4 | *Understanding of Staff Roles /Responsibilities* | *Department employees may not fully understand their roles within the CR Department, or within the RPO* | • There may be a lack of clarity around approach to processing a potential circular 230 complaints (Resolution forthcoming from "Yalta" discussions with OPR)<br>• Also, when department staff receives e-File related complaints, they do not feel as though there is sufficient information or guidance on what research needs to be done to build the case or which counterparts within RPO or IRS could support case development efforts. As a result, many e-File complaints, which are time sensitive, remained unresolved until after the end of the filing season |
| 5 | *Incorporation of Lessons Learned* | *Lessons learned from processing individual complaints are shared on an ad-hoc basis, and are* | • The team recommends an analysis of aggregated complaint data across RP groups to better understand how issue "buckets"/complaint categories are being tracked and analyzed<br>• For example, there is lack of routine sharing of knowledge and |

USA-0035259

*RPO Referrals Operational Review – Debrief Document*

| | | | |
|---|---|---|---|
| | | *not incorporated into department-wide training or documented in existing SOPs* | • experiences in dealing complaints that fall in each staff's assigned "bucket"/complaint category.  It seems that knowledge exchange on research and case-building occurs on an ad-hoc basis and is at the discretion of individual staff |
| 6 | *Leadership Feedback on Staff Performance* | *Exemplary work by department employees is recognized by CR Department leadership, but not included in EPFs* | • Management has consistently and proactively provided positive verbal and written feedback and recognition for exemplary performances to staff, in the areas of conducting thorough case work and collaborating with other stakeholders to resolve complaints<br>• No written feedback was included in employee personnel folders.<br>• This has contributed to a positive work environment within the CR Department, where staff feel that their effort is noted and appreciated by their leadership |
| 7 | *Employee Performance* | *Evaluations to date were done in a timely manner, however, no performance documentation was included in EPFs. Improved understanding of National Agreement Article 12 is needed.* | • All departures had been received from previous managers and all annual performance assessments had been completed in a timely manner; most within 60 days of the departure which resulted in the departure becoming the annual.<br>• The manager maintains a spreadsheet that summarizes annual and midyear performance due dates for each employee.<br>• One evaluation was completed after an employee had been in her new RPO position for approximately 4 months.  This rating reflected a straight 5 evaluation even though there were no documented performance reviews in the EPF.  Discussed the evaluation rating process with the Director and the FL Manager. The Director stated that the straight 5 evaluation was appropriate, and that the rating was the result of prorating the employees time in RPO vs her time in the previous position.  I explained that was not my understanding of the how the rating was to be completed.  I later confirmed that this evaluation was not completed in accordance with Article 12 of the National Agreement.<br>• There are no documented performance reviews included for any of the employees. The manager indicated that informal reviews had been conducted via email and face-to-face discussions, but none had been included to date. I explained that it was critical to include regular performance reviews, and explained that this can be as simple as printing an email where the employee was provided performance feedback. The manager thought the feedback had to be more formally documented to be included. |
| 8 | *Administrative (Drop) Files* | *Files in general need to be cleaned up, purged, and organized.  Flexiplace agreements and Expectation Memo should be in files.* | • A number of instances where documents were misfiled, or missing and later located, i.e. hadn't been filed or in the instance of evaluations hadn't been printed out of e-performance.<br>• Four of the nine employees do not have drop files.<br>• Files in general need to be cleaned up, purged and organized.<br>• Not all drop files included current emergency contact information, which was apparently gathered at the January training session. The manager did have a document that summarized emergency contact information for all employees. I encouraged the manager to track down the individual sheets, place them in the drop files, and have them updated regularly. |

