# EXHIBIT BK

# RPO Compliance & Enforcement Department

*Operational Review: Debrief Document*

**Washington, DC**

**September 11, 2012**

*IRS Return Preparer Office*



**Exhibit
PI 030**

6/16/2021

**Exhibit**

11

USA-0006169

USA-0006169-1

*RPO Compliance & Enforcement Operational Review – Debrief Document*

**Table of Contents**

1.0     Overview and Approach..................................................................................................... 3

2.0     Background and Current State............................................................................................. 7

3.0     Thematic Observations .................................................................................................. 10

4.0     Recommended Actions ................................................................................................. 1212

5.0     Appendix: Detailed Observations .................................................................................. 13

USA-0006170

USA-0006170-2

*RPO Compliance & Enforcement Operational Review – Debrief Document*

## 1.0 Overview and Approach

<u>MEETING DATES</u>: July 17 – 19, 2012

<u>NOTE TO REVIEWERS</u>: *The key observations and high-level recommendations outlined in this debrief document are based upon historical knowledge of Compliance & Enforcement Department standup, a high-level review of standard documentation, and a three-day meeting with department leadership and staff.*

**BACKGROUND AND INTRODUCTION**

As part as an office-wide analysis of all RPO departments, a small team led by the RPO Technical Advisor conducted an Operational Review of the C&E Department's progress, daily operations, and vision for continued maturation.  The scope of the engagement was to define the desired future state of department operations, discuss the proposed high-level roadmap to realize the future state, understand current business practices across several key metrics (e.g., department effectiveness, success in meeting "customer needs", inventory levels, workflow management, etc.), and develop recommended actions to close those gaps. The team also evaluated leadership/human-resource-related practices across the department to ensure effective ongoing management, as well as adherence to IRS/NTEU/RPO rules and guidelines. Nearly all employees within the department took part in the operational review and were given the opportunity to provide input, ask questions, and make recommendations for improvement.

**KEY FOCUS AREAS OF THE COMPLIANCE AND ENFORCEMENT OPERATIONAL REVIEW**

The Operational Review team conducted an assessment of the RPO C&E organization across four core areas:

1. **Policy, Mission, & Strategy:** *A review of the C&E Department's goals, existing metrics/targets to measure progress against those goals, and thought leadership that drives ongoing enhancements to the department*
   o <u>Purpose</u>: *To ensure that the C&E Department's goals align with the RPO's overall mission & vision, that staff within the C&E Department have a comprehensive understanding of the department's goals, and that the department is evolving with the needs of the RPO*
2. **Operating Model:** *An assessment  of the C&E Department's responsibilities, processes/effectiveness, collaboration across other RPO Departments, performance management, and workload levels*
   o <u>Purpose</u>: *To ensure that the C&E Department's tactical operations are effectively progressing against the organization's goals*
3. **Organization & People:** *An analysis of the C&E organizational structure, governance model, employee levels/skills, training opportunities/frameworks, and assurance that prescribed IRS/NTEU/RPO management practices are being followed*
   o <u>Purpose</u>: *To ensure that the C&E Department is appropriately organized and staffed at the correct staff levels*

USA-0006171
USA-0006171-3

*RPO Compliance & Enforcement Operational Review – Debrief Document*

4. ***Technology:*** *An assessment of the C&E Department's technology tools/ infrastructure as well as an analysis of the office's business/technology needs (i.e., case management processing, data tracking/storage/analysis needs, etc.)*
   - ○ *Purpose: To ensure that C&E has adequate technological support for the effective delivery of its business operations*

#### HIGH-LEVEL AGENDA

The review of department operations took place between July 17 and July 19, 2012, in the department's offices in Saint Louis, MO; the first day's agenda included a conference call with all available department employees, including those in the Atlanta, GA office.  Additionally, a separate team conducted in-person interviews with staff in Atlanta, GA on July 24, 2012.  While in St. Louis, the team followed a prescribed three-day schedule:

- ***Day 1****:* The session began with a two-hour meeting between the Operational Review team, the C&E director, and the group's frontline managers. The meeting focused on obtaining leadership's perspective on department standup progress, process effectiveness, identification of lessons learned, use of supporting technologies, desired-near term improvements, and vision for continued office maturation.  Following the meeting with management, the team conducted a joint interview with the director, the frontline managers, the PTIN analysts, and the technical analysts.  Employees were given the opportunity to provide an overview of their day-to-day processes and recommend improvements for the department as a whole
- ***Day 2****:* The team met individually with the PTIN analysts and technical analysts in the St. Louis office to gather information on their tactical/daily work processes and collect their perspectives on all aspects of the department's operations (e.g., process effectiveness, clarity in expectations, collaboration across C&E groups, collaboration across the RPO/IRS, etc.).  The technical advisor reviewed staff HR files to ensure that processes/policies prescribed by RPO/IRS/NTEU are being followed (e.g., assurance that exit performance reviews were conducted before the staff joined the RPO, ensure flexiplace agreements were in place, etc.). The team also gathered high-level data in support of the RPO-wide workload modeling effort (e.g., core functions, supporting activities, times to completion, high-level volumes, etc.)
- ***Day 3****:* The team continued remaining interviews with technical and PTIN analysts and scheduled one-on-one meetings with each of the frontline managers as well as the director. The team obtained additional information as necessary to close out the data gathering effort, and discussed preliminary findings and next steps with C&E Department leadership

#### MEETING ATTENDEES

During the course of the operational review, the team was able to engage most employees in the Compliance and Enforcement Department.  All interviewed employees were given opportunities individually and as a group to provide required information, as well as offer recommendations for improvement across the department.  The meeting attendees included:

