# EXHIBIT BN



# Annual Filing Season Program: Report to Congress

Department of the Treasury, Internal Revenue Service
www.irs.gov

USA-0038422

# Table of Contents

About This Report....................................................................... 3

Background............................................................................... 5

    Return Preparer Review................................................... 7

    Registered Tax Return Preparer Program........................ 8

        Registered Tax Return Preparer Test..................... 9

    Loving v. IRS.................................................................. 11

    Annual Filing Season Program....................................... 12

        Eligibility Requirements....................................... 12

        First Year Transition Rules................................... 14

        First Year Participation........................................ 15

        Limited Practice................................................... 16

        Education Campaign and Preparer Directory....... 17

Evaluation of Return Accuracy................................................. 19

Preparer Risk Analysis............................................................. 20

    DIF Score Findings......................................................... 21

Erroneous Payments................................................................ 26

Program Costs.......................................................................... 31

Conclusion............................................................................... 32

USA-0038423

Appendix.................................................................................33

# About This Report

This report is provided pursuant to U.S. Congressional House Report 114-194 of the Consolidated Appropriations Act, 2016, directing the Internal Revenue Service as described below:

> **Regulation of Paid Preparers -** *In February 2014, the Court of Appeals affirmed the District Court decision in Loving v. IRS that the IRS has no authority to regulate paid tax-return preparers. In June 2014, the IRS initiated a voluntary program with many of the same requirements of its defunct regulatory program. The Committee directs the IRS to submit to the Committees on Appropriations of the House and Senate not later than 120 days after enactment of this Act an evaluation, reviewed by the Government Accountability Office, of the accuracy of returns prepared by participants in the voluntary program for the 2015 tax season compared to accuracy of returns prepared by the same population of preparers prior to the 2015 tax season, including improper payments; the cost of implementing and operating the voluntary program; the cost of implementing and operating a regulatory program; and the expected effect on accuracy as a result of a regulatory program, including improper payments.*

To provide a framework for this report it is important to understand the circumstances leading to the development and implementation of the Annual Filing Season Program and to identify the make-up of the paid tax return preparer community.

The next section of this report provides historical background. For the other sections of the report, it is important to note that in calendar year 2014, approximately thirty-five percent (245,000) of all active Preparer Tax Identification Number (PTIN) holders reported being either a certified public accountant (CPA) or an attorney. They were responsible for approximately

USA-0038424

thirty-one percent (24 million) of all paid prepared returns. About seven percent (50,000) of all active PTIN holders reported being an enrolled agent (EA) and they prepared about twelve percent (10 million) of all paid prepared returns.

The remaining fifty-eight percent (410,000) of paid tax return preparers had no credential. They were responsible for preparing around fifty-seven percent (44 million) of paid prepared returns. The focus of the 2015 Annual Filing Season Program was on these 410,000 non-credentialed preparers. See Chart 1.

**Chart 1: Percent Distribution of Paid Preparers and the Volume of Paid Prepared Returns by Professional Credential in 2014**



USA-0038425

# Background

Filing a tax return is one of the biggest financial transactions of the year for many Americans. Approximately sixty percent of taxpayers pay a third party to prepare their federal individual income tax return.[1] There are no minimum qualification requirements for being a paid tax return preparer. The only requirement is to register with the Internal Revenue Service (IRS) and obtain a Preparer Tax Identification Number (PTIN).[2]

Currently there are over 707,000 PTIN holders and about forty-two percent of them have a professional credential (attorney, certified public accountant, enrolled agent, enrolled retirement plan agent, or enrolled actuary).[3]

For more than a decade, numerous organizations have called for increased regulation of federal tax return preparers, particularly for those preparers who are non-credentialed.  CPAs, attorneys, enrolled agents, enrolled retirement plan agents, and enrolled actuaries are generally subject to testing and continuing education requirements.

The National Taxpayer Advocate's annual reports to Congress have raised the issue of non-credentialed return preparers since 2002.[4]  In 2006, the Taxpayer Advocacy Panel recommended licensing of paid tax return preparers.[5]  Also in 2006, the Government Accountability Office (GAO) completed a limited study of paid tax return preparers and, finding serious errors, recommended the IRS conduct further research about the performance of tax return preparers.[6]

---

[1] Internal Revenue Service Office of Research.
[2] PTINs were mandated effective Jan. 1, 2011. Per T.D. 9501, I.R.B. 2010-46 (November 15, 2010).
[3] Internal Revenue Service Return Preparer Office.
[4] The National Taxpayer Advocate's Annual Reports to Congress are available on the IRS webpage at www.irs.gov/advocate/article/0,,id=97404,00.html.
[5] Taxpayer Advocacy Panel, 2006 Annual Report, Appendix E (2006).
[6] Government Accountability Office, *Paid Tax Return Preparers: In a limited Study, Chain Preparers Made Serious Errors*, GAO-06-563T (Apr. 4, 2006).

