IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Adam Steele, Brittany Montrois, and Joseph Henchman, on behalf of themselves and all others similarly situated,<br>　　　　*Plaintiffs*,<br><br>　　　v.<br><br>United States of America,<br>　　　*Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

　　　　　　　　　Civil Action No.: 1:14-cv-01523-RCL

**UNITED STATES' RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED
MATERIAL FACTS (*See* Dkt. No. 175-2)**

　　　　The United States responds below to each of Plaintiffs' statements of material

facts as to which they contend there is no genuine issue. *See* Dkt. No. 175-2. The United

States made every effort to respond to each allegation in Plaintiffs' statement of

undisputed material facts, however such response does not concede that the allegations

are material. Plaintiffs' section headings have not been included or responded to as they

constitute legal conclusions or argument.

　　　　The United States responds as follows:

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| 1 | A "tax return preparer" is "any person who prepares for compensation, or who employs one or more persons to prepare for compensation, any return of tax imposed by this title or any claim for refund of tax imposed by [the Internal Revenue Code]." 26 U.S.C. § 7701(a)(36). | Admitted, however, this is a statement of law, not facts. |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| 2 | Prior to 1976, there was no requirement for a tax-return preparer to place any identifying number on a tax return. *Furnishing Identifying Number of Tax Return Preparers*, 75 Fed. Reg. 14,539, 14,540 (Mar. 26, 2010) ("Section 6109(a)(4) as originally enacted by section 1203(d) of the Tax Reform Act of 1976. . . required return preparers to furnish on income tax returns and claims for refund of income tax an identifying number, as prescribed, to identify the preparer, the preparer's employer, or both."). | Admitted. |
| 3 | In 1976, Congress amended § 6109 of the Internal Revenue Code to require tax return preparers to list their social security number on all tax returns they prepared. Tax Reform Act of 1976, Pub. L. No. 94-455 § 1203(d), 90 Stat. 1520 (1976). | Admitted, however, this is a statement of law, not facts. |
| 4 | The purpose was "to enable the IRS to identify all returns prepared by specific individuals in cases where the IRS had discovered some returns improperly prepared by that individual." H.R. Rep. No. 94-658, at 274-82 (1975). | This is an assertion of law and not of fact, and legal conclusions do not belong in statements of fact. *See, e.g., Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); *Chin v. Garda CL New England, Inc.*, 2017 WL 3526253, at *2 (D. Mass. Aug. 16, 2017); *King v. Bernabei*, 2015 WL 1506063, at *2 (N.D. Ill. Mar. 24, 2015); *Abney v. Univ. of Virgin Islands*, 2013 WL 12354494, at *6 (D.V.I. Apr. 15, 2013). To the extent a response is required, denied. The referenced bill was passed because the rapid growth of the commercial tax preparation industry has led to a number of issues for the IRS. H.R. REP. 94-658, 274, 1976 U.S.C.C.A.N. 2897, 3170. |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| 5 | From 1976 to 1999, all tax return preparers were required to list their social security numbers on the tax returns they prepared. 1976 Tax Reform Act, Pub. L. No. 94-455 § 1203(d), 90 Stat. 1520 (1976); *Furnishing Identifying Number of Income Tax Return Preparer*, 64 Fed. Reg. 43,910, 43,910 (Aug. 12, 1999). | Admitted, however, this is a statement of law, not fact. |
| 6 | In 1998, Congress amended 26 U.S.C. § 6109 to allow the IRS to prescribe alternative numbers for the purpose of identifying individual preparers. Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, § 3710(a), 112 Stat. 685 (1998). | This statement is disputed because Congress amended 26 U.S.C. § 6109 to allow the IRS to prescribe alternative identifying numbers because it was "concerned that inappropriate use might be made of a preparer's social security number." S. REP. 105-174, 106. |
| 7 | In August 1999, the IRS issued regulations allowing preparers to obtain a unique Preparer Tax Identification Number ("PTIN") which could be used in lieu of the tax return preparer's SSN. 64 Fed. Reg. at 43,910. | Admitted. |
| 8 | As with other IRS identifying numbers, there was no cost to obtain a voluntary PTIN and no renewal requirement. Ex. A at 25:9-11[1]; Ex. B at 2-6. ███████████ ████████████████████████████ ████████████████████████ Ex. C at 012. | Admitted that there was no cost to obtain an PTIN prior to fiscal year 2011 and ████████████ ███████████████ ███████████████ ███████████████ ███████████████ ██████████ The cited material does not support the first sentence's assertion. |
| 8 – Fn. 1 | All references to "Ex. ___" are to Exhibits to the Declaration of Meghan S. B. Oliver. | There are no assertions in the footnote. To the extent a response is required, admitted. |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| 9 | The "Application for Preparer Tax Identification Number" (Form W-7P) required only the preparer's name, home address, telephone number, date of birth, and SSN. Ex. D at 800; Ex. E at 685. Preparers could submit the application on-line, by fax, or by mail. Ex. E at 683. | Admitted but avers that this form was not in use during the years at issue in this suit. |
| 10 | The Wage and Investment division of the IRS was responsible for issuing all IRS identification numbers[2] including voluntary PTINs. Ex. A at 14:9-14. ██████████████████████ the IRS had no way to collect user fees in exchange for PTINs. Ex. C at 009; Ex. F at 169:25-170:5. | Admitted that the Wage and Investment Division of the IRS was responsible for issuing the voluntary PTIN, ███████████████████ the IRS had no way to collect user fees in exchange for PTINs. The material cited does not support the first sentence. |
| 10 – Fn. 2 | *See Review and Verification of Individual Taxpayer Identification Number Applications Has Improved; However, Additional Processes and Procedures Are Still Needed*, TIGTA (May 2, 2013), https://www.treasury.gov/tigta/auditreports/2013 reports/201340052fr.html (ITINs); *Processes Do Not Always Ensure That Electronic Filing Identification Numbers Are Assigned to Qualified Applicants or Deactivated When Required*, TIGTA (Nov. 15, 2017), https://www.treasury.gov/tigta/auditreports/2018 reports/201840003fr.pdf (EFINs); *21.3.7 Processing Third-Party Authorizations onto the Centralized Authorization File (CAF)*, IRS (Aug. 31, 2021), https://www.irs.gov/irm/part21/irm_21-003-007r; *3.13.40* (CAFs); *Application for Tax Identification Number for Pending U.S. Adoptions*, IRS (Nov. 12, 2021) (ATINs), https://www.irs.gov/irm/part3/irm_03-013-040; *21.7.13 Assigning Employer Identification Numbers (EINs)*, IRS (Sept. 3, 2021), https://www.irs.gov/irm/part21/irm_21-007-013r (EINs); *Identity Protection Personal Identification* | This is an assertion of law and not of fact, and legal conclusions do not belong in statements of fact. *See, e.g., Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); *Chin v. Garda CL New England, Inc.*, 2017 WL 3526253, at *2 (D. Mass. Aug. 16, 2017); *King v. Bernabei*, 2015 WL 1506063, at *2 (N.D. Ill. Mar. 24, 2015); *Abney v. Univ. of Virgin Islands*, 2013 WL 12354494, at *6 (D.V.I. Apr. 15, 2013). To the extent a response is required, the material cited in the footnote is not disputed as it relates to other identifying numbers and should be viewed for context. |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| | *Numbers Are Not Provided to All Eligible Taxpayers*, TIGTA (Sept. 24, 2014), https://www.treasury.gov/tigta/auditreports/2014reports/201440086fr.html (IP PINs). | |
| 11 | As of August 30, 2010, the IRS had issued over 1.02 million PTINs under the voluntary PTIN system. Ex. G at 472. | Admitted. |
| 12 | In 2009, TIGTA published a report that "cited major issues with the Service's ability to understand, regulate and effect compliance amongst paid return preparers." Ex. H at 004. | Admitted that the quote is correct and that this is one conclusion reached by TIGTA, but the report should be read in full for context and other conclusions. |
| 13 | ██████████████████████████████████████ Ex. I at 004-005; Ex. J at 003 ██████████████ | Denied. The Plaintiffs' contention is vague as to its substance and the time period it references. The cited exhibits speak for themselves. |
| 14 | Since at least 1997, numerous legislative attempts had been made to regulate tax return preparers, but every time the IRS failed to secure authority from Congress. The Internal Revenue Service Restructuring and Reform Act of 1997 was introduced in identical form in both houses during the First Session of the 105th Congress. H.R. 2292, 105th Cong. (1997); S. 1096, 105th Cong. (1997). Those two bills sought to amend 31 U.S.C. § 330 to regulate "other persons engaged in the business of preparing returns or otherwise accepting compensation for advising in the preparation of returns." *Id.* at § 204(a)(1). When both bills died after they were referred to committee, the Internal Revenue Service Restructuring and Reform Act of 1998 was later reintroduced and passed into law without any provision relating to the regulation of tax return preparers. 112 Stat. 685. | The United States admits that, since 1997, legislation has been proposed in Congress that could have amended 31 U.S.C. § 330. The United States denies any suggestion the IRS sought "to secure authority from Congress." Aver that the IRS has been involved in proposing legislation to Congress. |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| 15 | In 2001, The Low Income Taxpayer Protection Act, which was introduced in the Senate, included language requiring the IRS to "promulgate regulations that . . . require the registration of income tax return preparers." S. 802, 107th Cong., § 2(b)(1)(A)(2001). That bill also never made it out of committee. Similar language was included in the Low Income Taxpayer Protection Act of 2003, S. 685, 108th Cong., § 2(b)(1)(A)(2003); The Tax Administration Good Government Act, H.R. 1528, 108th Cong., § 7530(a)(1)(2004); the Low Income Taxpayer Protection Act of 2004, H.R. 3983, 108th Cong., § 2(b)(1)(A)(2004); and the Low-Income Taxpayer Protection Act of 2005, H.R. 894, 109th Cong., § 2(b)(1)(A) (2005). None of those bills passed. | Admitted. |
| 16 | During the 109th Congress, the Senate Finance Committee reported to the floor with the Telephone Excise Tax Repeal and Taxpayer Protection and Assistance Act of 2006, which incorporated the Taxpayer Protection and Assistance Act of 2005. Both of those bills included an amendment to 31 U.S.C. § 330(a)(1) that modified the existing definition of "representatives of persons before Treasury" to include "compensated preparers of Federal Tax returns, documents, and other submissions," effectively granting the IRS authority to regulate tax return preparation. S. 832, 109th Cong., § 4(a) (2005); S. 1321, 109th Cong., § 203(a) (2006). Like the previous bills, neither bill passed, and the language was reintroduced over the next several Congresses as part of  the Taxpayer Protection and Assistance Act of 2007, S. 1219, 110th Cong., § 4(a) (2007), and three versions of The Taxpayer Bill of Rights Act, H.R. 5716, 110th Cong., § 4(a) (2008), H.R. 5047, 111th Cong., § 202(a) (2010), H.R. 6050, 112th Cong., § 202(a) (2012). No bill advanced out of committee. | Admitted. |
| 17 | In all, from 1997 to 2009, there were at least ten bills proposed in which Congress attempted to regulate, | The United States admits that the legislation described in |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| | or provide for registration of, tax-return preparers. None of the legislation was enacted. | paragraphs 14–17 was not enacted. |
| 18 | Thus, at the time of the 2009 TIGTA report, ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████ Ex. I at 005. | Dkt. No. 176-9 (Pl. Ex. I) is a PowerPoint from 2012 that states, ██████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████ *Id.* at BAH_0000406.0004. |
| 19 | In response to the TIGTA report, the IRS began a six-month study of tax-return preparers "to address the problem of incompetent and unscrupulous preparers." Ex. K at 698. The IRS intended to propose a "comprehensive set of recommendations to help the Internal Revenue Service better leverage the tax return preparer community with the twin goals of increasing taxpayer compliance and ensuring uniform and high ethical standards of conduct for tax preparers." Ex. L at 42; Ex. H at 004. | Denied, as explained at Dkt. No. 176-11 (Pl. Ex. K), "To address the problem of incompetent and unscrupulous return preparers, the IRS initiated an effort to regulate tax return preparers in Calendar Year (CY) 2009." The cited material does not mention a TIGTA report. Dkt. 176-8 (Pl. Ex. H) states: "IRS Commissioner Doug Shulman announced today [(June 4, 2009)] that by the end of 2009, he will propose a comprehensive set of recommendations to help |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| | | the Internal Revenue Service better leverage the tax return preparer community with the twin goals of increasing taxpayer compliance and ensuring uniform and high ethical standards of conduct for tax preparers." |
| 20 | In December 2009, the IRS issued the Return Preparer Review (Review) (Pub.4832). Ex. L. | Admitted. |
| 21 | The Review recommended requiring all paid tax-return preparers who are not attorneys, certified public accountants or enrolled agents to: (1) pass a competency examination; (2) complete 15 hours of annual continuing professional education; (3) satisfy certain ethical standards; (4) obtain a preparer identification number through mandatory registration; and (5) pay a user fee at registration and renewal. *Id.* at 2-4, 33. | Admitted, that the Return Preparer Review made the listed recommendations among other recommendations. The Return Preparer Review should be reviewed for the complete listing. Dkt. No. 176-12 (Pl. Ex. L). |
