# EXHIBIT BW

**This document has been produced in native format and also has been designated as CONFIDENTIAL**

**Filename:** **Return Preparer Office Context Document.docx**









# RPO Context Document









## 5.2 System Release 1 (PTIN Registration)

### *5.2.1 Scope*

The IRS Business and IT Relationship Management team managed the overall implementation of the PTIN registration system. Release 1 included the development of the registration system that enabled the users to apply and register for the PTIN by providing their PII such as name, address, SSN, date of birth, etc. The system has the ability to collect a user fee from the applicant and in return, provide them with a unique 9 digit PTIN. The application was made available to tax preparers on September 28, 2010. The team received an Interim Authority to Operate (IATO) on September 1, 2010 following by a six month Authority to Operate (ATO) on February 25, 2011. The Return Preparer Program Implementation Project Office (RPO PO) is in the process of addressing the following contingencies given in the ATO:

- Conducting and closing out all Federal Information Security Management Act (FISMA) related security activities
- Resolving Security Risk Assessment (SRA) findings
- Resolving vulnerability scan findings
- Conducting security code reviews
- Conducting detailed vulnerability scan and penetration tests
- Performing Section 508 tests

These tasks are in addition to completing milestones 3 / 4a and 4b to allow the extension of the Authority to Operate (ATO).

Release 1 lacked any ability to ensure RPs passed suitability checks, background checks or competency tests. As a work around, in Release 1 preparers were required to self-report if they were tax compliant and if they had any felonies in the previous 10 years. The project office has been monitoring and investigating preparers who self-reported either of these issues. The automated functionality for competency testing and PTIN renewals are planned to be added in Release 2.

### *5.2.2 Implications and Privileges*

Previously, PTINs were considered a privilege as opposed to a necessity. PTINs were provided upon request to return preparers as an ID number in lieu of a Social Security Number (SSN) on tax returns. As of FS2010, tax return preparers are required to obtain a PTIN in order to submit tax returns.

To obtain a PTIN, tax preparers are required to pass a competency exam proving their knowledge of the tax system and its policies and regulations. Tax preparers will also be required provide proof of continuous education and pass an ethics and suitability review in order to register for a PTIN.

On November 3, 2010, Commissioner Shulman gave approval to waive the continuing education requirement for provisional PTIN holders until the fees associated with continuing education vendors have been resolved. Therefore, return preparers who obtain a PTIN for FS2011 will not have to complete the continuing education and testing requirements for FS2011. These preparers will have until December 31, 2013 to take and pass their competency test. Return preparers who obtained a PTIN after the testing functionality was implemented on October of 2011 will need to pass the competency test prior to receiving a PTIN.



DRAFT




Currently the RPO team is formally tracking the number of PTINs issued, the number issued to legacy holders, the number issued to unregistered preparers, the number of applications, and the percentage of service calls answered vs. received. As of January 17, 2012 more than 800,010 Return Preparers have been issued a PTIN and 510,000 Return Preparers have been able to successfully renew.

### *5.2.3 Issues Encountered*

The RPO team initially faced challenges authenticating the identities of return preparers in the online registration process. There were multiple issues with the overall identity verification functionality including functional issues, source data issues, preparer data entry errors and technical issues within the IVS. Preparers were unable to complete the online registration process as a result of the system not being able to verify their identity. This resulted in increased frustration, calls to the helpdesk and paper application.

Approximately 7-9% of applicants attempting to register online were not able to. Issues verifying a preparer's address caused over 30% of the authentication failures. The overall authentication issue led to reduced customer service levels due to a significant increase in call center demand and an increase in paper applications.

#### *5.2.3.1 Mitigation to Address Tax Preparer Identity Verification Issues*

The IRS IT team took a number of steps to address the additional demand and improve existing service – particularly as it relates to identity verification:

- Provided Accenture and IRS CSRs with guidance / tips about common mistakes so they can help preparers authenticate
- Published FAQs with guidance directly for preparers to help correct data entry errors
- Modified TPPS to clarify that preparers were required to enter information exactly as it was displayed on their previous year's tax return
- Added interactive voice response pathways to the phone system to resolve general information questions
- Hired more CSRs to address the increased call center demand – a target of 120 CSRs was set in mid-December which was triple the initial number of CSRs
- Modified one aspect of IVS to address problems with the use of P.O. boxes
- Created night shifts to work the increased paper application volumes
- Worked with W&I to identify resources to work paper application backlog
- Worked with Cybersecurity and Privacy to explore acceptable changes to the IVS logic that could reduce the number of authentication errors while still meeting the required security standards

The IT team met with Cybersecurity and discussed the impact of removing the identity verification requirement. A new authentication risk assurance assessment was conducted on November 16, 2010

DRAFT




based on a single transaction to issue PTINs. As a result, the risk assurance level was downgraded to a Level 1, making removal of the identity verification service an option[1] (See Figure 33 below).

