# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ADAM STEELE, BRITTANY MONTROIS, and JOSEPH HENCHMAN,** on behalf of themselves and all others similarly situated, | |
| *Plaintiffs,* | |
| **v.** | **Case No. 1:14-cv-1523-RCL** |
| **UNITED STATES OF AMERICA,** | ~~*** FILED UNDER SEAL ***~~ *Rel. 2/21/23* |
| *Defendant.* | |

## <u>MEMORANDUM OPINION</u>

This case concerns the Internal Revenue Service's ("IRS" or "the agency") assessment of fees to income tax return preparers for its issuance and renewal of Preparer Tax Identification Numbers ("PTINs"). Plaintiffs, a class of return preparers, sued the United States for declaratory, injunctive, and monetary relief in this Court, arguing that the IRS lacked authority under the Independent Offices Appropriations Act ("IOAA"), 31 U.S.C. § 9701, to charge those fees. This Court agreed, granted summary judgment to plaintiffs, and enjoined the IRS from continuing to assess fees for PTIN registrations and renewals. *Steele v. United States* ("*Steele I*"), 260 F. Supp. 3d 52, 63–67 (D.D.C. 2017). On appeal, however, the Circuit vacated this Court's judgment, holding that that statute indeed authorized PTIN fees, and remanded for consideration of whether the fee amounts were excessive. *Montrois v. United States*, 916 F.3d 1056, 1062–68 (D.C. Cir. 2019).

Before the Court on remand are the parties' cross-motions for summary judgment, ECF Nos. 173, 175. Plaintiffs argue that many of the expenses used to justify the amount of the PTIN fees are unnecessary to the maintenance of the PTIN system and therefore those fees are excessive

in violation of the IOAA. The government moves only for partial summary judgment, conceding that the IRS unlawfully included certain expenses in its PTIN fee calculations but maintaining that the agency was within its authority to include others. The government further argues that it is entitled to an offset to its liability for sums it could have charged in fees while it was enjoined by this Court from assessing them. For the reasons that follow, the Court will **GRANT** in part and **DENY** in part plaintiffs' motion, **GRANT** in part and **DENY** in part the government's motion, and **REMAND** to the IRS to determine an appropriate refund for the class in a manner consistent with the IOAA.

## I. BACKGROUND

### A. Statutory and Regulatory Background

Both this Court and the Circuit have set out the statutory and regulatory background of this case extensively in prior opinions. *See Steele I*, 260 F. Supp. 3d at 56–58; *Montrois*, 916 F.3d at 1058–60; *Steele v. United States* ("*Steele III*"), No. 14-cv-1523-RCL, 2020 WL 7123100, at *1–2 (D.D.C. Dec. 4, 2020). Accordingly, the Court will summarize that background here only as necessary to resolve the pending cross-motions for summary judgment.

The Internal Revenue Code defines a "tax return preparer" as "any person who prepares for compensation, or who employs one or more persons to prepare for compensation, any return of" or "claim for refund of" federal income taxes. 26 U.S.C. § 7701(a)(36)(A). While the Code does not set professional standards or licensing requirements for return preparers, Congress enacted a statute in 1976 authorizing the IRS to require them to list their social security numbers for identification purposes on returns they prepared. *See* Tax Reform Act of 1976, Pub. L. No. 94-455, § 1203(d), 90 Stat. 1520, 1691.

In 1998, Congress amended that statute to authorize the IRS to permit return preparers to list a separate identification number issued by the agency instead of a social security number. 26

U.S.C. § 6109(a), (d). The IRS promulgated an implementing regulation the following year creating the PTIN program and allowing, but not requiring, return preparers to list the PTINs it issued in lieu of a social security number on returns. Furnishing Identifying Number of Income Tax Return Preparer, 64 Fed. Reg. 43,910 (Aug. 12, 1999) (codified at 26 C.F.R. pt. 1).

In 2010 and 2011, the IRS issued a series of regulations expanding its regulatory reach over return preparers. As a part of that effort, the IRS created a mandatory credentialing process for preparers who are not attorneys or certified public accountants, including a background check, a competency exam, and ongoing education requirements. *See* Regulations Governing Practice Before the Internal Revenue Service, 76 Fed. Reg. 32,286, 32,286–87 (June 3, 2011). The IRS also expanded the PTIN program, retooled it as a broader information-gathering system regarding preparers, made obtaining and renewing PTINs mandatory for preparers, and began charging a fee to obtain and renew one. *See* Furnishing Identifying Number of Tax Return Preparer, 75 Fed. Reg. 60,309, 60,309–10 (Sept. 30, 2010); User Fees Relating to Enrollment and Preparer Tax Identification Numbers, 75 Fed. Reg. 60,316, 60,316, 60,319 (Sept. 30, 2010).

To support the expanded program, the IRS organized a new Return Preparer Office ("RPO") with multiple departments, including, as relevant here, the Suitability Department, the Compliance Department, and various departments providing support to the entire office. The Suitability Department "was responsible for checking personal tax compliance, checking professional designation, matching prisoner lists, checking compliance of Enrolled Agents [] and Enrolled Retirement Plan Agents [], checking compliance with the Annual Filing Season Program [], Former Employee EA Enrollment Applications, and matching Specially Designated Nationals [] lists." Pls.' Statement of Undisputed Material Facts ("PSUMF") ¶ 81, ECF No. 177-30 (internal quotation marks and citation omitted); Def.'s Resp. to PSUMF ("DRPSUMF") ¶ 81, ECF No. 184-

1. The Compliance Department performed data analytics regarding compliance with PTIN reporting requirements, investigated so-called "ghost preparers" who failed to use a PTIN or used someone else's PTIN or an invalid number, and processed disciplinary referrals of preparers. PSUMF ¶¶ 82–85; DRPSUMF ¶¶ 82–85.

After the IRS implemented its new return preparer regulations, a group of return preparers sued the IRS, arguing that its new preparer credentialing process was unlawful because the statute that the agency used to justify it, 31 U.S.C. § 330, regarding persons practicing before the IRS, did not reach return preparers. *See Loving v. IRS*, 742 F.3d 1013, 1015–16 (D.C. Cir. 2014). The District Court granted summary judgment to the plaintiffs, invalidating the credentialing requirement, and the Circuit affirmed. *Id.* at 1021–22. *Loving* thus invalidated many of the RPO activities that the PTIN fees funded. However, it left undisturbed the regulations requiring all return preparers to obtain and renew PTINs and to pay a fee for doing so.

### B. The IRS's PTIN fee calculations

The following is a summary of the PTIN and vendor fees that the IRS charged return preparers between Fiscal Year ("FY") 2011 and 2017 and from FY 2021 to the present,[1] as well as the various cost models that the IRS used to set those amounts.

#### 1. Fees based on the 2010 Cost Model

In 2010, the IRS completed a Cost Model estimating that the annual PTIN registration and renewal fee should be set at $50, the amount that the agency would ultimately charge from the new PTIN system's implementation in FY 2011 through 2015. Def.'s Statement of Undisputed Material Facts ("DSUMF") ¶¶ 66, 71–73, ECF No. 173-2; Pls.' Resp. to DSUMF ("PRDSUMF") ¶¶ 66,

---

[1] As explained below, the IRS did not assess PTIN fees between FY 2018 and 2020 because of this Court's order enjoining it from doing so, which the Circuit later vacated.

71–73, ECF No. 187-2. The government summarizes the activities whose expected costs the IRS used to reach that number as follows:

- Communications & Customer Support
- IT Development & Implementation
- Program Compliance (Professional Designation Checks (PDC), Personal Tax Compliance (PTC), Criminal Background Checks (CBC), and administrative support)
- Management and supervisory costs (entitled OPR/PMO Operations Support)
- Foreign Preparer Processing

DSUMF ¶ 64; *see* 2010 Cost Model, Ex. 13 to Defs.' Mot. for S.J., ECF No. 174-8. Plaintiffs add, and the government does not dispute, that the "Program Compliance" component "also included 'Verify[ing] Return Preparers' Self-Reported Tax Compliance,' 'Develop[ing] processes for Identifying and Treating Return Preparers Filing w/o PTIN or Incorrect PTIN,' and 'Verify[ing] Return Preparers' Self Certified Continuing Education.'" PRDSUMF ¶ 64 (alterations in original) (quoting Ex. U to Pls.' Mot. for S.J. at 5, ECF No. 176-21); *see* PSUMF ¶ 34; DRPSUMF ¶ 34. Although the IRS conducted a "biennial review" of PTIN costs and produced a 2013 Cost Model, estimating that the PTIN fee should increase to $54.47, the IRS elected to keep the fee at $50 for the next two years. DSUMF ¶¶ 84–85; PRDSUMF ¶¶ 84–85.

