# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ADAM STEELE, BRITTANY
MONTROIS, and JOSEPH HENCHMAN,
on behalf of themselves and all others
similarly situated,

    *Plaintiffs,*

v.

UNITED STATES OF AMERICA,

    *Defendant.*

**Case No. 1:14-cv-1523-RCL**

## <u>MEMORANDUM OPINION</u>

Over a year ago, this Court determined that the fees the IRS charged tax return preparers to obtain or renew their Preparer Tax Identification Numbers (PTINs), along with the fees the agency required preparers to pay to a third-party vendor, were excessive. To determine the appropriate refund, the Court remanded this case to the IRS. The Court instructed the agency to provide a reasonable estimate of the share of the fees that exacted from tax return preparers based on activities held improper by the Court. Earlier in this case, the government conceded that it had overcharged preparers by $110,322,017. Now, the IRS has calculated an additional refund of $57,527,844. Plaintiffs challenge the IRS's methodology and urge the Court to order the refund of the PTIN and vendor fees in their entirety.

Both parties seem to think the Court did not mean what it said when it ruled that the remedy for this case would be for the IRS to produce a reasonable estimate of the amount improperly exacted. Plaintiffs expect the Court to suddenly change its mind and order the government to hand back everything return preparers were charged, both properly and improperly. The government

seems to think its work on remand is beyond scrutiny, as it did not deign to respond to many of plaintiffs' specific arguments.

The Court declines plaintiffs' invitation to abandon its previous rulings and order the PTIN and vendor fees refunded in full.  It also rejects plaintiffs' effort to subject the IRS's calculations to arbitrary and capricious review and to replace the IRS's refund determination with plaintiffs' own.  Rather, the Court will evaluate the IRS's refund determination on the basis articulated in the order remanding this matter to the agency.

In the main, the IRS's work on remand passes muster.  The agency used a reasonable methodology to estimate the extent to which the PTIN and vendor fees were excessive. Nonetheless, plaintiffs have identified several questionable decisions and apparent mistakes by the agency, which the government neither justified in its declarations nor defended against plaintiffs' challenges.  The Court thus cannot approve the IRS's refund determination at this stage.  Instead, the Court will remand this matter to the agency once more.  This time, the Court will require plaintiffs and the government to meet and confer so that they may at least attempt to resolve their disagreements before bringing the matter back to the Court.

Plaintiffs' motion to vacate will therefore be **GRANTED IN PART** and **DENIED IN PART**.  The government's motion to strike a report prepared by one of plaintiffs' counsel that purports to offer an alternative estimate of the IRS's refund obligation is **GRANTED**.  Finally, plaintiffs' motion to file their unredacted reply under seal will be **GRANTED**.

## I.   BACKGROUND

### A.  Statutory and Regulatory Background

The Court assumes familiarity with its memorandum opinion granting in part and denying in part plaintiffs' motion for summary judgment and defendant's motion for partial summary judgment. That opinion details this case's factual background and procedural posture up until the

post-summary judgment disputes. *See Steele v. United States* ("*Steele* SJ Op."), 657 F. Supp. 3d 23, 28–34 (D.D.C. 2023).  Accordingly, the Court will draw on that opinion but provide only the background information necessary to resolve the present motions.

The Internal Revenue Code defines a "tax return preparer" as "any person who prepares for compensation, or who employs one or more persons to prepare for compensation, any return of" or "claim for refund of" federal income taxes.  26 U.S.C. § 7701(a)(36)(A).  While the Code does not set professional standards or licensing requirements for return preparers, Congress enacted a statute in 1976 authorizing the IRS to require return preparers to list their Social Security numbers for identification purposes on returns they prepare.  *See* Tax Reform Act of 1976, Pub. L. No. 94-455, § 1203(d), 90 Stat. 1520, 1691.

In 1998, Congress amended that statute to authorize the IRS to permit return preparers to list a separate identification number issued by the agency instead of a Social Security number. 26 U.S.C. § 6109(a), (d).  The IRS promulgated an implementing regulation the following year creating the PTIN program and allowing, but not requiring, return preparers to list a PTIN issued by the IRS in lieu of a Social Security number on returns.  Furnishing Identifying Number of Income Tax Return Preparer, 64 Fed. Reg. 43,910 (Aug. 12, 1999) (codified at 26 C.F.R. pt. 1).

In 2010 and 2011, the IRS issued a series of regulations expanding its reach over return preparers.  As a part of that effort, the IRS expanded the PTIN program, retooled it as a broader information-gathering system as to preparers, made obtaining and renewing PTINs mandatory for preparers, and began charging a fee to obtain and renew a PTIN.  *See* Furnishing Identifying Number of Tax Return Preparer, 75 Fed. Reg. 60,309–10 (Sept. 30, 2010); User Fees Relating to Enrollment and Preparer Tax Identification Numbers, 75 Fed. Reg. 60,316, 60,319 (Sept. 30, 2010).  Preparers who were neither attorneys nor certified public accountants were required to

become "registered tax return preparers" by passing a background check and competency exam and fulfil continuing education requirements. *See* Regulations Governing Practice Before the Internal Revenue Service, 76 Fed. Reg. 32,286, 32,286–87 (June 3, 2011). To support the expanded program, the IRS organized a new Return Preparer Office (RPO) with multiple departments. The IRS also "required preparers to pay a 'vendor fee' to Accenture, a third-party contractor that the agency hired to develop, maintain, and operate the computer system responsible for PTIN registrations." *Steele* SJ Op., 657 F. Supp. 3d at 30–31.

The regulations also authorized the IRS to prescribe the manner for issuing and renewing a PTIN. *See* 26 C.F.R. 1.6109-2(d)–(e). To that end, since 2010 the IRS has required those seeking to obtain or renew a PTIN to complete IRS Form W-12. *See Steele v. United States*, No. 1:23-cv-918 (RCL), 2024 WL 1111639, at *2 (D.D.C. Mar. 14, 2024). Preparers must enter their name, Social Security number, date of birth, and contact information, as well as further information, such as whether the preparer is current on his or her own federal taxes and has any past felony convictions. *See id*.

After the IRS implemented its new return preparer regulations, a group of return preparers sued the IRS, arguing that its new preparer credentialing process was unlawful because the statute on which the agency relied for authority did not reach return preparers. *See Loving v. IRS*, 742 F.3d 1013, 1015–16 (D.C. Cir. 2014). The district court granted summary judgment for the plaintiffs, invalidating the credentialing requirement, and the Circuit affirmed. *Id.* at 1021–22. *Loving* thus invalidated many of the Return Preparer Office (RPO)'s activities that had been funded by fees charged for issuing or renewing a PTIN. But *Loving* left undisturbed the regulations requiring all return preparers to obtain and renew PTINs and to pay a fee and provide information to do so.

### B.  Procedural History

#### 1.  Pre-*Montrois* Procedural History

In the wake of *Loving*, plaintiffs Adam Steele and Brittany Montrois, on behalf of a putative class of tax return preparers, filed an action in this Court against the United States challenging the IRS's policies of requiring PTIN issuance and renewal, requesting allegedly unnecessary information to issue and renew a PTIN, and imposing a fee on the issuance and renewal of PTINs. *See* Compl., ECF No. 1.

The parties later cross-moved for summary judgment and on June 1, 2017, this Court granted in part and denied in part each party's summary judgment motion.  *Steele v. United States*, 260 F. Supp. 3d 52, 67–68 (D.D.C. 2017).  The Court first held that the Internal Revenue Code authorized the IRS to require the use of PTINs, although it did not address the renewal requirement.  *Id.* at 62–63.  But the Court sided with plaintiffs to hold that under the Independent Offices Appropriations Act (IOAA), the IRS lacked authority to *charge a fee* for PTINs.  *Id.* at 63–67. The Court therefore issued a final judgment and permanent injunction forbidding the IRS from charging for issuing or renewing PTINs.  Final J. & Permanent Inj., ECF No. 82, *Steele v. United States*, No. 1:14-cv-1523 (RCL) (D.D.C. July 7, 2017).

The government appealed, and in a March 1, 2019 decision, the D.C. Circuit determined that the IRS has authority to charge tax return preparers a fee for obtaining and renewing a PTIN.  *Montrois v. United States*, 916 F.3d 1056, 1062–66 (D.C. Cir. 2019).  The Circuit vacated the judgment of the Court and remanded the matter for further proceedings, "including an assessment of whether the amount of the PTIN fee unreasonably exceeds the costs to the IRS to issue and maintain PTINs."  *Id.* at 1058.