*May 17, 2012*

USA-0035260

*RPO Referrals Operational Review – Debrief Document*

| # | Category | Observation | Additional Description and Supporting Data |
|---|----------|-------------|---------------------------------------------|
| | | | • Neither flexiplace agreements nor employee expectation memos were included in any drop files. |
| 9 | *Flexiplace* | *Some confusion still exists.* | • As noted above, flexiplace agreements were not included in any drop files. Once they were located, the signed agreements were reviewed. There were no comments indicating that pre-approval was required to flex nor was there an indication of how frequently they could work it. Manager stated that verbal guidance was 1 day per pay period and that it needed to be pre-approved.<br>• When asked if the employees were working flexiplace, the FL Manager said "yes", and the Director said "no". The Director finally stated that the flexiplace agreements were pulled from the drop files, as directed by the RPO Director. Employees had been and continue to work flexiplace (when they actually started would need to be further clarified).<br>• If they are flexing, then the agreements need to be completed and included in drop files. I pointed to guidance issued by the RPO Director on March 19, 2012 regarding flexiplace agreements and gaining concurrence from the RPO Director before setting flexiplace policy. The Director indicated that she did not recall receiving that memo but would follow-up in accordance with that guidance.<br>• In talking with CR employees, as well as the CR FL Manager, all indicated that they were authorized to flex 1 day per pay period. With that said, there seems to be much confusion amongst the employees regarding the flex policy.<br>• The employee expectation memo, with the attached tour of duty guidance, that was shared with all employees in January 2012 includes some guidance on flexiplace. FP points made included the following: 1) Flexiplace is not avail immediately (although all signed FP agreements w/no limitations), 2) once in position significant amount of time, I see no reason why you can't flex 1 day per week (although all signed FP agreements while in training w/no limitations), and 3) "HQ-executives do not like flexiplace, so we do have to use our time wisely and cautiously" |

### KEY FINDINGS: TECHNOLOGY

| # | Category | Observation | Additional Description and Supporting Data |
|---|----------|-------------|---------------------------------------------|
| 1 | *RPO/CR Case Management Solution* | *The CR Department has developed a working interim Excel-based solution to manage the organization's caseload* | • The solution generally meets the department's needs, supporting case intake, assignments, tracking, and closure requirements<br>• However, the tool does not effectively enable RPO-wide data management, case building, or referral processing, nor does it support a comprehensive view of a return preparer, or ability to aggregate industry trends<br>• It is also unlikely that all complaint/referral data can be easily migrated to TPPS when the RPO adopts a centralized solution |
| 2 | | *After a case is input into TPPS and assigned to one department, the office* | • This issue will require that cases be re-entered into TPPS if a case is referred from one RPO department to another<br>• Analysis is required determine whether CR staff can enter cases in TPPS with an immediate assignment to another departments |

*May 17, 2012*

19

USA-0035261

*RPO Referrals Operational Review – Debrief Document*

| | | | |
|---|---|---|---|
| | | *assignment cannot be easily changed* | • vs. initially "assigning" the cases to RPO Complaint Referrals (Note: This may require that the department conduct case analysis prior to entering any data into TPPS, which may affect intake process efficiency) |
| 3 | | *During department standup, staff received a high-level TPPS overview, but the training was not delivered consistently to all employees* | • During standup, leadership leveraged TPPS overview materials to conduct training and provide a demonstration around inputting complaint cases into the TPPS Case Management Tool<br>• Due to technical issues (e.g., slow IRS firewall, incorrect user log-in credentials, incorrect user access settings, and perceived incorrect system configurations), not all CR staff received a comprehensive training in TPPS |
| 4 | *TPPS Case Management Usability* | *The CR department employees have an insufficient understanding of TPPS case management practices* | • In the near future, all RPO employees will use TPPS as a centralized case management solution; accordingly, all CR employees must develop a more thorough understanding of TPPS case processing capabilities<br>• Without a baseline understanding of TPPS, department employees will suffer from confusion and a lack of process efficiency once the RPO moves to a centralized case processing solution<br>• Need to immediately schedule training with employees in the CR department and representatives from V&BP/RM and Accenture, as necessary |
| 5 | *IAT Research Tool* | *An IAT Tool specific to the Return Preparer Office is not yet available* | • Staff is currently utilizing the IAT tool designed for OPR, which has brought a noteworthy improvement in case building efforts, but the tool lacks certain key functionalities that would be required by the RPO<br>• Development of a tool specific to the RPO's needs would streamline case development processes by enabling staff to run multiple queries on the same return preparer at the same time |

---

*May 17, 2012*

20

USA-0035262