USA-0006172

USA-0006172-4

*RPO Compliance & Enforcement Operational Review – Debrief Document*

- ***Melissa Reynard***, *RPO Technical Advisor & Operational Review Team Lead*:  Responsible for facilitating the three-day meeting, leading the data collection and analysis effort, developing formal recommendations for executive review, and debriefing RPO executives on key findings
- ***Rachel Erath,*** *Strategy and Policy Team Lead & Operational Review Team Member:*  Responsible for conducting interviews and generally assisting the technical advisor in collection of data at the tactical/processing level, as well as development of recommendations for holistic improvement across the department
- ***Diann Wensing***, *RPO Compliance & Enforcement Director*:  Oversees and manages department activities around planning and coordination of preparer compliance efforts Service-wide, including working with Karen Masken to develop and implement the annual Return Preparer Enforcement Strategy. Supported operational review by providing an overview of the current state, desk guides, program action plans, as well as describing a future-state vision and providing recommendations on improvement for core processes and supporting technologies
- ***Tracy Pettaway***, *C&E Technical Analyst Team Frontline Manager (Laguna Niguel, CA):* Oversees all strategy and planning efforts across the Technical Analyst Team, manages employees, conducts training, and makes recommendations for programmatic improvements. Supported operational review by providing required documentation/data, sharing remote collaboration practices followed across the department, providing examples of research requests, and supporting the director in offering recommendations for improvement
- ***Lucille Jessey***, *Technical Analyst (New Haven, CT):*  Responsible for coordination and planning for the ghost and deceased preparer compliance efforts with Research and SBSE resources and Site Identifying Number (SIDN) with SPEC; performs primary support acting as RPO liaison to other BODs and providing responses to ad hoc data requests (e.g., high-volume preparers)
- ***Bobbie Fowler***, *Technical Analyst (Austin, TX):*  Responsible for coordination and planning for the Return Preparer Visitation Program, e-file compliance visitations, and PTIN misuse compliance efforts; provides primary support for the SBSE Exam work plan for the C&E Department
- ***Diane Krpan***, *Technical Analyst (Town & Country, MO):*  Responsible for coordination and planning for EITC (partnering with the EITC Office) & other refundable credits, potential 1040x misuse, and emerging issues compliance efforts; provides primary support for streamlined injunctions, account adjustments, and UWR processes for the C&E Department
- ***Scott Wieczynski***, *Technical Analyst (New Carrollton, MD):* Performs ad hoc support for delivery and interpretation of research efforts within the C&E Department, delivers training/onboarding support for department employees, delivers treatment training for SBSE field personnel, supports IRM updates, delivers internal & external communications, and maintains RGS updates for the C&E Department
- ***Joan Cunningham***, *Technical Analyst (Newark, DE):*  Responsible for coordination and planning for the Certified Acceptance Agent and Foreign Preparer compliance efforts; performs primary support for, GAO & TIGTA audits and legislative issues, liaison to other Fed/State entities that deal with preparers, and coordinates with Strategy and Finance for C&E-related FOIA requests
- ***Joni Broadbent***, *Technical Analyst (Topeka, KS):*  Responsible for coordination and planning for the CI/fraud, scheme ID (LDC), prisoner, and identity theft compliance efforts; performs primary

USA-0006173
USA-0006173-5

*RPO Compliance & Enforcement Operational Review – Debrief Document*

support for penalty assessment issues, working to improve agent preparer penalty assessment and penalty processing issues, for the C&E Department

- ***Joe Scardina**, Social Scientist/Researcher (Brooklyn, NY):* Performs primary support for research efforts within the RPO and penalty analytics for the C&E Department, focusing on immediate analysis needs and ad hoc data requests while the Technical Advisor focuses on the detection/selection model development
- ***Lisa Burch**, Technical Analyst (New Carrollton, MD):* Currently supportss initiatives outside C&E Branch acting as task manager for Russell Research Contract; assigned to support research efforts within the RPO and CDW data validation for the C&E Department
- ***Kyle Oliver,** PTIN Analyst Group Frontline Manager (St. Louis, MO):* Oversees all tactical delivery across the PTIN Analyst group, facilitates flow of caseload, manages employees, conducts training, and makes recommendations for resolution of complex cases. Supported operational review by providing required documentation/data, sharing HR practices followed across the department, providing examples and metrics of closed caseload, and supporting the director in offering recommendations for improvement
- ***Corey Walton**, PTIN Analyst (Town & Country, MO), **Erin Hoffner**, PTIN Analyst (Town & Country, MO), **Keli Singleton**, PTIN Analyst (Town & Country, MO), **John Barkley**, PTIN Analyst (Town & Country, MO), **Clarice Johnson**, PTIN Analyst (Atlanta, GA), and **Angela Taylor-Woodfork**, PTIN Analyst (Atlanta, GA):* Responsible for researching and validating ghost preparers identified through Complaint Referrals or other research efforts; build cases for future penalty application; recommend preparer treatments, including letters and referrals to appropriate external parties for further action
- ***Michael Reynard**, Intern (Jacksonville, FL):* Performs support for research efforts to identify and validate ghost preparers and ad hoc research requests for the C&E Branch

*Staff Not Interviewed:*

- ***Kareen Williams,** Administrative Assistant (Saint Louis, MO):* Holds responsibility for assisting the Compliance & Enforcement Director with administrative operational activities
- ***Lorna Deperro**, PTIN Analyst (Atlanta, GA):* Responsible for researching and validating ghost preparers identified through Complaint Referrals or other research efforts; builds cases for future penalty application; recommends preparer treatments, including letters and referrals to appropriate external parties for further action; on extended leave

USA-0006174

USA-0006174-6

*RPO Compliance & Enforcement Operational Review – Debrief Document*

## 2.0 Background and Current State

**OVERVIEW**

The department is primarily charged with:

- Providing input to Service-wide enforcement planning and resource allocation
- Planning and directing Service-wide enforcement actions targeted toward return preparers (includes the development of new or innovative treatments required to change preparer behavior)
- Developing and running analysis necessary to identify Return Preparers requiring corrective treatment
- Detecting and planning enforcement activities related to RPs misusing or not utilizing PTINs