USA-0038426

Two years later, the Treasury Inspector General for Tax Administration (TIGTA) conducted a similar review with similar findings. [7] The same year, GAO conducted a second study and recommended that IRS develop a plan to require stricter regulation of paid preparers and suggested Congress adopt a nationwide paid preparer regulatory regime comparable to the state of Oregon's paid preparer regulatory regime.[8] Around the same time, multiple bills proposing regulation of tax return preparers were introduced and considered in Congress.[9]  None of the bills were enacted into law.

---

[7] Treasury Inspector General for Tax Administration, *Most Tax Returns Prepared by a Limited Sample of Unenrolled Preparers Contained Significant Errors*, Rept. # 2008-40-171 (Sept. 3, 2008).

[8] GAO, *Tax Preparers: Oregon's Regulatory Regime May Lead to Improved Federal Tax Return Accuracy and Provides a Possible Model for National Regulation*, GAO-08-781 (Washington, D.C.: Aug. 15, 2008).

[9] See, e.g., S. 802, Low Income Taxpayer Protection Act of 2001, 107th Cong. § 2 (2001); H.R. 1528 (incorporating S. 882), Tax Administration Good Government Act, 108th Cong. § 141 (2004); S. 1321 (incorporating S. 832), Telephone Excise Tax Repeal Act of 2005, 109th Cong. § 203 (2005); S. 1219, Taxpayer Protection and Assistance Act of 2007, 110th Cong. § 4 (2007); H.R. 5716, Taxpayer Bill of Rights Act of 2008, 110th Cong. § 4 (2008).

USA-0038427

# Return Preparer Review

In July 2009, recognizing the growing reliance by taxpayers on paid tax return preparers and the concurrent impact on tax administration, the IRS launched a comprehensive review of tax return preparation. The goals of the review were to identify ways to improve service provided to taxpayers and to protect taxpayers against the consequences of the lack of basic tax return preparation standards in the return preparation industry.

Public forums were held seeking input from five panels of interested stakeholders: consumer advocacy groups, tax professional associations, government agencies, the software industry, and the tax preparation industry. Additionally, more than 500 individuals and groups offered written comments to the IRS. Respondents overwhelmingly supported efforts to increase oversight of paid tax return preparers.

The review resulted in recommendations in eight categories: Mandatory Tax Return Preparer Registration, Competency Examination Requirement, Continuing Professional Education, Ethical Standards, Tax Return Preparer Enforcement, Tax Return Preparation Software, Refund Settlement Products, and Public Awareness and Service Enhancements.

Detailed results of the review and the specific recommendations are documented in IRS Publication 4832, Return Preparer Review (December 2009).

USA-0038428

# Registered Tax Return Preparer Program

In 2010, the IRS began implementing the recommendations from the Return Preparer Review through the regulation process. New requirements included:

- Registration of all paid tax return preparers,
- Minimum competency testing for non-credentialed tax return preparers, and
- Fifteen hours of continuing education annually by non-credentialed tax return preparers.

The registration requirement was implemented first. Effective January 1, 2011, a PTIN became the mandatory identification number for paid tax return preparers.[10]

Next, the IRS published regulations under 31 U.S.C. 330 in July 2011 reprinted as Treasury Department Circular No. 230, Regulations Governing Practice before the Internal Revenue Service.[11] The regulations established mandatory testing and continuing education requirements for most non-credentialed federal tax return preparers.[12]

Tax return preparers who successfully completed the mandatory testing and education requirements, as well as suitability requirements, were to be designated Registered Tax Return Preparers (RTRPs).

Per transition rules, tax return preparers already working in the profession were allowed almost three years—until the end of 2013—to pass the RTRP test.[13] The fifteen hour annual continuing education requirement was effective beginning in calendar year 2012 for anyone subject to the RTRP

---

[10] T.D. 9501, I.R.B. 2010-46 (November 15, 2010).

[11] T.D. 9527, I.R.B. 2011-27 (July 5, 2011).

[12] Certain supervised preparers and preparers who did not prepare Form 1040 series tax returns were exempt from Registered Tax Return Preparer requirements, as were those with professional credentials. IRS Notice 2011-6, Section 1.02.

[13] IRS Notice 2011-6, Implementation of Rules Governing Tax Return Preparers.

USA-0038429

test requirement regardless of when they tested.[14]

On November 28, 2011, the IRS launched the Registered Tax Return Preparer competency test and estimated that 350,000 existing tax return preparers would be required to pass it by December 31, 2013.

The goal of the multi-year plan was to ensure that all individual paid tax return preparers achieved and maintained a minimum competency standard. Beginning in 2014, PTINs would be restricted to attorneys, CPAs, enrolled agents, enrolled retirement plan agents, enrolled actuaries, RTRPs, and supervised preparers.[15] Also in 2014, the IRS planned to begin a substantial public education campaign advising taxpayers to use only return preparers with one of these credentials. An online directory containing all of the qualified return preparers would launch as part of the educational campaign.