| 22 | The Review also recommended implementing a "strong enforcement program" that "utilize[d] data gathered through registration and other means to address individuals who fail to comply with the new IRS paid preparer regulations." *Id.* at 37-38. | Admit that the quoted material is correct. The full quote states that "[m]ost commenters observed that increased IRS oversight of tax return preparers will require a strong enforcement program." In response to the commenters the Return Preparer Review states that the IRS "will develop a comprehensive, service-wide enforcement strategy that utilizes data gathered through registration and other means to address individuals who fail to comply with the new IRS paid preparer regulations." Dkt. No. 176-12 (Pl. Ex. L) at 37-38. |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| 23 | Shortly after publication of the Review, "the Return Preparer Initiative (RPI) was launched, with the goals of designing and standing up an organization that would address the recommendations of the 2009 Return Preparer Review and that would ultimately be responsible for the overall compliance and monitoring of tax professionals." Ex. H at 004. | Admitted. |
| 24 | ██████████████████████ Ex. M at 919-28. | Admitted. |
| 25 | The team worked with Booz Allen Hamilton, the organization's "thought partner[]," to "develop the framework, identify[] issues," and "help[] to stand up the RPO organization." Ex. A at 63:4-12; Ex. N at 161:20-162:3. | Admitted that Booz Allen Hamilton had a "management contract" with the IRS in 2010 under which it helped to "develop the framework, identify[] issues, [and] help[] to stand up the RPO organization. Dkt. No. 176-14 at 161:20–162:3 (Pl. Ex. N). Admit that the quotations, which are the recollections of former IRS employees, are correct, but deny their characterizations are correct. |
| 26 | The proposed organization centered on ██████████████████ Ex. I at 010. | Admitted. |
| 27 | Given the numerous, failed regulatory attempts in Congress, the IRS did not seek appropriations, and instead designed the organization to be funded entirely through user fees generated from the PTIN registration fee, the testing fee, and the continuing education fee. Ex. O at 748; Ex. P at 87:4-12; Ex. Q at | Denied. The three user fees contemplated in 2010 were determined because of, and according to, the requirements of 31 U.S.C. § 9701 and OMB Circular A-25. |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| | 457 ("There are certain costs for the entire program that are spread over the three user fees we plan to charge. 75% of those costs are allocated to the PTIN sign-up user fee."). The PTIN fee was the first IRS user fee charged for an identifying number, and the organization was the first IRS office fully funded by user fees. Ex. P at 87:17-88:2. | *See* Dkt. No. 176-15 (Pl. Ex. O ) at 748; Pl. Dkt. No. 176-16 (Ex. P) at 87:8-16; Dkt. No. 176-17 (Pl. Ex. Q) at 456–557. Retired IRS Employee Eva Williams testified that while she was in the CFO office that she was unaware of any offices other than RPO within the IRS that were fully funded with user fees. Dkt. No. 176-16 at 87:17–88:2 (Pl. Ex. P). At least beginning in 2012, RPO received funding from user fees and appropriations. |
| 28 | While "[g]enerally, user fees go into one big collection bucket at the Department of Treasury," the PTIN user fee was specifically set aside for the operation of the Return Preparer Office. Ex. N at 214:4-215:1. | Admitted. |
| 29 | The PTIN user fee was the ███████████ for the organization, Ex. R at 052, and was intended to cover "the bulk of total program costs inclusive of an anticipated 331 person organization to provide oversight for 1.2 M preparers." Ex. S at 043. | Admitted. |
| 30 | The organization was designed to establish and oversee the Registered Tax Return Preparer Program ("RP Program") , an "extensive regulatory effort," Ex. K at 698, and intended to implement the "recommendations that were in the Return Preparer Review. . . begin[ning]with the PTIN requirement. . . and then phas[ing] in, over approximately a three-year period, the testing and suitability requirements." Ex. F at 22:21-23:8; Ex. J at 007 ███████████████████████████████ | To the extent "organization" means RPO, admitted that in addition to overseeing the PTIN program, RPO also oversaw the Registered Tax Return Preparer (RTRP) Program. |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|-----|-------------------------------|------------------------|
| 31 | Registration was only a small piece of the proposed RP Program, but implementing it first was critical because the IRS "need[ed] to collect user fees at the time of registration and/or renewal to ensure the timely collection of financial resources needed to operate the program." Ex. H at 033; Ex. P at 130:10-131:19 (the PTIN user fee was intended to fund the entire program, not just "the simple act of assigning the number."); Ex. A at 125:5-18 ("[t]he program is supported by the user fee"); Ex. J at 009 (user fee intended ████████████████████ ███████████) | Denied. The Plaintiffs' contention is vague as to its substance and the time period it references. The Plaintiffs have cited no support for the contention that "[r]egistration was only a small piece of the proposed RP Program . . .." Moreover, the IRS "planned to recoup costs associated with the program through three user fees" and appropriations, not just the PTIN user fee. Dkt. No. 176-19 at 043 (Pl. Ex. S). |
| 32 | In July of 2010, the IRS and Booz Allen Hamilton finalized the cost model that set the initial PTIN user fee. Ex. T at 146:6-24; Ex. U (2010 cost model). Figures 5-8 in the Appendix attached to Plaintiffs' Motion for Summary Judgment are annotated excerpts of the 2010 cost model showing the costs that Plaintiffs believe were necessary to provide tax return preparers a PTIN. Pink shaded items are fully includable in the PTIN fee and pink striped items are partially includable in the PTIN fee. | The first sentence is admitted. The United States lacks knowledge as to the remaining allegations, which relates to Plaintiff's unsupported beliefs and thus denies that the statements are undisputed facts. |
| 33 | The user fee included costs for 313 FTEs and included the following capabilities:  (1) "Communications & Customer Support," (2) "IT (Amortized)," (3) "RP Program Compliance," (4) "OPR/PMO Ops [Office of Professional Responsibility/ Program Management Office Operations] Support," and (5) Registration for foreign tax return preparers. Ex. U at 5 of 26.  The registration user fee covered costs for seventy-five percent of the RP Program's IT, customer support and marketing, and program management office, and one hundred percent of "RP Program Compliance" and "Registration" costs. Ex. U at 10, 12, 14, 16, 19 of 26. A total of $59,427,633 in annual costs was expected. Ex. U at 5 of 26. A separate user | The first three sentences are admitted. The fourth sentence is denied. The 2010 Cost Model does not calculate a separate fee for continuing education providers and a separate testing fee for return preparers. *See* Dkt. No. 176-21 at 17–18 (Pl. Ex. U). |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| | fee was calculated for testing and continuing education. Ex. U at 17-18 of 26. | |
| 34 | RP Program Compliance[3] comprised a majority of the costs due to the nature of the activities being performed. Ex. U at 5 of 26; Ex. O at 749 (describing compliance as the "core User Fee focus area"). These activities included: (1) "Verify[ing] claimed Professional Designation for CPAs, Attorneys etc., (2) Conduct[ing] Background Check on Return Preparers' Criminal History. . . (3) Verify[ing] Return Preparers' Self Reported Tax Compliance, (4) Verify[ing] Return Preparers' Personal Tax Compliance, (5) Develop[ing] Process for Identifying and Treating Return Preparers Filing w/o PTIN or Incorrect PTIN, (6) Verify[ing] Return Preparers' Self Certified Continuing Education, and (7) Administrative Support." Ex. U at 5 of 26. | Admitted. Aver that the 2010 Cost Model should be viewed for context and completeness and that approximately $131 million (or 74%) of its expected three-year total costs of approximately $178 million were in the "RP Program Compliance" category. *See* Dkt. No. 176-21 at 5 (Pl. Ex. U). |
| 34 – Fn. 3 | Once formally established, the Suitability Office was responsible for most of the RP Compliance capability. Ex. V para. 42 (listing Suitability lanes of work: "(a) Professional Designation Checks; (b) Personal Tax Compliance; (c) Prisoner Lists; (3) Specially Designated Nationals; (e) Former Employee EA Enrollment Applicants; (f) Criminal Background Checks; (g) Referrals; and (h) Electronic Filing Identification Number Adjudication and Appeals.  Ex. W at 34:6-15. | Admitted that the 2010 Cost Model included certain expected activities that, under RPO's final organizational design, ended up being performed by the RPO Suitability Department; *i.e.,* (1) Professional Designation Checks (PDCs); (2) Personal Tax Compliance (PTC) checks; and (3) Criminal Background Checks (CBCs). Denied the characterization that this was "most of" of "RP Compliance capability." Dkt. No. 176-23 (Pl. Ex. W) does not support the contention in this paragraph. Denied that the other identified RPO Suitability Department lanes of work (e.g., Prisoner Lists) are included in the 2010 Cost Model's listing of "RP |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|-----|-------------------------------|------------------------|
| | | Program Compliance" activities. *See* Dkt. No. 176-21 at 5 (Pl. Ex. U). |
| 35 | Each of the five capabilities had a supporting sheet within the cost model, Ex. U, that provided additional information on the specific costs. For example:<br><br>Page 12 of 26 (Customer Support and Marketing) provided the supporting data for the Communications and Customer Support capability. It included activities such as: updating forms and publications, "contacting current PTIN users," "packag[ing] and ship[ping] applications inadvertently sent to IRS," "paid advertising for RP Program," "Development of Marketing Toolkit for Register[ed] Return Preparers," and "Development of 30 second TV commercial." Though Accenture was responsible for the contract center, the Customer Support and Marketing sheet also included line-items for "inquiry Response – Taxpayer & Return preparers" and "EPSS help desk to handle customer help inquiries" to account for anticipated calls to the IRS's general help line. *Id.* at 12 of 26; Ex. X at 59:9-61:2.<br><br>Page 16 of 26 (IT Costs) provided the supporting data for the IT capability. It included activities such as: "Retiring existing PTIN system," "IV&V [Identity Verification and Validation] Testing to test system and connection between vendor and IRS," "security and acceptance testing of vendor system," "one-time data extract of current PTINs from the existing PTIN system," "Authentication Address of Record," "Procure initial development of 'ideal' internal database to support RP registration tracking and analytics," "Create security tunnel on IRS.gov," and "Develop/maintain interface for Tax Compliance Checks." Ex. U at 16 of 26. | Admitted that the 2010 Cost Model had detailed subsidiary Excel worksheets that calculated expected costs for each of the five functions identified on the 2010 Cost Model's "Summary – Costs by Activity" Excel Worksheet. *See* Dkt. No. 176-21 at 5 (Pl. Ex. U). Portions of the cited material do not correctly summarize the material, do not support the propositions, and should be seen for their contents. Specifically, it is denied that Accenture was responsible for a "contract center" (Dkt. No. 176-21 at 12 Pl. Ex. U); denied that Dkt. No. 176-21 (Pl. Ex. U) at 19 is entitled "RPR Program Costs"; and denied that the cited material supports that the projected contractor costs related to Booz Allen. *See* Dkt. No. 176-16 at 133:10–17 (Pl. Ex. P). |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| | Page 19 of 26 (RPR Program Costs) provided the supporting data for the OPR/PMO Ops Support capability. This included items such as: Vendor/IT Management, COTR (Contracting Officer Technical Representative, a procurement function located within RPO), "Pre-September 2010 Program Implementation Staff," "Business Analysis," "Government/ Stakeholder Liaison," "Communications," "Program Compliance & Policy," and "Programmatic Executive Management/Oversight." *Id.* at 19 of 26. It also included a line-item for RP Program Contractors. *Id.* This was for the projected costs of the management contract with Booz Allen Hamilton. Ex. P at 133:10-17. | |
| 36 | On September 30, the IRS issued final regulations implementing the mandatory PTIN recommendation, and setting the IRS's portion of the PTIN user fee at $50.00. *Furnishing Identifying Number of Tax Return Preparer*, 75 Fed. Reg. 60,309, 60,309 (Sept. 30, 2010); *User Fees Relating to Enrollment and Preparer Tax Identification Numbers*, 75 Fed. Reg. 60,316, 60,317 (Sept. 30, 2010). | Admitted that on September 30, 2010, the IRS issued final regulations making the PTIN the sole identifying number for purposes of 26 U.S.C. § 6109(a)(4). Admitted that the regulation identified a $50 fee to apply for or renew a PTIN. The remaining allegations are denied. The $50 fee included direct and indirect costs to the government determined ex ante consistent with the IOAA and OMB Circular A-25. 75 Fed. Reg. 14359 (NPRM); 75 Fed. Reg. 60309 (final regulation); Dkt. No. 174-8 (Def. Ex. 13, 2010 Cost Model). |
| 37 | In addition to the $50 IRS portion, the PTIN user fee included $14.25 per registration and $13.00 per renewal to compensate the IRS's third-party PTIN-system vendor, Accenture. 75 Fed. Reg. at 60,317. | Admitted. Aver that there was a vendor fee calculated to be $14.25 for registration and $13.00 for renewal. 75 Fed. Reg. 60316. This vendor fee covered "costs incurred by the |