**Figure [ SEQ Figure * ARABIC ] - Risk Assurance Levels**

| Assurance Level | Description |
|---|---|
| Level 1 | Little or no confidence in the asserted identity's validity |
| Level 2 | Some confidence in the asserted identity's validity; See NIST Special Publication (SP) 800-63 for technical requirements for Level 2 |
| Level 3 | High confidence in the asserted identity's validity; See NIST Special Publication (SP) 800-63 for technical requirements for Level 3 |
| Level 4 | Very high confidence in the asserted identity's validity; See NIST Special Publication (SP) 800-63 for technical requirements for Level 4 |

#### *5.2.3.2 Identity Verification Issue Status*

After further review the team decided not to remove the identity verification service but to only remove the check on the address. The IVS now checks the name, date of birth, SSN and filing status. To mitigate any risks with not also verifying the address a post card will be sent to the address of record of all preparers registering after December 3, 2010 stating that someone registered for a PTIN with your information.

A known technical issue preventing preparers with a filing status of "married filing jointly" from being able to verify their identity online was also resolved in December of 2010. The functionality allowing preparers to manage their account was also disabled when the address verification was removed to help mitigate any privacy concerns related to allowing preparers to see Personal Identification Information (PII) data that they previously entered.

- As of Wednesday, December 15, 2010, the IRS Tax Professional PTIN System had issued more than 400,000 numbers
  - 72% were PTINs re-issued to existing PTIN holders and 28% were new PTINs issued to previously-unregistered preparers
- As of Sunday, April 15, 2011, the TPPS had issued more than 700,000 PTINs
- The service level in April 2011 was above 96% as a result of the increased number of CSR's and reduced number of users applying for PTINs and the paper PTIN application backlog is less than 200 applications. In addition enhancements to the IVS were made in July 2011 to meet the

[1] Federal rules require federal agencies that offer online government services to secure the privacy of citizens, businesses and other government agencies. To ensure privacy and security, agencies must authenticate users of their web-based transactions before permitting access to information entrusted to them. There are different levels of authentication. Each does an increasingly better job of assuring that users are who they claim to be. When designing web-based applications, IRS business owners must assess their envisioned transactions during the requirements development stage and determine the level of assurance needed for adequate protection. After completing the assessment, the appropriate level of assurance can be utilized by the application (See Figure 16)



DRAFT




authentication issues for name and address fields, which resulted in a reduced number of paper applications and call volume to the help desk

#### *5.2.3.3 Batch Tax Compliance Check Status*

For Release 2, a manual tax compliance check will be implemented to ensure that the return preparers are compliant with the criteria identified by the core team. Figure 34 outlines the process that will be used to perform the manual check. Over 710,000 Return Preparers will be subject to the manual check. MITS will run the check against the criteria identified and pass the results back to the Suitability team on September 30, 2011, December 28, 2011 and then on a quarterly basis. The cases that fail the criteria will be managed by the Suitability team in TPPS case management tool. The case management tool will provide case workers with the ability to prioritize, assign, update and track the status of a case. RPO Project Office has worked with Accenture to finalize the requirements and design for the case management tool. RPO is currently conducting the functional and 508 testing on the case management tool. In conjunction, RPO is also working with Accenture to finalize the requirements to automatically upload the batch tax compliance results into TPPS by the end of January 2012. This will enable TPPS to automatically check the return preparers that pass the personal tax compliance check, competency testing and issue the certificate. The long term goal is to automate the tax compliance check (tentatively scheduled for completion in September 2012). This will restrict the return preparers from acquiring the PTIN if they are not compliant and open up a case for the Suitability team to review and resolve.



**Figure [ SEQ Figure * ARABIC ] - Batch Tax Compliance Check Process**




DRAFT

### *5.2.4 MITS Partnership*

For release 1 (PTIN Registration), MITS was primarily responsible for developing the Identity Verification System (IVS) that is used to verify the identity of the PTIN applicants and authenticate them against the PII on the IRS records. In addition to developing the IVS, MITS was also instrumental in working with Accenture to develop the interface between the two systems. MITS has also provided guidance on all security related activities to ensure the project is meeting IRS standards.