The government now concedes that the IRS should not have included the personal tax compliance, criminal background check, self-reported tax compliance, or continuing education activities in its calculations, because those activities were invalidated by *Loving*. DSUMF ¶ 68. Removing the costs associated with those items from the original calculations, the government asserted at the time of its opening summary judgment brief that the appropriate PTIN fee based on the 2010 Cost Model would have been $17. *Id.* ¶¶ 69–70 (citing 2010 Cost Model at 3). The government made further concessions with respect to the 2010 Cost Model after filing its opening brief and now only defends a PTIN fee of $14.05 for FY 2011 through 2013. *See* Def.'s Reply at

10–11, ECF No. 203; Second Decl. of Carol A. Campbell ("Second Campbell Decl.") ¶ 6, ECF No. 203-1. The government makes similar concessions with respect to the 2013 Cost Model, which it now cites as an appropriate measure of fees for FY 2014 and 2015, and asserts that the fee for those years should have been $37.25. DSUMF ¶¶ 86–90; Def.'s Reply at 11–12.

In addition to the PTIN fees themselves, the IRS required preparers to pay a "vendor fee" to Accenture, a third-party contractor that the agency hired to develop, maintain, and operate the computer system responsible for PTIN registrations. DSUMF ¶¶ 112–13; PRDSUMF ¶¶ 112–13. From FY 2011 to 2015, that fee was set by the contract between the IRS and Accenture at $14.25 for new PTIN registrations and $13 for PTIN renewals. DSUMF ¶¶ 115–18; PRDSUMF ¶¶ 115–18, 123. The government continues to defend the vendor fees in full. *See* Def.'s Opp'n at 27–29, ECF No. 183.

In sum, from FY 2011 to 2015, preparers registering for a PTIN for the first time paid a $50 PTIN fee and a $14.25 vendor fee, for a total of $64.25; and preparers renewing their PTIN paid a $50 PTIN fee and a $13 vendor fee, for a total of $63. The government now concedes that the PTIN fee associated with each of those numbers should have been only $17 for FY 2011 through 2013 and $37.25 for FY 2014 and 2015. Thus, the government impliedly asserts that the total amount charged should have been $31.25 for new registrants and $30 for renewing registrants during FY 2011 through 2013 and $51.50 for new registrants and $50.25 for renewing registrants during FY 2014 and 2015.

### 2.  Fees based on the 2015 Cost Model

In 2015, the IRS completed a second biennial review and issued a new Cost Model, estimating that the PTIN fee to be charged in FY 2016 and 2017 should be set at $33. 2015 Cost Model at 1, Ex. 21 to Def.'s Mot. for S.J., ECF No. 174-12; DSUMF ¶ 94; PRDSUMF ¶ 94. That

number was lower than the original $50 fee in part because of certain activities that the Circuit invalidated in *Loving*. DSUMF ¶ 95; PRDSUMF ¶ 95. The government later conceded additional costs in the 2015 Cost Model that it determined in a subsequent biennial review to be improper based on *Loving* and now asserts that the proper PTIN fee for FY 2016 and FY 2017 would have been approximately $24. DSUMF ¶ 103; PRDSUMF ¶ 103.

The IRS also continued to require return preparers to pay the vendor fee to Accenture. For FY 2016, the vendor fee remained at $14 for new registrations and $13.25 for renewals. DSUMF ¶¶ 120–23; PRDSUMF ¶¶ 120–123. By FY 2017, a new contract between the IRS and Accenture had taken effect, and the vendor fee increased to $17 for both new registrations and renewals. DSUMF ¶¶ 124–25; PRDSUMF ¶¶ 124–25.

In sum, in FY 2016, preparers registering for a PTIN for the first time paid a $33 PTIN fee and a $14 vendor fee, for a total of $47; and preparers renewing their PTIN paid a $33 PTIN fee and a $13.25 vendor fee, for a total of $46.25. In FY 2017, preparers paid a $33 PTIN fee and a $17 vendor fee, for a total of $50, regardless of whether they were registering for the first time or renewing their registrations. The government now concedes that the PTIN fees associated with those numbers should have been $24. Thus, the government impliedly asserts that the total amount charged should have been $38 for new registrants and $37.25 for renewing registrants in FY 2016 and $41 for all preparers in FY 2017.

### 3.  Fees based on the 2019 Cost Model

As explained below, this Court enjoined the assessment of PTIN fees in 2017 and the Circuit vacated that decision in 2019. In 2019, the IRS completed another biennial review and produced another Cost Model estimating that the PTIN fee should be approximately $21 for both new registrations and renewals. DSUMF ¶¶ 107–108; PRDSUMF ¶¶ 107–08. The new fee of $21

took effect in August 2020 and remained in effect through at least FY 2022.[2] *See Preparer Tax Identification Number (PTIN) User Fee Update*, 85 Fed. Reg. 43433 (July 17, 2020).

The vendor fee to Accenture also remained in force. Beginning in FY 2018 and continuing to the present, the vendor fee is set at $14.95 for both registrations and renewals. DSUMF ¶ 133; PRDSUMF ¶ 133. While the aforementioned injunction was in effect and the IRS was unable to charge PTIN fees, the IRS itself paid the vendor fee, which was set by contract, to Accenture for each registration or renewal. DSUMF ¶ 134; PRDSUMF ¶ 134.

In sum, in FY 2021 and 2022, preparers paid a $21 PTIN fee and a $14.95 vendor fee, for a total of $35.95, each year for a registration or renewal.

### C. The Present Case

The present case began in 2014, after the Circuit's decision in *Loving*, when a putative class of tax-return preparers filed an action in this Court against the United States challenging the regulations making PTINs mandatory and imposing a fee on the issuance and renewal of PTINs. *See* Compl., ECF No. 1. The plaintiffs sought review of the PTIN fees under the Administrative Procedure Act ("APA") and requested declaratory and injunctive relief, as well as an award of restitution refunding the PTIN fees they had paid. *Id.*[3] On August 8, 2016, the Court certified a class of "[a]ll individuals and entities who have paid an initial and/or renewal fee for a PTIN, excluding Allen Buckley, Allen Buckley LLC, and Christopher Rizek," ECF No. 63, and

---

[2] Plaintiffs ask the Court to take judicial notice of an apparent decrease in the PTIN fee amount for FY 2023 by $5.20. *See* Pls.' Request for Jud. Notice, ECF No. 218. For reasons explained below, later calculations are not relevant to the excessiveness of the FY 2011–2017 PTIN fees, which are the only ones at issue in this opinion. Accordingly, the Court will deny plaintiffs' request that it take judicial notice.

[3] Although the initial complaint did not mention the APA, plaintiffs' first amended complaint, filed in August 2015, clarified that they were challenging the PTIN fees as "unlawful agency action under the Administrative Procedure Act, 5 U.S.C. § 706(2)." First Am. Compl. ¶ 42.

appointed Motley Rice LLC as counsel for the class.[4] The following month, the parties cross-moved for summary judgment. ECF Nos. 66, 67.

On June 1, 2017, this Court granted in part and denied in part both parties' summary judgment motions. *Steele I*, 260 F. Supp. 3d at 67–68. First, the Court held that the Internal Revenue Code authorized the IRS to require the use of PTINs, and that the agency's decision to do so was not arbitrary and capricious under the APA. *Id.* at 62–63. Second, the Court held that the IOAA did not authorize the IRS to charge a fee for the issuance or renewal of PTINs, reasoning that PTINs did not constitute a "service or thing of value provided by [an] agency," 31 U.S.C. § 9701(b), within the meaning of that statute—the only proper basis for a fee under it, *Steele I*, 260 F. Supp. 3d at 63–67. The Court therefore enjoined the IRS from charging a PTIN fee going forward. ECF No. 82. Only the government appealed. *See* Notice of Appeal, ECF No. 90.

The government then filed a motion for a stay pending appeal of the Court's injunction against charging a PTIN fee. ECF No. 84. The Court denied that motion. *Steele v. United States* ("*Steele II*"), 287 F. Supp. 3d 1, 6 (D.D.C. 2017).

On appeal, the Circuit vacated and remanded in a March 1, 2019 decision. *Montrois*, 916 F.3d at 1068. The Circuit first ruled for the government on the IOAA ground, holding that the PTIN system was a service that provided return preparers a private benefit—specifically, "protect[ing] the confidentiality of their personal information"—and therefore that the statute authorized the imposition of a fee to recoup the costs of "generating PTINs and maintaining a database of PTINs." *Id.* at 1062–67. The Circuit then dispatched an alternative argument that this Court never reached: that the decision to impose a fee was arbitrary and capricious under the APA.

---

[4] As reflected on the public docket, the persons and firm excluded from the class are also plaintiffs' counsel.