## 2. Summary Judgment and Remand to the IRS

Following remand, the parties cross-moved for summary judgment. *See* ECF Nos. 173, 175. The Court granted in part and denied in part each party's motion. The Court held that the FY 2011 through FY 2017 PTIN and vendor fees were excessive as a matter of law. In reaching this conclusion, the Court held it would not defer to the IRS in determining whether the activities used to justify the PTIN and vendor fees were sufficiently related to the provision of PTINs to return preparers, but it would defer to some extent to the IRS's estimation of the costs to carry out those activities. *Steele* SJ Op., 657 F. Supp. 3d at 38–39. If the charged-for activities are appropriate, the next question is "whether, as a quantitative matter, the amount charged for carrying them out is reasonable" and on that question the IRS's "estimation of that amount is [entitled to] 'more than mere deference or weight.'" *Id.* at 39 (quoting *Cent. & S. Motor Freight Tariff Ass'n, Inc. v. United States*, 777 F.2d 722, 729 (D.C. Cir. 1985)).

With that standard in mind, the Court concluded that the IRS's fees improperly charged for certain activities. Specifically, the Court held "the PTIN and vendor fees for FY 2011 through 2017 were excessive to the extent that they were based on the following activities:

- All activities already conceded by the government in this case.
- Any Compliance Department activities other than (1) investigating ghost preparers; (2) handling complaints regarding improper use of a PTIN, use of a compromised PTIN, or use of a PTIN obtained through identity theft; and (3) composing the data to refer those specific types of complaints to other IRS business units.
- All Suitability Department activities.
- The portion of support activities that facilitated provision of an independent benefit to the agency and the public.
- The portion of Accenture's activities as a vendor that facilitated provision of an independent benefit to the agency and the public.

*Id.* at 48.  But the Court acknowledged that since "the scope of the compliance and support activities just identified is unclear from the record . . . . that scope, and the corresponding cost amount" would need to be ascertained.  *Id.*

To do so, the Court remanded this matter back to the IRS.  The Court noted that "notwithstanding the reviewing court's authority to determine what *activities* an agency may lawfully charge for under the IOAA, that statute commits the *amount* to be charged to agency discretion."  *Id.* at 49 (citing 31 U.S.C. § 9701(b) and *Cent. & S.*, 777 F.2d at 729).  It also observed the gap in relative institutional competence between the Court and the IRS.  *See id.* ("Judges 'do not sit as a board of auditors, steeped in accountancy and equipped to second-guess an estimate which seems on its face to be reasonable.'" (quoting *Cent. & S.*, 777 F.2d at 738)).  Accordingly, the Court ruled that it would "remand to the IRS to determine an appropriate refund for the class that is consistent with this Opinion and the accompanying Order."  *Id.*  Specifically, the Court ordered the IRS to

> determine in a manner consistent with the accompanying Memorandum Opinion the amount of the FY 2011 through 2017 PTIN and vendor fees it lawfully charged return preparers by subtracting from the fees it actually charged a reasonable estimate of the cost of the activities identified [by the Court] as being invalid bases for an IOAA fee.

Remand Order 2, ECF No. 222.  The IRS's determination of a reasonable estimate would be entitled to "more than mere deference or weight."  *Steele* SJ Op., 657 F. Supp. 3d at 39 (quoting *Cent. & S.*, 777 F.2d at 729.

As amended,[1] the Remand Order required the IRS to calculate the refund for the PTIN fees charged between October 1, 2010 and October 31, 2015 using the 2010 Cost model and $50 fee amount as the baselines and to calculate the refund for the PTIN fees charged between November

---

[1] *See infra* note 8.

1, 2015 and July 10, 2017 with the 2015 Cost Model and $33 fee as the baseline.  Amend. Order 1, ECF No. 236.[2]  And it required the IRS to determine the refund for the vendor fees charged between October 1, 2010 and October 31, 2015 based on the agency's initial contract with Accenture and fee amounts of $14.25 for new registrations and $13 for renewals and it required the IRS to determine the refund for the fees charged between November 1, 2015 and July 10, 2017 using "the subsequent contract (to the extent it contemplates different activities)" and the $17 fee. *Id.* at 2.

The Court retained jurisdiction for purposes of further proceedings.  Remand Order 2.  And it ordered the parties to file joint status reports every thirty days to update the Court on the IRS's work on remand until that work was complete.  *Id.* at 3.

### 3.  The IRS's Work on Remand

The Court signed its remand order on January 23, 2023.  Over the next year, the parties filed status reports.[3]  Finally, just one day short of a year later, the IRS reported that it had completed its calculations.  Notice, ECF No. 256.  It estimated the amount of the Court-ordered refund to be $167,766,068.  *Id.*  This figure included both the United States' prior concessions of $110,322,017 plus an additional $57,444,051.  *Id.*  To explain the methodology behind the IRS's estimate, the agency submitted a declaration of Kimberly D. Rogers, Director of the RPO.  1st Rogers Decl., ECF No. 257.  The declaration included as attachments two 2022 declarations from Carol A. Campbell, then-director of the RPO, concerning the government's concessions at the

---

[2] For simplicity's sake, however, the Court will refer to the FY 2011–2015 and 2016–2017 PTIN and vendor fees.

[3] In the meantime, the Court denied plaintiffs' motion for partial final judgment under Federal Rule of Civil Procedure 54(b) and motion for clarification on whether PTIN fees could include costs relating to "ghost preparers" or the registration of foreign preparers.  *Steele v. United States*, No. 1:14-cv-1523 (RCL), 2023 WL 6215790 (D.D.C. Sept. 25, 2023).

summary judgment stage.  *See id.* ¶ 6; 1st Campbell Decl., ECF No. 257-1; 2d Campbell Decl., ECF No. 257-2.

In response, plaintiffs moved for a briefing schedule for their challenge to the IRS's work on remand.  ECF No. 263.  The government opposed this motion and noted that in response to plaintiffs' requests for more detailed information about the calculations, it planned to produce a supplemental declaration.  ECF No. 265.  The Court ordered the government to file any supplemental declaration by March 8, 2024.  Order, ECF No. 269.  And it ordered plaintiffs to file any challenge to the IRS's work on remand by March 22, and to set forth any legal basis for further action by the Court.  *Id.* Following the Court's Order, the IRS filed a supplemental declaration by Ms. Rogers with more detailed information, 2d Rogers Decl., ECF No. 270-1, including tables indicating the government's prior concessions and additional refunds for every cost category, *see* Ex. 1 to 2d Rogers Decl. ("2011–2015 Costs Table"), ECF No. 270-2; Ex. 2 to 2d Rogers Decl. ("2016–2017 Costs Table"), ECF No. 270-3.  Before discussing what happened next, the Court will summarize the IRS's work on remand.

### (i)  The PTIN Fee

On top of the government's prior concessions, the IRS estimated the amount charged for the PTIN fee to be refunded at $51,032,080.  1st Rogers Decl. ¶ 27.

For FY 2011 through 2013, the IRS estimated the refund amount at $952,309.  *Id.* ¶ 16.  In these years, the PTIN fee was $50.  *Id.* ¶ 14.  The agency used the 2010 Cost Model to identify impermissible activities that had not already been conceded and to estimate the amount to be refunded for each cost category.  *Id.* ¶ 15.  The 2010 Cost Model is a model the IRS used to calculate an annual PTIN fee of $50.  *See* 2010 Cost Model, ECF No. 174-8.  It includes projected costs for various capabilities—for example "Communications & Customer Support"—and their

component "Cost Categor[ies]" such as "Customer Support," "Marketing & Branding," and "Communications" and sub-categories. *See id.* at 1.