The department is currently comprised of one director, two frontline managers (one for the Technical Analyst Group and one for the PTIN Analyst Group), seven Technical Analysts graded at GS-13/14, one Social Scientist graded at GS-13, seven PTIN Analysts graded at GS-11/12, one administrative assistant graded at GS-7, and one intern. The frontline manager for the PTIN Analyst Group and four PTIN Analysts are located in Town & Country, MO, while the remaining three PTIN Analysts are located in Atlanta, GA and one intern is located in Jacksonville, FL. The PTIN Analyst Group Clerk is currently an open position, but will likely be located in Town & Country, MO. The frontline manager for the Technical Analyst Group is located in Laguna Niguel, CA, while the Technical Analysts are located in New Carrollton, MD (2), New Haven, CT (1), Town & Country, MO (1), Austin, TX (1), Topeka, KS (1), and Newark, DE (1) with the Social Scientist located in Brooklyn, NY. The director and administrative assistant are located in Town & County, MO. Prior to joining the RPO in January and February 2012, the PTIN Analysts held a variety of positions Service-wide including call-site, walk-in assistance center, SBSE Exam (TCO), and SBSE Collections (RO). The PTIN Analyst Group commenced operations in March of 2012.

**PREPARER ENFORCEMENT PLANNING AND IMPLEMENTATION**

The Technical Analyst Group focuses on:

- Developing techniques to detect return preparer errors
- Developing cost-effective compliance treatments to alter undesired behavior
- Coordinating return preparer enforcement actions across the BODs
- Continuously improving processes to increase PTIN usage

Each year, the Technical Analyst Group oversees the development and implementation of a coordinated strategy to address return preparer compliance through different treatment approaches. The group is currently closing out the FY2012 activities, continuing to monitor PAC and ghost exam cases delivered to the field in October of 2011, and focusing on new initiatives (e.g., high-volume preparers, use of a deceased preparer's PTIN, foreign preparers not authorized to work in the US, domestic preparers claiming foreign status to avoid program requirements). The group is also preparing to deliver the FY2013 Enforcement Plan and the associated treatment and training materials needed to address the programmatic and tax preparation compliance issues. The group holds primary responsibility for

USA-0006175

USA-0006175-7

*RPO Compliance & Enforcement Operational Review – Debrief Document*

planning, implementing, and monitoring the preparer enforcement activities.  Since the primary detection and selection of preparers for treatment in 2013 now lies with the Research Technical Advisor in the Office of the Director, the Technical Analysts are focusing on the development of materials required to implement the programmatic and tax preparation treatments, including development of letters, training materials, call scripts, and data collection instruments (DCIs).  As of July 24, 2012, letters and training materials have been submitted to RPO Communications for additional feedback, while DCIs and scripts for calls (incoming and outgoing) are under development.

#### GHOST CASE ASSIGNMENT AND INVENTORY TRACKING

The PTIN Analysts draw their inventory primarily from:

- NetReveal analysis (2012)
- EFINs transmitting returns with "bad PTINs"
- Complaint Referrals
- Direct referrals from within the IRS (ad hoc)
- Split refund cases

When a ghost case is received by the PTIN Analyst Group, the group's clerk typically enters case information (e.g., name and TIN) into the case management spreadsheet, and then forwards the compiled case to the PTIN Analyst Frontline Manager.  The frontline manager then inputs the source of the case and assigns the case to a PTIN Analyst, recording the analyst assigned and the date assigned. Case assignment is made based on *first-in first-out, with occasional insertion of cases from the research identified lists of potential cases*.  The physical case files containing the original complaint and supplemental documents (if applicable) are forwarded to the case specialists to whom the cases are assigned.

Research and case-building, which are also based on a first-in first-out inventory management system, are performed by PTIN Analysts.  Following case analyses, the PTIN analysts add recommended dispositions (e.g., "no action", send letter, refer case to SBSE, or develop penalty case), case activities logs, and check-sheets to the physical case file and *submit for Frontline Manager's review and approval*.  Approved case files are processed/closed out by the Frontline Manager to ensure uniform practices around record retention and referrals to other IRS entities are being followed, where necessary.  *The Excel-based spreadsheet is then updated to record case closure dates, tax years affected, and final dispositions*.

#### STATUS OF CURRENT CASE INVENTORY

Since March 2012, the PTIN Analyst Group has received over 14,000 potential ghost cases (i.e., "unassigned", in process and closed), 91 from Complaint Referrals and the remaining majority of cases coming from internal IRS compliance and research sources.  As of June 29, 2012, 164 cases have been successfully researched and submitted for managerial review, with 114 of them having closed.  PTIN Analysts have conducted research on approximately 82 cases, which were either closed due to self-correction (36), recommended for referral to another IRS division for further review or investigation (21), or recommended letter to the preparer (25).

USA-0006176

USA-0006176-8

*RPO Compliance & Enforcement Operational Review – Debrief Document*

At the time of the operational review, this case work has led to the identification of $1,679,200 in potential penalties, however because corrective steps have been  taken by a portion of the return preparer population (i.e., several preparers that could have been issued penalties due to noncompliance in 2009 came into compliance in years 2010 or 2011), the C&E Department recommends $749,000 in penalties for application when/if the penalty assessment delegation orders are approved.

The majority of potential ghost cases came from compliance research efforts, including 4,000 cases with geographically dispersed returns requiring additional research, 4,320 split refund cases, and 5,224 cases identified in NetReveal (NetReveal cases identified prior to January 1, 2012 as part of the FY2012 RP Enforcement Strategy).  The department has closed 114 cases as of June 29, 2012; recommending $749,000 in penalties of the $1,679,200 in applicable penalties

Of the $1,679,200 in penalties that could be issued to return preparers, the population breakdown of 77 individuals is:

- Active PTIN Holders:  3
- Provisional PTIN Holders:  55
- Decedents:  1
- Expired PTIN Holders:  8
- Not in TPPS:  10

Of the $749,000 in penalties that the C&E Department would like to pursue, the population breakdown of 17 individuals is:

- Provisional PTIN Holders:  10
- Expired PTIN Holders:  2
- Not in TPPS:  5

**PERFORMANCE MEASURES**

***The current Excel-based spreadsheet does not allow the PTIN Analyst Group to collect data on all aspects of the group's performance***.  ***Very limited performance metrics*** are available to gauge the average processing time of a ghost cases (including PTIN Analyst research and recommendation write-up), the types of recommended dispositions, and the sources of potential ghosts.