### Registered Tax Return Preparer Test

The timed, 2.5 hour RTRP test included 120 questions in a combination of multiple choice and true or false formats. Administered by a third-party vendor selected and overseen by the IRS, the purpose of the test was for non-credentialed tax return preparers to:

- Establish minimum competency regarding basic federal individual income tax laws,
- Demonstrate knowledge of preparing Form 1040 and related schedules, and
- Demonstrate understanding of ethical responsibilities under Circular 230.

Substantial efforts were made in 2011 and 2012 to notify those who were subject to the testing requirement. These efforts resulted in the

---

[14] IRS Notice 2011-80, Guidance Regarding Obtaining and Renewing PTINs and Continuing Education Requirements for Registered Tax Return Preparers.

[15] IRS Notice 2011-6, Section 1.02, defined supervised preparers as those who were employed by a law firm, CPA firm, or other recognized firm and were supervised by an attorney, CPA, enrolled agent, enrolled retirement plan agent, or enrolled actuary who was authorized to practice before the IRS and signed the returns prepared by the supervised preparer.

USA-0038430

administration of  84,030 tests as of January 2013, with 62,329 individuals passing the test and another 10,822 future test appointments scheduled.

USA-0038431

# *Loving v. IRS*

Eleven months prior to the end of the established RTRP testing period, on January 18, 2013, the U.S. District Court for the District of Columbia in response to a suit brought by plaintiffs challenging the RTRP program, held that the IRS did not have authority to mandate testing and continuing education.  The court also enjoined the IRS from enforcing these provisions.[16] The IRS immediately ceased  testing and announced that continuing education by non-credentialed return preparers was encouraged but not required.

On February 11, 2014, the U.S. Court of Appeals for the District of Columbia Circuit upheld the decision of the lower court.[17]

The PTIN requirement was unaffected by the *Loving* court decision.[18]   There is, however, current litigation challenging the IRS's authority to impose a user fee for registration and renewal of a PTIN and alternatively challenging the amount of such fee as excessive.[19]

Following the decision in *Loving*, the IRS implemented a voluntary program to encourage continuing education among non-credentialed preparers.

---

[16] *Loving v. IRS*, 917 F. Supp. 2d 67, 81 (D.D.C 2013).

[17] *Loving v. IRS*, 742 F.3d 1013 (D.C. Cir. 2014).

[18] *Loving v. IRS*, 920 F. Supp. 2d 108, 112 (D.D.C. 2013).

[19] *Steele v. United States*, Civil Case No. 1:14-CV-01523, United States District Court for the District of Columbia.

USA-0038432

# Annual Filing Season Program

On June 26, 2014, the IRS announced an interim program called the Annual Filing Season Program. As described by IRS Commissioner John Koskinen, "This voluntary program is not the ideal solution. But until legislation is enacted, we still have a responsibility to taxpayers and to our tax system to keep moving forward with our efforts to improve service to taxpayers."[20]  As indicated in the General Explanations of the Administration's Fiscal Year 2017 Revenue Proposals (Greenbook), paid tax return preparers have an important role in tax administration and "incompetent and dishonest preparers increase collection costs, reduce revenues, disadvantage taxpayers by potentially subjecting them to penalties and interest as a result of incorrect returns, and undermine confidence in the tax system."

The Annual Filing Season Program, unlike the Registered Tax Return Preparer initiative, is not a system of regulation, but an incentive program that encourages non-credentialed tax return preparers to improve their knowledge of federal tax law and filing season requirements through continuing education.  Those who complete program requirements are granted an Annual Filing Season Program Record of Completion.[21]

## Eligibility Requirements

An Annual Filing Season Program Record of Completion is issued to return preparers who voluntarily obtain a specified number of continuing education hours in preparation for a specific tax year. Participants must also pass a tax compliance check, have a current year PTIN, and consent to adhere to practice obligations outlined in Subpart B and section 10.51 of Circular 230.[22]

---

[20] Prepared Remarks for John Koskinen; Press Briefing, June 26, 2014.

[21] The IRS's authority to implement the Annual Filing Season Program, although voluntary, is also the subject of current litigation.  See American Institute of Certified Public Accountants v. Internal Revenue Service, Civil Action No. 1:14-CV-1190, United States District Court for the District of Columbia.

[22] Rev. Proc. 2014-42, Annual Filing Season Program.

USA-0038433

The continuing education requirements must be fulfilled prior to the beginning of the tax year. For example, to participate in the Annual Filing Season Program for the tax filing season that took place in calendar year 2015, all courses must have been completed by December 31, 2014.

In general, participants must obtain 18 hours of continuing education, including a six hour federal tax refresher course with a comprehension test. All hours, including the refresher course, must be obtained from IRS-approved continuing education providers. In addition to the six hour Annual Federal Tax Refresher course, the other hours must include 10 hours of other federal tax law topics and two hours of ethics.

Certain non-credentialed return preparers are exempt from the six hour refresher course and test. These individuals may participate in the Annual Filing Season Program by obtaining 15 hours of continuing education, including three hours of federal tax law updates, two hours of ethics, and 10 hours of other federal tax law topics.