14

| No. | Plaintiffs' Asserted Statement | United States' Response |
|-----|-------------------------------|------------------------|
| | | vendor to administer the application and renewal process" and those costs were "separate from the costs to the IRS for administering the PTIN application and renewal program." *Id.* at 60319. "The respective fees pay for different aspects of administering the PTIN program, each of which is essential to providing PTINs to tax return preparers." *Id.*<br><br>Based on the above, all other contentions in this paragraph are denied. |
| 38 | The difference in the registration and renewal fee was due to the fact that ▮▮▮▮▮▮▮▮▮▮▮▮▮ x. Y at 2. This is because ▮▮▮▮▮▮▮▮▮▮▮ *Id.*; Ex. X at 61:12-23 (confirming that TPPS stored the application information). | Admitted to the extent this asserted fact relates to the 2010 vendor fee ($14.25 for registration and $13 for renewal). *See also* Response to Paragraph 37 (above). |
| 39 | The user fee was initially based on a three-year renewal. But, to avoid an economically significant regulation that required congressional approval, it was changed to annual renewal. Ex. Z at 134; Ex. P at 156:4-157:8. This changed the IRS's portion of the user fee from $156 every three years to $50 annually, and Accenture's portion from ▮▮▮▮▮▮▮▮▮▮▮▮ Ex. U at 7 of 26; Ex. AA at 642. | Admitted that the Plaintiffs' citation to the deposition testimony of Eva Williams, a former financial analyst for the CFO's office, supports this assertion. Aver that the Congressional Review Act (CRA) provides a different review process than was described by Ms. Williams, and the CRA should be seen in its entirety. |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|-----|-------------------------------|------------------------|
| | | |
| 40 | Accenture was awarded a contract to ███████████ █████████████████████████████████ ███████████ x. AA at 645. The contract required Accenture to ██████████████████████████████ ████████████████████████████ *Id.* | Admitted. |
| 41 | The contract also required Accenture to operate a contact center to process paper PTIN applications and to address ████████████████████ █████████████████████████ *Id.* at 652-53; Ex. AB (showing call types including ██████████████████████ █████████████████████████ | Admitted. |
| 42 | The contract was a █████████████ which specifically provided that Accenture would ████████████████████████████ ████████████████████ x. AC at 837. | Admitted. |
| 43 | Instead, Accenture was required by ████████████████████████ ████████ *Id.* In addition, ██████████████████████████████ ██████████████████████████ Ex. AD at 5 of 6; Ex. AE at 41:15-19; 60:20-22 ████████████████████ █████████████ | The first sentence is admitted. The second sentence is denied. ████████████████ ████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████ Dkt. No. 177-13 at 41:15–19 (Pl. Ex. AE). Dkt. No. 177-12, at 5 (Pl. Ex. AD); Dkt. No. 177-13 at 60:20–22 (Pl. Ex. AE). ███████████████████ *Id.* |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|-----|-------------------------------|------------------------|
| 44 | Four months after the contract was awarded, Accenture finalized the development of the Tax Professional PTIN System (PTIN System), using one of its preexisting systems with minor adjustments. Ex. X at 48:16-21. Accenture subcontracted with ███ ████████████████ and with ██████ for its "commercial-off-the-shelf" licensing software. Ex. AE at 8:19-9:9, 11:18-12:5, 26:7-20. Most of the PTIN System functionality was part of the standard software and was available "out of the box" without additional customization. *Id.* at 11:3-17; Ex. AA at 646. | The first sentence is denied. The development of the Tax Professional PTIN System (TPPS) continued for years, and the TPPS continues to be updated and developed. While Accenture had a system in place that the IRS could use with some adjustments, those adjustments were not minor. Dkt. No. 176-24 at 48:16–21 (Pl. Ex. X).<br><br>The second sentence is admitted.<br><br>The third sentence is denied. Accenture's IT system was ███ ███████████████ ████████████████ ████████████████ ████████ Dkt. No. 177-9 at USA-0020646 (Pl. Ex. AA). Both Accenture and ██████ made customizations to the TPPS software. Dkt. No. 177-13 at 12:6–13:6 (Pl. Ex. AE). |
| 45 | In late September 2010, Accenture issued the first PTINs through the PTIN System. Ex. AF at 004 | Admitted that TPPS went "live" on September 28, 2010. Dkt. No. 176-32 at 5 (Pl. Ex. AF, BAH_0001710.0004). |
| 46 | Individuals who had previously obtained a voluntary PTIN had to reapply and pay the $64.25 initial PTIN fee, but the IRS and Accenture transferred ████████████████ ████████████ o these individuals could keep their current PTIN number. Ex. AA 646-47; Ex. AG at 102 ("If you already have a PTIN, the | Admitted that individuals who previously obtained a voluntary PTIN had to reapply using the new application process and that Accenture received ████████ ████████████████ ████████████████ ████████████ |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| | same number will be reassigned if your information matches your original application."). | ███████████████████████ <br> Dkt. No. 176-33 at 3 (Pl. Ex. AG, USA-0006099); Dkt No. 177-9, USA-0020646–47 (Pl. Ex. AA). The remaining allegations are denied. The final 2010 regulations identified: (1) a $50 fee to apply for or renew a PTIN, and (2) a $14.25 vendor fee for processing the application for a PTIN or a $13.00 vendor fee for processing the renewal of a PTIN. *See* 31 C.F.R. § 300.9 (2010). |
| 47 | Preparers were required to create an account that contained information regarding "the status of [their] PTIN, and testing and continuing education if [they had to] meet those requirements" and a link to the PTIN application form. Ex. AG at 100. To obtain a PTIN, the return preparer submitted the application through the PTIN System and paid the applicable fee. Ex. K at 698. | Admitted that preparers were required to create an account on TPPS. Admitted that this account contained a link to the PTIN application form. Admitted that to obtain a PTIN, applicants must submit an application and pay the applicable fee. Denied that this account "contained information." The supporting material states that "through this account, [preparers] could keep up with information about the status of [their] PTIN, and testing and continuing education if [they] must meet those requirements." Dkt. No. 176-33 at 4 (Pl. Ex. AG, USA-0006100). |
| 48 | While the PTIN application included numerous data fields, ████████████████ | The first sentence is denied. Under 26 U.S.C. § 6109, the |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
|  | ███████████████████ x. AE at 236:13-237:2. This enabled the IRS to verify the identity of the tax return preparer, and issue the PTIN ██████████ Ex. AH at 016. Individuals who did not have a Social Security Number were still required to obtain a PTIN by submitting identifying documents for manual identity verification and processing. Ex. N at 154:1-155:4. | IRS, not its contractors, makes the determination of what information is necessary to issue a PTIN. The entirety of the information collected on the PTIN application enabled the IRS to verify identity and issue PTINs ████████████ Dkt. No. 177-14, AFS_00138016 (Pl. Ex. AH). The second and third sentences are admitted. |
| 49 | The new PTIN application requested eleven fields beyond those that were on the original Form W-7P including: past felony convictions, tax filing status and history, federal tax compliance, professional credentials, and information on the applicant's business. Ex. AI at 802- 03. | Admitted. |
| 50 | The IRS planned to eventually make registration conditional on satisfying the other RP Program requirements including suitability checks and the competency exam once they were implemented, and this additional information would be used to evaluate whether an applicant satisfied those requirements. Ex. N at 66:18-67:9; Ex. J at 027 ███ ███████████████████████████ ███████████████████████████ Because those requirements were being phased in later, these initial PTINs were referred to as ███████ PTINs and would become ████████ once the IRS implemented the RP Program, and the tax return preparer satisfied all additional requirements. Ex. AJ at 023, 026. | Admitted that the IRS initially planned to conduct certain suitability checks on non-credentialed tax return preparers prior to issuing some active PTINs and that the IRS planned to integrate suitability check data into TPPS. The remaining allegations are denied. Information collected was merely for identification. 26 U.S.C. § 6109. ████████████ PTINs would become ████████ once the IRS implemented the RTRP program, and the tax return preparer satisfied all additional requirements. ███████████████ ███████████████████ ███████████████████ |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| | | ███████ Dkt. No. 177-15, BAH_0000205.0023 and BAH_0000205.0026 (Pl. Ex. AJ). |
| 51 | At the time of the initial system launch, the PTIN System had the necessary capabilities for ███████ Ex. AK at 188. Additional functionalities for ███████ Ex. AA at 047-051; Ex. AK at 188-89. | Admit that ███████ as completed at the time of the initial launch. Denied that the identified functions are the only "necessary capabilities." While additional functionalities ███████ *Compare* Dkt. No. 177-9 at USA-0020647–51 (Pl. Ex. AA) *with* Dkt. No. 177-16 at AFS_00174188–89 (Pl. Ex. AK). |
| 52 | Releases 2, 3, and 4 ███████ | Admitted. |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|-----|-------------------------------|------------------------|
| | ████████████████████ ████████████ Ex. AK at 188. | |
| 53 | These later releases also added numerous system enhancements considered beyond the scope of the original contract including ██████████ ████████████████████████ ████████████ Ex. AL at 274; Ex. AM at 766-68; Ex. AK at 156-59, 188-89 (describing functionality introduced in each PTIN System release). | The Plaintiffs' contention is vague as to its substance and the time period it references, especially the Plaintiffs' use of "considered" and "numerous." Admitted that there were contract modifications that altered the scope of the original contract, including various updates to the functions of TPPS. Dkt. No. 177-16 at AFS_00174188– 89 (Pl. Ex. AK); Dkt. No. 177-17 at AFT__00072767–68( Pl. Ex. AM); Dkt. No. 176-38 at 21 (Pl. Ex. AL, USA-00001274); Dkt. No. 177-8 at 3–4 (Pl. Ex. Y). |
| 54 | ████████████████████████ ████████████████████████ ████████ *See, e.g.,* Ex. AN at 679, 684-85 (amending contract to account for various out-of-scope items); Ex. AO at 619, 622 (same); Ex. AP at 160 ████████████ ████████████████████████ ████████████████████ | Admitted. |
| 55 | The IRS continued to pay Accenture for these costs until Accenture increased its portion of the user fee in 2015. | Admitted that the IRS paid Accenture until Accenture's "2016 contract recompete." The remaining allegations are denied. Accenture simply increased its user fee in 2015 because Accenture competitively bid to continue |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|-----|-------------------------------|-------------------------|
|     |                               | to provide certain PTIN services and then won that recompete. *See* Dkt. No. 175-2, ¶ 109 (referring to Accenture's "2016 contract recompete"). The 2015 regulations identified: (1) a $33 fee to apply for or renew a PTIN, and (2) a $17 vendor fee for processing the application for a PTIN. *See* 80 Fed. Reg. 66792. |
| 56  | The IRS decided to ██████████ ████████████████████████████ ████████████████████████████ Ex. J at 013. | Admitted. |