### *5.2.5 Transition Management Strategy*

Transition Management (TM) is the process of ensuring an organization's alignment to changes in its business strategy, organization structure, and systems. The goal of TM is to define the activities necessary to ensure a successful implementation of a large scale organizational change. TM is an IRS ELC requirement for all large-scale efforts with a technology component. TM involves engaging stakeholders to define the impacts associated with the implementation of an organization's strategy, structure, and / or system across standard "Readiness Categories". Transition Readiness Assessment questions generally fall into four categories, including:

- **People:** Includes impacts to the organization, roles and responsibilities, staffing requirements, communication needs, Union Relations (i.e., NTEU), contractor support needs and training plans




- **Process & Policy:** Changes to the previous business policies and processes as well as systems development, operations and maintenance
- **Assets:** Changes to the previous state of tangible items such as: facilities, hardware, software, tools, licenses and maintenance agreements
- **Financials:** Identification of funds required to transition and / or maintain relevant processes or systems, ensuring that funding has been identified for each readiness category and gap

The IRS RPO Transition Management approach will build upon the guidance provided by the MITS Transition Management Office. The MITS Transition Management Office (TMO) generally prescribes a three phased approach to Transition Management: Organizational Alignment, Gap Identification, and Gap Closure.

- **Phase 1: Organizational Alignment:** Includes identifying key stakeholders and readiness categories associated with the implementation of the TPPS and stand-up of the Return Preparer Office in 2011
- **Phase 2: Gap Identification:** Conduct regular meetings with the core RPO team and extended stakeholders to assess transition readiness within the context of identified readiness categories
- **Phase 3: Gap Closure:** Define and document gap closure plans in Gap Closure Action Log and include in Transition Management Plan

Although the Transition Management effort is required as part of an upcoming TPPS milestone exit, the approach to identifying and resolving readiness gaps has been incorporated since the project onset. The RPO Transition Management plan will be utilized as a change management vehicle to formally document the gaps that have been identified to date. It will also ensure service-wide stakeholders are engaged and that additional organizational gaps are defined, prioritized, and mitigated moving forward. The TPPS was launched in a relatively short period of time in order to ensure that the critical PTIN registration capability was in place for the 2011 tax filing season. As a result of the aggressive timeline the project office launched the system prior to completing several of the typical ELC activities that would be complete prior to the launch of a new system. To mitigate any risks associated with this approach the project considered the gaps between the current and future-states and addressed the high priority items critical to the successful deployment of the new system but the actual transition management plan was not complete prior to the initial deployment. The TMP for Release 1 will explain the current and future-states and the status of gaps associated with Release 1. This TMP will be used as the foundation for the Release 2 TMP.

## 5.3 System Release 2 (PTIN Renewal, Testing and Background checks)

### *5.3.1 Scope*

TPPS Release 2 was deployed in three steps in the fall of 2011: the system registration enhancements went live on October 1, followed up by the newly developed renewal functionality that was deployed on October 17. Finally, Prometric's testing system with the interface to TPPS through which the return preparers will fulfill their suitability testing requirements was deployed on November 27, 2011. Background check functionality that was planned for this release was put on hold in October 2011 following concerns raised by return preparer community and professional tax return businesses. RPO undertook a concerted effort to find the most suitable solution to maintain integrity of its PTIN issuing authority and address all concerns of the community it was establish to serve. Several options were



DRAFT




Treatments with positive ROIs will be further examined for potential scaling in subsequent years or expansion into other issue areas.

## 12 Complaint Referrals

### 12.1 Complaint Referrals Department Overview

The Complaint Referral (CR) department is responsible for all disciplinary decisions related to a return preparer not rising to the thresholds requiring an official review by the Office of Professional Responsibility (OPR). Additionally, this branch is responsible for fielding all referrals from numerous channels and performing preliminary case development on Circular 230 issues. The branch will build preliminary case files, determine jurisdiction, and record key metrics for tracking. The branch will pass these cases to the appropriate IRS divisions for treatment. This branch will make recommendations to the Compliance and Enforcement Branch of the RPO for inclusion into prioritizing preparers for potential visitation or other compliance activity.