*Id.* at 1067–68. Because only the government appealed, the Circuit's decision did not disturb this Court's holding that the IRS was authorized to require preparers to obtain PTINs.

On remand, this Court entered a new scheduling order and the parties commenced fact discovery on the reasonableness of the fees charged. *See* ECF Nos. 100, 127. That is when infighting among plaintiffs' counsel threatened to derail the case. Mr. Buckley, co-counsel for plaintiffs, evidently could not reach an agreement to share control of the case with class counsel Motley Rice LLC, and on January 23, 2020, he filed a motion to be appointed as lead counsel for the class. ECF No. 118. The Court denied that motion. ECF No. 126.

Without the Court's assistance in wresting control of plaintiffs' case from his co-counsel, Mr. Buckley decided to go rogue. He filed two motions, purportedly on behalf of the class, but against class counsel Motley Rice LLC's wishes: one for a preliminary injunction against requiring registered preparers to renew their PTINs and another for leave to file an amended complaint adding allegations that the PTIN renewal (as opposed to registration) requirement was unlawful and that the PTIN fees charged after 2020 were excessive. ECF Nos. 128, 133. Both factions of plaintiffs' counsel and the government eventually reached a stipulation regarding the latter motion, and the government consented to the addition of allegations about the post-2020 fee amounts but not the renewal requirement. ECF No. 139.

On December 4, 2020, the Court denied the preliminary injunction motion and granted in part and denied in part the motion for leave to file an amended complaint. *Steele III*, 2020 WL 7123100, at *7. The Court noted that the government stipulated to the addition of allegations about the post-2020 fees but reasoned that the so-called "allegations" in the proposed amended complaint were added after undue delay and that adding them to the complaint would be futile because they were simply "naked legal conclusions" about the agency's authority to require registered preparers

10

to renew their PTINs. *Id.* at *5–6. Accordingly, the Court granted leave to amend the complaint with respect to the former but not the latter. *Id.* The Court then denied the preliminary injunction motion because the operative complaint contained no allegations about the legality of requiring registered preparers to renew their PTINs. *Id.* at *6–7.

On March 23, 2022, the parties filed their cross-motions for summary judgment on the excessiveness of the PTIN and vendor fees. ECF Nos. 173, 177. On May 12, 2022, the parties filed their opposition briefs, ECF Nos. 183, 185, and Mr. Buckley, still unwilling to yield his claim as class-counsel-in-exile, filed a short supplemental brief in support of plaintiffs' motion, ECF No. 188.[5] The parties filed their replies on July 8, 2022, ECF Nos. 203, 207-4, and one week later, plaintiffs moved for leave to file a surreply, ECF No. 211, which the Court will **GRANT**. The summary judgment motions are now ripe for review.

## II.   LEGAL STANDARDS

### A. Summary Judgment and the APA

In ordinary civil actions, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A court evaluating a summary judgment motion must "view the evidence in the light most favorable to the nonmoving

---

[5] Mr. Buckley also filed a motion to modify the proposed summary judgment order filed by his co-counsel. ECF No. 206. Because there is no indication on the docket that class counsel agrees to that modification, Court will **DENY** that motion.

party and draw all reasonable inferences in its favor." *Arthridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 629 (D.C. Cir. 2010).

"But when, as here, the court is reviewing a final agency action under the APA, the standard set forth in Rule 56(a) does not apply." *Ardmore Consulting Grp., Inc. v. Contreras-Sweet*, 118 F. Supp. 3d 388 (D.D.C. 2015). Rather, "the function of the district court is a more limited one: 'to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Id.* (quoting *Kaiser Found. Hosps. v. Sebelius*, 828 F. Supp. 2d 193, 198 (D.D.C. 2011)).[6] The reviewing court must make that determination in accordance with the APA's judicial review provision, which requires the court to set aside agency action that is unlawful for any of a variety of reasons, including, as relevant here, that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

## B. The IOAA

Although the APA is the procedural vehicle for plaintiffs' challenge to the PTIN fees, the substance of that challenge alleges that the IRS assessed those fees in excess of its statutory authority to set user fees under the IOAA. The IOAA provides in relevant part as follows:

> The head of each agency (except a mixed-ownership Government corporation) may prescribe regulations establishing the charge for a service or thing of value provided by the agency. Regulations prescribed by the heads of executive agencies are subject to policies prescribed by the President and shall be as uniform as practicable. Each charge shall be—
>> (1) fair; and
>> (2) based on—

---

[6] The Court acknowledges that there is no administrative record in this case and that it has allowed the parties to engage in fact discovery and produce an ordinary summary-judgment–like record. Nevertheless, because plaintiffs seek judicial review of an agency action—specifically, the setting of the PTIN and vendor fees—the Court will evaluate the summary judgment motions under the standard used in APA cases.

(A) the costs to the Government;
(B) the value of the service or thing to the recipient;
(C) public policy or interest served; and
(D) other relevant facts.

31 U.S.C. § 9701(b).

"To justify a fee under the [IOAA], . . . an agency must show (i) that it provides some kind of service in exchange for the fee, (ii) that the service yields a specific benefit, and (iii) that the benefit is conferred upon identifiable individuals." *Montrois*, 916 F.3d at 1062–63. The Circuit has already held that "the PTIN fee satisfies those conditions." *Id.* at 1063.

As for the factors to be considered in calculating the amount of the fee, decisions interpreting the IOAA have given it a limited construction. In *Nat'l Cable Television Ass'n, Inc. v. United States ("NCTA I")*, 415 U.S. 336 (1974), interpreting an earlier, substantially similar version of the statute, the Supreme Court held that the "'value to the recipient' is . . . the measure of the authorized fee" under the statute, because that construction avoids a concern that by calculating a "fee" based on the public interest or other factors, an agency would assess what is functionally a tax, potentially usurping Congress's exclusive power of taxation. *Id.* at 340–43 (citing U.S. Const. Art. I, § 8); *see also Fed. Power Comm'n v. New England Power Co.*, 415 U.S. 345, 349–51 (1974) (companion case).

Applying that precedent to the current version of the statute, the Circuit has identified two constraints on the costs that agencies may pass off to users under the statute. First, "[a]n agency may not charge more than the reasonable cost it incurs to provide a service, or the value of the service to the recipient, whichever is less." *Engine Mfrs. Ass'n v. Envt'l Protection Agency*, 20 F.3d 1177, 1180 (D.C. Cir. 1994). That calculation need not be perfect—the activities charged for need only be "reasonably related" to the cost to the agency and the value to the recipient, and the total may include both "direct and indirect" costs associated with the service provided. *Nat'l Cable*

*Television Ass'n v. Fed. Comm. Comm'n* ("*NCTA II*"), 554 F.2d 1094, 1107 (D.C. Cir. 1976); *see also Montrois*, 916 F.3d at 1066. Second, "when the specific agency activity in question produces an *independent* public benefit, the agency must reduce the fee that it would otherwise charge by that portion of the agency's costs attributable to that public benefit." *Cent. & S. Motor Freight Tariff Ass'n, Inc. v. United States*, 777 F.2d 722, 729 (D.C. Cir. 1985) (emphasis in original).

For more detailed instructions on the factors to be considered when calculating costs, agencies typically look to an Office of Management and Budget ("OMB") guidance document known as Circular A-25. *See* Office of Mgmt. and Budget, Circular A-25 (Rev.), https://www.whitehouse.gov/wp-content/uploads/2017/11/Circular-025.pdf (last accessed Jan. 17, 2023). Circular A-25 expresses a "[g]eneral policy" that "[a] user charge . . . will be assessed against each identifiable recipient for special benefits derived from Federal activities beyond those received by the general public." *Id.* § 6. It also lists the types of costs of carrying out an activity that an agency should include in its estimation of that activity's "full cost," such as "[d]irect and indirect personnel costs," "[p]hysical overhead," "management and supervisory costs," and "[t]he costs of enforcement, collection, research, establishment of standards, and regulation." *Id.* § 6(d)(1). Both the Supreme Court and the Circuit have cited earlier versions of Circular A-25 with approval, specifically for the proposition contained in its general policy statement that it is the private benefit to an identifiable beneficiary, rather than the public benefit, that should be the measure of an agency user fee. *See New England Power Co.*, 415 U.S. at 349–50; *Seafarers Intern. Union of N. Am. v. U.S. Coast Guard*, 81 F.3d 179, 183 (D.C. Cir. 1996). However, neither court has held that an IOAA fee is automatically lawful simply because the agency followed Circular A-25's guidance regarding the types of costs to use in estimating the full cost of carrying out an activity.