For FY 2014 through 2015, the IRS used the 2010 Cost Model to "define the activities and their projected costs," resulting in an estimated refund of $34,968,502. 1st Rogers Decl. ¶¶ 17, 21. In other words, the IRS determined the non-chargeable activities based on the 2010 Cost Model, and then used the actual number of PTINs issued in FY 2014–2015 to estimate the amount to be refunded. *Id.* ¶¶ 17–18.[4]

Next, the IRS estimated the total additional PTIN refund for FY 2016–2017 to be $15,111,270. *Id.* ¶ 26. Per the Remand Order, the IRS used the 2015 Cost Model and fee amount of $33 as the baseline for these years. *Id.* ¶ 24. Although the 2010 Cost Model projected costs per category of activity, the 2015 Cost Model relied on the salaries and benefits of RPO employees. *See* 2015 Cost Model 27, ECF No. 174-12. Using the 2015 Cost Model, the IRS identified non-chargeable activities. 1st Rogers Decl. ¶ 25. It then determined amounts charged for such activities based on the number of PTINs issued or renewed in those years. *Id.* ¶ 25. It estimated that particular percentages of certain cost categories had been for non-chargeable activities. *Id.* For instance, the agency estimated that 28% of costs for "Compliance/Complaint Referrals" needed to be refunded. *Id.*

---

[4] The IRS also provided a lower alternative estimate of $18,806,444 for FY 2015–2016 based on the 2013 Cost Model. 1st Rogers Decl. ¶ 23. But the Court will not consider this alternative. It previously held that because in those two years the IRS charged the fee amount "noticed by regulation as calculated in its 2010 Cost Model," the government was "wrong to rely on the 2013 Cost Model to differentiate FY 2011 through 2013 from FY 2014 and 2015." *Steele* SJ Op., 657 F. Supp. 3d at 39. It therefore ruled that it would "evaluate the alleged excessiveness of the PTIN fees for all of FY 2011 through 2015 based on the justifications given in the 2010 Cost Model." *Id.*; *see also* Amend. Order 1. Granted, the Court provided that "the IRS may look to later cost models for assistance in identifying costs that were improperly included in the 2010 and 2015 Cost Models." Amend. Order 1; *see also Steele* SJ Op, 657 F. Supp. 3d at 39 n.9 ("[T]he IRS may . . . . use later cost models for assistance in calculating an eventual *refund* based on a more granular breakdown of the various RPO departments' activities."). But here, the IRS has not attempted to use the 2013 Cost Model to gain insights into the costs included in the 2010 Cost Model. Instead, it has provided a refund calculation for FY 2015–2016 based entirely on the 2013 Cost Model. *See* Ex. 3 to 2d Rogers Decl., ECF No. 270-4. Since that is incompatible with the Court's ruling, the Court will not consider the IRS's alternative calculation.

Combining the agency's yearly PTIN refunds for FY 2011–2017 amounted to $51,032,080, not counting the government's prior concessions. *Id.* ¶ 27.

### (ii) The Accenture (Vendor) Fee

The IRS estimated the amount of vendor fees to be refunded at $6,411,972. 1st Rogers Decl. ¶ 60.

As discussed above, the IRS required preparers to pay not only a PTIN fee to the IRS, but also a vendor fee to Accenture. From FY 2011 to 2015, that fee was set by the first contract between the IRS and Accenture at $14.25 for new PTIN registrations and $13 for PTIN renewals. *Id.* ¶ 28. For FY 2016 and 2017, under the second IRS-Accenture contract, the vendor fee was set at $17 for both new registrations and renewals. *Id.* ¶ 29.

In estimating a refund, the difficulty for the IRS lay in its lack of access to Accenture's "exact costs." *Id.* ¶ 30. However, it had three sources of information: (1) its contracts with Accenture, (2) a sealed declaration from Michael P. Miller, Managing Director for Accenture Federal Services, LLC, provided by Accenture in response to plaintiffs' written requests, and (3) Accenture call center data provided by Accenture that breaks down the number of return preparer calls handled by Accenture's call center. *Id.* ¶¶ 30–31; *see also* Miller Decl., ECF No. 262-3; Call Center Report, ECF No. 262-4.

For FY 2011 through 2015, the IRS estimated the Court-ordered refund of the Accenture fee at $3,535,432. 1st Rogers Decl. ¶ 49. The IRS's approach was to calculate, for each payment made to Accenture, what percent of the payment was due to non-chargeable activities, then multiply that percentage by the total amount of fees paid to arrive at the total refund amount. First, based on the Miller Declaration, the IRS concluded that the $1.25 difference between the initial PTIN registration fee ($14.25) and the PTIN renewal fee ($13.00) was appropriate, 1st Rogers

Decl. ¶¶ 32–35, because the cost difference related to "the portions of Accenture's work related to the issuance, renewal, and maintenance of PTINs," *Steele* SJ Op., 657 F. Supp. 3d at 45.  The IRS also relied on the Miller Declaration to conclude that 27% of the remaining $13.00 fee charged for both issuance and renewal went to Accenture's call center and that, based on the numbers of calls per category in the Call Center Report, 2.69% of return preparer calls should be excluded as unlawful.  1st Rogers Decl. ¶¶ 36–41.  This yielded a refund of $0.09 per vendor fee.  *Id.* ¶ 47.

Tackling the rest of the vendor fee (i.e., the vendor fee minus the $1.25 differential and minus the amount relating to the call center), however, was less straightforward.  Without internal Accenture data, the IRS could not readily sort how much of the remaining fee went to permissible or impermissible activities.  *See* 1st Rogers Decl. ¶ 45.  Instead, the IRS sliced the first Accenture contract into "Contract Line Item Numbers" ("CLINs"),[5] identified "all unique and specific CLINs," excluded call center-related CLINs, identified the remaining CLINs that were non-allowable, and calculated the percentage of non-chargeable, non-call center CLINs to the total number of non-call center CLINs.  *Id.* ¶¶ 44–45.  The IRS weighted each CLIN equally, which it considered to be "the most reasonable basis upon which to base its estimate" given the lack of "internal Accenture data regarding its exact pricing to return preparers of the various CLINs."  *Id.* ¶ 45.  This process estimated the percentage of the non-call center costs dedicated to non-chargeable activities at 9.23%.  *Id.* ¶ 44(e).  The IRS then multiplied the remaining fee by 9.23% to arrive at an estimated refund amount of $0.88 per fee paid.  *Id.* ¶¶ 44(f), 47.  The non-chargeable call center-related services were added to the remaining non-chargeable costs to equal $0.97 per

---

[5] The contracts themselves did not list CLINS.  *See* FY 2011–2015 Accenture Contract ("1st Contract"), ECF No. 258-3; FY 2016–2017 Accenture Contract ("2d Contract"), ECF No. 258-4.  Rather, the IRS broke down the contracts into chunks of at least one sentence and designated each a CLIN.  *See* CLINs Table for FY 2011–2015 Accenture Contract, ECF No. 271-2; CLINs Table for FY 2016–2017 Accenture Contract, ECF No. 271-3.  Although plaintiffs contend these are not technically CLINs, the Court will refer to them as such for the sake of clarity.  *See* Pls.' Reply 9 n.6, ECF No. 9.

vendor fee per year.  *Id.* ¶ 47.  Multiplying this by the number of fees issued each year resulted in a total refund amount for FY 2011 through 2015 vendor fees of $3,535,432. *Id.* ¶ 49.

The IRS used a similar methodology to estimate a refund for the vendor fees for FY 2016–2017 of $2,876,539.  *Id.* ¶¶ 50–59.[6]  Thus the total estimated refund for vendor fees amounted to $6,411,972.  *Id.* ¶ 60.  Combining that figure with the total estimated refund for the IRS portion of the fees yields $57,444,051.  *Id.* ¶ 61.  Once the government's prior concessions are included, the IRS's estimated refund amount was $167,766,068.

### 4.  Plaintiffs' Motion to Vacate

Plaintiffs have moved to "Vacate Challenged Agency Actions."  Pls.' Mot. to Vacate ("Pls.' Mot."), ECF No. 276.  They argue that the Court should review the IRS's estimate not just for conformity with the terms of the Court's Remand Order, but also under the arbitrary and capricious standard of the Administrative Procedure Act.  *Id.* at 8.  Plaintiffs attack the IRS's estimate for lack of supporting explanation and criticize steps taken to arrive at the estimated refund amounts.  *Id.* at 8–14.  They further argue that the Accenture fee should be refunded in its entirety because the estimate of the Accenture fee was arbitrary and capricious and because the IRS lacked authority to impose that fee in the first place.  *Id.* at 15–23.  Finally, plaintiffs urge the Court to refund the PTIN fees in full—despite *Montrois* and the Court's Summary Judgment Opinion.  *Id.* at 23–25.  Alternatively, plaintiffs' motion requests that the Court adopt a report prepared by plaintiffs' attorney Allen Buckley that purports to provide an alternative estimate of

---

[6] The calculation for this period differed in two respects.  First, since Accenture charged the same amount for registration and renewals, there was no need to consider a difference between these two amounts.  Second, the IRS concluded that it was not required to refund any of the costs relating to Accenture's call center for FY 2016–2017 because during this timespan Accenture's costs from return preparer calls relating to non-chargeable activities were covered by the government rather than by return preparers.  1st Rogers Decl. ¶ 53.

the costs the Court had ordered the IRS to calculate.  *Id.* at 25–26; *see also* Buckley Report, Ex. 2 to Pls.' Mot. to Vacate, ECF No. 279-1.[7]

Following plaintiffs' motion, the government filed a combined opposition and motion to strike Mr. Buckley's report.  Gov.'s Opp'n to Pls.' Mot. to Vacate & Mot. to Strike ("Gov.'s Opp'n"), ECF No. 281.  The government defended the IRS's estimates as consistent with the Court's Order.  *See id.* at 8–22.  The government also argued that the Court should strike the Buckley Report on several grounds.  *See id.* at 22–24.  Finally, the government raised several arguments about the eventual distribution to class members and calculation of attorney's fees.  *See id.* at 24–26.  Plaintiffs filed a reply, Pls.' Reply, ECF No. 283, and moved for leave to file under seal an unredacted version of that reply, Pls.' Mot. to Seal, ECF No. 284.  Finally, Mr. Buckley filed a response to the government's motion to strike.  Buckley Response to Mot. to Strike, ECF No. 283.