Based on data collected thus far, the PTIN Analyst spends 8 hours on average researching and writing up a recommendation per case, depending on the amount of information and complexity of a case.  Ghost cases can lead to a network of ghost preparers which requires additional research for each additional preparer.  To help control processing time and limit cases with extensive research hours, the PTIN Analyst Group Frontline Manager instituted a rule that no more than 10 hours can be spent on a case without review and managerial approval.

## 3.0 Thematic Observations

As part of the operational review, the team collected data across four main categories: 1) Policy, Mission, and Strategy, 2) Operating Model, 3) Organization and People, and 4) Technology.  The initial data gathering effort resulted in a set of key observations that will guide recommendations for

USA-0006177
USA-0006177-9

*RPO Compliance & Enforcement Operational Review – Debrief Document*

improvement and continued department standup. The preliminary findings across the four main categories are:

1. ***Policy, Mission, and Strategy***: In general, C&E department employees are unified in their vision of the impact the department can have in increasing compliance in the RP community. Further, the department's employees are being leveraged effectively in identification of ghost preparers and in development of caseload across its technical programs. Documented C&E processes are being followed largely as they have been defined, but the organization is unable to issue penalties and depends largely on stakeholders across the IRS to deliver the C&E's core mission (e.g., visitations, penalty assessments). In general, through long-standing relationships developed between employees, the C&E Department has points of contact with organizations across the IRS (e.g., SBSE Examination, EITC Program Office) that are working with the RPO to accomplish its goals. However, the C&E Department does not have pre-identified, formalized liaison relationships, POCs, in other IRS organizations (e.g., IRS Collection) to aid in delivery of the C&E Department's mission. The technical analysts are able to redeploy resources as necessary – for example, when visits associated with WIRA filters were cancelled, the technical analyst group developed an alternate proposal (i.e., one with an increased focus on programmatic compliance) in a short period of time. Many of the technical analysts have backgrounds in field investigation, and are able to bring their expertise to bear during pursuit of the C&E Department's mission. Much of the current focus on the C&E Department is on programmatic compliance issues; however as detection models are developed and deployed in coming years, there will be a shift in resource allocation toward return-filing noncompliance, as well as support for the 2013 compliance strategy. There is some confusion, and quite a bit of frustration, within the C&E Department regarding its role relative to the research technical advisor's role in the Office of the Director. There appear to be too many "hands in the pot". This has resulted in much re-evaluation and re-work and a general sense of confusion and frustration. The Op Review and C&E leadership team discusses the benefit of standing up a research/strategic planning arm within the C&E Department that would complement the activities undertaken by the technical analyst group.

2. ***Operating Model***: The department is structured into two groups, the PTIN Analyst Group and the Technical Analyst Group. The PTIN Analysts are able to ***leverage available resources and perform well during development of ghost RP cases.*** The processes, procedures, and tools are well documented in the PTIN Analyst Desk Guide, allowing the PTIN Analysts to successfully identify, research, validate, and recommend treatment on ghost RP cases. There is ***potential for inefficiencies in the case management lifecycle that could challenge inventory tracking and limit improvement in PTIN Analyst case work.*** Challenges exist with the TPPS case management system with processing ghost preparers (no PTIN, no currently know SSN) makes it difficult for the PTIN Analyst Group to efficiently receive referrals from Complaint Referrals through a streamlined intake process utilizing TPPS. Also, because TPPS case management tokens are limited, using the current TPPS case management to obtain application data, call notes, and other information housed within TPPS that could inform their treatment recommendation is more challenging/time consuming. The PTIN Analyst Group should consider

USA-0006178
USA-0006178-10

*RPO Compliance & Enforcement Operational Review – Debrief Document*

developing a formalized process to obtain feedback on cases referred outside the RPO and house this data with the case management system, allowing them to better understand the needs of their stakeholders outside the RPO.  There may also be **an opportunity for collaboration across C&E**, allowing the PTIN Analysts to work with Technical Analysts to learn more about the overall C&E effort and identify potential research and case work prioritization best practices.  The organization could also benefit from a system (e.g., RP360) that could automatically deconflict cases with the other BODs instead of the current process which requires individual deconfliction with multiple BODs at various levels (nationally and locally).

3. ***Organization and People***:  Employees within the Compliance & Enforcement Department **seem engaged and motivated** to effectively carry out their responsibilities, and advance the mission of the organization.  Employees demonstrated an understanding of **their individual role** and their **department's role** relative to the RPO's mission, but a few lacked a full awareness how their department fit in with the other RPO departments (e.g., Complaint Referrals and Suitability).  Several noted that knowledge of the RPO and its role within IRS is not consistently shared Service-wide, as many of the stakeholders that that they work with on a regular basis seem unaware of the specific details of the office's mission.  Several employees across the department voiced a preference to be regularly **informed of senior-level decision making** such that they can more fully understand shifts in direction or priority.  For example, improved transparency regarding the delay in granting the authority to issue penalties may help them to maintain a high level of morale and avoid the prevalence of a feeling that their efforts are not affecting RP behavior.  The PTIN analysts also mentioned that being **co-located allowed them to collaborate on work and share best practices** to improve overall department efficiency (the two PTIN analysts that are not co-located in St Louis expressed concerns w/being left out).  The technical analyst group in particular has **deep institutional knowledge** that needs to be documented and shared w/the other technical analysts to ensure knowledge transfer and continuity of operations when there is employee turnover.  This institutional knowledge allows the Technical Analysts to utilize observational methodologies for identifying non-compliance, but an **increased understanding of data-driven methodologies** would balance their approach and help the department develop and implement improved detect/select tools and processes to identify non-compliance.