Return preparers exempt from the federal tax refresher course include:

- Anyone who passed the Registered Tax Return Preparer test
- Established state-based return preparer program participants currently with testing requirements (active registrants of the Oregon Board of Tax Practitioners, California Tax Education Council, and/or Maryland State Board of Individual Tax Preparers)
- Anyone who passed Part I of the Special Enrollment Exam seeking enrolled agent status within the past two years
- Certain Volunteer Income Tax Assistance (VITA) and Tax Counseling for the Elderly (TCE) volunteers
- Other accredited tax-focused credential-holders: The Accreditation Council for Accountancy and Taxation's Accredited Business Accountant/Advisor (ABA) and Accredited Tax Preparer (ATP) programs

USA-0038434

An outline of the requirements beginning for tax year 2016 (courses would have been completed in 2015) is shown in Table 1.

**Table 1: Annual Filing Season Program Continuing Education Requirements for Tax Year 2016 and Beyond**

| Annual Filing Season Program Exemption Status | Annual Federal Tax Refresher Course & Test | Tax Law Updates | Federal Tax Law | Ethics | Total CE Credits |
|---|---|---|---|---|---|
| Non-Exempt | 6 | n/a | 10 | 2 | 18 |
| Exempt | n/a | 3 | 10 | 2 | 15 |

**First Year Transition Rules**

Continuing education requirements for participating in the first year of the Annual Filing Season Program were reduced since the program did not launch until June 2014. An outline of the continuing education requirements for tax year 2015 (courses would have been completed in 2014) is shown in Table 2.

USA-0038435

**Table 2: Annual Filing Season Program Continuing Education Requirements for Tax Year 2015**

| Annual Filing Season Program Exemption Status | Annual Federal Tax Refresher Course & Test | Tax Law Updates | Federal Tax Law | Ethics | Total CE Credits |
|---|---|---|---|---|---|
| Non-Exempt | 6 | n/a | 3 | 2 | 11 |
| Exempt | n/a | 3 | 3 | 2 | 8 |

**First Year Participation**

The IRS issued Annual Filing Season Program Records of Completion to more than 41,000 non-credentialed tax return preparers for the 2015 tax year, slightly more than ten percent of the target population of all non-credentialed tax return preparers.

The Annual Filing Season Program Record of Completion recipients completed approximately 712,600 hours of continuing education in 2014, an average of almost 18 hours per return preparer. In comparison, non-participating non-credentialed tax return preparers completed an average of 4.9 hours of continuing education in 2014.[23]

---

[23] Average hours are calculated based on hours reported by IRS-approved continuing education providers.

USA-0038436

**Limited Practice**

An additional component of the Annual Filing Season Program is a change to the rules regarding representation rights for non-credentialed tax return preparers.

Prior to January 1, 2016, all non-credentialed tax return preparers had limited practice rights before the IRS. This meant they could represent clients whose returns they prepared and signed, but only before revenue agents, customer service representatives, and similar IRS employees, including the Taxpayer Advocate Service.[24]

As announced in the Annual Filing Season Program guidance, Rev. Proc. 2014-42, by procedural rule effective for tax returns and claims for refunds prepared and signed after December 31, 2015, only those non-credentialed tax return preparers who participate in the Annual Filing Season Program will have limited practice rights.[25]  The tax return preparer must participate in the program for both the year of return preparation and the year of representation to represent their client before the IRS.

There are no changes to representation rules for enrolled agents, CPAs, and attorneys. These tax professionals continue to have unlimited practice rights and can represent any taxpayer before any IRS office, including collection and appeals, regardless of whether they prepared the tax return in question.

This change does not impact the ability to prepare and sign tax returns. Anyone with a valid PTIN may legally prepare tax returns.

**Education Campaign and Preparer Directory**

---

[24] Rev. Proc. 81-38.
[25] The limited practice rule changes have no impact on returns prepared and signed by non-credentialed preparers on or before Dec. 31, 2015.

USA-0038437

For tax season 2015, the IRS launched a revamped public education campaign.  Extensive outreach efforts were conducted (and continue to be conducted) to encourage taxpayers to make wise decisions when choosing a paid tax return preparer.[26]

Outreach materials included guidance on understanding the different types of credentials and qualifications held by return preparers.  The IRS partnered with numerous tax professional organizations to develop mutually agreed upon language for the campaign.  Eight organizations joined IRS Commissioner Koskinen in the campaign kick-off on December 18, 2014, including:

- The American Association of Attorney-Certified Public Accountants
- American Institute of Certified Public Accountants
- Council for Electronic Revenue Communication Advancement
- National Association of Enrolled Agents
- National Association of Tax Professionals
- National Conference of CPA Practitioners
- National Society of Accountants
- National Society of Tax Professionals

Additionally, on January 31, 2015, the IRS made available a new tool to assist taxpayers in making wise decisions when choosing a tax return preparer, the 'Directory of Federal Tax Return Preparers with Credentials and Select Qualifications'.  The directory contains those tax return preparers who have a current year PTIN, as well as a professional credential or Annual Filing Season Program Record of Completion, which equates to approximately 47 percent of all PTIN holders.[27]

The directory is a searchable, sortable listing featuring:  the name, city, state and zip code of attorneys, certified public accountants, enrolled agents, enrolled retirement plan agents, enrolled actuaries, and Annual Filing Season Program participants.