| 57  | Thus, it had only a small portion of its anticipated 313 FTEs filled at the time the PTIN System began issuing PTINs and collecting fees. Ex. AQ at 116:22-117:5; Ex. AR at 325 ("[C]an we discuss the true 'must haves' of staffing for September 1st. We may have to scale back some of the associated requirements around CE processing or workstreams, to widdle [sic] this down to a smaller number that can be negotiated. We then can back into the longer vision of what's needed for additional negotiations with the Union."); Ex. AS at 033 ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████ | Admitted that RPO never reached the expected 313 FTEs. Aver that because instead of the expected 1.2 million PTINs, fewer than 730,000 return preparers actually annually registered or renewed a PTIN during fiscal year 2011 through fiscal year 2013. *See* Dkt. No. 175-3, ¶ 62 (only 700,000 PTINs issued as of April 2011). Aver that the actual standing up of RPO did not begin until early calendar year 2011 with the result that the Implementation Team was performing the relevant work as of late calendar year 2010 and continued to do so into calendar year 2011. *See* Dkt. No. 175-3, ¶¶ 60–61; Dkt. No. 177-6 (Pl. Ex. M, |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| | | Implementation Status Report dated April 4, 2011). |
| 58 | These "initial positions were important for standing up the registration system." Ex. AQ at 116:22-117:5; Ex. J at ██████████████████████████████████████████████ | Denied. Although the quoted text is found in the cited materials, the quotes do not support the asserted facts and are contradicted by Plaintiffs' Appendix. *See* Dkt. No. 175-1 at 5–8. Aver that the actual standing up of RPO did not begin until early calendar year 2011 and so the Implementation Team was performing the relevant work as of late calendar year 2010 and continued to do so into calendar year 2011. *See* Dkt. No. 175-2, ¶¶ 60–61; Dkt. No. 177-6 (Pl. Ex. M Implementation Status Report dated April 4, 2011). |
| 59 | "[P]ositions focused on the analysis of data" and other aspects of the RP program were deferred until sufficient funds and data had been collected. Ex. AQ at 114:22-116:2 ("[Y]ou need data to influence the program . . . If you want to talk about how many return preparers that have PTINs that have tax compliance issues, you can't talk about it unless you know what the data is, what the numbers are. What is the data showing? Are there trends?"); Ex. J at 013 ████████████████████████████████████████ Ex. X at 177:22-178:2. | Admitted to the extent Plaintiffs are referring to the deferral of aspects of the RTRP Program. |
| 60 | On October 26, 2010, almost a month after the PTIN System went live, Commissioner Shulman announced the creation of the Return Preparer Office (RPO). The Office would "have broad responsibility for the return preparer initiative," and would "manage all [IRS] activities related to | Admitted. |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
|  | continuing education and testing of all professionals under IRS jurisdiction[,] . . . the registration system and process, as well as coordinate resource planning for IRS efforts across the organization related to return preparers." Ex. AT at 046. |  |
| 61 | Four months later, in February of 2011, "the RPI team received IRS Commissioner approval to begin the process of standing up the organization." Ex. H at 008. | Admitted. |
| 62 | ███████████████ Ex. M at 917, 921. | Admitted and aver that, while not finalized, the standing up of RPO began in early 2011, and the Implementation Team was performing the relevant work as of late 2010 and continued to do so into early 2011. *See* Dkt. No. 175-2, ¶¶ 60–61; Dkt. No. 177-6 (Pl. Ex. M, Implementation Status Report dated April 4, 2011). |
| 63 | RP program hiring finally began in earnest ███ Ex. AU at 004 ███ Ex. AV at 004. | Admitted that the cited documents support ███████ ███████ *See* Dkt. No. 177-22 at BAH_0001145.004 (Pl. Ex. AU); Dkt. No. 177-23 at 004 (Pl. Ex. AV). |
| 64 | On June 3, 2011, the IRS finalized the third regulation and formally introduced the Return Preparer Program. *Regulations Governing Practice Before the Internal Revenue Service*, 76 Fed. Reg. 32,286, 32,296 (June 3, 2011). This implemented additional recommendations from the Review by requiring uncredentialed tax return preparers to become "Registered Tax Return Preparers" through the | Admitted, except to the extent Plaintiffs refer to the "Return Preparer Program." Plaintiffs correctly identify the program in the cited material. Aver that the cited testimony states that the Registered Tax Return Preparer Program credential involving testing would be "phase[d] in over |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| | "Registered Tax Return Preparer Credential Program." Ex. F at 30:3-18<br><br>(Registered Tax Return Preparer was "the name of the new credential that was created through the recommendations of the Return Preparer Review report."). | three years." *See* Dkt. No. 176-6 at 30:10–14 (Pl. Ex. F). |
| 65 | Individuals "would obtain that credential by passing a test, passing a suitability test" and completing "continuing education requirements every year." Ex. F at 30:10-18; 76 Fed. Reg. at 32,287. | Admitted to the extent that "individuals" refer to non-credentialed applicants. Aver that the RTRP credential program would be phased in over three years. *See* Dkt. No. 176-6 at 30:10–14 (Pl. Ex. F). |
| 66 | Individuals were also required to obtain a PTIN. 76 Fed. Reg. at 32,296. | This is an assertion of law and not of fact and legal conclusions do not belong in statements of fact. *See, e.g.,* *Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); *Chin v. Garda CL New England, Inc.*, 2017 WL 3526253, at *2 (D. Mass. Aug. 16, 2017); *King v. Bernabei*, 2015 WL 1506063, at *2 (N.D. Ill. Mar. 24, 2015); *Abney v. Univ. of Virgin Islands*, 2013 WL 12354494, at *6 (D.V.I. Apr. 15, 2013). To the extent a response is required, denied. While the cited regulations required a PTIN to obtain the Registered Tax Return Preparer (RTRP) credential, it was the final PTIN regulations issued eight months earlier on September 30, 2010, that required that tax return preparers obtain a PTIN. *See* 76 Fed. Reg. at |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| | | 32,287 (referencing the prior PTIN regulations and stating the "final regulations under section 6109 provide that, for returns or claims for refund filed after December 31, 2010, the identifying number of a tax return preparer is the individual's preparer tax identification number (PTIN) . . . .."). |
| 67 | Consistent with the initial design, and the cost model used to set the PTIN user fee, the regulation specified that the PTIN user fee would cover the costs of administering the program including: "(1) the costs the government faces in administering registration cards or certificates for each registered tax preparer; (2) costs associated with prescribing by forms, instructions, or other guidance which forms and schedules registered tax preparers can sign for; and (3) tax compliance and suitability checks conducted by the government." 76 Fed. Reg. at 32,296. | Admitted to the extent "the program" refers to the PTIN program. However, the material cited refers to the RTRP program, not the PTIN Program. |
| 68 | In addition to providing funding for the Return Preparer Program, mandatory PTIN registration allowed the IRS to "collect more accurate data on return preparers," "provide better service to the tax return preparer community and taxpayers generally," and "made it easier for the IRS to locate and review the returns prepared by a tax return preparer when instances of misconduct [were] detected." Ex. AW at 020; Ex. K at 698 (Mandatory PTINs "allow[ed] the IRS to better identity tax return preparers, centralize information, and effectively administer the rules relating to tax return preparers."). | Denied as unsupported and incomplete. Plaintiffs' Exhibit AW is a Canadian Briefing Manual that says these are "estimated benefits of return preparer registration." Dkt. No. 176-49. Plaintiffs' Exhibit K is a TIGTA report that quotes a Regulation and states in full, "The requirement to use a PTIN will allow the IRS to better identify tax return preparers, centralize information, and effectively administer the rules relating to tax return preparers. The final regulations will also benefit taxpayers and tax |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| | | return preparers and help maintain the confidentiality of SSNs." Dkt. No. 176-11; *see also* 75 Fed. Reg. 60309 (Sept. 30, 2010). |
| 69 | While the details of the organizational design continued to evolve over time, the anticipated activities remained the same. Ex. AQ at 43:19-25; *Compare* Ex. L at 3-4 *with* Ex. AV at 004 and Ex. AX at 007. | The relevant time frame for this asserted fact is unclear. Denied. The cited documents do not support the asserted fact. RPO's organizational design and anticipated activities changed over time. *Contrast* Dkt. No. 178-1 at 20–21 (2010 Cost Model projects that expected Personal Tax Compliance (PTC) costs will be over 47% of total expected costs) *with* Dkt. No. 174-23 (Dkt. Ex. 40, King Decl., ¶¶ 89–92) (RPO Suitability stopped performing PTC checks in 2013 because of *Loving;* Suitability only reinitiated PTC checks in later years on a small portion of PTIN holders) *and* Dkt. No. 174-12 (Def. Ex. 21, 2015 Cost Model) (no longer including RPO Competency & Standards and RPO Continuing Education Departments' expected costs in the PTIN fee); *see also* Dkt. No. 173-2, ¶ 72. |
| 70 | By late 2011 the Return Preparer Office was a fully functioning organization ██████████ ████████████████████ ████████████████ | Denied. ████████████ ████████ ████████████ *See* Dkt. No. 174-19 |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| | Ex. J at 011; *see also* App. Fig. 4. | (Def. Ex. 35, Goudey Decl., Ex. 3–10) (RPO Org. Charts from 2012 through 2019). |
| 71 | Ex. J at 011; App. Fig. 4. | The claimed time period for this asserted fact is unclear.<br><br>Denied.<br><br>*See* Dkt. No. 174-19 (Def. Ex. 35, Goudey Decl., Ex. 3–10) (<br><br>*See* Dkt. No. 175-2, ¶ 33 |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| 72 | The RPO's mission was ███████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ █████████ Ex. AY at 004; Ex. AZ at 195. | Admitted. |
| 73 | This ███████ was supported by ██████ ████████████████ ██████ ████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ Ex. AY at 004, 006. ████████████████████ ████████████ Ex. AX at 006. | Admitted that a particular draft Booz Allen document from 2012 uses the term ████ ██████████ at 004 and includes the quoted text for Referrals, Detection & Discipline and for Stakeholder Management at 006. *See* Dkt. No. 177-25 at BAH_0002736.004 & BAH_0002736.006 (Pl. Ex. AY). Admitted that another Booz Allen document from 2013 enumerates the four listed ███████████████ Dkt. No. 177-24 at BAH_0003075.006 (Pl. Ex. AX). Denied that professional designation verifications are ██████████████████ Dkt. No. 177-25 at BAH_0002736.006 (Pl. Ex. AY). |
| 73 – | The IRS also had a separate office for ██████████ ████████ a separate office of Procurement which | Admitted. |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|-----|--------------------------------|------------------------|
| Fn. 4 | negotiated, signed, and approved all contracts and contract expenses, and a Chief Financial Officer, who office typically "coordinate[d] any activities involving user fees." Ex. P at 56:13-57:2; Ex. AJ at 003; Ex. BA at 33:16-24, 170:24-171:4. | |