**CR Primary Objectives**

The primary objectives of the CR branch are to:

- Serve as a centralized referral staging area (e.g., complaints from the field, public, etc.)
- Review the initial complaint and conduct preliminary research to build a case file to pass to OPR or other IRS divisions
- Provide discipline for those found to be in violations of Return Preparer Suitability requirements

**Roles and Responsibilities**

<u>Role of Issue Resolution Team Frontline Manager</u>

The Frontline Manager will be responsible for directing and monitoring the flow of incoming and outgoing complaints and referrals for the CR branch. He or she will also monitor the subordinate employees' work performances; supervise for the processing of incoming referrals and complaints; and provide oversight for administrative functions of the Issues Resolution Team.

<u>Role of Issue Resolution Team Case Specialist</u>

The Case Specialist will be responsible for investigation and resolving all incoming complaints, coordinating investigations with other stakeholders, and interact with various stakeholders, maintain administrative functions as it relates to the position as well as workflow.

<u>Role of Issue Resolution Team Clerk</u>

CR clerks provide administrative and clerical support. Clerical responsibilities include intake process for Form 14157, case processing, maintenance of office files, answering and routing telephone inquiries, receiving, routing and distributing mail, maintaining and ordering office supplies, timekeeping and other duties as assigned to support the manager and work group.

<u>Role of Administrative Support</u>



DRAFT



The administrative assistant for Director, Complaint Referral provides administrative and management services essential to the operation and management of the CR organization. The administrative assistant performs office management duties such as distributing and consolidating information, maintaining the CR SharePoint site, answering and directing calls, maintaining personnel files, timekeeping, ordering supplies, oversight of CR clerical staff and other administrative duties as assigned.

Processing of Complaints

The Complaint Referral Branch reviews incoming Form 14157 received and other types of correspondence from a complainant to determine if the registered tax return preparer and the alleged misconduct meet RPO jurisdictional and threshold criteria.

The CR review process is a pre-enforcement screening and analysis of the referral to expedite case assignments within the RPO and routing non-RPO cases to the appropriate IRS offices. Several groups will be established across the country to handle incoming complaints.

To facilitate systematic management and documentation of incoming complaints, the CR branch has selected the TPPS Case Management Tool to assist its staff to perform their duties. The TPPS Case Management Tool is a full function system for use in processing PTIN applications, capturing suitability determination and allow remaining RPO branches to monitor, add information on alleged misconduct of the RP. Accenture, the provider of the TPPS Case Management Tool, has contracted AFFINA, a third party call center, to intake PTIN registration related issues and inquiries from the public. It is anticipated that some complaints might be filed by peer RPs through the AFFINA toll-free phone number. Therefore, the CR has requested AFFINA to record the details of the complaints on Form 14157. Training and job aids for the TPPS Case Management Tool will be provided.

The diagram below illustrates the life cycle of the complaint handling process flow, from the point of in-taking to closure. It also indicates the processing steps of which TPPS Case Management Tool needs to be access after a complaint case is established in the system. Depending on the allegation(s) in the complaint, the case building procedures will vary and details are provided in various job aids.

DRAFT






**Figure [ SEQ Figure * ARABIC ] - Complaint Handling Process Overview**




### *12.1.1 Operations Review (May 2012)*

**Background and Current State**

<u>**OVERVIEW**</u>

The department is primarily charged with:

- Serving as a centralized complaint referral processing/staging area (e.g., complaints from the field, public, etc.)
- Reviewing the initial complaint, logging required information, conducting research to build a case file, and sending case file/required complaint documentation to other RPO divisions, or externally to OPR/IRS stakeholders

The department is currently comprised of one director, one frontline manager, eight case specialists graded at GS-11/12, one administrative assistant graded at GS-7, and one clerk graded at GS-5. The frontline manager, three case specialists, and the clerk are located in St. Louis, MO, while the remaining five case specialists are located in Atlanta, GA. The director and administrative assistant are located in Crystal City, VA. Prior to joining the RPO in mid-December 2011 and early January 2012, the case



specialists held positions within various IRS divisions as RA, ROs, CI Investigative Analysts, and TCOs. Case referrals training was held the week of January 23, 2012. The Complaint Referrals Department commenced operations in February of 2012.