## III.    DISCUSSION

The Court now turns to the parties' cross-motions for summary judgment. Plaintiffs move for summary judgment only as to liability, arguing that the FY 2011 through 2017 PTIN and vendor fees were excessive as a matter of law and that the IRS may not ask any more than a basic list of biographical questions on the PTIN application.[7] The government seeks partial summary judgment, conceding that portions of the FY 2011 through 2017 PTIN fees were excessive but continuing to defend other portions of those fees and all of the vendor fees, and arguing that it is entitled to an "offset" to any award of restitution based on the amount it could have charged return preparers from FY 2017 to 2020 but was unable to because of the Court's prior injunction against the collection of PTIN fees.

Because the issues raised by both motions are so intertwined, the Court will discuss them together. First, the Court will determine the extent to which the disputed fees were unlawfully excessive under the IOAA. Second, the Court will consider the government's claimed offset to an award of restitution. Third, the Court will briefly discuss plaintiffs' argument that the IRS may only ask for limited biographical information on PTIN applications. Finally, the Court will determine the appropriate remedy.

For the reasons that follow, the Court holds that the FY 2011 through 2017 PTIN and vendor fees were excessive as a matter of law, that the government is not entitled to an offset to

---

[7] Although the operative complaint includes allegations that the PTIN fees charged after *Montrois*, beginning in 2020, are also excessive, *see* Second Am. Compl. ¶¶ 55–59, plaintiffs' summary judgment motion does not address that issue. That is apparently because the opposing parties jointly stipulated that they would "first seek adjudication and a partial final judgment—by way of summary judgment, trial, appeal, and/or settlement—of the disputes related to the 2010–17 Claim." Stip. Re: Post-2019 PTIN Fees ¶ 3, ECF No. 144. Nevertheless, the government's summary judgment motion defends the post-2020 PTIN and vendor fees in full, and plaintiffs' opposition to that motion does not discuss the issue. *See* Def.'s S.J. Mem. at 25–28, ECF No. 173-1; Pls.' Opp'n, ECF No. 185. Ordinarily, "[w]here a party fails to address arguments raised by the opposing party's motion for summary judgment, the Court may treat those arguments as conceded." *Comptel v. FCC*, 945 F. Supp. 2d 48, 55 (D.D.C. 2013). But given the parties' joint stipulation, which the government seems to have disregarded, the Court will simply decline to adjudicate the excessiveness of the post-2020 fees at this stage without deeming plaintiffs to have conceded that point.

restitution for fees it was unable to charge due to the Court's prior injunction, and that plaintiffs' challenge to the questions asked on the PTIN application is improperly raised. The Court will remand to the IRS to determine an appropriate refund to the class.

## A. The Excessiveness of the PTIN and Vendor Fees

Plaintiffs argue that the PTIN and vendor fees charged in FY 2011 through 2017 were excessive because they included costs not strictly necessary to the administration of the PTIN system. *See* Pls.' S.J. Mem. at 16–24, ECF No. 177-29. The government concedes that certain costs were wrongfully included in the PTIN calculations but defends the inclusion of other costs that plaintiffs dispute. *See* Def.'s S.J. Mem. at 12–25, ECF No. 173-1; Def.'s Opp'n at 8–29.

As an initial matter, the parties disagree about the proper standard for evaluating plaintiffs' challenge to the PTIN and vendor fee amounts. Plaintiffs argue that the Court must determine for itself whether any given expense was "necessary" to the provision of the private benefit justifying the imposition of the fee—here, protecting return preparers' identities—without giving any deference to the agency's determination of that question. *See* Pls.' S.J. Mem. at 16–17. The government argues that because the Circuit in *Montrois* held that PTINs confer a private benefit, any direct or indirect cost "reasonably related" to the overall PTIN scheme that was not invalidated by *Loving* was allowable as a basis for the PTIN fees, and the Court must give "more than mere deference or weight" to the agency's determination of what expenses are so related. Def.'s S.J. Mem. at 10–12, 16–17. Both proposed standards miss the mark.

Plaintiffs' proposed "necessary" standard takes a word from a single Circuit opinion out of context and makes out the scope of judicial review of IOAA fees to be more aggressive than it is supposed to be. Plaintiffs make much of the Circuit's pronouncement in *Elec. Indus. Ass'n, Consumer Elecs. Grp. v. FCC*, 554 F.2d 1109 (D.C. Cir. 1976), that "a fee [may] only charge for

those expenses which are *necessary* to service the applicant or grantee." *Id.* at 1115 (emphasis added). But the next sentence of that decision, which states that "[e]xpenses incurred to serve some independent public interest cannot, under [*NCTA I*], be included in the cost basis for a fee," makes clear that the Circuit's emphasis was not on the degree of necessity to the provision of the service, but on the contrast between funding the provision of private benefits and benefits to the public at large. *Id.* In *NCTA II*, decided the same day, the Circuit stated that an IOAA fee "must be *reasonably related* to those attributable direct and indirect costs which the agency actually incurs in regulating (servicing) the industry," 554 F.2d at 1107 (emphasis added), language similar to which the Circuit has repeated in subsequent decisions, *see, e.g.*, *Seafarers*, 81 F.3d at 185 (holding that IOAA fees for licensing must be "sufficiently related to the statutory criteria" for issuing the license).

Moreover, a test turning on the Court's own view of what expenses are strictly "necessary" to the maintenance of an otherwise authorized program providing a private benefit would usurp for the Court a cost-estimating function that Congress textually committed, to some extent, to agency discretion. After all, the IOAA authorizes "[t]he head of each agency" to "prescribe regulations establishing the charge" of fees and lists the factors that agency heads are to consider in setting them. 31 U.S.C. § 9701(b); *cf. Cent. & S.*, 777 F.2d at 729 ("Because Congress has expressly delegated to the ICC the responsibility for setting these fees, the ICC in exercising that authority is at the zenith of its powers; the ICC's fees, therefore, are entitled to more than mere deference or weight.") (internal quotation marks and citations omitted).

On the other hand, the government's proposed "more than mere deference or weight" standard collapses important distinctions between quantitative and qualitative determinations and misstates the law in two ways.

First, an agency may not charge for an activity as part of an IOAA fee simply because that activity is lawful and "reasonably related" to an *overall program*, part of which provides a private benefit. The Circuit has held that "when the specific agency activity in question produces an independent public benefit, the agency must reduce the fee that it would otherwise charge by that portion of the agency's costs attributable to that public benefit." *Cent. & S.*, 777 F.2d at 729 (emphasis omitted). Thus, for example, in *Elec. Indus. Ass'n*, the Circuit remanded to the Federal Communications Commission to reset or explain a fee that funded "94 percent of the annual budget" of its "Common Carrier Bureau" because "it strain[ed] the limits of credulity" to believe that just "six percent of the work of that bureau had justifications independent of the services rendered to private parties." 554 F.2d at 1109. In other words, when calculating an IOAA fee to support a program that in part benefits private parties and in part independently benefits the agency and the public, the agency must disaggregate with respect to each charged-for activity the cost of providing the service to private beneficiaries from the cost of doing work that benefits the agency and the general public. So, in this case, it is not enough that an activity be generally PTIN-related and not invalidated by *Loving*. Rather, the government must be able to explain with respect to each activity that formed the basis for the PTIN fees how that activity was reasonably related to providing the private benefit that the Circuit identified in *Montrois*: a means of identifying return preparers that protects them from identity theft. As explained below, certain PTIN-related activities in fact provided an independent public benefit and thus should not have been charged for in full.

Second, the government's blanket assertion that the agency's determination of fee amounts is due "more than mere deference or weight" blurs the lines between the type of activity performed and the cost of carrying out that activity. The government asserts flatly that "[w]hen an agency

properly exercises its authority to charge a fee under the IOAA," the agency's "fee schedule is 'entitled to more than mere deference or weight.'" Def.'s S.J. Mem. at 11 (quoting *Cent. & S.*, 777 F.2d at 729). To be sure, the Circuit has reasoned that the IOAA's commitment of fee-setting to agency discretion entitles the calculations themselves to significant deference. *See Cent. & S.*, 777 F.2d at 729. But that is only a statement about the agency's discretion to calculate the *amount* of costs and benefits associated with a given activity, not whether a specific *activity* is sufficiently related to the provision of a private benefit. Determining whether an activity confers a private benefit, with or without also conferring an independent public benefit, is a matter of applying the IOAA, a statute that the IRS does not administer. And "[a] court does not defer to an agency's interpretation of a statute that it is not charged with administering." *Del. Riverkeeper Network v. FERC*, 857 F.3d 388, 396 (D.C. Cir. 2017).[8]

In sum, any challenge to an IOAA fee amount could potentially involve two separate inquiries, each of which requires a different level of deference to the agency. The first, and most relevant here, is whether, as a qualitative matter, the activities whose cost is used to justify the fee are reasonably related to the provision of the private benefit associated with the fee rather than an independent benefit to the agency and the public. The Court need not give any special deference to the agency in making that determination. But if the charged-for activities meet that qualitative bar, then the other inquiry is whether, as a quantitative matter, the amount charged for carrying them out is reasonable. And the agency's estimation of that amount is "more than mere deference or weight." *Cent. & S.*, 777 F.2d at 729.