The parties' motions are now ripe for review.[8]

---

[7] Mr. Buckley has appointed himself to the role of "class-counsel-in-exile," resulting in him repeatedly submitting documents without the consent of plaintiffs' actual class counsel.  *Steele* SJ Op., 657 F. Supp. 3d at 33.  In March, the Court dismissed a splinter suit brought by Mr. Buckley for claim-splitting.  *Steele v. United States*, No. 1:23-cv-918-RCL, 2024 WL 1111639 (D.D.C. Mar. 14, 2024).  This time, however, class counsel has adopted Mr. Buckley's approach by incorporating it into the plaintiffs' brief as an alternative form of relief.

[8] Upon joint motion of the parties, the Court had modified the Remand Order to reflect the actual effective dates of the PTIN and vendor fees.  Amend. Order, ECF No. 236.  But, in reviewing the parties' filings, it became apparent that the IRS's estimates were based on the dates in the original rather than the amended remand order.  So, the Court ordered the government to show cause as to why the case should not be remanded back to the IRS for failure to comply with the Cour's Amended Remand Order.  Show Cause Order, ECF No. 285.  In response, the government acknowledged that it had inadvertently failed to comply with the Amended Remand Order by including PTINs issued or renewed in October 2015 in the calculation for FY 2016 rather than FY 2015.  Gov. Response to Show Cause Order 1, ECF No. 286.  But the government argued that remand is not necessary, because running the numbers correctly results in increasing the refund owed by $83,790, a change of around 0.1 percent.  *Id.* 1–3.  Plaintiffs did not challenge this calculation and agreed that a separate remand to decide the issue is unnecessary.  Pls.' Response to Show Cause Order, ECF No. 287.  In light of the parties' responses, the Court will proceed to evaluate the IRS's estimate without a separate remand for compliance with the Amended Remand Order.

## II.   DISCUSSION

For the reasons discussed below, the Court will evaluate the IRS's work on remand to determine if the agency has reasonably estimated the impermissible portion of the fees that must be refunded.  While the Court rejects many of plaintiffs' challenges to the IRS's approach, it does see several apparent errors that preclude it from finding the agency's refund determination to be reasonable.  The Court will therefore remand this case back to the agency to try again.[9]

### A.   Preliminary Matters

Before the Court can evaluate the IRS's work on remand, it must address several preliminary matters.

### 1.   The Court Has Authority to Review the IRS's Work on Remand

As a threshold matter, the Court is satisfied that it has authority to review the IRS's determination.

After the Court prompted plaintiffs to explain the legal basis for further action by the Court, they contended that courts in this District routinely evaluate whether the work performed by an agency on remand complied with the terms of the remand.  *See* Pls.' Mot. 6–7.  Defendants do not challenge a court's general authority to enforce its own remand order.  The Court concludes it has authority to proceed.  *See, e.g.*, *Flaherty v. Pritzker*, 17 F. Supp. 3d 52, 55 (D.D.C. 2014) (noting that "[d]istrict courts have the authority to enforce the terms of their mandates" and that "[t]he exercise of this authority is 'particularly appropriate' when a case returns to a court on a motion to

---

[9] The government chose to dedicate several pages of its brief to a class recovery issue.  *See* Gov.'s Opp'n 24–26.  Specifically, the government argues that to avoid ordering money damages for which the United States has not waived sovereign immunity, restitution must be limited to the amount each class member paid for his or her PTIN issuance or renewal.  *Id.*  Plaintiffs are correct that answering questions of class distribution at this stage would be premature.  *See* Pls.' Reply 2 n.3.

enforce the terms of its mandate to an administrative agency." (quoting *Int'l Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 922 (D.C. Cir. 1984)).

### 2. The Court Will Not Abandon Its Remand Order

Next, plaintiffs raise two arguments for why the Court should not simply review the IRS's estimate for compliance with the Remand Order. Neither is persuasive.

#### *(i) The Court Will Not Vacate the Fees Entirely*

First, plaintiffs assert that the Court should simply disregard the IRS's estimate. Instead, it should vacate the IRS's establishment of the challenged PTIN and vendor fees in the first place and order the fees refunded in full. Pls.' Mot. 20–25; Reply 2–3, 12–14.

But the suggestion that the Court decide for itself the amount to be refunded contradicts "settled principles of administrative law," according to which "when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995) (collecting cases). What is more, plaintiffs' proposal is an invitation to disregard the previous rulings of this Court and the D.C. Circuit. The D.C. Circuit has held that the IOAA authorized the IRS to impose fees to recoup the costs of "generating PTINs and maintaining a database of PTINs" and that the decision to impose a PTIN fee was not arbitrary and capricious. *Montrois*, 916 F.3d at 1062–68. And this Court has already concluded that the IRS permissibly charged for certain activities. *Steele* SJ Op., 657 F. Supp. 3d at 41. The Court will not negate the previous rulings in this case by vacating lawful regulations or ordering the IRS to refund both the lawful and unlawful portions of the PTIN

fees.[10] Plaintiffs' maximalist position is simply another instance of their refusal to accept rulings that do not go their way. *See, e.g., Steele v. United States,* 2023 WL 6215790, at *1 (denying motion for clarification "because the plaintiffs seek not clarification, but relitigation of a matter already decided"); *Steele v. United States*, No. 1:23-cv-918 (RCL), 2024 WL 1111639, at *12 (D.D.C. Mar. 14, 2024) (noting that plaintiffs' counsel Allen Buckley's "evident purpose in launching" a splinter suit against the IRS was to "do an end-run around the Court's orders in" the original case). Plaintiffs have not moved for reconsideration and the Court will not reverse course now.

The Court therefore rejects plaintiffs' desperate attempt to undo the Court's remand to the agency.

*(ii) The IRS's Work Is Not Subject to Arbitrary and Capricious Review*

Second, plaintiffs seek to challenge the IRS's work as arbitrary and capricious under the APA. *See* Pls.' Mot. 6–8 (citing 5 U.S.C. § 706(2)). But that standard is inapplicable because the IRS's refund determination is not final agency action.

"The APA permits judicial review of 'final agency action' only." *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 955 (D.C. Cir. 2019) (citing 5 U.S.C. § 704). The APA defines "agency action" as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). An

---

[10] Also, the Court will not entertain plaintiffs' related argument that the Accenture fee was imposed unlawfully. *See* Pls.' Mot. 22–23. In its Summary Judgment Opinion, the Court declined to consider this precise argument because plaintiffs had raised it for the first time in their reply brief, and therefore waived it. *Steele* SJ Op., 657 F. Supp. 3d at 44; *see also Nippon Shinyaku Co., Ltd. v. Iancu*, 369 F. Supp. 3d 226, 239 n.8 (D.D.C. 2019) ("Arguments raised for the first time in a reply brief are waived."). Over a year after the Court's ruling, plaintiffs now say that the Court erred in finding this argument was raised for the first time in a reply brief. Pls.' Mot. 22. Yet the time to raise this argument was in a motion for summary judgment, not a reply brief and not at the damages stage of litigation. Plaintiffs have made no effort to explain their delay, let alone their entitlement to reconsideration. Under these circumstances, the Court declines to revisit its earlier ruling. Finally, for the reasons discussed below the Court rejects the premise of plaintiffs' argument that they may raise the issue afresh at this stage because the IRS's estimate is final agency action.

agency action is final only if two conditions are met. "First, the action must mark the 'consummation' of the agency's decisionmaking process . . . it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)). "[S]econd, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" *Id.* (quoting *Port of Boston Marine Terminal Ass'n. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

Here, the IRS's determination of an appropriate refund pursuant to the Court's Order is not final agency action. Establishing the PTIN fees in the first place was final agency action. *See Steele* SJ Op., 657 F. Supp. 3d at 34; *see also* 31 U.S.C. § 9701(b) ("The head of each agency . . . may prescribe regulations establishing the charge for a service or thing of value provided by the agency."). *Montrois* already decided that the IRS's decision to impose a PTIN fee was not arbitrary and capricious. *Montrois*, 916 F.3d at 1067. In remanding to the agency, this Court has not ordered the IRS to set new fees. Rather, it has directed the IRS to calculate reasonable estimates of how much of the previously-exacted fees were charged for unlawful activities. Unlike regulations establishing the amount of fees, this calculation does not bind regulated parties. *Cf. Tozzi v. U.S. Dep't of Health & Hum. Servs.*, 271 F.3d 301, 310 (D.C. Cir. 2001) ("Reviewability under the APA hinges upon whether the listing has legal effect, which in turn is a function of the agency's intention to bind either itself or regulated parties.") (internal quotation and citation omitted). It was not an exercise of regulatory authority. *Cf. Racing Enthusiasts & Suppliers Coal. v. EPA*, 45 F.4th 353, 358 (D.C. Cir. 2022). Rather, it was a response to a request issued by the Court so that it could craft an appropriate remedy with the benefit of the IRS's expertise and with proper respect for the IRS's statutory role. Plaintiffs'

examples of courts reviewing agency work on remand are not to the contrary, *see* Pls.' Mot. 6–7, 23, because in each of the cited decisions, the court reviewed final agency action, remanded the case to the agency to provide additional justification for the agency's decision, and then reviewed the same agency action in light of the new justifications.[11]

Since the IRS's estimate was not final agency action, the Court will not consider whether it is arbitrary and capricious under the APA.  Instead, the Court will consider whether the IRS's work on remand complies with the Court's order remanding to the agency.