4. ***Technology***:  Compliance and Enforcement employees generally have access to the technological data sources that are required for them to successfully fulfill their job functions.  However, in some cases, they do not have access to all of the data required to develop a full recommendation package.  For example, technical analysts voiced a preference to be able to view correspondence history in TPPS, but only a limited number of tokens are available.  The organization is currently using an Excel-based inventory tracking tool, which is generally meeting its needs, but the long-term recommendation is to centralize case processing in a common system that can be leveraged across the RPO.

Additional observations gleaned from the RPO Compliance and Enforcement operational review are tracked in the Appendix (Section 5.0).

USA-0006179
USA-0006179-11

*RPO Compliance & Enforcement Operational Review – Debrief Document*

## 4.0 Recommended Actions

In order to continue to mature the RPO's Compliance and Enforcement Department, the team recommends that several guiding recommendations be leveraged to improve organizational impact.

1. ***Increase Volume and Type of RP Touches/Treatments***: C&E Department employees on the PTIN and technical analyst teams bring unique skillsets around identification of noncompliance and leveraging findings in pursuit of preparer treatments. The ability to deliver additional treatments would increase the RPO's visibility in the RP community and across the IRS. Additionally, direct C&E employee touches to the RP community (e.g., phone calls to suspected ghosts, communicating directed CE, etc.) would increase external awareness of RPO program compliance assurance activities, and would enable C&E employees to make an impact in the RP community.

2. ***Push Internal IRS Communications and Strengthen Liaison Relationships***: Continue to build IRS-wide understanding of RPO mission, goals, and operations to ensure that the RPO C&E Department's capabilities are fully leveraged across the IRS, and ensure that redundancies across the Service are minimized. Formalize liaison relationships between the C&E Department and other IRS organizations to ensure that stakeholders have a centralized point of contact for preparer-related issues to enable exchange of data, sharing of casework, and identification of lessons learned. As necessary, develop supporting MOUs to formalize key processes.

3. ***Facilitate a Separation of Responsibilities discussion between the C&E Department and the Office of the Director***: Given the current lack of clarity between research and operational efforts within the technical analysts in the C&E Department and the Research Technical Advisor in the Office of the Director, a separation of responsibilities analysis should be undertaken to strengthen operational ownership of efforts undertaken by C&E Department employees in the long term. The desired result of the analysis will enable operational autonomy for the C&E Department while ensuring that daily operations within that department do not adversely affect long-term research and/or data analytics capabilities owned by the Office of the Director.

4. ***Stand up a Strategic Planning Group within the C&E Department***: Given the wide compliance expertise brought by many of the technical and PTIN analysts in the C&E Department, the organization may evaluate the feasibility of centralizing the coordination of proposed research and analysis functions within a single group outside of the technical analyst group. A separate, centralized planning group within the department will formalize all ad hoc data gathering and research/analysis across the PTIN and technical analyst groups with a goal of creating synergies in identification of results, and in creating a centralized point of contact for identification of data needs and control groups that are outside of current efforts within the Office of the Director.

5. ***Provide additional employee training/education***: Within the C&E Department, there is a demand for training/increased awareness on many aspects of the IRS's and RPO's service offerings as part of professional development and competency building among the staff. Develop and deliver/re-deliver training/education on TPPS Case Management functionality, responsibilities of all RPO departments, Service-wide touch points, needs of case recipients, and case processing practices across all core categories for all staff.

USA-0006180
USA-0006180-12

*RPO Compliance & Enforcement Operational Review – Debrief Document*

## 5.0 Appendix: Detailed Observations

In addition to the thematic key observations presented in section 3.0, the Operational Review team tracked detail around specific observations obtained from leadership and staff across the Compliance and Enforcement Department.

**KEY FINDINGS: POLICY, MISSION & STRATEGY**

| # | Category | Observation | Additional Information and Potential Risks |
|---|----------|-------------|---------------------------------------------|
| 1 | Enforcement Delivery | *The C&E Department is dependent upon other IRS BODs to execute treatment systems* | • While it is broadly understood that the C&E technical analyst group is responsible for coordinating and communicating with other IRS BODs regarding return preparer compliance issues and proposed RP enforcement/treatment schemes, its mission and objectives could be hampered by the C&E Department's reliance on other BODs to carry out enforcement schemes (e.g., visitations, exams, audits)<br>• The ability to enforce compliance more directly (e.g directly assess penalties) could improve C&E's ability to pursue its mission and ensure accurate message delivery to the preparer<br>• In addition, it may prove beneficial for C&E to have an auditor in house to support technical needs in identifying cases that should be referred to Exam. As C&E moves towards a focus on filing compliance issues the available technical support may become increasingly useful. |
| 2 | | *The liaison relationships forged by the C&E Department with organizations outside of the RPO may not be as formalized and effective as necessary* | • In general, through long-standing relationships developed between employees, the C&E Department has points of contact with organizations across the IRS (e.g., SBSE Examination, EITC Program Office) that are working with the RPO to accomplish its goals<br>• In other IRS organizations (e.g., IRS Collection), the C&E Department does not have pre-identified, formalized liaison relationships, POCs, available to them to aid in delivery of the C&E Department's mission. For example, the C&E Department had difficulty in locating a point of contact from whom to develop processes on penalty issuance and collection<br>• Identifying and formalizing specific POCs for related program issues will help ensure program continuity and further the IRS' awareness of RPO program activities. |
| 3 | | *The C&E Department is working with IRS Chief Counsel to better understand the situations in which 3rd party contact rules apply* | • In some cases (TBD), 3rd party contact applies, preventing C&E employees from contacting taxpayers immediately and directly about their return preparers. This requirement adds cycle time for PTIN analyst case processing activities<br>• C&E is working with the IRS Chief Counsel's Office to define the criteria/situations in which 3rd party guidance must be followed in order to limit negative impact from increased processing time |