---

[26] Consolidated educational materials are at www.irs.gov/chooseataxpro
[27] Another 0.4 percent of PTIN holders qualify to be listed in the directory, but have opted out of being listed.

USA-0038438

Taxpayers may search the directory using the preferred credentials or qualifications they seek in a preparer, or by a preparer's location, including professionals who work abroad.

USA-0038439

# Evaluation of Return Accuracy

An evaluation of the accuracy of returns prepared by Annual Filing Season Program participants for the 2015 tax season compared to the accuracy of returns prepared by the same population of preparers prior to the 2015 tax season is the focus of this requested report.

While it is generally inferred that the completion of continuing education courses by tax return preparers would lead to more accurate return preparation, demonstrating that this is true with administrative data is problematic. The only way to determine the real accuracy of a tax return is to audit the return in full.  The current audit rate for individual income tax returns is less than one percent.[28]

To determine the accuracy of returns prepared by a particular paid tax return preparer, the IRS would normally examine at least 30 returns prepared by the subject preparer.  This type of preparer investigation is referred to as a Program Action Case.  At the end of Fiscal Year 2015, there were 543 open Program Action Cases.  The number of cases started in Fiscal 2015 was 145, thus many of the open cases were started prior to the beginning of the fiscal year.

The number of Program Action Cases started in Fiscal Year 2015 represents less than one-quarter of one percent of all PTIN holders.  Attempting to break it down further by whether the preparer was credentialed and then by whether the preparer participated  in the Annual Filing Season Program would not produce any meaningful results.

There are practical impediments to auditing a sufficient number of preparers necessary to draw accurate conclusions about return accuracy.  As an alternative, the IRS conducted a risk analysis to evaluate the first year of the Annual Filing Season Program.

---

[28] Internal Revenue Service, 2015 Data Book, Table 9a.

USA-0038440

# Preparer Risk Analysis

The following risk analysis considers only non-credentialed tax return preparers and whether they participated in the Annual Filing Season Program.

The analysis also focuses on only preparers who signed at least twenty returns in calendar year 2015 and had an active PTIN, which equals about 225,000 preparers.  Of the 225,000, 192,000 (roughly 85 percent) did not participate in the Annual Filing Season Program and approximately 33,000 (fifteen percent) participated.

Chart 2 depicts the proportion of returns completed by preparers in the analysis group (those that prepared at least 20 returns in 2015 with an active PTIN) by whether they participated in the Annual Filing Season Program.   Of the 148.6 million returns filed in 2015, approximately six percent (8.5 million) were returns prepared by participants in the Annual Filing Season Program, compared to twenty-four percent (35.0 million) that were prepared by the non-participant group.

The remaining seventy percent (105.2 million) includes returns that were self-prepared either on paper or using software, volunteer-prepared, prepared by credentialed return preparers, or prepared by non-credentialed preparers who prepared fewer than 20 returns in 2015.

USA-0038441

**Chart 2: Return Volume (in millions)**



**DIF Score Findings**

In lieu of the actual accuracy of a preparer's returns, the predicted risk, based on IRS computer scoring, can be used to infer the accuracy of the returns.  The Discriminant Function System (DIF) score rates each return for the potential for change, based on past IRS experience with similar returns[29].  While using the DIF score may be useful to gain insights into the accuracy of a preparer's returns, it is based on prediction, not fact, and one cannot declare definitively that a return with a high DIF score is, in fact, inaccurate.

For this analysis, preparers are placed onto a normal (bell-shaped) curve based on the average DIF scores of the returns they prepared and then grouped into risk categories based on the percentile in which their average score falls, enabling the assessment of the risk of a particular preparer relative to all other preparers. Table 3 displays the six risk categories and how they are defined for this analysis.  Methodology of the approach is in the appendix.

---

[29] www.irs.gov/uac/The-Examination-(Audit)-Process.

USA-0038442

**Table 3: Risk Categories**

| Risk Category | Percentile of Preparer's Average DIF Score | Percent of Preparers in Risk Category |
|---|---|---|
| Lowest Risk | 0-10 | 10% |
| Low Risk | 11-25 | 15% |
| Moderately Low Risk | 26-50 | 25% |
| Moderately High Risk | 51-75 | 25% |
| High Risk | 76-90 | 15% |
| Highest Risk | 91-100 | 10% |

Chart 3 shows the number of preparers in each risk category broken out by Annual Filing Season Program participants and non-participants. Of the 22,500 highest risk preparers (those above the 90th percentile), almost 21,000 (ninety-three percent) did not participate in the Annual Filing Season Program.