| 74 | The ███████████████████████████████████████████████████████████████████████████████████ *Id.* at 007; App. Fig. 1. | Denied. For an accurate description of the various RPO Departments' activities, *see* Dkt. No. 174-19, *passim* (Def. Ex. 35, Goudey Decl.), (VPBR Department activities); Dkt. No. 173-21, *passim* (Def. Ex. 36, Weiczynski Decl.) (Compliance Department activities); Dkt. No. 174-20, *passim* (Def. Ex. 37, Wensing Decl.) (Compliance Department activities); Dkt. No. 174-17, *passim* (Def. Ex. 33, Ruf Decl.) (Communications Department activities); Dkt. No. 174-21, *passim* (Def. Ex. 38, New Decl.) (Strategy & Finance Department activities); Dkt. No. 174-13, *passim* (Def. Ex. 40, King Decl.) (Suitability Department activities); Dkt. No. 174-24, *passim* (Def. Ex. 41, Rogers Decl.) (Suitability Department activities). *See contra*, Dkt. No. 175-1 at 5–8 (listing multiple categories). |
| 75 | ███████████████████████████████████████████████████████ x. AX at 022, 035; App. Figs. 2-3. This sub-function was outsourced to Accenture which was responsible for issuing and maintaining | Denied. The cited material does not support the facts. While Accenture had primary responsibility for overseeing TPPS, this does not mean that RPO Vendor Processes & |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| | PTINs. Ex. BB at 006 ███████████████ ███████████████████████ Ex. BC at 251:16-252:8 ("Accenture [has] issue[d] the PTINs for renewals and registrations throughout the history of RPO."); Ex. X at 52:7-10 (confirming that "Accenture was the vendor chosen to build and maintain the system used to issue PTINs"); Ex. BD at 306:12-18 (Accenture is "responsible for maintaining the PTIN system, TPPS, and [contact] center operations."). | Business Requirements (VPBR) does not have any responsibility with respect to TPPS processing of PTIN registration and renewals because VPBR oversees and supports that asserted "sub-function." *See* Dkt. No. 174-18, ¶¶ 37–49, 52–54 (Def. Ex. 34, Hernandez Decl.); Dkt. No. 174-19, *passim* (Def. Ex. 35, Goudey Decl.). |
| 76 | The Return Preparer Office itself did not "have the ability to issue a PTIN," Ex. N at 41:25-42:5, and RPO's role was primarily "oversight of Accenture's work." Ex. A at 50:3-13; Ex. X at 62:1-3 (confirming that the IRS did not issue PTINs). | Admitted that Accenture issued PTINs as the contractor for RPO. Denied as to the remaining statements. Accenture is unable to issue PTINs without direction from RPO. Dkt. No. 176-14 at 41:25–42:5 (Pl. Ex. N). RPO had more duties than oversight of Accenture's work. *See* Dkt. No. 174-18, *passim* (Def. Ex. 34, Hernandez Decl.) (VPBR Department activities); Dkt. No. 174-19, *passim* (Def. Ex. 35, Goudey Decl.) (VPBR Department activities); Dkt. No. 173-21, *passim* (Def. Ex. 36, Weiczynski Decl.) (Compliance Department activities); Dkt. No. 174-20, *passim* (Def. Ex. 37, Wensing Decl.) (Compliance Department activities); Dkt. No. 174-17, *passim* (Def. Ex. 33, Ruf Decl.) (Communications Department activities); Dkt. No. 174-21, *passim* (Def. Ex. |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|-----|-------------------------------|------------------------|
| | | 38, New Decl.) (Strategy & Finance Department activities); Dkt. No. 174-13, *passim* (Def. Ex. 40, King Decl.) (Suitability Department activities); Dkt. No. 174-24, *passim* (Def. Ex. 41, Rogers Decl.) (Suitability Department activities). |
| 77 | ███████████████████████████████ ████████████████████ Ex. AX at 007, which was responsible for: "[c]oordination among RPO departments, third-party vendors, and relevant business owners to ensure business and system operations were coordinated, formalized, and efficient"; "[o]versight of existing RPO contracts with third-party vendors, including development of Quality Assurance Plans"; and "[m]anagement and maintenance of all RPO systems, including identification of technical requirements and oversight of system design and development." Ex. BE at 985; Ex. BF paras. 10-13. | Admitted, but aver that this asserted fact does not provide a complete description of VPBR activities. *See* Dkt. No. 174-18, *passim* (Def. Ex. 34, Hernandez Decl.); Dkt. No. 174-19, *passim* (Def. Ex. 35, Goudey Decl.). |
| 78 | The Vendor Department managed six RPO systems or projects: the PTIN System (run by Accenture); Continuing Education Provider Application and Renewal System (CEPARS); Academic Professional, and Corporate (AP&C) Testing System; e-trak Practitioner (e-trak); RP360 project; and the PTIN Security Code (PSC) project which was an initiative designed to protect an individual's PTIN and help avoid identity theft. Ex. BE at 987; Ex. BA at 76:15-77:13. And COTRs within the Vendor Department managed the contracts with all RPO vendors including Accenture, Prometric, AIRE, Kinsail, and Booz Allen. Ex. BE at 986. | Admitted but aver this asserted fact does not provide a complete description of VPBR activities nor account for the passage of time. *See* Dkt. No. 174-18, *passim* (Def. Ex. 34, Hernandez Decl.); Dkt. No. 174-19, *passim* (Def. Ex. 35, Goudey Decl.). |
| 79 | The Vendor Department consisted of sixteen employees, but only a small portion of them spent time overseeing the Accenture contract or on PTIN- | Denied. Since the RPO stood up in 2011, the number of employees within the Vendor |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| | related work within the PTIN System. Ex. BF para. 63. | Department has fluctuated. *See* Dkt. No. 176-58 ¶ 16 (Pl. Ex. BF, Goudey Decl.). Two Contracting Officers within the Vendor Department are responsible for managing the Accenture Contract. *Id.* ¶ 63. These Contracting Officers spent most of their time on the Accenture contract. *Id.* ¶ 64. |
| 80 | ███████████████████ ███████████████████ ███████████████████ ███████████████████ ███████████████████ ███████████████████ Ex. AX at 008. ██████ ███████████████████ ███████████████ *Id.* ████████ | Denied. For an accurate description of the various RPO Departments' activities, see Dkt. No. 174-19, *passim* (Def. Ex. 35, Goudey Decl.), (VPBR Department activities); Dkt. No. 173-21, *passim* (Def. Ex. 36, Weiczynski Decl.) (Compliance Department activities); Dkt. No. 174-20, *passim* (Def. Ex. 37, Wensing Decl.) (Compliance Department activities); Dkt. No. 174-17, *passim* (Def. Ex. 33, Ruf Decl.) (Communications Department activities); Dkt. No. 174-21, *passim* (Def. Ex. 38, New Decl.) (Strategy & Finance Department activities); Dkt. No. 174-13, *passim* (Def. Ex. 40, King Decl.) (Suitability Department activities); Dkt. No. 174-24, *passim* (Def. Ex. 41, Rogers Decl.) (Suitability Department activities). Admits that the ████████████████ ████████████████ but the allegation that |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| | | there ████████ ████████████████ is unsupported by the document cited. The final sentence is admitted. |
| 81 | Suitability "was responsible for checking personal tax compliance, checking professional designation, matching prisoner lists, checking compliance of Enrolled Agents ('EAs') and Enrolled Retirement Plan Agents ('ERPAs'), checking compliance with the Annual Filing Season Program ('AFSP'), Former Employee EA Enrollment Applicants, and matching Specially Designated Nationals ('SDNs') lists." Ex. V para. 6. | Admits but avers this allegation does not provide a time frame and that the activities performed by Suitability changed over the years. Dkt. No. 176-22, *passim* (Pl. Ex. V, Rogers Decl.); Dkt. No. 174-23, *passim* (Def. Ex. 40 King Decl.). |
| 82 | Compliance and Enforcement and Complaint Referrals merged in October 2014. Ex. BH paras. 6, 41. Because RPO did not have enforcement authority, "enforcement" was removed from the title, and the department became Compliance and Complaint Referral.  Ex. BI at 11:19-12:5. | Admitted. |
| 83 | Complaint Referrals ████████ ███████████████████████ ██████████████ theft of refund cases, tax preparation complaints, and e-file violations. Ex. AJ at 005; Ex. BJ at 247. | Admitted. Aver that Plaintiffs' Exhibits AJ (Dkt. No. 177-15) and BJ (Dkt. No. 176-62), dated in 2012 do not completely describe Complaint Referral activities, either as a separate Department or after merged into the Compliance Department. *See* Dkt. No. 176-60 (Pl Ex. BH) *and also* Dkt. No. 174-20, ¶¶ 49–51, 158–90 (Def. Ex. 37, Wensing Decl.); Dkt. No. 173-21, ¶¶ 19–27 (Def. Ex. 36, Wieczynski Decl.) |
| 84 | Initially, Compliance was responsible for two workstreams: Enforcement Planning & Direction (EPD) and Unidentified Return Preparers. EPD | Admitted. Aver that the asserted fact provides an incomplete description of |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|-----|-------------------------------|------------------------|
| | focused on data analytics, and employed several individuals, including a social scientist to research and analyze return preparer patterns and behavior. Ex. BK at 174. Because of this, ███████ ██████████████████████ Ex. AV at 004. EPD was responsible for "develop[ing] and run[ning] analytics to identify return preparers requiring treatment," "develop[ing] innovative treatments to change return preparer behavior, " and working with other IRS business operating divisions to coordinate these efforts. Ex. BH para. 39. | early RPO Compliance Department activities, and entirely omits later year RPO Compliance Department activities. For a more complete description of RPO Compliance Enforcement Planning & Direction Group (EPD) and Unidentified Return Preparers Group (Ghost Group) activities, *see* Dkt. No. 176-60 (Pl. Ex. BH) *and also* Dkt. No. 174-20, ¶¶ 24–34, 39, 42–47, 57–60 (Def. Ex. 37, Wensing Decl.); Dkt. No. 173-21, ¶¶ 8–30 (Def. Ex. 36, Wieczynski Decl.). |
| 85 | The Unidentified Return Preparer group identified individuals who failed to report their PTIN, used another individual's PTIN, or used an invalid identifying number, such as a social security number. Ex. BL at 005. This group targeted individuals who "may choose to go 'underground' rather than comply with the new requirements," recognizing that "[s]everal of these Return Preparers are non-filers" and "[t]here is a high-probability [sic] some cases will develop into fraud cases." *Id.* at 006, 008. The group also aimed to "[b]ring Return Preparers into income tax compliance. . . ." by identifying preparers who sought to avoid the tax compliance check "new requirement." *Id.* at 022. | Admitted. Aver that the third sentence provides an incomplete description of the Unidentified Return Preparer Group's (Ghost Preparer Group's) aims, purposes, and functions. For a more complete description of the Ghost Preparer Group's activities, *see* Dkt. No. 173-21, ¶¶ 8–13, 17–18 (Def. Ex. 36, Wieszynski Decl.) (Ghost Preparer Group case data tables); Dkt. No. 174-20 ¶¶ 52–56, 66–68, 101–34 (Def. Ex. 37 Wensing Decl,) (explanation of Ghost Preparer Group activities). |
| 86 | The RPO believed these compliance efforts were critical to addressing the "large concern in the preparer community that the people who were abiding by the regulations and. . .doing testing and getting the PTINs and getting continuing education, | Admitted. |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
|  | would go down this path, but the bad actors, the folks who are ghost preparers, underground, we wouldn't do anything about." Ex. N at 44:7-20; *see also* Ex. L at 37 (stating that "[i]f individuals believe that the IRS will not detect noncompliance or sanction those who are not compliant, tax return preparers and taxpayers will lose confidence in the standards and may have an incentive not to comply"). |  |
| 87 | Continuing Education was responsible ██████████ Ex. J at 011, and Competency and Standards was responsible ████████████████████ ██████████ *Id.* | Admitted. |