### CASE ASSIGNMENT AND INVENTORY TRACKING

Leadership in the Complaint Referrals Department has assigned responsibility to their staff around the following complaint categories:

- e-File Allegation
- Project Case
- Theft of Refund
- Potential Circular 230 Violation
- Potential Ghost Preparer
- Other Return Preparer Allegations

Employees in the department are generally assigned a category of work for which they are responsible. Each day the clerk retrieves the mail, counts and date stamps receipts. He then goes to the oldest cases and inputs 20-25 of them into the excel spreadsheet where the inventory is tracked, and generally issues an acknowledgement letter (as of May 10, 2012 there were approximately 200 acknowledgement letters waiting to be mailed). Based on the checkboxes on Form 14157 selected by the complainants, the CR clerk assigns complaint cases to the corresponding case specialist for further research and case-building. When multiple checkboxes are selected by the complainant, the case is assigned to the case specialist responsible for the category associated with the most severe violation. In cases in which the complaint was not clearly documented and/or explained on Form 14157 or via email/complaint letters/Form 3949, the clerk must use his general knowledge/judgment to determine which category the complaint should fall under. Case assignment is made solely on first-in first-out basis; cases are not prioritized based on any other criteria, i.e. type/complexity/criticality of referral. The physical case files containing the original complaint and supplemental documents are forwarded to the case specialists to whom the cases are assigned.

Research and case-building, which are also based on a first-in first-out inventory management system, are performed by case specialists. Following case analyses, recommended dispositions (e.g., "no action", case referral to SBSE, or case transfer to C&E/Ghost), case activities logs, and check-sheets are added to the physical case file and submitted for Frontline Manager's review and approval. Approved case files are processed/closed out by the clerk to ensure uniform practices around record retention and referrals to other IRS entities are being followed, where necessary. The Excel-based spreadsheet is then updated to record case closure dates and final dispositions. For cases referred outside of RPO, the clerk copies key documentation to mail. Closed cases that need to be stored are then packaged and mailed to Crystal City. Due to space constraints these are packaged and sealed in UPS envelopes and stored in boxes pending mailing. Because PII is included this information should be stored in locked cabinets, instead of boxes in the work area.

### STATUS OF CURRENT CASE INVENTORY

Since January 1, 2012, the Complaint Referrals Department has received 4090 complaints from the public, as well as from internal IRS sources and, as of May 11, 2012, 4,055 complaints have been successfully logged and categorized. Due to management decisions made as a result of an excessive case backlog, an additional approximately 2,386 RP complaints received in 2011 (forwarded by Fresno



DRAFT




Campus and other BODs) are not being logged or processed at this time. Case Specialists have conducted research on approximately 789 complaints, which were either closed with no further action (i.e., the complaints lacked merit), requires a soft letter to be sent as treatment, or referred to another IRS division for further review or investigation. However, approximately 70 complaint cases designated as "closed" have been set aside (i.e. not sent to record retention), awaiting issuance of soft letters, which are pending RPO approval, prior to making a final disposition (these letters have been in Counsel since March 19, 2012; some follow-up has occurred but still pending). In summary, the department has:

- Received **6476** complaints as of May 11, 2012, including **2,386** complaints received prior to January 1, 2012. **4090** complaints have been received since January 1, 2012.
- Logged **4,055** complaints as of May 11, 2012
- Identified 789 cases as closed from March 1, 2012 through May 15, 2012 (all Case Specialists were assigned to input complaints during the month of February). 70 of these cases still require the issuance of a series of soft letters, which in effect means that they are still open. Actual closures from March 1, 2012 through May 15, 2012 are **719**.
- Open inventory as of May 11, 2012 is **3301** complaint cases. Note that this does not include the 2,386 cases received prior to January 1, 2012. Nor does it include inquiries received from the RPO Mailbox (a guesstimate of 40).

**Performance Measures**

The current Excel-based spreadsheet does not allow the Complaint Referrals Department to collect data on all aspects of the department's performance. Very limited performance metrics are available to gauge the average age of complaint cases, the types of non-compliances reported by complainants, the make-up of potentially non-compliant RPs with professional designations, etc.

Based primarily on daily observations, department leadership estimates that the Clerk categorizes and logs 20-25 complaints into the Excel-based tracking tool on a daily basis, while the daily receipt of complaints averages at 50-60. Depending on the amount of information provided by the complainant and the complexity of complaint, the case specialists spend 1.5 – 4.5 hours to complete the necessary research and determine the disposition of the complaint. On average, the group as a whole closes approximately 20 complaints on a daily basis.