---

[8] The government also suggests that compliance with Circular A-25 definitively establishes that a fee amount is lawful under the IOAA. *See* Def.'s S.J. Mem. at 15 ("Here, the IRS complied with the directives of OMB Circular A-25, and therefore, the PTIN user fee is reasonable under the IOAA."). But the Court need not reach that issue, because if an agency does not distinguish between "special benefits derived from Federal activities" and "those received by the general public," OMB Circular A-25 § 6—the sole distinction at issue in this case—then it has not complied with Circular A-25.

In this case, that means that the Court will not defer to the IRS's determination of whether the activities used to justify the PTIN and vendor fees were sufficiently related to the provision of PTINs to return preparers, but it will defer to the IRS's estimation of how much it costs to carry out those activities. With that standard in mind, the Court will consider each of the disputed fees in turn, considering first the FY 2011 through 2015 PTIN fees, followed by the FY 2016 and 2017 PTIN fees, and concluding with the vendor fees for the entire period of FY 2011 through 2017.

### 1. The FY 2011 through 2015 PTIN fees

Plaintiffs argue that they are entitled to summary judgment holding that the FY 2011 through 2015 PTIN fee of $50 was excessive to the extent that it was based on (1) compliance and suitability costs, which comprised most of the costs used to justify the fee; and (2) customer support, communication, IT, and operational support (together, "support") costs beyond certain limited subcategories. The government concedes much ground but maintains that it permissibly charged for certain limited activities in the first category and all activities in the second.

As an initial matter, the parties disagree over which cost models to use in evaluating the alleged excessiveness of the fees. The government justifies a portion of the $50 fee for FY 2011 through 2013 based on the IRS's 2010 Cost Model and a larger portion of the same fee for FY 2014 and 2015 based on the 2013 Cost Model. Def.'s S.J. Mem. at 20–23. Plaintiffs argue that only the 2010 Cost Model is relevant to all five years. Pls.' Opp'n at 6–8. The Court agrees with plaintiffs that the government is wrong to rely on the 2013 Cost Model to differentiate FY 2011 through 2013 from FY 2014 and 2015. Congress "expressly requir[ed] in the IOAA that fees be prescribed by regulation." *New England Power Co. v. U.S. Nuclear Regulatory Comm'n*, 683 F.2d 12, 16 (1st Cir. 1982); *see* 31 U.S.C. § 9701(b). That requirement ensures "that such fees be communicated in advance to those who would have to bear them, thus permitting them to take

intelligent action to avoid undesired consequences." *Id.* Whatever amount the IRS theoretically could have charged in FY 2014 and 2015 based on its internal 2013 Cost Model, it chose instead to charge the amount noticed by regulation as calculated in its 2010 Cost Model. The government cannot now avoid liability for any excessive fees charged in FY 2014 and 2015 based on activities for which it theoretically could have charged but actually did not. The Court will therefore evaluate the alleged excessiveness of the PTIN fees for all of FY 2011 through 2015 based on the justifications given in the 2010 Cost Model.[9]

### (i) Compliance and suitability costs

Plaintiffs argue that none of the RPO Compliance or Suitability Departments' activities were a valid basis for the FY 2011 through 2015 PTIN fees because those activities were invalidated by *Loving*. *See* Pls.' S.J. Mem. at 20–21. The government concedes that many costs related to suitability activities were an invalid basis for PTIN fees for that same reason, but it continues to defend compliance and suitability costs in four categories. *See* Def.'s Opp'n at 19–24. The Court agrees with plaintiffs in part and the government in part as to the Compliance Department and agrees with plaintiffs in full as to the Suitability Department.

First, the government defends in full the IRS's decision to charge for the activities of the RPO Compliance Department, which "processes taxpayer complaints against return preparers, identifies return preparers who require enforcement, and conducts enforcement activities against return preparers who misuse or who do not use a PTIN." Def.'s Opp'n at 19–20. Specifically, the government asserts that the Compliance Department's activities include:

> (1) investigating "ghost preparers" (return preparers that do not list
> their PTINs on returns they prepared for compensation as required
> by law); (2) handling complaints from return preparers that a client's

---

[9] That is not to say that the IRS may not use later cost models for assistance in calculating an eventual *refund* based on a more granular breakdown of the various RPO departments' activities. But in determining how much the IRS over-charged return preparers, the *baseline* must be the amount it actually charged in the first instance.

> prior return preparer may have acted improperly by using a compromised PTIN or committed identity theft to obtain a PTIN; and (3) composing the data to refer complaint cases to IRS business units outside the RPO for further enforcement if necessary.

Def.'s Opp'n at 19. According to the government, those activities are permissible bases for an IOAA fee because they "are reasonably related to the PTIN Program," which "advances the goals of protecting against identity theft recognized by *Montrois* as a special benefit justifying the PTIN user fee." *Id.*

As explained above, the government confuses the applicable standard by discussing whether these activities are reasonably related to the PTIN program *overall* rather than specifically to the associated private benefit of providing return preparers with a means of identification that protects their identity. Nevertheless, the Court agrees that the IRS permissibly charged for at least some of the three specific categories of Compliance Department activities that the government identifies. To the extent that they relate to misuse of PTINs, all three are reasonably related to the provision of the private benefit that the Circuit identified in *Montrois*—protection of preparers' identity—because the misuse of PTINs compromises their ability to serve as a secure means of identification. And tellingly, plaintiffs do not expressly dispute that much in their reply brief. *See* Pls.' Reply at 13–15, ECF No. 207-4.

However, uncontroverted record evidence establishes that the Compliance Department undertook additional activities unrelated to the misuse or nonuse of PTINs. For example, the declaration of Diann Wensing, the former Director of RPO Compliance, which the government cites as giving a "more complete description" of the Compliance Department's work, DRPSUMF ¶ 84, states that the Compliance Department's referral groups handled a broad swath of complaints, "includ[ing] theft of refund, preparer misconduct, RPO Program Noncompliance, Tax Preparation Noncompliance, . . . TPPS Count Mismatch, etc." Wensing Decl. ¶ 161, Ex. BH to Oliver Decl.,

ECF No. 176-60. Wensing further states that the Compliance Department's Enforcement Planning & Direction Group undertook certain activities apparently unrelated to misuse or nonuse of PTINs, including "[d]eveloping strategy recommendations for IRS Senior Management" to "Address Unregulated Return Preparer Conduct." *Id.* ¶ 208. In short, it is apparent that some of the Compliance Department's activities concerned misconduct affecting return preparers' *customers* rather than the return preparers *themselves*. Those activities indisputably confer an independent public benefit, and thus their cost must be disaggregated from that of the three categories of preparer-benefitting activities identified above.

Accordingly, the Court holds with respect to the Compliance Department that only the direct and indirect costs of (1) investigating ghost preparers; (2) handling complaints regarding improper use of a PTIN, use of a compromised PTIN, or use of a PTIN obtained through identity theft; and (3) composing the data to refer those specific types of complaints to other IRS business units were valid bases for the corresponding amount of the FY 2011 through 2015 PTIN fees.

Second, the government defends the IRS's decision to charge for the Suitability Department's professional designation checks ("PDCs"), which "verify the self-reported credentials of CPAs and attorneys" working as return preparers. Def.'s Opp'n at 20–21. Plaintiffs argue that PDCs have nothing to do with the provision of a private benefit to return preparers because they "were designed to confirm credentials, not identities, and were performed at additional cost after PTIN applicants had received PTINs and had been identified." Pls.' Reply at 10. The Court agrees with plaintiffs. The government provides no explanation whatsoever as to how verifying that an already-identified preparer's self-reported professional credentials are accurate is reasonably related to protecting that or any other preparer's identity. Instead, the government merely relies on "[t]he IRS['s] . . . interest in verifying the identity of PTIN holders

and verifying this same identifying information is correctly displayed on [a] public facing website"
that includes a directory of preparers. Defs.' Opp'n at 21. That is an independent benefit to the
agency and the public at large whose cost must be disaggregated from that of providing private
benefits to return preparers. *See Cent. & S.*, 777 F.2d at 729. Accordingly, the Court holds that the
IRS unlawfully included the cost of PDCs in its calculation of the FY 2011 through 2015 PTIN
fees.