### 3.  To Comply With the Remand Order, the Estimates Underlying the IRS's Refund Determination Must Be Reasonable

As discussed above, the Court tasked the IRS with "determin[ing] an appropriate refund for the class that is consistent with" the Court's Summary Judgment Opinion and accompanying order.  *Steele* SJ Op., 657 F. Supp. 3d at 48.  Specifically, the Court required the IRS to produce "a reasonable estimate of the cost of the activities identified [by the Court] as being invalid bases for an IOAA fee" and then to subtract that figure from the FY 2011 through 2017 PTIN and vendor fees it actually charged return preparers.  Remand Order 2.  The IRS was required to craft only a "reasonable estimate" of the invalid costs, not an exact determination nor even an amount the Court would necessarily agree with.  *See Steele* SJ Op., 657 F. Supp. 3d at 49 (emphasizing that the IOAA "commits the *amount* to be charged to agency discretion" (citing 31 U.S.C. § 9701(b) and *Cent. & S.*, 777 F.2d at 729)); *id.* (noting that judges "do not sit as a board of auditors, steeped in

---

[11] *See Resolute Forest Prod., Inc. v. U.S. Dep't of Agric.*, 187 F. Supp. 3d 100, 102 (D.D.C. 2016); *Muwekma Ohlone Tribe v. Salazar*, 813 F. Supp. 2d 170, 184–188 (D.D.C. 2011), *aff'd*, 708 F.3d 209 (D.C. Cir. 2013); *Bean Dredging, LLC v. United States*, 773 F. Supp. 2d 63, 67 (D.D.C. 2011); *Air Transp. Ass'n of Canada v. F.A.A.*, 323 F.3d 1093, 1094–95 (D.C. Cir. 2003). The only exception is *Plunkett v. Castro*, 67 F. Supp. 3d 1 (D.D.C. 2014). That decision is slightly more similar to this case because it involved review of the agency's work on remand.  But the *Plunkett* court was nonetheless reviewing final agency action, not an estimate prepared by the agency to assist the court in devising a remedy.  *See Plunkett*, 67 F. Supp. 3d at 11, 22.

accountancy and equipped to second-guess an estimate which seems on its face to be reasonable" (quoting *Cent. & S.*, 777 F.2d at 729)).

Accordingly, the Court will uphold the IRS's refund determination, so long as (1) the agency subtracted estimates for the costs of activities identified as invalid bases for IOAA fees from the amounts it actually charged and (2) those estimates are "reasonable."

In considering the reasonableness of the IRS's estimates, the Court will bear in mind the difficult and exceptional context in which the agency had to arrive at its figures. Some allowance must be made for the fact that this is "an unusual case in which the agency [was] asked to [set a new fee] retrospectively." *Steele* SJ Op., 657 F. Supp. 3d at 49. The Court ordered the IRS to estimate what it could lawfully have charged as far back as FY 2011 without handing it the keys to a time machine. Estimates calculated a decade or more after the fact may be reasonable even if rougher than what might be appropriate in other contexts. So, the IRS's retrospective estimates will not necessarily be treated as if they were contemporaneous agency action.[12] And even when an agency acts prospectively to set a fee under the IOAA, since "calculat[ing] the exact cost of servicing each individual . . . would be an all but impossible task," its computation "must necessarily be based on numerous approximations and can only be expected to be accurate within reasonable limits." *See Nat'l Cable Television Ass'n, Inc. v. F.C.C.*, 554 F.2d 1094, 1105–06 (D.C. Cir. 1976). The alternative to this flexible approach would be the anomaly of "allow[ing]

---

[12] Plaintiffs have seized on the Court's statement that "the government must be able to explain with respect to each activity that formed the basis for the PTIN fees how that activity was reasonably related to providing the private benefit that the Circuit identified in *Montrois*: a means of identifying return preparers that protects them from identity theft." *Steele* SJ Op., 657 F. Supp. 3d at 38. But they have taken this language out of context. This passage concerned the qualitative question of whether an activity could be used to justify a PTIN fee, not the quantitative question of whether on remand the IRS provided a reasonable estimate of the excessive portion of its fees. *See id.* at 38–39. The Court did not require the IRS to explain every aspect of its calculation of the appropriate refund. That said, the requirement that the IRS's estimate be reasonable does imply that the agency must provide enough information for the Court to determine whether its estimates are reasonable. That may require more or less information depending on the circumstances.

plaintiffs the opportunity to have a court set the fee and substitute its own judgment for the agency's simply because they waited until after they had paid the fee for several years to challenge it and seek monetary relief." *Steele* SJ Op., 657 F. Supp. 3d at 49.

With those considerations in mind, the Court will turn to the appropriate refund.

### 4. The Court Will Strike the Buckley Report

In evaluating the IRS's work on remand, the Court will disregard the report authored by plaintiffs' attorney Allen Buckley and submitted by plaintiffs. Without getting into the propriety of a counsel of record putting himself forward as an expert witness, the Court will strike plaintiffs' document because it second-guesses the remedy already adopted in the Memorandum Opinion and is irrelevant to the task at hand.

Federal Rule of Civil Procedure 12(f) permits a court to strike "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" from a "pleading." Fed. R. Civ. P. 12(f). "Under this Rule, 'pleading' encompasses expert reports." *Barnes v. District of Columbia*, 289 F.R.D. 1, 6 (D.D.C. 2012) (Lamberth, C.J.) (quoting U.*S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 474 F. Supp. 2d 75, 79 (D.D.C. 2007) (Lamberth, J.)). The Buckley Report purports to be an expert report, as Mr. Buckley relies on his status as a Certified Public Accountant and knowledge of cost accounting. Buckley Report 1.

In the Summary Judgment Opinion, the Court firmly explained that it would not grant "plaintiffs the opportunity to have a court set the fee and substitute its own judgment for the agency's." *Steele* SJ Op., 657 F. Supp. 3d at 49. The Court left no doubt that "[t]he only proper place for this case to go is back to the IRS." *Id.* Nonetheless, plaintiffs argue that if the Court does not agree to refund the PTIN fees in full, it should refund an amount calculated by Mr.

Buckley.  Pls.' Mot. 25–27.[13]  To that end, plaintiffs have presented the Court with a ninety-four-page report authored by Mr. Buckley that purports to determine the fees the IRS could have lawfully charged for PTIN issuance and renewal in FY 2011 through 2017.  *See* Buckley Report. Yet the Court will not do an about-face and let plaintiffs supplant the agency and calculate the refund amount themselves.

The Court will therefore disregard and strike this purported expert report.

### 5.  The Court Will Grant Plaintiffs' Motion to File Under Seal

Finally, plaintiffs have moved for leave to file under seal an unredacted version of their reply because it contains information deemed confidential or Highly confidential under the Protective Order, ECF No. 114.  As the government does not oppose this motion, and the redacted information concerns details of internal Accenture processes, it will be granted.

### B.  The Court Will Order a Partial Remand Back to the IRS

The Court cannot approve the IRS's refund determination because the agency's work on remand suffers from several apparent defects identified by plaintiffs.  The government has failed to respond to many of plaintiffs' arguments, thus needlessly complicating the Court's assessment of plaintiffs' various challenges and contributing to the necessity of a remand back to the IRS. Starting with the PTIN fees, the agency's refund determination for support costs for FY 2011–2015 is too slight to be facially reasonable.  As for the Accenture fees, although the agency's overall approach is reasonable, its implementation has seemingly fumbled some details.  Since the Court cannot approve the IRS's refund determination in its entirety, it will give the agency a chance

---

[13] Class counsel maintains that he merely consented to the inclusion of this argument in the brief in the spirit of cooperation, and asserts that "[t]his section was authored by Attorney Buckley without input from class counsel." Pls.' Mot. 27 n.5.  However, it was class counsel who signed and filed this motion, and therefore he is responsible for its contents.  *See* Fed. R. Civ. P. 11(b) ("By presenting to the court a . . . written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney . . . certifies" certain features of the legal and factual contentions therein).  Plaintiffs cannot shirk responsibility for an argument they chose to present in their brief.

to revise, or at least try to justify, its work on remand.  However, the Court finds that plaintiffs'
other challenges to the agency's estimated refund are meritless.