USA-0006181
USA-0006181-13

*RPO Compliance & Enforcement Operational Review – Debrief Document*

| | | | |
|---|---|---|---|
| 4 | | *There's a perception that IRS policy prevents C&E from contacting taxpayers immediately and directly about their return preparers* | • Guidance has been issued to taxpayer's advising them what to do if they get a call from someone stating they're from the IRS but they suspect they're not.<br>• There is no prohibition on calling taxpayers directly, unless there's a POA on file.<br>• More work needs to be done here to fully understand the IRS policy, and to set our own.<br>• See ref<br>• http://www.irs.gov/uac/Report-Phishing |
| 5 | Compliance Experimentation | *Fasciliate a balanced approach to identifying and addressing compliance issues incorporating both longer term research-driven strategies and shorter term operationally identified areas of non-compliance.* | • **As appropriate, RPO is focusing more on developing longer term, research-driven strategies to address RP compliance issues.**<br>• **Recent efforts by the C&E team to use data in combination w/their operational expertise and experience to explore/experiment with RP areas of non-compliance has been challenged** |
| 6 | Foreign Preparer Monitoring & Treatment | *The C&E Department might be missing opportunities to detect and apply treatments to non-compliant "foreign: return preparers residing within the United States* | • For example, some individuals are claiming to be foreign return preparers living abroad in order to bypass RPO program requirements requiring that those living in the US have SSNs.  The C&E Department is working with RPO VPBRM BizOps to determine appropriate courses of action |
| 7 | e-File Rules and Communications | *The C&E Department may be missing valuable communication opportunities regarding program compliance or customer service related to electronic filing* | • In the event of compromised EFINs, the RPO does not currently have a letter that can be sent to the business owner of an EFIN to inform them that their EFIN has been compromised and that they should change their security code<br>• There is currently no official or coordinated guidance/strategy advising EROs that all of their preparers must have PTINs. Failure to ensure they have PTINs could potentially justify penalty or EFIN revocation for this activity |
| 8 | Program Focus | *The C&E Department is focusing resources heavily on program non-compliance detection and treatment* | • The majority of Technical and PTIN Analysts are currently focused on programmatic issues (e.g., ghost issues) and less on preparation conduct.  The capability is currently being developed to run detection models on return filing behavior and, in the future, RPO-wide caseload will be balanced between programmatic and return filing noncompliance |
| 9 | Enforcement Across Professional Designations | *There may be opportunities to better leverage existing correspondence/visitations to monitor and, to the extent possible, issue potential treatments for IRS communities (EFIN holders, CAAs) that also have PTINs* | • The IRS should consider more effectively coordinating enforcement efforts across all IRS communities, especially for individuals who have several designations (i.e., those with PTINs, EFINs who are also CAAs)<br>• For example, if a CAA review is being conducted on a CAA that is also a return preparer, the IRS agent may consider evaluating their RPO program/tax preparation compliance during the same visit |
| 10 | "Out of Scope" Responsibilities | *Some of the technical analysts in the C&E Department are, in some cases, supporting activities that are outside the scope of the C&E organization* | • For example, activities such as writing/delivering training to SB/SE and managing foreign preparer "appeals" deter C&E staff from identifying additional compliance and/or enforcement treatment streams<br>  ○ As an alternative to authoring development and delivering training, C&E's resources may be better used by serving as SMEs during training development<br>  ○ Additionally, managing the foreign preparers "appeals" may be an activity better suited for |

USA-0006182<br>USA-0006182-14

*RPO Compliance & Enforcement Operational Review – Debrief Document*

| # | Category | Observation | |
|---|---|---|---|
| | | | VPBRM BizOps . <br>Note: This may simply be a matter of ensuring that the employees better understand their role, both in the short and long-term. |
| 11 | *Leadership Communication* | *There is an understanding of individual roles within the C&E department, but questions exist around the way that the C&E Department fits into the broader vision of the RPO, and the IRS* | • The Office of the Director and the C&E Department each play a role in advancing the mission of compliance and enforcement across the IRS. Some C&E employees perceive a lack of clarity in roles owned by the RPO Research Technical Advisor and roles owned by the C&E Department<br>• In other examples, communications around major program decisions (e.g., messaging on progress against delegation order approval) need to be more consistently shared.<br>• A formal feedback mechanism would support C&E employee understanding around why individual research requests/projects are adopted by the RPO Research Technical Advisor, and would likely improve quality and appropriateness of submissions |
| 12 | *Strategic Planning within C&E* | *Opportunities for longer-term strategic planning within the C&E Department may sometimes be limited due to high-priority, quick-turnaround projects* | • Needs around planning, training, delivery, and monitoring annual enforcement strategy deployment, as well as other priorities, is filling the majority of staff's time.  While this is a part of the C&E Department's role,  it is being done in lieu of long-term strategic planning.  Some of the skillsets brought by the technical analysts could also be utilized to inform long-term strategic planning.  For example, ongoing support for outside data requests (e.g., high-volume RPs) requires immediate support and distracts staff from other duties<br>• Also, enhanced coordination among the technical analyst group may enable synergies in research requests and/or ad hoc data analysis needs |