**Chart 3: Number of Non-Credentialed Paid Preparers in Each Risk Category by Participation in the Annual Filing Season Program Based on DIF Scores**



USA-0038443

Chart 4 mirrors Chart 3, but weights the risk by the number of returns a preparer signed.

**Chart 4: Return Volume of Non-Credentialed Paid Preparers in Each Risk Category by Participation in the Annual Filing Season Program Based on DIF Scores**



Preparers in the highest risk group who did not participate in the Annual Filing Season Program prepared more than 1.8 million returns compared to approximately 220,000 returns prepared by the highest risk preparers who did participate (ninety-three percent and seven percent, respectively).

Chart 5 compares the percent distribution across the risk categories of participants and non-participants in the Annual Filing Season Program. Participants in the program were less likely to be in the highest risk group than non-participants (five percent compared to eleven percent, respectively). Fifty-six percent of the participants fell below the overall median (the three low risk groups), compared to forty-nine percent of non-participants. Thus, it appears that preparers who choose to participate in the program likely prepare returns that are more accurate.

USA-0038444

**Chart 5: Percent Distribution Across the Risk Categories of Non-Credentialed Paid Preparers by Participation in the Annual Filing Season Program Based on DIF Scores**



Like many new products or services, the participation rate for the Annual Filing Season Program is expected to follow an S-shaped growth curve. Figure 1 shows the general form of a growth curve.

**Figure 1: S-Shaped Growth Curve**



USA-0038445

The initial years of the Annual Filing Season Program are expected to have relatively few early adopters, followed by a greater participation rate, and then taper off with the late adopters.  However, it is not envisioned that all non-credentialed preparers will eventually adopt and participate in the program.

The innovators and early adopters (those who participated in year one) are self-selected and, as has been shown, are less at-risk than those who did not participate.  The initial group of participants is a small fraction of the non-credentialed preparers and they are not representative of all non-credentialed preparers, so it is difficult to ascertain how effective the program will be based on the first year.

An analysis of preparers who prepared at least 20 returns in both calendar year 2014 and 2015 shows that there was almost no difference between participants and non-participants in movement between the risk categories. There were approximately 32,000 participants who prepared at least 20 returns in each year and 148,000 non-participants.  For this group, 54 percent of the participants and 55 percent of non-participants that were in the highest risk category in 2014 remained in the highest risk group in 2015.

USA-0038446

# Erroneous Payments

The Earned Income Tax Credit (EITC) is a refundable tax credit supplementing the earned income of low to moderate income workers. While it is intended to help lift these individuals out of poverty, the payment error rate is significant and resulted in its inclusion as a high-risk program covered by the Improper Payments Elimination and Recovery Act of 2010 (IPERA).[30] An improper payment is generally defined as any payment (statutory, contractual, administrative, etc.) that should not have been made or was made in an incorrect amount, whether an underpayment, overpayment, duplicate payment or a payment to an ineligible recipient.

Like the overall accuracy of a return, it is not possible to tell with certainty whether a taxpayer qualifies for the EITC without conducting an audit. Returns with EITC claims go through an additional scoring algorithm that assesses the risk of the claim.  This scoring system is rules-based and referred to as the Dependent Data Base (DDB). The DDB is used to address compliance for the EITC and related tax issues, including dependent exemptions, filing status, Child and Dependent Care Credit, Child Tax Credit and education benefits.

The following risk analysis for EITC has been done in the same way as the overall risk analysis for Annual Filing Season Program participants, but uses the DDB scores on the returns in lieu of DIF, and is confined to preparers with 20 or more returns claiming the EITC.

In calendar year 2015, there were more than 28 million EITC claims for a total of approximately $67.7 billion dollars.  Charts 6 and 7 show the portion of the number of claims and the portion of the total dollars claimed by participation in the program.

**Chart 6: Number of EITC Claims (in millions)**

---

[30] IPERA, Pub. L. 111-204.

USA-0038447



Of the 28 million total claims, approximately six percent (1.7 million) were on returns prepared by participants in the Annual Filing Season Program, compared to thirty-two percent (9 million) that were prepared by the non-participant group. The remaining sixty-two percent of claims (17.5 million) includes claims made on returns by paid preparers with credentials, volunteer-prepared returns, and self-prepared returns either on paper or using software.

**Chart 7: Amount of EITC Claims (in billions)**



USA-0038448

Of the $67.7 billion in claims, $4.4 billion (seven percent) is attributed to Annual Filing Season Program participants compared to $24.6 billion (thirty-six percent) attributed to non-participants.

Chart 8 depicts the proportion of participants in each of the risk categories for EITC (defined the same way as the overall risk categories). Of the 13,700 preparers in the highest risk category, less than 700 (5 percent) were participants in the Annual Filing Season Program.