| 88 | Communications was largely responsible for ███ ██████████████████ which involved communicating with "internal and external stakeholders to understand RP community, industry challenges, and business unit requirements that the RPO is implementing," "oversee[ing] the marketing and branding efforts for return preparers (RPs), Enrolled Agents (EAs), Enrolled Actuaries (EAcs), and Enrolled Retirement Planning Agents (ERPAs)," and "[d]evelop[ing] and distribut[ing] targeted communications to the RP community." Ex. BM at 036, 037 (identifying work with internal IRS stakeholder groups (RPO departments, Media Relations, Earned Income Tax Credit, National Public Liaison, and Stakeholder Liaison) and external stakeholder groups (return preparers, enrolled agents, and taxpayers)). | Admitted. Avers that for a complete description of RPO Communication Department's activities both pre-*Loving* and post-*Loving*, *see* Dkt. No. 174-17, ¶¶ 48–51 (identifying pre-*Loving* activities with time allocation percentages) & ¶ 52 (identifying post-*Loving* activities with time allocation percentages) (Def. Ex. 33, Ruf Decl.). |
| 89 | The other ██████████████████████ ████████████████████████████████ ████████████████████████████████ ███████████ x. AX at 21. ████████████ ███████████ *Id.* | Admitted. Avers that for a complete description of the activities of these RPO Departments *see* Dkt. No. 174-21, *passim* (Def. Ex. 38, New Decl.) (enumeration of Strategy & Finance activities); Dkt. No. 174-19, *passim* (Def. |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|-----|-------------------------------|------------------------|
| | | Ex. 35, Goudey Decl.) (enumeration of VPBR activities); IRM 1.1.28.4 (Office of the Director, RPO). |
| 90 | In March 2012, tax return preparers filed a suit challenging the final regulations published June 3, 2011 that implemented the Return Preparer Program. Compl. at 2, 21, *Loving v. IRS*, No. 1:12-cv-00385-JEB, ECF No. 1 (D.D.C. Mar. 13, 2012). | Admitted. The *Loving* complaint should be viewed for context and completeness as to the allegations and claims. *See Loving v. I.R.S.*, No. 1:12-cv-385, Dkt. No. 1 (Compl.) (D.D.C. Mar. 13, 2012). |
| 91 | The District Court granted summary judgment for the plaintiffs and found that the IRS "lack[ed] statutory authority to promulgate or enforce the new regulatory scheme for 'registered tax return preparers.'" *Loving v. IRS*, 917 F. Supp. 2d 67, 80 (D.D.C. 2013). The court granted declaratory and injunctive relief which required the IRS to stop "enforcing its new regulatory scheme for registered tax-return preparers." *Id.* at 109. | This is an assertion of law and not of fact, and legal conclusions do not belong in statements of fact. *See, e.g., Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); *Chin v. Garda CL New England, Inc.*, 2017 WL 3526253, at *2 (D. Mass. Aug. 16, 2017); *King v. Bernabei*, 2015 WL 1506063, at *2 (N.D. Ill. Mar. 24, 2015); *Abney v. Univ. of Virgin Islands*, 2013 WL 12354494, at *6 (D.V.I. Apr. 15, 2013). To the extent a response is required, denied. The *Loving* District Court subsequently modified the injunction "to make clear that the IRS is not required to suspend its PTIN program, nor is it required to shut down all of its continuing-education centers; instead, they may remain, but no tax-return preparer may be required to pay testing or continuing-education fees or |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|-----|-------------------------------|------------------------|
|     |                               | to complete any testing or continuing education" *See Loving v. IRS*, 917 F. Supp. 2d 67, *modified*, 920 F. Supp. 2d 108, 112 (D.D.C. 2013). |
| 92 | The D.C. Circuit affirmed and held that "the IRS's statutory authority under Section 330 cannot be stretched so broadly as to encompass authority to regulate tax-return preparers." *Loving v. IRS*, 742 F.3d 1013, 1021 (D.C. Cir. 2014). | This is an assertion of law and not of fact and legal conclusions do not belong in statements of fact. *See, e.g., Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); *Chin v. Garda CL New England, Inc.*, 2017 WL 3526253, at *2 (D. Mass. Aug. 16, 2017); *King v. Bernabei*, 2015 WL 1506063, at *2 (N.D. Ill. Mar. 24, 2015); *Abney v. Univ. of Virgin Islands*, 2013 WL 12354494, at *6 (D.V.I. Apr. 15, 2013). To the extent a response is required, admitted that the quotes are correct and the case was affirmed. The full opinion should be seen for completeness and context. *Loving v. IRS*, 742 F.3d 1013 (D.C. Cir. 2014). |
| 93 | Prior to *Loving*, the RPO's activities had remained relatively stable. But the D.C. Circuit's opinion holding that "the IRS ha[d] no authority to regulate paid tax-return preparers," Ex. BN at 424, "inhibited RPO Suitability's ability to execute core functions, limiting the department's ability to achieve its strategic goal of creating a qualified practitioner community." Ex. AZ at 198. | To the extent that this is an assertion of law and not of fact, legal conclusions do not belong in statements of fact. *See, e.g., Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); *Chin v. Garda CL New England, Inc.*, 2017 WL 3526253, at *2 (D. Mass. Aug. 16, 2017); *King v. Bernabei*, 2015 WL 1506063, at *2 (N.D. |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| | | Ill. Mar. 24, 2015); *Abney v. Univ. of Virgin Islands*, 2013 WL 12354494, at *6 (D.V.I. Apr. 15, 2013). To the extent a response is required, the first sentence is denied. In fiscal year 2011 and fiscal year 2012, many RPO Departments' procedures and activities were still being developed and were not yet at "steady-state." *See* Dkt. No. 173-2, ¶¶ 71–72. The second sentence is admitted. Aver that RPO did promptly comply with *Loving*, including ceasing conducting *Loving*-invalidated suitability Personal Tax Compliance (PTC) checks and Criminal Background Checks (CBC) upon uncredentialed return preparers after *Loving* in FY2013. *See* Dkt. No. 178-1, at 24–25 (citing Dkt. No. 174-24 (Def. Ex. 41), Dkt. No. 174-23 (Def. Ex. 40), and Dkt. No. 173-2, ¶99). Aver that IRS is not defending costs included in the PTIN user fee that were invalidated by *Loving* and has finalized concessions for costs for multiple years. Dkt. No. 175-2 ¶ 112. |
| 94 | After *Loving*, the RPO no longer could require non-credentialed preparers to take a test, satisfy continuing education or pass suitability checks, such as personal tax compliance checks and background checks. Ex. N at 108:19-110:18; Ex. K at 699-700, 713-16; Ex. AZ at 198. | This is an assertion of law and not of fact, and legal conclusions do not belong in statements of fact. *See, e.g.*, *Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); *Chin v. Garda CL New England,* |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|-----|-------------------------------|-------------------------|
|     |                               | *Inc.*, 2017 WL 3526253, at *2 (D. Mass. Aug. 16, 2017); *King v. Bernabei*, 2015 WL 1506063, at *2 (N.D. Ill. Mar. 24, 2015); *Abney v. Univ. of Virgin Islands*, 2013 WL 12354494, at *6 (D.V.I. Apr. 15, 2013). To the extent a response is required admitted. Aver that IRS is not defending costs included in the PTIN user fee that were invalidated by *Loving* and has finalized concessions for costs for multiple years. Dkt. No. 175-2 ¶ 112. |
| 95  | Notwithstanding, the suitability department "grew a little bit with the addition of a temporary team" to "process [testing fee] refunds and to answer questions regarding those refunds." Ex. W at 87:18-24; Ex. N at 55:16-56:1 (there were no "layoffs or firings" within the RPO as a result of *Loving*). This team was funded with PTIN fees. Ex. BO at 3 of 4 (including new team in row 14 of summary tab). | This allegation is confusing as it is not clear to what "notwithstanding" relates. To the extent "notwithstanding" refers to the effect of *Loving* should have shrunk the suitability department, the inference is not logical or supported and is denied. Subject to this, the quotes in the supporting material in the first sentence are correct. The second sentence is vague as it mentions two teams ("this team" and a "new team") and is not supported by the cited material. Aver that IRS is not defending costs included in the PTIN user fee that were invalidated by *Loving* and has finalized concessions for costs for multiple years. Dkt. No. 175-2 ¶ 112. |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| 96 | After *Loving*, "the RPO substantially shifted its focus away from unregulated preparers towards tax professionals and voluntary participants in the Annual Filing Season Program" Ex. K at 713; Ex. N at 95:16-21 (RPO started laying the groundwork for the Annual Filing Season Program "after we lost in February 2014."). | Admitted. Aver that IRS is not defending costs included in the PTIN user fee that were invalidated by *Loving* or part of the Annual Filing Season Program (AFSP) and has finalized concessions for those costs for multiple years. Dkt. No. 175-2 ¶ 112. Aver that IRS has conceded these amounts for fiscal years 2014 through 2017. |
| 97 | Acknowledging that it "continue[d] to believe regulation of paid tax return preparers is important for the proper functioning of the U.S. tax system," Ex. BP at 321-22, the IRS created the Annual Filing Season Program, "a voluntary program with many of the same requirements of its defunct regulatory program." Ex. BN at 424. | The use of the word "acknowledging" is vague as to whom the IRS is acknowledging this. Admitted that the quotation is correct. Aver that the AFSP was not invalidated by *Loving*. Aver that IRS is not defending costs included in the PTIN user fee that were invalidated by *Loving* or part of the AFSP and has finalized concessions for those costs for multiple years. Dkt. No. 175-2 ¶ 112. |
| 98 | Individuals who chose to participate in the Annual Filing Season Program were required to take "6 hours of federal tax filing season refresher course (with a required comprehension test at completion)," "10 hours of federal tax law topics," and "2 hours of ethics." Ex. BP at 322. Annual Filing Season Program participants also were required to pass a personal tax compliance check and criminal background checks. Ex. V paras. 58, 80. | Admitted. Aver that the AFSP was a separate voluntary program created after the mandatory program was struck down. *Loving v. IRS*, 917 F. Supp. 2d 67, *modified*, 920 F. Supp. 2d 108, 112 (D.D.C. 2013); *AICPA v. Internal Revenue Serv.*, 746 F. App'x 1 (D.C. Cir. 2018). Aver that AFSP was upheld by *AICPA v. internal Revenue Serv.*, 746 F. App'x 1 (D.C. Cir. 2018). Aver that the IRS is not |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| | | defending any costs of the AFSP. Declaration of Carol Campbell, ¶ 8 (Suitability). |
| 99 | The Annual Filing Season Program was free to the participant, and TPPS capabilities for the Annual Filing Season Program were funded with appropriations. Ex. BD at 274:18-275:5. However, the IRS continued to fund most of the RPO with PTIN fees including the "labor costs of some employees who handle the Annual Filing Season Program as part of their duties." Ex. BQ at 9, resp. 17; Ex. BR at 15 of 21. | Denied. Although there has been no additional IRS charge to AFSP participants, the AFSP was not free because each participant still had to pay continuing education fees to the provider(s). *See www.Irs.gov/tax-professionals/frequently-asked questions-annual-filing-season-program.* Aver that the IRS is not defending any costs of the AFSP. Declaration of Carol Campbell, ¶ 8 (Suitability). |