**Key Observations**

As part of the operational review, the team collected data across four main categories: 1) Policy, Mission, and Strategy, 2) Operating Model, 3) Organization and People, and 4) Technology. The initial data gathering effort resulted in a set of key observations that will guide recommendations for improvement and continued department standup. The preliminary findings across the four main categories are:

1. ***<u>Policy, Mission, and Strategy</u>***: The Complaint Referrals Department has a defined vision for the organization that enables 1) Efficient and ***accurate processing*** of complaints that are routed to the appropriate owner, 2) ***Impact on return preparer behavior*** through two-way communications around complaint resolution, and 3) Use of an ***analytics capability to inform the community-wide compliance issues/behavior trends*** using aggregated complaint data. At present, the CR Department may not be making the best use of available resources in order to meet RPO's complaint processing needs and achieve that vision. . CR case specialists do not



DRAFT




fully understand the roles/responsibilities of the other RPO departments impacted by their work, nor do they fully understand the ***ways in which its "customers" are using cases that are referred by the department.*** **This** is likely driving process inefficiencies across the RPO and the broader IRS, and may be resulting in a lack of effectiveness in case building activities within the CR Department. In addition, the inventory management processes need to be reconsidered. Given the current state of the CR inventory, operating solely on a FIFO basis with no consideration given for other case type priorities results in low priority work being processed while high priority work sits. The CR departments is also receiving a large volume of complaints that are not within the RPO's jurisdiction, which is placing an additional burden on already stretched resources.

2. ***<u>Operating Model</u>***: The organization's effectiveness is diminished by department-wide ***process inefficiencies/"pain points"*** and ***bottlenecks***, which primarily result from a lack of clarity in roles and processes, as well as from ineffective case management methodologies and tools. For example, although the long-term vision for the department is to ensure that each case specialist is equipped to process any type of complaint within RPO's jurisdiction, each employee within the CR department is ***currently specializing in processing specific case types*** (e.g., Theft of Refunds, e-File Allegations). This approach can act as an inhibitor for reprioritization of department-wide workforce responsibilities in instances when the CR Department experiences a particularly high workload in any complaint category, and is proving particularly problematic when cases that should be considered high priority, such as Theft of Refund, sit while lower priority cases, such as pay stub cases, get worked. Also, the department is operating at a relatively low case closure rate (~20 cases per day) which, when coupled with a daily case intake of ~50-60 cases, has resulted in a ***large case processing backlog***, which is currently at a level of approximately 3,300 cases. It also appears as though efforts within the CR department are being duplicated in cases when the complainant incorrectly categorizes a complaint, or when additional research is necessary to reevaluate complaints that cite multiple issues. Process duplication may also affect operations between the department and its partners within the RPO and across the IRS. For example, if CR employees spend extensive time evaluating a potential Circular 230 violation, the team is unsure as to whether OPR will conduct a thorough set of its own analyses on the same case, which would result in a ***large-scale duplication of effort between RPO and its partners***. Additionally, the department's use of an interim Excel-based complaint tracking system is ***inhibiting their ability to conduct analyses around preparers*** with multiple offenses, as well as make determinations on ***aggregated noncompliance*** in the return preparation industry
3. ***<u>Organization and People</u>***: Employees within the Complaint Referrals Department ***do not seem to have sufficient training*** to effectively accomplish their assigned tasks. Employees cite a lack of ***full awareness of their individual role*** relative to their CR peers, and their ***department's role*** relative to those of other RPO departments (e.g., C&E, Suitability) and those ***across the IRS*** (e.g., OPR). They seem to have bits and pieces of needed information, but lack of fuller understanding of the impacts of their decisions. Employees indicate that they are developing processes from scratch and educating themselves as best they can despite the fact that other IRS organizations have done or are doing similar work which could potentially be leveraged



DRAFT




from both a process and training perspective. An example would be theft of refund cases. Current processes exist for handling those inquiries outside of RPO, including guidance on how to respond to taxpayers (likely complainants). It is likely training exists as well. In addition, although CR employees are assigned to work PTIN inquiries, they lack a basic understanding of the PTIN issuance process. Also, several employees across the department voiced a preference to participate more actively in the decision-making process across the CR Department or, at a minimum, to be regularly ***informed of senior-level decision making*** such that they can more fully understand shifts in direction or priority.