Third, the government defends the IRS's decision to charge for the Suitability
Department's prisoner list checks and specially designated national ("SDN") checks, which
determine whether an applicant is incarcerated or designated by the Treasury Department as being
associated with certain targeted countries or illicit activities, respectively. *See* Def.'s Opp'n at 21–
23. Plaintiffs argue that prisoner list and SDN checks provide no benefit to return preparers. *See*
Pls.' Reply at 11. The Court agrees with plaintiffs. The government asserts that prisoner list and
SDN checks help the Bureau of Prisons and Treasury Department to administer their own
programs and that "[i]t is reasonable for the IRS to determine that the PTIN Program should be
administered in compliance with, and without undermining, other important federal programs and
regulations." Def.'s Opp'n at 22. Reasonable though that determination may be, it does not justify
charging for prisoner list and SDN checks as part of the PTIN fee under the IOAA, because
facilitating other agencies' operations is not reasonably related to the private benefit of protecting
return preparers' identities. Again, that is an independent public benefit whose cost must be
disaggregated from that of the private benefit to return preparers. *See Cent. & S.*, 777 F.2d at 729.
Accordingly, the Court holds that the IRS unlawfully included the cost of prisoner list and SDN
checks in its calculation of the FY 2011 through 2015 PTIN fees.

Fourth, the government defends the IRS's decision to charge for the Suitability Department's processing of suitability referrals by taxpayers or agency components of preparers who purportedly should not be able to obtain or maintain a PTIN—for example, because a preparers has been "legally enjoined from return preparation and from obtaining or renewing a PTIN." Def.'s Opp'n at 23–24. Plaintiffs point out that referrals also involved other complaints, such as "personal tax compliance," PDCs, and prisoner list and SDN checks, and argue that "[t]he suitability checks and referrals, including referrals about enjoined preparers, were separate services undertaken to improve tax administration, benefit[t]ing only the IRS and the public." Pls.' Reply at 12. The Court agrees with plaintiffs. Suitability referrals were merely an intake system for the processing of Suitability Department inquiries that either the government no longer defends or the Court has just held provided no identifiable private benefit. Accordingly, the Court holds that the IRS unlawfully included the cost of suitability referrals in its calculation of the FY 2011 through 2015 PTIN fees.

### (ii) Support costs

The remainder of plaintiffs' motion with respect to the FY 2011 through 2015 PTIN fees challenges the IRS's decision to charge for certain RPO customer support, communication, IT, and operational support activities beyond those plaintiffs consider "necessary" to the provision of PTINs. *See* Pls.' S.J. Mem. at 20–25. In the corresponding portion of its cross-motion and its opposition, the government continues to defend a substantial portion of those costs. *See* Def.'s S.J. Mem. at 20–23; Def.'s Opp'n at 24–26. The Court cannot agree with either party in full.

Rather than identify specific support costs as being insufficiently related to the provision of a private benefit, plaintiffs simply assert that the only "activities [that] were (and are) necessary to provide tax-return preparers a PTIN [are] (1) a small portion of customer support costs; (2) a

small portion of communication costs; (3) a small portion of IT costs; (4) a small portion of OPR/PMO Ops Support." Pls.' S.J. Mem. at 21 (internal quotation marks and citation omitted). Plaintiffs then explain why some specific costs in those categories *were* permissible bases for a fee under the IOAA but make no effort to explain why other support costs *were not*. The Court cannot simply accept plaintiffs' unexplained assurances that support costs beyond those on their list were not allowable.

Still, it is undisputed that the IRS charged for support activities facilitating its entire pre-*Loving* return preparer regulatory apparatus. *See* 2010 Cost Model at 3 (listing such broad, department-wide support activities as "Programmatic Executive Management/Oversight" and "Operations Support"). Some of those support activities must have facilitated substantive activities that had nothing to do with protecting return preparers' identities, some of which were also invalidated by *Loving*. The portion of the support costs associated with those activities cannot be considered reasonably related to the provision of a private benefit and thus cannot form a valid part of the basis for an IOAA fee.

While the government concedes some support costs included in the 2010 Cost Model, its concessions apparently do not reach all activities insufficiently related to the provision of a private benefit. As summarized in a declaration by current RPO Director Carol Campbell, those concessions do not include IT costs at all and only include communications and operational support costs "that are not PTIN-related." Second Carol Campbell Decl. ¶ 6, ECF No. 203-1. Given the breadth of the RPO program before *Loving* and the 2010 Cost Model's failure to separate out the different work that the supporting departments were supporting, it is virtually certain that some RPO IT activities between FY 2011 and 2015 supported substantive activities invalidated by *Loving*. Furthermore, the government makes no attempt to estimate the portion of any RPO support

costs that went to providing the PTINs' associated identity-protecting benefit by issuing them and maintaining the PTIN database rather than other "PTIN-related activities" like PDCs which, as explained above, provided only an independent benefit to the agency and public. The government has not demonstrated that all of the support costs it continues to defend were reasonably related to the provision of a private benefit and therefore has not demonstrated its entitlement to partial summary judgment on that issue.

Ultimately, the determination of which support costs were allowable must come down to the portion of those costs that went to support the provision of PTINs and maintenance of the PTIN database, and thus the conferral of the attendant private benefit of identity protection, rather than other RPO activities that were not PTIN-related or aspects of the PTIN program that conferred an independent public benefit, such as the Suitability Department activities discussed above. Only the former were valid bases for the FY 2011 through 2015 PTIN fees. As explained below, the agency will have an opportunity to determine what portion of support costs laid out in the 2010 Cost Model meet that bar on remand.

### 2. The FY 2016 and 2017 PTIN fees

The Court now turns to the PTIN fees for FY 2016 and 2017, which were set at $33 based on the 2015 Cost Model. Plaintiffs argue that those fees were excessive for the same reasons argued with respect to the FY 2011 through 2015 fees. *See* Pls.' S.J. Mem. at 25–27. The government makes essentially the same concessions it did with respect to those earlier fees—defending all compliance costs, certain suitability costs, and most support costs—and argues that it is entitled to partial summary judgment holding that a PTIN fee of $24 was permissible under the statute for FY 2016 and 2017. *See* Def.'s S.J. Mem. at 23–25.

Since the same activities remain in dispute with respect to the FY 2016 and 2017 PTIN fees as the FY 2011 through 2015 fees, the Court's holding as to each of those activities remains the same. First, allowable compliance costs include only the direct and indirect costs of (1) investigating ghost preparers; (2) handling complaints regarding improper use of a PTIN, use of a compromised PTIN, or use of a PTIN obtained through identity theft; and (3) composing the data to refer those specific types of complaints to other IRS business units. Second, it was unlawful for the IRS to charge for any suitability costs as part of the PTIN fees. Finally, it was only lawful for the IRS to charge PTIN users for support costs to the extent that they funded activities supporting the provision of PTINs, maintenance of the PTIN database, and in turn, the attendant private benefit rather than an independent benefit to the agency and public.

The FY 2016 and 2017 PTIN fees do differ from the FY 2011 through 2015 PTIN fees in one relevant respect: They were determined based on the 2015 Cost Model. Thus, on remand to the agency, that later cost model will be the yardstick against which to measure which costs were actually allowable under the IOAA.

### 3. The FY 2011 through 2017 vendor fees

The Court will now consider the vendor fees that the IRS required PTIN users to pay Accenture from FY 2011 to 2017. As noted above, those fees were set at $14.25 for new PTIN registrations and $13 for PTIN renewals during FY 2011 through 2016 and $17 for both new registrations and renewals in FY 2017.

As an initial matter, the Court will not consider plaintiffs' argument, raised for the first time in their reply brief, that the entire vendor fee was unlawful because it was not promulgated by regulation as required by the IOAA. *See* Pls.' Reply at 16–17. Whatever the merits of that argument, plaintiffs had every opportunity to include it in their opening summary judgment brief

but chose not to do so. "Arguments raised for the first time in a reply brief are waived." *Nippon Shinyaku Co., Ltd. v. Iancu*, 369 F. Supp. 3d 226, 239 n.8 (D.D.C. 2019).

What is properly before the Court is plaintiffs' argument that the *amount* of the FY 2011 through 2017 vendor fees was excessive under the IOAA. As with the PTIN fees themselves, plaintiffs argue that only the portion of the vendor fees "necessary to providing tax-return preparers a PTIN" were properly included in the PTIN fee. Pls.' S.J. Mem. at 19–20. The government defends the FY 2011 through 2017 vendor fees in full, arguing that they were set before Accenture updated the PTIN system to include capabilities invalidated by *Loving. See* Def.'s Opp'n at 27–29.[10] The Court agrees with plaintiffs in part.