### 1.  The PTIN Fees

In evaluating the IRS's refund determination for the PTIN fees, the Court cannot wholly
agree with either party.  The Court finds that the IRS's estimated refund for its support costs for
FY 2011–2015 is simply too small to be reasonable, at least on its face.  It will therefore require
the agency to either explain or revise its estimated refund for this set of costs. However, the Court
does not agree with plaintiffs that the IRS erroneously estimated a refund of 28% of the costs of
the Compliance Department for FY 2016–2017.

### (i)  Support Costs for FY 2011–2015

The IRS has estimated a refund for the FY 2011–2015 support costs that is too low to be
reasonable, at least on its face.  The Court will therefore require the agency to revisit or at least
explain these estimates.

The Summary Judgment Opinion directed the IRS to calculate refunds for unallowable FY
2011–2015 support costs beyond what the agency had already conceded.  In this period, the IRS
charged for certain RPO "support costs" involving "customer support, communication, IT, and
operational support."  *Steele* SJ Op., 657 F. Supp. 3d at 39.  The government later conceded certain
support costs in the 2010 Cost Model but "continue[d] to defend a substantial portion of those
costs."  *Id.* at 42.  The concessions omitted IT costs as well as communications and operational
support costs deemed PTIN-related.  *Id.* at 43 (citing 2d Campbell Decl. ¶ 6).  Because "[t]he
government ha[d] not demonstrated that all of the support costs it continues to defend were
reasonably related to the provision of a private benefit," the Court concluded that on remand the
IRS would need to determine what portion of support costs were not allowable, in addition to the

amounts already conceded.  *Id.*   Of the support costs, the IRS calculated additional refunds of 0% of Marketing & Branding, 0% for Communications, 0% for OPR/PMO Ops Support, and 0.5% for IT.  2011–2015 Costs Table ll. 12, 19, 103, 113.

The government's position that it need only refund an additional sliver of support costs beyond the amount already conceded is at odds with the Summary Judgment Opinion.  For one thing, it would be surprising if the support costs sufficiently related to provision of a private benefit so dwarfed the unallowable support costs because "the IRS charged for support activities facilitating its entire pre-*Loving* return preparer regulatory apparatus."  *Steele*, 657 F. Supp. 3d at 42.  And it seems the IRS failed to refund activities already deemed unallowable by the Court. Take, for example, "Vendor / IT Management (Includes Vendor Mgmt. (not strictly IT) for Reg., Testing, and [Continuing Education] and Business Owners of System Implementation)," a subcategory of OPR/PMO Ops Support.  *See* 2011–2015 Costs Table ll. 72–76.  The IRS neither conceded any of these costs nor determined that any refund was necessary.  Yet plaintiffs correctly point out that the Summary Judgment Opinion held that testing and continuing education "are not reasonably related to the provision of a private benefit."  *Steele* SJ Op., 657 F. Supp. 3d at 44. How can the IRS maintain that 100% of the costs of this category concerned provision of a private benefit, even though the category expressly relates to activities already held impermisslbe?  The IRS does not say, because the government chose not to respond to plaintiffs' argument.

Likewise, the IRS's decision to refund only 0.5% of IT costs for FY 2011 through 2015 is unreasonable on its face.  *See*  2011–2015 Costs Table ll. 104–113.  The Court is skeptical that 99.5% of IT costs for this period were sufficiently related to provision of a private benefit even though "[g]iven the breadth of the RPO program before *Loving* and the 2010 Cost Model's failure to separate out the different work that the supporting departments were supporting, it is virtually

certain that some RPO IT activities between FY 2011 and 2015 supported substantive activities invalidated by *Loving*." *Steele* SJ Op., 657 F. Supp. 3d at 42–43.  The 0.5% figure for FY 2011–2015 is also hard to square with the agency's other estimates of IT costs.   Somehow, the amount of "IT/Contract Costs" to be refunded is around $6,500 a year for FY 2011–2015 using the 2010 Cost Model, about $1,650,000 for 2014 and 2015 using the 2013 Cost Model, and approximately $300,000 for 2016 and 2017 using the 2015 Cost Model.  1st Rogers Decl. ¶¶ 15, 18, 22, 25.  In the absence of any justification from the IRS, the Court is unwilling to assume that the IT costs unrelated to provision of a private benefit swung so wildly between time periods.  The government has not tried to explain these apparent discrepancies, as it failed to address plaintiffs' arguments about inadequate refunds of support costs.

Therefore, in light of the apparent flaws in the IRS's work on remand and the government's failure to defend this work, the Court finds the IRS's estimated refund amounts for support costs in FY 2011–2015 to be unreasonable on their face.[14]

---

[14] To be clear, the problem with the agency's refund determinations for support costs is that the estimates seem too low, at least absent explanation.  But the Court does not accept plaintiffs' argument that the IRS erred by repeatedly setting the portion to be refunded at a neat and arguably arbitrary 33.3%.  *See* Pls.' Mot. 11.  Of course, the share of unallowable costs in each category was not exactly one third.  But under the circumstances, a rough estimate is not necessarily unreasonable.  And contra plaintiffs, Pls.' Mot. 10; Pls.' Reply 6, it is not automatically unreasonable to decide to refund one-third of a particular cost category without explaining how the agency arrived at that particular percentage.  The problem here is that the IRS provided a suspiciously small refund and failed to justify it even in the teeth of cogent concerns raised by plaintiffs.

*(ii) Refund Calculations for FY 2016–2017*

Plaintiffs also attack the IRS's estimates for FY 2016–2017, specifically the IRS's estimated refund of 28% of the costs of the Compliance Department. But the IRS's estimates appear reasonable on their face, and plaintiffs have not yet offered a compelling reason to think otherwise.

Plaintiffs contend that the IRS's estimated refund for the Compliance Department is too low. Using the 2015 Cost Model, the IRS estimated restitution of between 28% and 100% per cost category. *See* 2016–2017 Costs Table Column F. Plaintiffs argue that "the IRS cannot merely assert costs are reasonable without articulating any basis for that determination particularly given that many of these departments were performing functions wholly unrelated to PTIN issuance and maintenance." Pls.' Mot. 14. However, the only estimate they specifically criticize is the 28% refund of the costs of the RPO Compliance Department. *Id.*; *see also* 2016–2017 Costs Table l. 12. Certainly, the PTIN fees charged for certain improper Compliance Department costs. "[W]ith respect to the Compliance Department," this Court has held "that only the direct and indirect costs of (1) investigating ghost preparers; (2) handling complaints regarding improper use of a PTIN, use of a compromised PTIN, or use of a PTIN obtained through identity theft; and (3) composing the data to refer those specific types of complaints to other IRS business units were valid bases for the corresponding amount of the FY 2011 through 2015 PTIN fees." *Steele* SJ Op., 657 F. Supp. 3d at 41. The Court thus excluded the Compliance Department's "additional activities unrelated to the misuse or nonuse of PTINs," including "misconduct affecting return preparers' customers rather than the return preparers themselves." *Id.* at 40–41.

The question is whether the IRS could reasonably estimate that 28% of the Compliance Department's costs were for activities unrelated to the misuse or nonuse of PTINs while 72%

involved the three permissible categories.[15]   Plaintiffs suggest this estimate is not reasonable because under the 2015 Cost Model, "Compliance: UnID [Unidentified] Preparer Detection" represented only around a third of the costs of the Compliance Department.  Pls.' Mot. 14; *see also* 2015 Cost Model at 19).  But they offer no reason to think that the IRS could not reasonably estimate that, given the Compliance Department's remaining responsibilities, 72% of its costs were for allowable activities.  In determining whether the IRS's estimate is reasonable, the agency's judgment is entitled to "more than mere deference or weight."  *Steele* SJ Op. 39 (quoting *Cent. & S.*, 777 F.2d at 729).  The Court did not require the IRS to provide perfectly accurate cost breakdowns.  To do so retrospectively would be impossible.  Even to do so in real time would be exceedingly difficult, if not impossible, because some expenses cannot be neatly separated into costs related or unrelated to provision of a private benefit.  That is particularly true for the 2015 Cost Model, because while the 2010 Cost Model is based on costs of particular functions, the 2015 model is based on salaries and benefits of employees in particular departments, who may have dedicated some of their time to allowable activities and some to unallowable ones.  So, the Court sees no reason to second-guess the IRS's estimates for FY 2016–2017.