**KEY FINDINGS: OPERATING MODEL**

| # | Category | Observation | Additional Information and Potential Risks |
|---|---|---|---|
| 1 | *Process* | *In general, PTIN Analysts leverage available resources and perform well during development of ghost RP cases* | • Each PTIN analyst has his/her own "go-to" approaches, but largely they collaborate across the group on best practices while leveraging the methods detailed in the PTIN analyst desk guide<br>• Cases that are evaluated by PTIN analysts are worked in a relatively systematic way, and submitted to the frontline manager, who determines whether to refer the cases to other IRS BODs based on objective criteria established with each BOD |
| 2 | *Case Management* | *Potential inefficiencies in the case-management lifecycle could lead to challenges in inventory tracking as well as inhibit improvements in PTIN analyst case work* | • Overall, records/inventory appeared to be well maintained for cases at all stages of the case work lifecycle within C&E. There appeared to be inefficiencies in how casework flows into C&E, as well as how casework is processed once it flows out of C&E.<br>• For example, there are opportunities to improve Complaint Referral Department processes to enable a streamlined intake process within C&E (i.e., casework coming from CR can be irregular from a timing and level-of-development perspective); additionally, cases coming from the field or other sources currently arrive in an ad hoc manner<br>• In another example, there are opportunities to improve the |

USA-0006183<br>USA-0006183-15

*RPO Compliance & Enforcement Operational Review – Debrief Document*

| # | Category | Observation | |
|---|----------|-------------|---|
| | | | feedback mechanisms regarding cases that are referred out of C&E to enable a more comprehensive understanding of customer needs – e.g., metrics on ultimate outcomes of referred cases, feedback on the quality of the C&E case work prior to referral, etc. |
| 3 | Collaboration | *There may be opportunities for collaboration across C&E, particularly around research and case work prioritization, if technical analysts and PTIN analysts worked more closely together* | • Several staff members of both the PTIN analyst group and technical analyst group indicated that they rarely collaborate with members of the other group. There could be an opportunity to enhance the research and case work outcomes and direction of both groups if they collaborated more closely.<br>   ○ For example, one individual suggested that individual PTIN analysts should support individual technical analysts to enhance the programmatic cohesion of the cases that PTIN analysts develop, enabling the technical analyst to identify/set up the issue then allowing the PTIN analysts to perform the casework required to further develop the details around the issue.<br>   ○ In another approach, the PTIN analysts could be invited to rotate among the technical analysts to gain a more comprehensive understanding of holistic C&E operations |
| 4 | Deconfliction | *De–confliction processes are being defined in an IRM update. They are at present labor intensive.* | • Current processes for deconfliction require that the RPO interact with multiple Service-wide stakeholders to ensure that a return preparer is not being treated by multiple organizations<br>• In the longer term, a system such as RP360 may enable a comprehensive understanding of individual preparers. To address near-term concerns C&E is currently investigating how to obtain a RPO freeze code to communicate out deconfliction information outside the RPO |

**KEY FINDINGS: ORGANIZATION AND PEOPLE**

| # | Category | Observation | Additional Information and Potential Risks |
|---|----------|-------------|---------------------------------------------|
| 1 | *Employee Motivation* | *Overall, C&E employees appeared engaged in their roles and motivated to carry out their responsibilities* | • Across interviews, both PTIN analysts and technical analysts expressed satisfaction with the overall purpose and nature of their work |
| 2 | *Understanding of RPO Mission* | *While some C&E employees did not have a clear understanding of how their organization fit into the overall RPO mission/vision, others (i.e., PTIN Analysts) clearly understood their role in enforcing program compliance* | • However, there was a prevalent sentiment that the mission and goals of RPO, as well as the political/strategic context of the current RPO direction, were not always clearly communicated to C&E employees<br>• There was also a view among C&E employees that it was not easy to determine which RPO departments were responsible for what duties. Roles and responsibilities were not always effectively communicated across the office. Cited examples include:<br>   ○ Coordination and execution of stakeholder data requests<br>   ○ POCs between C&E and suitability not clear/not formalized<br>   ○ Development of Critical Job Elements<br>   ○ Frequency and timing of cases delivered by CR<br>• ***Risk:*** RPO employees could lose sight of how their role fits |

USA-0006184
USA-0006184-16

*RPO Compliance & Enforcement Operational Review – Debrief Document*

| | | | |
|---|---|---|---|
| | | | into the larger RPO organization without formalized and regular communication from RPO leadership<br>• **Risk:** Lack of understanding of the overall RPO strategic direction could inhibit the development of tech analysts' research ideas/enforcement schemes |
| 3 | Training | *C&E employees felt there was not enough orientation or training to inform them of all of the parts of RPO, which groups fulfill which duties, and who the appropriate POCs are for each issue/part of the program* | • Training materials and an orientation exist, but more could be done to "on board" C&E/RPO employees into the program to ensure they are aware of everything the program does and who to go to for each area of the program |
| 4 | Strategic Coordination of Research | *There appeared to be opportunities for more formal and strategic coordination between the different research efforts within C&E, as well as between RPO and the IRS more broadly* | • For example, the RPO Research Technical Advisor has control of strategic research, detection/ selection/analysis efforts and C&E Social Scientist – Joe Scardina manages ad hoc research requests/data pulls for return preparers. However, there is no formal delineation or C&E-wide coordination for how these two research resources can be used in concert<br>• **Risk:** Lack of a coordinated research strategy could lead to duplication of efforts or under-utilized research resources or opportunities; also, lack of reasoning around rejected research requests add to the lack of clarity across the RPO<br>  ○ A more formal agreement on division of responsibilities between the Office of the Director and the C&E Department could represent a more efficient overall C&E research strategy. If necessary, their individual research efforts could focus on separate PTIN populations, to prevent against "cross contamination" |
| 5 | Morale | *Lack of authority to issue penalties & confusion about roles/responsibilities of C&E related research may lower morale among PTIN and technical analysts* | • The level of motivation among the PTIN analysts could be threatened by the sense that their case development work is not resulting in penalty issuance. To mitigate this, it could be better communicated to the PTIN analysts the benefits of their work (e.g., a more comprehensive knowledge of the non-compliant population, which provides context for treatment efforts in the coming years). There could also be improved transparency regarding the status/reason for delay in issuing delegation orders.<br>• Noted frustration/confusion re work done by Research Technical Advisor and C&E Staff. |
| 6 | Staff Location | *A close geographic proximity between PTIN analysts and management may be required to support successful operations* | • St. Louis PTIN Analysts collaborate closely on best practices and are able to have questions easily addressed by management. By contrast, the two PTIN analysts located in Atlanta feel distanced from the rest of the C&E Department<br>• Despite St. Louis management's attempt to implement mentoring programs, the Atlanta staff has lower performance levels (i.e., longer case processing times), in general |
| 7 | Organization/ Communication | *There are opportunities to improve the cohesion and RPO-wide awareness of the global RPO communications strategy* | • One of the PTIN analysts suggested that they did not always have a good sense of the letter campaigns launched by other RPO departments as well as the broader IRS. As a result, staff may sometimes feel as though they are missing context/useful data points on |