**Chart 8: Number of Non-Credentialed Paid Preparers in Each Risk Category by Participation in the Annual Filing Season Program Based on DDB Scores**



In Chart 9, the same pattern holds true when preparers are weighted by the number of EITC claims; less than 57,000 (five percent) of the returns prepared by a highest risk preparers were prepared by participants in Annual Filing Season Program, compared to more than one million (ninety-five percent) prepared by non-participants in the highest risk group.

USA-0038449

**Chart 9: Return Volume of Non-Credentialed Paid Preparers in Each Risk Category by Participation in the Annual Filing Season Program Based on DDB Scores**



Chart 10 compares the percent distribution of each respective group across the risk categories.  Annual Filing Season Program participants were less likely to be considered highest risk than non-participants (three percent compared to eleven percent, respectively).

Sixty-five percent of the participants fell below the overall median (moderately low risk, low risk, lowest risk), compared to forty-seven percent of non-participants.  Thus, it appears that preparers who choose to participate in the Annual Filing Season Program likely prepare fewer returns that result in erroneous payments.

USA-0038450

**Chart 10: Percent Distribution Across the Risk Categories of Non-Credentialed Paid Preparers by Participation in the Annual Filing Season Program Based on DDB Scores**



USA-0038451

# Program Costs

Initial expenses for implementation planning and start-up of the Return Preparer Initiative were approximately $3.6 million.  These costs included expenses for seven IRS employees and a contract vendor to assist with the stand-up of the program.

From 2011 until January 2013 (when the U.S. District Court for the District of Columbia ruled that the IRS did not have authority to mandate the Registered Tax Return Preparer program), the IRS spent $136 million on all aspects of implementing the Return Preparer Program.  These costs included mandatory PTIN implementation, salaries and benefits, overhead, and $69 million in contract vendor costs.

As of March 1, 2016, the IRS spent $4 million on the Annual Filing Season Program since its launch in June 2014. Because the framework had already been established with the Registered Tax Return Preparer program, the bulk of the cost for the Annual Filing Season Program was for salaries, benefits, and overhead, with just $1.2 million in contract vendor costs.

USA-0038452

# Conclusion

As the predictive analysis in this report suggests, returns prepared by Annual Filing Season Program participants are statistically more likely to be at less risk for non-compliance (or greater accuracy) than the returns prepared by non-program participants.  While this bodes well for the success of the Annual Filing Season Program, it must be remembered that early adopters in any program are more likely to be a lower compliance risk than the later adopters.  Preparers who voluntarily embrace the Annual Filing Season Program in the initial years generally will be those preparers who are already engaged in ensuring and/or improving their competency and are inclined towards greater overall compliance.  Thus, analysis at such an early stage of the program on the compliance of these preparers and their level of engagement are not accurate predictors for the very large remainder of the non-credentialed or non-participating preparer population.

However, it is reasonable to assume that as the competency level of a preparer increases, non-compliance and the risk of non-compliance should decrease.  Phrased in another way, better prepared return preparers should generate more accurately prepared returns.  A voluntary continuing education program may be an incentive for a small number of preparers, but it will not be sufficient impetus or motivation to ensure basic competency for the larger segment of the non-credentialed preparer population.

While a regulatory program will not be the silver bullet for ensuring return accuracy or erasing improper payments, over time, it will impact overall preparer accuracy and tax compliance.  Return preparers who are required to establish minimum competency and to stay abreast of changes in the tax law and ethical requirements are critical to maintaining the integrity of our tax system, as they are integral to having a taxpaying public who both understand and comply with their tax obligations.

USA-0038453

# Appendix

**Methodology for Grouping Preparers into Risk Categories**

In lieu of the actual accuracy of a preparer's returns, the predicted risk, based on IRS computer scoring, can be used to infer the accuracy of the returns. The Discriminant Function System (DIF) score rates each return for the potential for change, based on past IRS experience with similar returns. The Dependent Data Base (DDB) is a rules-based system used to score returns for the Earned Income Tax Credit (EITC) and related tax issues, including dependent exemptions, filing status, Child and Dependent Care Credit, Child Tax Credit and education benefits. While using these scores can be useful to gain insights into the accuracy of a preparer's returns, they are based on prediction, not actual fact and one cannot declare definitively that a return with a high score is, in fact, inaccurate.

One issue with using predictive scores is that they undoubtedly have Type I (false positive) and Type II (false negative) errors and these errors introduce bias.  However, since the analysis is focused on the difference between participants in the Annual Filing Season Program and non-participants, and there is no reason to believe the errors are different between these two groups, the bias is canceled out.  Formally:

> Let X=Participants; Y= non-participants; a= bias introduced by Type I errors; b= bias introduced by Type II errors.  Then the difference =

USA-0038454

$(X+a+b) - (Y+a+b)$

$= X+a+b-Y-a-b$

$= X-Y.$

Thus, these errors have no adverse effect on this analysis.