| 100 | The IRS is required to review all IRS user fees every two years. Office of Mgmt. & Budget, OMB Circular A-25, User Charges § 6(a)(2) (2017). | This is an assertion of law and not of fact, and legal conclusions do not belong in statements of fact. *See, e.g., Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); *Chin v. Garda CL New England, Inc.*, 2017 WL 3526253, at *2 (D. Mass. Aug. 16, 2017); *King v. Bernabei*, 2015 WL 1506063, at *2 (N.D. Ill. Mar. 24, 2015); *Abney v. Univ. of Virgin Islands*, 2013 WL 12354494, at *6 (D.V.I. Apr. 15, 2013). To the extent a response is required admitted that OMB Circular A-25 requires the IRS to review user fees every two years. OMB Circular A-25, § 8(e). |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| 101 | The IRS conducted these reviews in 2013, 2015, and 2017, but the 2013 biennial review resulted in no change to the user fee. Ex. BS at 81:9-15. | Admitted. Aver that even though the IRS continued to charge a $50 PTIN user fee, the 2013 Biennial Review indicated that increasing the IRS's portion of the PTIN user fee to $54.47 would have been appropriate. *See* Dkt. No. 174-11 (Def. Ex. 20, 2013 Cost Model). |
| 102 | On October 30, 2015, the IRS issued a temporary regulation reducing the PTIN user fee from $50 for issuance and renewal to $33 for issuance and renewal. *Preparer Tax Identification Number (PTIN) User Fee Update*, 80 Fed. Reg. 66,792, 66,796 (Oct. 30, 2015). As justification for the fee reduction, the temporary regulation stated:<br><br>The reduction in the fee amount [wa]s attributable to several factors, which include the reduced number of PTIN holders (approximately 700,000) from the number originally projected (1.2 million) in 2010, which reduced associated costs; the absorption of certain developmental costs in the early years of the program; and the fact that certain activities that would have been required to regulate registered tax return preparers will not be performed. In particular, the determination of the user fee no longer includes expenses for personnel who perform functions primarily related to continuing education and testing for registered tax return preparers. Additionally, the expenses related to personnel who perform continuing education and testing for enrolled agents and enrolled retirement plan agents were also removed from the user fee.<br><br>*Id.* at 66,794. | The first sentence is admitted. The second sentence is an assertion of law and not of fact, and legal conclusions do not belong in statements of fact. *See, e.g.*, *Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); *Chin v. Garda CL New England, Inc.*, 2017 WL 3526253, at *2 (D. Mass. Aug. 16, 2017); *King v. Bernabei*, 2015 WL 1506063, at *2 (N.D. Ill. Mar. 24, 2015); *Abney v. Univ. of Virgin Islands*, 2013 WL 12354494, at *6 (D.V.I. Apr. 15, 2013). To the extent a response is required, the quote in the second sentence is correct. Aver that the justification listed for the fees is incomplete and the full justification is included in the Notice of Proposed Rulemaking. 80 Fed. Reg. 66852 (Oct. 30, 2015). Aver that the fee reduction from $50 to $33 does not result from a comparison between the expected costs in the 2010 and 2015 Cost Models. The fee |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| | | reduction from $50 to $33 for fiscal year 2016 and fiscal year 2017 resulted from the expected three-year costs in the 2015 Cost Model, which were lower than the 2013 Cost Model's expected three-year costs. *See* Dkt. No. 173-2, ¶¶ 96, 97. |
| 103 | Notwithstanding the IRS's recognition that after *Loving* suitability only "applie[d] to tax professionals (*i.e.*, attorneys, CPAs and enrolled agents) and those who volunteer for the Annual Filing Season Program," Ex. K at 699, IRS still recovered the costs of those activities through the user fee:<br><br>The PTIN user fee is based on direct costs of the PTIN program, which include staffing and contract-related costs for activities, processes, and procedures related to the electronic and paper registration and renewal submissions; tax compliance and background checks; professional designation checks; foreign preparer processing; compliance and IRS complaint activities; information technology and contract-related expenses; and communications. The PTIN user fee also takes into account various indirect program costs, including management and support costs.<br><br>80 Fed. Reg. at 66,794. | Admitted that the PTIN user fee is based on "direct costs" and "indirect costs," and the regulation quote is correct. The remaining allegations are denied.<br><br>The introductory phrase, "Notwithstanding the IRS's recognition that after *Loving* suitability only" is argumentative and not supported by the material, which is a TIGTA report that discusses suitability of return preparers in general and not as a department of RPO. Dkt. No. 176-11 at 5 (Pl. Ex. K). After *Loving*, the IRS could properly continue to charge for suitability activities including those relating to incarcerated individuals, Specially Designated Nationals (SDNs), and enjoined preparers. *See* Dkt. No. 173-2, ¶ 39.<br><br>Aver that IRS is not defending costs included in the PTIN user fee that were invalidated by *Loving* and has finalized |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|-----|-------------------------------|------------------------|
| | | concessions for costs for multiple years. Dkt. No. 175-2 ¶ 112. |
| 104 | The 2015 biennial-fee-review review cost model expected ███████████ *Compare* Ex. BT at 6, 16 of 55 *with* Ex. BR at 5, 9 of 21 ███████ | Admitted. |
| 105 | The 2015 cost model included many of the same cost types as the 2010 cost model including ██████████ Ex. BR at 13, 15 of 21. Figures 9-10 in the Appendix attached to Plaintiffs' Motion for Summary Judgment are annotated excerpts of the 2015 cost model showing the costs that Plaintiffs believe were necessary to provide tax return preparers a PTIN. The pink striped items are partially includable in the PTIN fee. | Denied.<br><br>As to form, the format of the 2015 Cost Model is very dissimilar to the format of the 2010 Cost Model. *Compare* Dkt. No. 174-12 (Def. Ex. 21, 2015 Cost Model) *with* Dkt. No. 174-8 (Def. Ex. 13, 2010 Cost Model).<br><br>As to substance, the 2015 Cost Model is dramatically different from the 2010 Cost Model. Over 65% of the 2010 Cost Model's expected costs were for *Loving*-invalidated activities. *See* Dkt. No. 178-1 at 21. By contrast, only a small proportion of the expected costs in the 2015 Cost Model were for *Loving*-invalidated activities. First, the 2015 Cost Model did not include expected costs for *Loving*-invalidated testing and continuing education activities. *See* Dkt. No.173-2, ¶ 95. In addition, RPO |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|-----|-------------------------------|------------------------|
|     |                               | Suitability Department had substantially reduced *Loving*-invalidated Personal Tax Compliance (PTC) and Criminal Background Check (CBC) activities. *See* USA SUMF No. 99; Dkt. No. 178-1 at 24–25 (citing Dkt. No. 174-23 (Def. Ex. 40) & Dkt. No. 174-24 (Def. Ex. 41)).<br><br>Aver that IRS is not defending costs included in the PTIN user fee that were invalidated by *Loving* and has finalized concessions for costs, including PTC checks and CBCs, for multiple years. Dkt. No. 175-2 ¶ 112; Dkt. No. 173-2, ¶¶ 99–100.<br><br>The last sentence is denied as it is Plaintiffs' argument and contains no citation for support. |
| 106 | At the same time, Accenture increased its fee to $17.00 for both registration and renewal. 80 Fed. Reg. at 66,794. | To the extent the phrase "at the same time" refers to the fee for fiscal years 2016 and 2017, admitted. Aver that Accenture did not increase its fee for fiscal years 2016 and 2017. Accenture's original contract ran for one base year and four option years. Dkt. No. 177-11 (Pl. Ex. AC). Accenture determined to compete for the next available contract period, and it won that subsequent competitive bidding contest. *See* Dkt. No. 175-2, ¶ 109 (referring to |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|-----|-------------------------------|------------------------|
| | | Accenture's "2016 contract recompete"). Accenture's initial fee under its new competitively bid contract was $17 for both registration and renewal, but that resulted from the competitive bidding process; Accenture did not simply "increase its fee to $17." |
| 107 | Ex. AE at 91:14-92:2. | Denied. The cited material does not support the asserted fact. *See* Dkt. No. 177-13 at 91:14–92:2 (Pl. Ex. AE). |
| 108 | The increase in Accenture's portion of the PTIN fee shifted costs associated with the contact center and additional system enhancements from the IRS to the tax return preparer. Ex. P at 221:11-17 ("[T]here were significant out-of-scope costs for Accenture. This became a buzz word."). | Denied. The cited material does not support the asserted fact. *See* Dkt. No. 176-16 at 221:11–17 (Pl. Ex. P) (referring to an Apportionment Request in 2011 and not to elements of Accenture's $17 fee applicable in 2016 and 2017). |
| 109 | As part of its 2016 contract re-compete, Accenture lowered its fee to $14.95, and in 2017, the IRS lowered its portion of the user fee to $31.00. Ex. BD at 371:19-372:10; Ex. BS at 113:7-16. Neither of these were implemented prior to the June 1, 2017 Steele injunction. | Admitted that the vendor fee decreased from $17 to $14.95 and admitted that the 2017 Cost Model calculated the PTIN user fee at $31. Denied as to the remaining allegations. The fees were not charged to return preparers during the pendency of the *Steele* Injunction. The cited material does not support the asserted facts. |
| 110 | In 2014, Plaintiffs filed this Action, challenging the IRS's authority to impose a PTIN fee and, in the alternative, alleging the PTIN fee was excessive. | Admitted. |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
| | Compl., *Steele v. United States*, Case No: 14-cv-01523-RCL, ECF 1 (Sept. 8, 2014). | |
| 111 | On June 1, 2017 this Court granted summary judgment for plaintiffs finding that "although the IRS may require the use of PTINs, it may not charge fees for issuing PTINs." *Steele v. United States*, 260 F. Supp. 3d 52, 67-68 (D.D.C. 2017). At that point, the IRS had already issued or renewed approximately 5,146,189 PTINs and collected over 300 million dollars in PTIN user fee revenue. Ex. BU at 3, 4. | Admitted. Aver that the upper bound of the estimated range of total PTIN registration plus renewal transactions during fiscal year 2011 through fiscal year 2017 was 5,146,189, but that of the approximately $305 million paid by return preparers during that time, approximately $231 million of this amount went to the IRS and approximately $74 million was paid to Accenture. *See* Dkt. No. 176-73 at 2–4 (Pl. Ex. BU). Aver that IRS is not defending costs included in the PTIN user fee that were invalidated by *Loving* and has finalized concessions for costs for multiple years. Dkt. No. 175-2 ¶ 112. |
| 112 | On appeal, the D.C. Circuit determined the IRS could impose a PTIN fee, but remanded to this Court to determine "whether the amount of the PTIN fee unreasonably exceeds the costs to the IRS to issue and maintain PTINs" and "impermissibly encompasses functions falling outside the IRS's statutory authority." *Montrois v. United States*, 916 F.3d 1056, 1058, 1068 (D.C. Cir. 2019). The IRS already has acknowledged that the user fee included certain, unspecified costs that it is unwilling to defend, and, to date, has conceded $31,436,689 in user fee revenue. Ex. BG at 2-3 of 7. This has been deposited in an interest-bearing escrow account for | The first sentence is an assertion of law and not of fact, and legal conclusions do not belong in statements of fact. *See, e.g., Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); *Chin v. Garda CL New England, Inc.*, 2017 WL 3526253, at *2 (D. Mass. Aug. 16, 2017); *King v. Bernabei*, 2015 WL 1506063, at *2 (N.D. Ill. Mar. 24, 2015); *Abney v. Univ. of Virgin Islands*, 2013 WL 12354494, at *6 (D.V.I. |