A review of employee personnel and drop files indicated the following:

- The manager has a process for ensuring timely completion of annual and midyear performance assessments. However, he needs to ensure that documented performance reviews are regularly included in EPFs. In addition, both the Director and the FL Manager need to ensure that evaluative ratings are completed in accordance with Article 12 of the National Agreement.
- Two key documents, the flexiplace agreements and employee expectation memos were not included in any of the drop files. Both need to included and guidance to employees needs to be further clarified, with approval from RPO Director.

4. ***Technology***: The department has developed an ***Excel-based complaint tracking tool*** that is enabling employees to input data and track complaints across the complaint processing lifecycle and, by the time the operational review has concluded (Week of 5/14/2012), all ***4,055 complaints received in CY2012*** have been logged into the tracking spreadsheet. The workbook is used to make case assignments, manage progress, and track closure rates. Though the tracking tool is generally meeting the department's day-to-day needs, it ***does not enable a comprehensive view of a preparer across the RPO***, or more broadly across the IRS. Also, case input and tracking mechanisms are ***labor- and time-intensive***, and ***do not enable easy analysis*** of individual preparer behavior, or aggregated complaint-driving return preparer behavior. Also, without a centralized data repository, ***all complaint case building data that does not meet the threshold of an external organization is at risk of being lost*** if the complaint is not formally "referred"

**Key Recommendations**

In order to continue to mature the RPO's Complaint Referrals Department, the team recommends that several guiding recommendations be leveraged to improve organizational impact.

1. ***TPPS Case Management***: Effective as soon as possible, all complaints received by the IRS RPO will be logged into TPPS. This will enable access to a "one stop shop" for information on individual return preparers across the RPO. Additionally, this will alleviate administrative burden around case development that does not result in a referral to another organization (i.e., CR Department staff will have the ability update the PTIN-holder's record in TPPS and close the



DRAFT



referrals). As necessary, the CR Department should also identify and transcribe all existing high-priority complaints into TPPS

2. ***Understanding of Customer Needs***: Conduct an analysis around the preferences/processes of the recipients of all CR Department caseload to ensure that the department is meeting their needs, and to ensure that efforts are not duplicated within CR, between CR and other RPO departments, and across the IRS. Some of this work has already begun, and is proving valuable.
3. ***Process Review/Refresh***: Develop approach and conduct analysis of core mission-facing processes (e.g., case intake, Circular 230 complaint resolution, etc.) across the CR Department to identify potential "pain points", recommend enhancements, and realize economies of scale, where available. Initial focus should be on maximizing efficiencies around inventory management and case prioritization. Ensure that the full lifecycle of complaints received by the RPO are appropriately catalogued, tracked, analyzed, and closed/referred. As part of this effort, ensure that RPO, and the CR employees, have a sound understanding of the end-to-end process, i.e what happens after it leaves RPO, so that they can better understand the context of their work and facilitate improved processes and continuity in transition. Where possible, consider leveraging similar processes existing in other Organizations.
4. ***Long-term Workforce Analysis***: Following implementation of process enhancements, and based upon a more complete understanding of trends in caseload, the team recommends that the CR Department determine whether their organization is staffed with the correct number of employees, and that existing employees are bringing the right skill set to daily operations
5. ***Training***: Within the CR Department, there is a high demand for training on many aspects of the IRS's and RPO's service offerings as part of professional development and competency building among the staff. Develop and deliver/re-deliver comprehensive training on the PTIN issuance process, TPPS Case Management functionality, responsibilities of all RPO departments, Service-wide touch points, needs of complaint case recipients, and case processing practices across all core complaint categories for all staff. Leverage available training material from other Organizations, where possible, and consider shorter, ongoing training sessions, as opposed to a comprehensive "one-and-done" approach to minimize impacts to case processing and to establish an environment of continual learning.
6. ***Internal Communications***: Institute additional "town hall" meetings with all CR Department staff to facilitate the two-way exchange of information with geographically-disbursed employees across the organization. This will provide a venue that will enable communication around/integration of lessons learned across the department, enable staff to ask questions and make recommendations to leadership, and help generate staff buy-in across the department. Consider inviting guest speakers.
7. ***External Communications***: The review team generally concurs with the CR Director's recommendation that, once a complaint has been substantiated and the CR department is planning to send the case to another IRS/RPO organization, the department should issue a letter to the implicated preparer to inform them that the IRS has been made aware of potential noncompliance so as to drive an immediate effect on RP behavior.

DRAFT