The government does not dispute that a significant portion of the vendor fees went to fund activities that had nothing to do with providing or maintaining PTINs and their attendant private benefit of identity protection to return preparers. For instance, the government admits that, at least in later releases, the PTIN system that Accenture designed and maintained had "the ability to . . . determine preparer suitability based on tax compliance history successfully, . . . process continuing education credit hours completed by calendar year, and perform case management," DRPSUMF ¶ 52 (internal quotation marks and citation omitted), and that Accenture's contract with the IRS required it to maintain a call center to address "preparer questions related" not only to "registration [and] renewal," but also to "testing, and [continuing education] processes and timelines," *id.* ¶ 41 (internal quotation marks and citation omitted). Those activities are not reasonably related to the

---

[10] The government also appears to argue in its opposition brief that plaintiffs lack standing to challenge the vendor fee because it was set by a contract to which they were not a party and thus may be challenged only in the Court of Federal Claims under the Administrative Dispute Resolution Act, and then only if they are "interested parties" within the meaning of that statute. *See* Def.'s Opp'n at 27 (citing *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 (Fed. Cir. 2001)). However, the government concedes in the very next paragraph that "the only challenge Plaintiffs *can* raise in this proceeding is whether the product or service for which the IRS contracted is a direct or indirect cost of the PTIN Program that can be charged consistent with the IOAA and OMB Circular A-25." *Id.* at 28 (emphasis added). Plaintiffs *only* challenge the vendor fee as a user fee under the IOAA.

provision of a private benefit—rather, they provided an independent public benefit that was later invalidated by *Loving*.

Nevertheless, the government argues that none of that matters, because the fees were initially set by contract in 2010, before many of those capabilities were implemented, and the initial release of the PTIN system only had the ability to issue, renew, and maintain PTINs. *See* Def.'s Opp'n at 28–29. That argument is unpersuasive. It is not as if the IRS and Accenture contracted for a more limited system and Accenture then just *happened* to expand its capabilities at a later date. The 2010 contract between the IRS and Accenture, which set the vendor fee amounts in effect during FY 2011 through 2016, expressly contemplated that Accenture would implement capabilities beyond the issuance, renewal, and maintenance of PTINs and would maintain a call center taking questions beyond those subjects. For example, the contract required Accenture to "develop and maintain a system capable of recording self-certification of continuing education reported by paid tax return preparers," including "capabilities to receive and electronically record test results," IRS-Accenture Contract (eff. Sept. 10, 2010) ¶ 1, Ex. AA to Pls.' Mot. for S.J., ECF No. 177-9, and to implement support for "a tax compliance check prior to receiving a PTIN verifying that return preparers have no outstanding obligations on their personal or business federal tax returns" and a function "check[ing] to see if additional [continuing education] or test requirements are necessary," *id.* ¶ 2.2 (internal quotation marks omitted). It also required Accenture to "[d]evelop a service delivery program that address[es] preparer questions related to" not only PTIN registration and renewal, but also continuing education and testing. *Id.* ¶ 3. The vendor fees were calculated to compensate Accenture for developing and maintaining the entire expanded PTIN system, and the government cites no authority for the proposition that the Court should deem those fees not to include the costs of certain activities simply because those activities,

which were expressly contemplated by the contract from the very beginning, began some time after the contract became effective.

Because the FY 2011 through 2017 vendor fees went beyond funding the portions of Accenture's work related to the issuance, renewal, and maintenance of PTINs and charged return preparers to cover portions of that work that benefitted only the agency and the public, those fees were excessive under the IOAA. The Court therefore holds that the IRS unlawfully required return preparers to pay whatever portion of the FY 2011 through 2017 vendor fees was attributable to activities unrelated to the issuance, renewal, and maintenance of PTINs and support for those activities. As explained below, the IRS will have an opportunity on remand to estimate that portion.

## B. The Government's Claimed Offset

In its motion for partial summary judgment, the government argues that in the event it is found liable for some amount of restitution to the class, it is entitled to an offset in the amount of reasonable PTIN fees it could have charged return preparers, and vendor fees it would not have had to pay to Accenture itself, during FY 2018 through 2020 if not for this Court's 2017 injunction against the assessment of any PTIN fees, which the Circuit reversed. *See* Def.'s S.J. Mem. at 28–33. That argument is riddled with problems, and the Court cannot accept it.

As a general rule, "[t]he right to recover what one has lost by the enforcement of a judgment subsequently reversed is well established." *Baltimore & O.R. Co. v. United States*, 279 U.S. 781, 786 (1929). Accordingly, courts have recognized claims in restitution to "money [] paid pursuant to a court order that is subsequently reversed." *Broadcom Corp. v. Qualcomm Inc.*, 585 F. Supp. 2d 1187, 1189 (C.D. Cal. 2008). But this case presents a different scenario. The government does

not actually assert a counterclaim for restitution.[11] Moreover, if it did so, it would be seeking restitution not for money the IRS paid to plaintiffs, but for the value of the IRS's uncompensated work of providing and maintaining their PTINs during the injunction period.

The government cites no case in which a court has offset a plaintiff's eventual restitution award based on a sum that the defendant could have charged the plaintiff for its services but for a later-invalidated permanent injunction. The primary case that the government does cite, *Williams v. Wash. Metro. Area Transit Comm'n*, 415 F.2d 922 (D.C. Cir. 1968), involved an entirely different scenario. In that case, the Washington Metropolitan Area Transit Commission ("the Commission") issued an order raising transit fares that the Circuit later determined to be unlawful. *Williams*, 415 F.2d at 925–26. The Circuit ordered the Commission "to make restitution for all amounts collected as a consequence of the fare increase initially authorized by" the order, except for a certain amount of that increase "conceded" by the plaintiffs to have been lawful. *Id.* at 976. *Williams* is not analogous to this case for two reasons. First, the later-invalidated order at issue was not a court-ordered injunction, but an agency-ordered fare increase. Second, the Circuit reduced the amount of restitution not by an amount that the agency *could have* charged but was *unable* to, but an amount that the agency *did* charge and concededly *was* able to.

Without any support on point, the government is asking the Court to approve a type of offset that is, to the Court's knowledge, entirely novel. That does not automatically make it impermissible—as the government correctly notes, the form of monetary relief plaintiffs seek is restitution, an equitable remedy whose amount the Court may reduce if equity so requires. *See*

---

[11] Because the Court declines to order an offset for a variety of independent reasons, it need not consider plaintiffs' argument that the government was *required* to plead its claimed offset as a counterclaim rather than an affirmative defense. *See* Pls.' Opp'n at 20–21.

*Williams*, 415 F.2d at 943–45. But whatever the Court's authority to order an offset as an exercise of equitable discretion, it declines to do so in this case for several reasons.

For one, the period for which the government seeks an offset actually extends past the vacatur of the injunction, into a period during which no order of this Court was stopping the IRS from assessing PTIN or vendor fees if it so desired. The Circuit's mandate vacating this Court's earlier judgment issued in March 2019, *see* ECF No. 98, and yet the government now seeks an offset for forgone fees extending all the way up to August 2020, when the IRS finally reinstated the PTIN and vendor fees, *see* Def.'s S.J. Mem. at 30–33. The government offers no explanation as to why the IRS did not attempt to assess PTIN or vendor fees in the intervening period of nearly a year and a half. If any offset due to the injunction were theoretically available, it would only be for the period during which the injunction was actually in effect: between July 2017 and March 2019.

Moreover, even narrowing the government's claimed offset to the relevant period, an offset to monetary relief requires the existence of mutual debts, which the government has not established here. "The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 19 (1995) (quoting *Studley v. Boylston Nat. Bank*, 229 U.S. 523, 528 (1913)). There are two problems with applying that principle in this case as the government requests. First, just because the government should have been *able* to charge PTIN and vendor fees during the relevant period, that does not necessarily mean that return preparers who registered or renewed during that period now *owe* the government the amount that it should have been able to charge. There is no evidence in the record that the IRS ever communicated to PTIN users during the relevant period that it intended to charge them a fee in the

event that the injunction was vacated, much less that it did so in accordance with the requirements of the IOAA, which would have been the basis for it to impose a financial obligation in exchange for the PTIN registrations and renewals. Second, there is a problem of mutuality: It appears that the class that the Court certified does not perfectly match up with the group of return preparers that the government now essentially asserts owes the IRS back-fees. As noted above, the Court certified a class of "[a]ll individuals and entities who have paid an initial and/or renewal fee for a PTIN, excluding Allen Buckley, Allen Buckley LLC, and Christopher Rizek." ECF No. 63. It is possible that some return preparers who paid a fee to obtain or renew a PTIN before the injunction did not renew that PTIN during the injunction period, and that some who obtained a PTIN for the first time during the injunction period did not subsequently renew that PTIN after the injunction was lifted and pay a fee. While the class-action form necessarily requires some rough justice in adjudicating the *amount* of monetary relief class members are due, what the government seeks here is essentially the adjudication of an alleged mutual debt that is not, in fact, mutual to every class member.