Plaintiffs' true objection is not that the estimate is unreasonable, but that the IRS did not offer sufficient explanation.  *See* Pls.' Mot. 13.  But the Court never required the IRS to provide explanations for every step along the way to its refund determination.  Without a definite reason to doubt the agency's quantitative judgment about a "reasonable estimate[] of the portions it lawfully could have charged," the Court will accept the IRS's decision.  *See Steele* SJ Op., 657 F. Supp. 3d at 49.

---

[15] It is not necessarily surprising that the estimated refund for compliance costs is 28% for FY 2016–2017 but 93.2% for FY 2011–2015, 2011–2015 Costs Table l. 64, since the PTIN fee was $33 rather than $50 "in part because of certain activities that the Circuit invalidated in *Loving*."  *Steele* SJ Op., 657 F. Supp. 3d at 31.

Therefore, the Court rejects plaintiffs' challenge to the refund determination for the Compliance Department for FY 2016–2017.

### 2. Accenture Fees

Next, plaintiffs raise several challenges to how the IRS calculated the refund for the Accenture fees. The Court rejects plaintiffs' argument that the IRS must refund the extra $1.25 charged in FY 2011–2015 for PTIN issuance but not renewal. Turning to the call center costs, although it is permissible for the IRS to use Accenture's call center data, the agency did not provide a reasonable estimate of the proportion of call center activities unrelated to issuance, renewal, or maintenance of PTINs. As for the remaining Accenture costs, the IRS employed a reasonable methodology of estimating the proportion of improperly charged-for activities by looking to the CLINs in the two Accenture contracts. However, plaintiffs have identified several instances in which the IRS seems to have improperly applied that methodology, and the government has failed to respond to these arguments. For these reasons, the Court will require the IRS to revisit its determinations concerning the refund of the Accenture fees.

#### (i) The $1.25 Differential Between Initial Registrations and Renewals

First, plaintiffs attack the IRS's conclusion that the $1.25 charged as part of the initial PTIN registration fee ($14.25) but not the PTIN renewal fee ($13.00) between October 1, 2010 and October 31, 2015 was appropriate. According to plaintiffs, the IRS's explanation that the $1.25 difference went to the portions of Accenture's work concerning PTIN issuance, renewal, and maintenance of PTINs, 1st Rogers Decl. ¶¶ 32–35, must be rejected because it was based solely on the Miller Declaration provided by Accenture in December 2021, years after the fees were established. Pls.' Mot. 16.

But plaintiffs are wrong to argue that the IRS could not use data from a document created after the fact for litigation. Although "litigation affidavits are an unacceptable basis for appellate review of agency decision-making," Pls.' Mot. 16 (quoting *Rodway v. U.S. Dep't of Agric.*, 514 F.2d 809, 816 (D.C. Cir. 1975)), that principle is inapposite here because the Court is not reviewing agency decision-making. Next, plaintiffs misread the Court's remand order. They argue that in requiring the IRS to "use its initial contract with Accenture . . . and the subsequent contract" to determine "the lawful amount charged and the corresponding refund," the Court implicitly prohibited the IRS from relying on any other sources. Pls.' Mot. 16 (quoting Remand Order 2). But the Court did no such thing.

In any event, plaintiffs undercut their argument that the IRS may not use a litigation affidavit to make its refund determination. Here, plaintiffs decry the IRS for relying on ex post information from Accenture; elsewhere, they ask the Court to do just that. *See* Buckley Report 1 ("[I]t is only logical to use actual Accenture costs when available"); Pls.' Mot. 26 ("Plaintiffs' co-counsel, Attorney Allen Buckley, believes that under the unique circumstances of this case—retrospectively setting a user fee and the availability of material produced in discovery regarding actual costs—the Court should also utilize information produced in discovery.").[16] Moreover, the government points out that at the summary judgment stage plaintiffs themselves relied on the Miller Declaration. *See* Decl. of Meghan B. Oliver in Support of Pls.' Mot. for Summary J. 3, ECF No. 176 (providing the Miller Declaration as plaintiffs' Exhibit Y); Pls.' Statement of Facts ¶ 38, ECF No. 177-30 (citing the Miller Declaration).

---

[16] As previously mentioned, plaintiffs' brief argues in the alternative that the Court should adopt the calculations of Mr. Buckley's report. See Pls.' Mot. 25–26. Plaintiffs try to create some distance from this argument, articulating Mr. Buckley's position while stating that class counsel's position is that the Court should stick to the "extant administrative record." *Id.* at 26. Essentially, plaintiffs wish to have the benefits of presenting certain arguments without the risks of having those arguments held against them. But as discussed above, plaintiffs are responsible for what they include in their brief. *See supra* note 13. The Court will not indulge plaintiffs' ploy to have their cake and eat it too.

For these reasons, the Court finds no merit in plaintiffs' challenge to the IRS's conclusion that the $1.25 differential was appropriately charged.

### (ii) Call Center Costs

Next, plaintiffs object to the IRS's use of Accenture call center data.  Although the Court rejects plaintiffs' view that the IRS may not rely on this data, it concludes that the IRS has failed to reasonably estimate the proportion of call center activities that were unrelated to Accenture's work concerning issuance, renewal, and maintenance of PTINs.  The Court will therefore require the IRS to make another attempt to provide a reasonable estimate of allowable costs associated with the Accenture call center.

Although plaintiffs argue the IRS could not legitimately rely on this set of data because it is not part of the administrative record and did not exist at the time the Accenture portions of the PTIN fees were set, Pls.' Mot. 17, for the reasons discussed above the IRS may permissibly use information even if it was divulged during litigation.

Plaintiffs next assert that the IRS erred in deeming certain categories of calls to be entirely related to permissible activities, resulting in 97% of call center costs being treated as permissible. According to plaintiffs, "many of the category descriptors in the Phone & Chat log appear to be of mixed purpose that cannot be disaggregated."  Pls.' Mot. 17.  They cite the categories of "Account Assist & Change," "General Questions," "Communications," and "Program Requirements."  *See* Call Center Report.  The call center document sorts the calls received into a number of categories. The IRS determined that certain categories—Continuing Education and Annual Filing Season Program calls; Escalation (Deceased Preparer and Tax Conviction/Felony) calls; or Non-PTIN calls—concerned activities that improperly facilitated provision of an independent benefit to the agency and public.  1st Rogers Decl. ¶ 41.  These categories represented approximately 2.69% of

calls.  *Id.*  The IRS deemed the vast majority of calls permissible because they fell into permissible categories.  *Id.* ¶ 40.  The IRS did not attempt to estimate a percentage of which calls in these categories were for permissible versus impermissible activities.  Instead, it assumed that *all* calls in such categories related to provision of a private benefit.

That faulty assumption undermines the reasonableness of the IRS's conclusion that 97% of call center costs were for permissible activities.  The Court has previously recognized that "[t]he 2010 contract between the IRS and Accenture, which set the vendor fee amounts in effect during FY 2011 through 2016, expressly contemplated that Accenture would implement capabilities beyond the issuance, renewal, and maintenance of PTINs and would maintain a call center taking questions beyond those subjects."  *Steele* SJ Op., 657 F. Supp. 3d at 45.  That is because "Accenture's contract with the IRS required it to maintain a call center to address 'preparer questions related' not only to 'registration [and] renewal,' but also to 'testing, and [continuing education] processes and timelines.'"  *Id.* at 44 (citing Def.'s Resp. to PSUMF ¶ 41, ECF No. 184-1).  "Those activities are not reasonably related to the provision of a private benefit—rather, they provided an independent public benefit that was later invalidated by *Loving*."  *Id.*

Given that the Accenture call center addressed inquiries unrelated to issuance, renewal, or maintenance of PTINs, it is simply not reasonable for the IRS to assume that *all* calls logged in broad categories such as "General Questions" and "Program Requirements" were related to issuance, renewal, and maintenance of PTINs.  If the government has a good reason to think otherwise, it has not bothered to share it with the Court, since the Rogers Declarations shed no light on the subject and the government has not addressed plaintiffs' argument.  The IRS's estimate of call center expenses unrelated to provision of a private benefit need not be perfect.  But it must be within a zone of reasonableness.  The Court cannot take the government's estimates on faith,

particularly when the government has already acknowledged making an obvious, albeit relatively inconsequential, blunder in including PTINs issued or renewed in October 2015 in the calculation for FY 2016 rather than FY 2015.  *See* Gov. Response to Show Cause Order 1.