USA-0006185<br>USA-0006185-17

*RPO Compliance & Enforcement Operational Review – Debrief Document*

| # | Category | Observation | Additional Information and Potential Risks |
|---|---|---|---|
| | | | consistent IRS messaging |
| 8 | Staffing | *PTIN Analysts feel as though additional staff could address inventory levels and potentially add efficiency to the intake process* | • The C&E Department currently has an "unassigned" case backlog of approximately 13,553 cases, which could be limited by hiring additional PTIN analysis to support workload<br>• Additionally, hiring a clerk may create a helpful liaison between the manager and the staff, as well as when cases flow into and out of the C&E Department |
| 9 | Skills/Knowledge | *Much of the success of the C&E Department is reliant on the institutional knowledge of staff* | • Heavy reliance on the IRS institutional knowledge of C&E Department staff creates the risk of lost human capital in the event of staff turnover<br>  ○ Succession plans are in place for some individuals (e.g., Bobbie Fowler), but a more formalized IC system (i.e. brown bags, POC lists, stakeholder maps) would help reduce the impact of losing individuals and their institutional knowledge |
| 10 | | *Improved understanding of data-driven methodologies are needed on the technical analyst team* | • The technical analyst team primarily utilizes traditional observational methodologies for identify compliance issues<br>• Improved analytical capability would allow the team to balance observational and analytical methodologies to develop stronger, more defensible detection criteria |
| 11 | Understanding of RPO Mission across the IRS | *There may be opportunities to improve other IRS BODs' understanding of RPO's mission and service offerings* | • The C&E Department staff noted a lack of external understanding around the scope of the RPO's work, which can lead to a lack of clarity in roles and responsibilities |
| 12 | EPF Reviews | *Some work to be in the EPFs. Some employees do not appear to have current annuals in place.* | • PTIN Analyst Group. 9 EPFs reviewed, 2 were lacking current annuals (AT/CW). Both annuals should've been completed by the previous manager.  Expectations shared, generally employees performance reviews conducted quarterly, nice midyear and performance review documentation.<br>• Technical Analyst Group::7 EPF reviews, 2 need some work in that copies of annuals not in EPF (LJ/DR). No performance reviews were included in any EPFs. RPO hasn't specifically established performance review guidelines, nor has the C&E Director.  It seems that they're should be some performance documentation included in EPFs. |
| 13 | Drop Files | *Well organized, complete* | • All employees had emergency contact information included. All but the intern, who is not eligible for flexiplace, had flexiplace agreements in drop files. |

**KEY FINDINGS: TECHNOLOGY**

| # | Category | Observation | Additional Information and Potential Risks |
|---|---|---|---|
| 1 | Access to Data | *C&E Department employees do not have access to all of the systems that could be useful in delivery of their responsibilities (e.g., TPPS, EFDS, RICS)* | • With the exception of application data, previous RPO activity, and correspondence history (visible in TPPS), RPVUE provides much of the data that is housed by systems to which C&E Department employees do not have access<br>• Access to EFDS could provide C&E analysts with a library of fraud issues detected by CI and W&I.  However, there could be security concerns about accessing this data and a |

Formatted: Not Highlight
Formatted: Not Highlight
Formatted: Not Highlight
Formatted: Not Highlight
Formatted: Not Highlight
Formatted: Not Highlight
Formatted: Not Highlight
Formatted: Not Highlight
Formatted: Not Highlight
Formatted: Not Highlight
Formatted: Not Highlight
Formatted: Not Highlight
Formatted: Not Highlight
Formatted: Not Highlight
Formatted: Not Highlight
Formatted: Not Highlight
Formatted: Not Highlight

USA-0006186
USA-0006186-18

*RPO Compliance & Enforcement Operational Review – Debrief Document*

| | | | |
|---|---|---|---|
| | | | compelling business case would need to be established for C&E analysts to gain access<br>• The technical analyst team believes that there is a large RP data mining opportunity that could be realized through gaining access to RICS (Return Integrity & Correspondence Services). More analysis is necessary to determine the usefulness of gaining RICS access. |
| 2 | Case Management Tool | *The Excel-based case management tool used by the PTIN analyst group may become cumbersome with larger case numbers in the future* | • The current Excel-based case management system is being used relatively effectively by the C&E PTIN analyst manager<br>• However, it may not be an optimal solution long-term for two reasons<br> ○ It will be difficult to keep manage larger case volumes using an Excel file<br> ○ It does not enable easy data access by other RPO groups |
| 3 | | *Improved direct access to TPPS as an RPO-wide case management system is needed to reduce bottlenecks* | • To improve efficiency and reduce bottlenecks with data entry direct access to TPPS or another Office-wide case management solution is needed, primarily the PTIN Analyst Group |
| 4 | Skills | *Additional training for supporting IT tools (e.g., Versa, CDE, and GII) may improve office operations* | • One analyst who'd recently obtained access to Versa indicated that there was no formal training for this system and that she was unable to effectively operate the system<br>• Another technical analyst indicated that she did not know how to use the CDE & GII system/software |

USA-0006187
USA-0006187-19