Individual Income Tax Returns (Form 1040) are placed into one of thirteen examination classes based on characteristics on the return. The exam classes have varying ranges for the DIF score and so the first step was to standardize the DIF scores across the exam classes. This was done using the min-max method and confining the score to values of $0.1 - 0.9$. The exact formula used was:

$( ( (0.9-0.1)*(DIF\ Score - min.\ DIF\ Score) ) / (max.\ DIF\ Score - min.\ DIF\ Score)) +0.1$

The original range based on the raw DIF Score, and the ranges after the scores were standardized are shown for each exam class in the table below.

| | Raw DIF Score | | | Standardized DIF Score | | |
|---|---|---|---|---|---|---|
| Exam Class | Mean | Min | Max | Mean | Min | Max |
| All | 107.7 | 1 | 987 | 0.20 | 0.1 | 0.9 |
| 66 | 62.1 | 1 | 300 | 0.26 | 0.1 | 0.9 |
| 70 | 109.1 | 1 | 825 | 0.20 | 0.1 | 0.9 |
| 71 | 317.7 | 1 | 916 | 0.38 | 0.1 | 0.9 |
| 72 | 77.3 | 1 | 987 | 0.16 | 0.1 | 0.9 |
| 73 | 118.1 | 1 | 860 | 0.21 | 0.1 | 0.9 |

USA-0038455

| | | | | | | |
|---|---|---|---|---|---|---|
| **74** | 91.9 | 1 | 899 | 0.18 | 0.1 | 0.9 |
| **75** | 308.8 | 1 | 920 | 0.37 | 0.1 | 0.9 |
| **76** | 359.3 | 1 | 856 | 0.44 | 0.1 | 0.9 |
| **77** | 346.1 | 1 | 841 | 0.43 | 0.1 | 0.9 |
| **78** | 90.8 | 1 | 727 | 0.20 | 0.1 | 0.9 |
| **79** | 110.1 | 1 | 836 | 0.20 | 0.1 | 0.9 |
| **80** | 137.3 | 1 | 918 | 0.22 | 0.1 | 0.9 |
| **81** | 88.2 | 1 | 817 | 0.19 | 0.1 | 0.9 |

Once the DIF Scores were standardized across the exam classes, the average standard score for each preparer was calculated, and then these scores were transformed so that the distribution of the preparers' average score was approximately normal. The normality of this distribution was determined by looking at the skewness and kurtosis (how peaked/flat the curve is) statistics.  Generally, the skewness statistic should be between -3 to 3 and the kurtosis statistic should be between -0.8 and 0.8. The skewness statistic for the non-transformed average standard score was 2.1; however, the kurtosis statistic was 8.4. The formula for the transform used was:

$1/(\text{Preparer's average Score}^2)$

The resulting distribution statistics were skewness = -0.1 and kurtosis = 0.1.

The final step was to map the preparers onto a standard-normal curve and then place them into the appropriate risk category based on where they are on the curve. This was done by first converting the transformed standard scores to a standard normal distribution. The formula for this conversion is:

USA-0038456

(Preparer's Score – Mean Score) / Standard Deviation of Scores

The converted scores are commonly referred to as z- scores and provide information about how far the particular score is from the mean. Once the z-scores are calculated, a table provides the p-value, which provides information on where the score lies on the normal distribution.  If the underlying data is perfectly normal, then the p-value will exactly equal the percentile (for example, a p-value of 10 = the 10th percentile,  p-value of 90 = 90th percentile).  As stated above, the data was transformed to an approximately normal distribution.  The table below shows the percentile distribution of the p-values.  The values for the 10th, 25th, 50th, 75th and 90th were used as the cut-off values to place preparers into the risk categories.

| Percentile | P-value | Risk Category |
|---|---|---|
| 100% Max | 100 | |
| 99% | 98 | Highest Risk |
| 95% | 93 | |
| 90% | 89 | High Risk |
| 75% | 76 | Moderately High Risk |
| 50% (Median) | 53 | Moderately Low Risk |
| 25% | 24 | Low Risk |
| 10% | 9 | |
| 5% | 4 | Lowest Risk |
| 1% | 1 | |
| 0% Min | 0 | |

USA-0038457

The methodology for the EITC risk analysis mirrored the general risk analysis but used the DDB scores instead of DIF. In addition, there was no need to standardize these scores so the first step was omitted. The distribution of the preparers' mean scores had an initial skewness value of 1.4 and kurtosis of 4.2. This data was transformed by taking the square root of the preparer's mean DDB score, resulting in a distribution with skewness of 0.1 and kurtosis of 0.7. The remaining steps were exactly the same as the steps taken for the overall risk categorization. The table below shows the p-value distribution and cutoff points used in the EITC risk analysis.

| Percentile | P-value | Risk Category |
|---|---|---|
| 100% Max | 100 | |
| 99% | 99 | Highest Risk |
| 95% | 95 | |
| 90% | 90 | High Risk |
| 75% | 73 | Moderately High Risk |
| 50% (Median) | 49 | Moderately Low Risk |
| 25% | 26 | Low Risk |
| 10% | 11 | |
| 5% | 6 | Lowest Risk |
| 1% | 1 | |
| 0% Min | 0 | |

USA-0038458