| No. | Plaintiffs' Asserted Statement | United States' Response |
|---|---|---|
|  | the benefit of the class and will be applied to any final judgment or resolution of the case. | Apr. 15, 2013). To the extent a response is required, admitted. The D.C. Circuit remanded the case to District Court to determine whether the PTIN user fee is consistent with the IOAA. *Montrois v. United States*, 916 F.3d 1056, 1068 (D.C. Cir. 2019).<br><br>The last two sentences are admitted. |

Dated: May 12, 2022

DAVID A. HUBBERT
Deputy Assistant Attorney General

*/s/ Stephanie A. Sasarak*
STEPHANIE A. SASARAK
EMILY K. MILLER
JOSEPH E. HUNSADER
BENTON T. MORTON
Trial Attorneys, Tax Division
JOSEPH A. SERGI
Senior Litigation Counsel
U.S. Department of Justice
Post Office Box 227
Ben Franklin Station
Washington, DC  20044
Telephone:  (202) 307-2250
Facsimile:  (202) 514-6866
Joseph.A.Sergi@usdoj.gov
Joseph.E.Hunsader@usdoj.gov
Stephanie.A.Sasarak@usdoj.gov
Emily.K.Miller@usdoj.gov
Benton.T.Morton@usdoj.gov
*Counsel for the United States of America*