Finally, an order approving the offset that the government seeks would have the effect of imposing (albeit retrospectively) a user fee, a task that the IOAA authorizes only "[t]he head of each agency" to carry out, and by "regulation[]" at that. 31 U.S.C. § 9701(b). The Court is not the right entity, nor an order of restitution the right means, to assess under the statute a fee that was never formally set by the agency.

For these reasons, the Court declines to fashion an equitable remedy for plaintiffs' restitution claim that offsets the IRS's liability by the amount of PTIN and vendor fees that it would have charged but could not, or did not, because of this Court's subsequently invalidated 2017 injunction. To be clear, the Court expresses no opinion as to whether the IRS may claw back

the forgone PTIN and vendor fees through some other means, such as an administrative process setting fees retroactively for return preparers who registered or renewed their PTINs during the relevant period, or a civil action of its own for restitution. That question is beyond the scope of the present proceeding.[12]

### C. The Information Requested on the PTIN Applications

Finally, plaintiffs argue that the IRS lacks statutory authority to request any information on the PTIN application beyond the preparer's "name, address, telephone number, social security number and date of birth," Pls.' S.J. Mem. at 27, and perhaps email address, *id.* at 28 n.12, because that is the only information that "may be necessary to assign an identifying number," which is all the statute authorizes the IRS to require, 26 U.S.C. § 6109. However, while one factual allegation in the operative complaint hints at plaintiffs' belief that the IRS asks for more information than is necessary to provide a PTIN, *see* Second Am. Compl. ¶ 20 ("For more than a decade, the IRS charged no fee to issue a PTIN and required tax return preparers to submit only their name, address, SSN (if applicable), and date of birth."), an express claim that the IRS exceeds its statutory authority under the PTIN statute by requesting further information is nowhere to be found in that complaint, *see id.* ¶¶ 43–59 (listing claims).[13] "New claims cannot be pled in summary judgment briefs." *Cloud Foundation, Inc. v. Salazar*, 999 F. Supp. 2d 117, 127 (D.D.C. 2013). That is just

---

[12] The government also argues that plaintiffs previously asserted that an offset would be available and are now estopped from arguing to the contrary. *See* Def.'s Reply at 21. But in the pleading that the government cites, plaintiffs' opposition to the government's motion for a stay pending appeal, ECF No. 85, plaintiffs took no such position. Rather, plaintiffs argued that "if it prevailed on appeal, the government could attempt to recover the lost fees through a restitution *claim* against PTIN holders." *Id.* at 19 (emphasis added). That assertion contemplates a separate action or counterclaim, and besides, it says nothing of plaintiffs' view of the *merits* of such a claim.

[13] In its prayer for relief, the operative complaint does request "[a] judgment declaring that the IRS may only request information from tax return preparers that is authorized by statute." Second Am. Compl., Prayer for Relief ¶ 5. However, even there, the complaint does not identify the authorizing statute or what specific requested information allegedly exceeds that authority. Thus, with respect to the application questions, the operative complaint does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," as any claim must. Fed. R. Civ. P. 8(a)(2).

what plaintiffs attempt to do here. The Court therefore will not entertain plaintiffs' argument about the IRS's statutory authority to request additional information on PTIN applications or their request for a declaratory judgment on that subject.

### D. The Appropriate Remedy

As explained above, the PTIN and vendor fees for FY 2011 through 2017 were excessive to the extent that they were based on the following activities:

- All activities already conceded by the government in this case.

- Any Compliance Department activities other than (1) investigating ghost preparers; (2) handling complaints regarding improper use of a PTIN, use of a compromised PTIN, or use of a PTIN obtained through identity theft; and (3) composing the data to refer those specific types of complaints to other IRS business units.

- All Suitability Department activities.

- The portion of support activities that facilitated provision of an independent benefit to the agency and the public.

- The portion of Accenture's activities as a vendor that facilitated provision of an independent benefit to the agency and the public.

But the scope of the compliance and support activities just identified is unclear from the record. It thus remains to be determined how that scope, and the corresponding cost amount, will be ascertained.

The parties have not meaningfully briefed the appropriate course of action in the event that, following the Court's summary judgment decision, disputes remain as to the scope of the activities at issue and the cost of carrying out those activities. Plaintiffs assume that there will be a trial, at least on the amount of restitution. *See* Pls.' S.J. Mem. at 4 ("[P]laintiffs move only for an order granting summary judgment as to liability . . . while reserving the amount of the excess fees

for trial."). The government, on the other hand, asserts for the first time in its reply brief that, "[i]n the unlikely event that the Court finds that the adjusted PTIN user fee is still unreasonable, remand is the appropriate remedy because neither the Court nor a party challenging the fee may seize the authority to develop the fee that has been granted to the agency by Congress." Def.'s Reply Supp. S.J. at 4–5. At any rate, the Court must now decide how this case will proceed following the adjudication of the cross-motions for summary judgment.

This case cannot go to trial. Although the Court has permitted plaintiffs to seek the monetary remedy of restitution, this is still a case in which the Court is reviewing an agency action—the setting of IOAA fees, with an eye to whether those fees were excessive—under the APA.[14] And in pushing for a trial on the extent to which the challenged fees were excessive, plaintiffs "misunderstand the role the district court plays when it reviews agency action. The district court sits as an appellate tribunal, not as a court authorized to determine in a trial-type proceeding whether" an agency determination was "factually flawed." *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1225 (D.C. Cir. 1993).

The only proper place for this case to go is back to the IRS. That is because, notwithstanding the reviewing court's authority to determine what *activities* an agency may lawfully charge for under the IOAA, that statute commits the *amount* to be charged to agency discretion. *See* 31 U.S.C. § 9701(b); *Cent. & S.*, 777 F.2d at 729. Judges "do not sit as a board of auditors, steeped in accountancy and equipped to second-guess an estimate which seems on its face to be reasonable." *Id.* at 738. Accordingly, when a court determines that an IOAA fee was excessive because it charged for unallowable activities, the extent and expense of which are in

---

[14] As explained in the Court's August 8, 2016 Memorandum Opinion, although the APA does not waive the United States's sovereign immunity with respect to money *damages*, it does in some cases waive sovereign immunity with respect to *restitution* of funds paid to the agency. *See* ECF No. 64 at 9–14 (citing *America's Community Bankers v. FDIC*, 200 F.3d 822, 830 (D.C. Cir. 2000)).

dispute, the proper remedy is to remand to the agency to show its work and set a new fee within the bounds of what the law allows. *See, e.g.*, *Engine Mfrs. Ass'n*, 20 F.3d at 1184. To be sure, this is an unusual case in which the agency will be asked to do so retrospectively. But it would be anomalous to allow plaintiffs the opportunity to have a court set the fee and substitute its own judgment for the agency's simply because they waited until after they had paid the fee for several years to challenge it and seek monetary relief.

Accordingly, the Court will remand to the IRS to determine an appropriate refund for the class that is consistent with this Opinion and the accompanying Order. Specifically, the Court will order the IRS to determine reasonable estimates of the portions it lawfully could have charged of the FY 2011 through 2015 PTIN fees based on the 2010 Cost Model, the FY 2016 and 2017 PTIN fees based on the 2015 Cost Model, and the FY 2011 through 2017 vendor fees based on the IRS-Accenture contracts. The Court will retain jurisdiction.

## IV.    CONCLUSION

For the foregoing reasons, the Court will **GRANT** in part and **DENY** in part plaintiffs' motion for summary judgment and **GRANT** in part and **DENY** in part defendant's motion for partial summary judgment. The Court will issue a declaratory judgment holding that the PTIN and vendor fees for FY 2011 through 2017 were excessive to the extent that they were based on the following activities:

- All activities already conceded by the government in this case.

- Any Compliance Department activities other than (1) investigating ghost preparers; (2) handling complaints regarding improper use of a PTIN, use of a compromised PTIN, or use of a PTIN obtained through identity theft; and (3) composing the data to refer those specific types of complaints to other IRS business units.

- All Suitability Department activities.

- The portion of support activities that facilitated provision of an independent benefit to the agency and the public.

- The portion of Accenture's activities as a vendor that facilitated provision of an independent benefit to the agency and the public.

Furthermore, the Court will remand to the IRS and order it to determine an appropriate refund by recalculating those fees, using the 2010 Cost Model as a benchmark for the FY 2011 through 2015 PTIN fees and the 2015 Cost Model as a benchmark for the FY 2016 and 2017 PTIN fees, and excising a reasonable estimate of the portions of those fees that the Court has held unlawful. The Court will retain jurisdiction. A separate Order shall issue this date.

Date:  1/23/23

Royce C. Lamberth
United States District Judge