Since the Court finds unreasonable the IRS's unsupported, undefended assumption that all calls in certain general categories related to permissible activities, the IRS must try again to provide a reasonable estimate of the call center costs.

> *(iii)Use of the Contracts*

Finally, plaintiffs object to the IRS's methodology for calculating the remaining Accenture costs.   The  Court  finds  that  under  the  circumstances  the  IRS's  CLIN-based  approach  is  a reasonable method for using the contracts to estimate the amount of the remaining fee charge to be refunded.  But the IRS seems to have applied its methodology unreasonably in at least a few instances.   Specifically, plaintiffs have identified two instances in which the agency apparently double-counted the same sentence in a contract, and have located one instance in which the agency seemingly failed to recognize a non-chargeable activity as such.

As previously discussed, the agency divided its Accenture contracts into "Contract Line Item Numbers," identified "all unique and specific CLINs," excluded call center-related CLINs, identified the remaining CLINs that could not be charged under the Remand Order, and calculated the share of non-call center CLINS that represent non-chargeable activities.  1st Rogers Decl. ¶¶ 44, 55.  The IRS then multiplied that percentage by the remaining portion of the vendor fee to estimate the per-PTIN refund.  *Id.* ¶ 44(f).  Although plaintiffs raise three challenges to this method, each fails.

First, plaintiffs contend that the IRS should not have assumed that all CLINs cost the same amount.  Pls.' Mot. 18.  But it is difficult to see how else the agency, without Accenture's internal

cost allocation data, could have reasonably weighted the hundreds of CLINs.  *See* 1st Rogers Decl. ¶¶ 44, 55.  Plaintiffs do not offer an alternative way to do so.  "The IRS judged an equal weighting method to be the most reasonable basis upon which to base its estimate," *id.* ¶ 45, and the Court will not disturb that judgment.

Second, plaintiffs argue that the IRS has been too quick to deem certain CLINs "not unique," which results in their exclusion from the calculation of the percentage of Accenture's remaining costs to be refunded.  Pls.' Mot. 18.  Plaintiffs cite the example of Annual Filing Season Program costs for the second contract, *id.* at 18–19, but the government points out these were excluded because they were not included in the PTIN fee and thus were paid for by the IRS itself, not return preparers, Gov.'s Opp'n 20–21 (citing 2d Contract USA-0021044, -0021079, ECF No. 258-4).  Plaintiffs also challenge the exclusion of CLINS relating to Tax Compliance Checks, Pls.' Mot. 19, but these were also within the Annual Filing Season Program portion of the contract and were properly excluded from the same reason, *see* 2d Contract USA-0021070–0021072.

Third, plaintiffs assail the agency's "sentence-counting" as simply absurd on its face.  Pls.' Mot. 18.  Yet under the circumstances, it is not absurd to estimate how Accenture allocated its costs based on how the contracts were structured. Plaintiffs acknowledge "[t]here is no clear-cut means of" apportioning Accenture's costs.  Buckley Report 9.  And they fail to offer a better option.  Their only suggested alternative method is no less arbitrary: since according to Mr. Buckley only a fifth of the questions on the forms for PTIN issuance or renewal were appropriate, one should simply assume that one fifth of Accenture's costs was legitimate and the remaining four-fifths were not.  Buckley Report 9–10.  As between these alternative methods, the Court will not substitute plaintiffs' judgment for the agency's.

But while the Court accepts the IRS's overall approach, plaintiffs raise concerns that preclude the Court from finding the IRS's use of the Accenture contracts to be reasonable, at least absent further explanation from the government.

Plaintiffs assert that the IRS has failed to identify certain duplicative CLINs as "not unique," and although two of its examples are meritless, the other two appear to be genuine defects in the IRS's work on remand.  *See* Pls.' Mot. 19.  The first two either involve distinguishable tasks[17] or concern similar but separate aspects of Accenture's activities under the contracts.[18] However, plaintiffs cite two examples in which the government has seemingly listed the same sentence from the same subsection of the contract as a CLIN twice and then failed to treat the duplicates as "not unique."  *See* CLINs Table for FY 2011–2015 Accenture Contract ll. 220, 222, ECF No. 271-2 ██████████████████████████████████████ ████████████████████████████████████ (concerning § 3.2 of the first Accenture contract); *id.* at ll. 221, 223 ████████████████████████████████ ████████████████ (also concerning § 3.2 of the first Accenture contract); *see also* 1st Contract § 3.2, ECF No. 258-3.  The government did not bother to respond to this argument.  At least without a persuasive explanation from the government, it appears unreasonable to count the same sentence in the contract as two separate CLINs.  The Court will require the IRS to either justify these choices or else revise its work on remand.

---

[17] *Compare* CLINs Table for FY 2011–2015 Accenture Contract l. 47, ECF No. 271-2 ██████████ ████████████████████████████, *with id.* at l. 48 ██████████████████ ████████████████████████ *and id.* at l. 61 ██████████████████████████████████████ ██████████████████████████████████████████ .

[18] Although the CLINs at rows 46 and 83 for FY 2011–2015 share identical language—████████████ ████████████████████████████████—one concerns registration and the other renewal.  *See* CLINs Table for FY 2011–2015 Accenture Contract ll. 46, 83; 1st Contract §§ 2.2, 2.3.

Plaintiffs also argue that "the IRS continues to treat the cost of certain activities as permissible even though they expressly relate to eligibility requirements, testing, or continuing education." Pls.' Mot. 20. One of the examples they cite is unpersuasive. One of the CLINs deemed allowable the IRS is: ███████████████████████████

███████████████████████████ *Id.* at 20 (quoting Contract Obligations in FY 2011–2015 Accenture Contract l. 45); *see also* 1st Accenture Contract § 2.2. But this contractual requirement does appear to represent a "portion[] of Accenture's work related to the issuance, renewal, and maintenance of PTINs." *Steele* SJ Op., 657 F. Supp. 3d at 45. Plaintiffs' other example, however, is persuasive. For the first contract the government has included as a non-refundable CLIN: ██████████████████████████████████████

██████████ Contract Obligations in FY 2011–2015 Accenture Contract l. 160; *see also* 1st Accenture Contract § 2.7. As testing and continuing education are "activities [that] are not reasonably related to the provision of a private benefit," *Steele* SJ Op., 657 F. Supp. 3d at 44, it would seem that this CLIN should in fact be treated as unallowable. Of course, the government has not responded to this argument. Therefore, it seems the government has erroneously categorized at least one CLIN.

So, while the IRS's methodology for using its Accenture contracts to estimate much of the refund for the vendor fee is reasonable, the agency's specific application of that methodology appears to be unreasonable in at least a few instances. The government will need to either persuasively defend these choices or else revise its work on remand.

### 3. Remedy

"The only proper place for this case to go is back to the IRS." *Steele* SJ Op., 657 F. Supp. 3d at 49. The agency's failure to provide a reasonable estimate so far does not affect the reasons

for remand given by the Court in its Summary Judgment Opinion.  *See id.*  It is up to the agency to determine the appropriate refund amount, subject to the Court's approval.

The instructions given in the Remand Order, as amended, still stand.  But this time, the Court will impose some additional guidance. Before the agency files a notice in this Court of its estimated refund, it must meet and confer with plaintiffs.  The parties must make a good-faith effort to narrow any areas of disagreement.  *Cf.* LCvR 7(m).  No later than thirty days after the conference, they must file a joint status report succinctly outlining their points of disagreement about the IRS's refund estimate.  When the IRS files its notice of its revised refund estimate, it must address plaintiffs' objections.  Its explanation need not necessarily be detailed, but must provide the Court with a sufficient basis for finding the estimate reasonable.  Once it files this notice, plaintiffs will have thirty days to file a challenge to the IRS's refund determination.  The government will then have thirty days to respond.  The Court will expect the government to respond to plaintiff's specific arguments.  Otherwise, the Court may treat these arguments as conceded. *See Brett v. Brennan*, 404 F. Supp. 3d 52, 59 (D.D.C. 2019) ("It is well-understood that 'if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded.'" (quoting *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014)); LCvR 7(b) (providing that if an opposition "memorandum is not filed within the prescribed time, the Court may treat the motion as conceded"). Plaintiffs will then have fourteen days to file a reply.

### III.   CONCLUSION

For the foregoing reasons, the Court must send this case back to the IRS to try again. Accordingly, the Court will **GRANT IN PART** and **DENY IN PART** plaintiffs' Motion to

Vacate. And it will **GRANT** the government's motion to strike the Buckley Report. Finally, it will **GRANT** plaintiffs' motion to file their reply under seal.

A separate Order consistent with this Memorandum Opinion shall issue.

Date: _____ 8 - 9 - 24

Royce C. Lamberth
United States District Judge